1  THERESA M.B. VAN VLIET
   Chief
2  Narcotic and Dangerous Drug Section
   CATHERINE S. WINGFIELD
3  Trial Attorney
   Narcotic and Dangerous Drug Section
4  Criminal Division
   United States Department of Justice
5        P.O. Box 27312, Central Station
         Washington, D.C. 20038
6        Telephone: 202-616-2262

FILED
CLERK, U.S. DISTRICT COURT
AUG 17 1998
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
AUG 12 1998
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY
BY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

11  JUAN RAMON MATTA          )   No. CV 98-1126-WJR
    BALLESTEROS,              )   CR 88-129 WJR
12                Movant,     )
                              )   EXHIBITS A-D OF GOVERNMENT'S
13            v.              )   OPPOSITION TO MOTION TO VACATE,
                              )   SET ASIDE OR CORRECT SENTENCE:
14  UNITED STATES OF AMERICA, )
                              )
15                            )
                              )
16                Respondent. )
    _____  )

17

18      Respondent, United States of America, as represented by the undersigned Trial Attorney,

19  hereby attaches Exhibits A-D of the government's opposition to the above-captioned Motion to

20  Vacate, Set Aside or Correct Sentence filed pursuant to 28 U.S.C. § 2255 by defendant Juan Ramon

    Matta Ballesteros.

21

22      DATED:      August 13, 1998

23                                      Respectfully submitted,

24                                      THERESA M.B. VAN VLIET
                                        Chief
25                                      Narcotic and Dangerous Drug Section

26                                      CATHERINE S. WINGFIELD
                                        Trial Attorney
27                                      Narcotic and Dangerous Drug Section
                                        Criminal Division
28                                      United States Department of Justice

ENTER ON ICMS
AUG 18 1998

RECEIVED BUT NOT FILED
AUG 12 1998
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
BY DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
AUG 17 1998
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

**TABLE OF CONTENTS**
**VOLUME I**


| DESCRIPTION | DATE | PAGE # |
|---|---|---|
| **EXHIBIT A** | | |
| **Matta Ballesteros Transcript** | | |
| • Drummond | Oct. 11, 1990 | 1-8 |
| • Drummond | Oct. 11, 1990 | 9-13 |
| • Drummond | Oct. 5, 1990 (pm) | 14-16 |
| • Lager | Oct. 9, 1990 | 17-42t |
| • Penrod | Oct. 5, 1990 (pm) | 43-54 |
| • Hunt | Dec. 4, 1990 | 56-75 |
| • Retamoza | Dec. 7, 1990 | 76-105 |
| • Retamoza | Dec. 7, 1990 | 106-119 |
| • Retamoza | Dec. 7, 1990 | 120-148 |
| • Seizure | Nov. 29, 1990 | 149-152 |
| • Seizure | Nov. 30, 1990 | 153-157 |
| • Retamoza | Dec. 7, 1990 | 158-164 |
| • Retamoza | Dec. 7, 1990 | 165-166 |
| • Spanish National Police | Oct. 23, 1990 | 167-178 |
| • Spanish National Police | Nov. 21, 1990 | 179-188 |
| • Spanish National Police | Oct. 24, 1990 | 189-190 |
| • Spanish National Police | Oct. 24, 1990 | 191 |
| • Spanish National Police | Oct. 24, 1990 | 192 |
| • Spanish National Police | Nov. 15, 1990 | 193-197 |
| • Government Closing Argument | Jan. 2, 1991 | 198-199 |
| • Lozano | Dec. 14, 1990 | 199a-199j |
| • Lozano | Dec. 14, 1990 | 199k-199m |
| • Rodriguez | Dec. 14, 1990 | 199n-199s |
| • Pretrial Conference | May 4, 1989 | 200-201 |
| • Pretrial Conference | March 12, 1990 | 202-204 |
| • Pretrial Conference | March 12, 1990 | 205-207 |
| • Pretrial Conference | May 1, 1990 | 208-209 |
| • Pretrial Conference | May 15, 1990 | 210-213 |
| • Pretrial Conference (FN) | Dec. 5, 1989 | 214-217 |
| • Pretrial Conference | May 15, 1990 | 218-219 |
| • Martinez (direct) | Oct. 23, 1990 | 220-231 |
| • Martinez | Oct. 23, 1990 | 235 |
| • Martinez | Oct. 23, 1990 | 240 |

- Martinez                          Oct.  23, 1990          243
- Martinez                          Oct.  23, 1990          245-246
- Martinez                          Oct.  23, 1990          241
- Martinez                          Oct.  25, 1990          247-248
- Martinez (cross)                  Oct.  26, 1990          249-252
- Martinez                          Oct.  26, 1990          253-256
- Martinez                          Oct. 26, 1990           260-262
- Martinez                          Oct. 26, 1990           266-273
- Martinez                          Oct. 26, 1990           274
- Martinez                          Nov. 13, 1990           275-282
- Martinez                          Oct. 26, 1990           283-294
- Martinez                          Oct. 26, 1990           295-297
- Martinez                          Oct. 26, 1990           298-300

**EXHIBIT  A**

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA



- - -

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| VS. ) | CR 88-129-WJR |
| ) | |
| JUAN RAMON MATTA-BALLESTEROS, ) | |
| ) | |
| DEFENDANT. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

THURSDAY, OCTOBER 11, 1990

DONNA BOWERS, C.S.R., R.P.R.
OFFICIAL COURT REPORTER
430 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 621-2400

000001

1    Q.    AND WHAT WAS ANDREA DRUMMOND DOING FOR A LIVING?

2    A.    SHE HAD HER OWN BUSINESS.    SHE WAS WASHING AIRCRAFTS.

3    SHE HAD A DETAIL BUSINESS WHERE SHE HAD A CONTRACT WITH THE

4    COMPANY THAT I WAS PARTNERS WITH, WASHING AND DETAILING OUT

5    AIRCRAFT AND HEAVY EQUIPMENT, HOMES OR ANYTHING.    SHE HAD A

6    PORTABLE SPRAY UNIT THAT WOULD WASH DOWN HOUSES OR ANYTHING.

7    Q.    WAS SHE PRIMARILY WASHING DOWN AIRPLANES?

8    A.    YES, UH-HUM.

9    Q.    AND DURING THIS PERIOD OF TIME, DID YOU HAVE OCCASION

10    TO TRAVEL TO THE HOTEL SUITES DEL REAL IN GUADALAJARA?

11    A.    YES, SIR.

12    Q.    AND COULD YOU ESTIMATE FOR THE LADIES AND GENTLEMEN OF

13    THE JURY WHEN YOU WENT TO THE -- WHEN YOU FIRST WENT TO THE

14    HOTEL SUITES DEL REAL?

15    A.    WHAT YEAR THAT WAS?

16    Q.    YES.

17    A.    I BELIEVE THE FIRST TIME WAS IN 1981 RIGHT WHEN IT WAS

18    A BRAND NEW HOTEL.    I AM NOT EXACTLY SURE WHEN.

19    Q.    OKAY.    NOW, DURING APPROXIMATELY THE FALL OF 1982, DID

20    YOU HAVE OCCASION TO GO BACK TO THE HOTEL SUITES DEL REAL?

21    A.    YES, I DID.

22    Q.    DID YOU HAVE OCCASION TO MEET ANYONE WITH WHOM YOU

23    WOULD LATER FORM A BUSINESS CONNECTION?

24    A.    YES, SIR, I DID.

25    Q.    WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY IN

88

1   YOUR OWN WORDS WHO YOU MET DOWN AT THE SUITES DURING THAT

2   PERIOD OF TIME?

3   A.   YES, SIR.   THE FIRST PEOPLE I MET WAS A GUY THAT I HAD

4   WORKED WITH PREVIOUSLY ON SOME MARIJUANA THAT INTRODUCED ME

5   TO HIS BROTHER, A GUY I CALLED MIKE AT THE TIME.

6           THERE WAS A NUMBER OF PEOPLE COMING IN.   THIS

7   HOTEL IS VERY NOTED FOR PEOPLE COMING IN AND OUT AS FAR AS

8   THE SMUGGLING BUSINESS.   I BELIEVE IT WAS OWNED BY THE DRUG

9   PEOPLE, AND THERE WAS A NUMBER OF PEOPLE THAT I MET AND SEEN

10  IN THE HOTEL.

11  Q.   OKAY.   DID YOU MEET AN INDIVIDUAL BY THE NAME OF MELO?

12  A.   YES, I DID.

13  Q.   OKAY.   AND --

14  A.   HE WAS THE GENTLEMEN I WAS REFERRING TO.   I DIDN'T SAY

15  HIS NAME, BUT IT WAS MIKE'S BROTHER.

16  Q.   DO YOU KNOW HIS LAST NAME?

17  A.   NO, SIR I DON'T.

18  Q.   OKAY.   HAD YOU EVER PREVIOUSLY MET HIM?

19  A.   YES, I HAD.

20  Q.   AND WHERE HAD YOU MET HIM PREVIOUSLY?

21  A.   I MET HIM ORIGINALLY AT MIGUEL'S OFFICE OR MIKE'S

22  OFFICE I BELIEVE ABOUT A YEAR BEFORE THAT.

23  Q.   OKAY.   AND AS A RESULT OF MEETING HIM IN THE FALL OF

24  1982, DID HE INTRODUCE YOU DO ANYONE?

25  A.   BEFORE?

000003

1    Q.   NO.  IN THE FALL OF 1982.

2    A.   YES, SIR.

3    Q.   AT THE SUITES, DID HE INTRODUCE YOU TO ANYBODY?

4    A.   YES, SIR.  HE INTRODUCED ME TO HIS -- HIS BROTHER.

5         MR. CONNOLLY:  OKAY.  NOW, I ASK THE CLERK TO SHOW

6    THE WITNESS GOVERNMENT EXHIBIT 15, PLEASE.

7         THE CLERK:  GOVERNMENT'S EXHIBIT NUMBER 15 PLACED

8    BEFORE THE WITNESS.

9         THE WITNESS:  YES, SIR.  THAT IS MIGUEL.

10   BY MR. CONNOLLY:

11   Q.   CAN YOU IDENTIFY THAT PICTURE?

12   A.   YOU MEAN WHERE IT WAS TAKEN?

13   Q.   NO.  DO YOU KNOW THE PERSON IN THAT PICTURE?

14   A.   YES, I DO.  IT IS MIGUEL FELIX GALLARDO.

15   Q.   AND IS THAT THE NAME YOU KNEW HIM BY?

16   A.   I ALWAYS CALLED HIM MIKE.

17   Q.   WHEN DID YOU FIRST MEET MIGUEL FELIX GALLARDO?

18   A.   OFFICIALLY MEETING HIM WAS THIS TIME IN THE FALL OF

19   '82.

20   Q.   OKAY.  NOW, HAD YOU SEEN HIM PREVIOUS TO THAT?

21   A.   YES, SIR, I HAD BEEN TO HIS OFFICE IN GUADALAJARA ONCE

22   BEFORE WHEN I WAS DEALING WITH OTHER PEOPLE AT THE TIME.

23   Q.   OTHER PEOPLE?

24   A.   YES, SIR.

25   Q.   OKAY.  NOW, DID YOU HAVE A CONVERSATION IN THE FALL OF

1    1983 WITH MIGUEL FELIX GALLARDO ABOUT SUPPLYING OR BEING

2    SUPPLIED WITH COCAINE?

3    A.   IN '83?  YES, SIR.

4    Q.   '82?

5    A.   '82 , YES, I DID.

6    Q.   WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY

7    WHAT YOU SAID TO HIM AND WHAT HE SAID TO YOU AS CLOSE AS YOU

8    CAN RECALL.

9    A.   OKAY.  I REMEMBER WE MET IN THE LITTLE RESTAURANT --

10   BAR THEY HAVE THERE IN THE HOTEL.  AND HE HAD COME IN, AND

11   HE WAS PRETTY GRUBBY BECAUSE OF -- HE HAD BEEN WORKING ON

12   SOME ANTIQUE CARS OUT IN THE BACK, AND I DIDN'T RECOGNIZE

13   HIM OR REALIZE WHO HE WAS AT THE TIME.

14        ANYWAY, WITH HIS BROTHER MELO AND SOME OTHER

15   GENTLEMEN THAT WERE THERE, WE GOT TO TALKING ABOUT COCAINE,

16   AND WE AGREED TO -- OR I AGREED TO PICK UP SOME COCAINE IN

17   LONG BEACH, CALIFORNIA, AND SELL, OR I HAD ASKED HIM TO GET

18   SOME.  HE MENTIONED HE COULD SUPPLY ME WITH IT, AND THEN I

19   ASKED HIM TO GET IT.

20   Q.   AND WHAT DID HE SAY?

21   A.   YES.

22   Q.   DID HE GIVE YOU A PRICE?

23   A.   YES, HE DID.

24   Q.   WHAT WAS THE PRICE?

25   A.   AT THAT TIME, IF I REMEMBER CORRECTLY, IT WAS AROUND

1    60,000 A KILO.

2    Q.   WAS THAT A GOOD PRICE FOR THAT TIME PERIOD?

3    A.   I THOUGHT SO, YES, SIR.

4    Q.   DO YOU KNOW WHAT KILOS WERE GOING FOR IN ARIZONA AT

5    THAT TIME PERIOD?

6             MR. STOLAR:  OBJECTION.  FOUNDATION.

7             THE COURT:  SUSTAINED.

8             WELL, HE CAN ANSWER YES, AND THEN WE WILL FIND OUT

9    BEFORE HE GIVES US WHAT IT WAS.

10            THE WITNESS:  YES, SIR.

11   BY MR. CONNOLLY:

12   Q.   WERE YOU AT THAT TIME USING COCAINE?

13   A.   YES, SIR, I WAS.

14   Q.   AND WERE YOU PURCHASING COCAINE IN THE PHOENIX AREA?

15   A.   YES.  NOT IN THE PHOENIX AREA, NO, SIR.

16   Q.   OKAY.  WERE YOU AWARE OF WHAT COCAINE WAS SELLING FOR

17   IN THE PHOENIX AREA?

18   A.   YES, SIR, I WAS.

19   Q.   HOW WERE YOU AWARE OF WHAT COCAINE WAS SELLING FOR IN

20   THE PHOENIX AREA AT THAT TIME?

21   A.   BECAUSE I HAD SOLD SOME IN THE AREA PRIOR TO THIS.

22   Q.   OKAY.  COULD YOU ESTIMATE FOR THE COURT WHAT THE PRICE

23   OF A KILO WAS IN PHOENIX IN 1982?

24   A.   I BELIEVE IT WAS AROUND -- AROUND 80,000.

25   /////

000006

1   Q.   OKAY.   NOW, AFTER THIS CONVERSATION OR DURING THIS

2   CONVERSATION WITH MIGUEL FELIX GALLARDO, DID YOU MAKE

3   ARRANGEMENTS TO PURCHASE SOME COCAINE?

4   A.   YES, I DID.

5   Q.   AND DID YOU HAVE $60,000 AT THAT TIME?

6   A.   NO, I DID NOT.

7   Q.   WHAT ARRANGEMENTS WERE MADE FOR YOU TO PURCHASE THE

8   COCAINE?

9   A.   IT WAS ON A -- HE FRONTED IT TO ME.

10  Q.   WHAT DOES "FRONTED" MEAN IN DRUG PARLANCE?

11  A.   IN OTHER WORDS, HE GAVE IT TO ME ON CREDIT.

12  Q.   NOW, THIS IS SOMEONE YOU HADN'T DEALT WITH BEFORE?

13  A.   YES, SIR.

14  Q.   DID ANYONE VOUCH FOR YOU AT THAT TIME?

15  A.   YES, SIR.   MELO DID.

16  Q.   AND DID YOU RECEIVE THE COCAINE THERE IN MEXICO?

17  A.   NO, I DID NOT.

18  Q.   WHAT ARRANGEMENTS WERE MADE FOR YOU TO RECEIVE THE

19  COCAINE?

20  A.   UPON RETURN TO THE UNITED STATES, I WOULD GO TO THE

21  ROCHELLE HOTEL IN LONG BEACH AND I WOULD -- I WAS TO CONTACT

22  SOMEBODY BACK IN MEXICO.   THEY GAVE ME A PHONE NUMBER TO

23  CALL BACK INTO MEXICO, AND THEY WOULD GET IN CONTACT WITH

24  ME, WHICH THEY DID DO.

25  Q.   OKAY.   NOW, YOU WOULD CALL A NUMBER IN MEXICO, AND THEN

93

1    YOU WOULD BE CALLED?

2    A.    YES.   I WOULD GIVE THEM -- WHEN I CALLED MEXICO I GAVE

3    THEM MY ROOM NUMBER AND WHAT HOTEL ACTUALLY I WAS AT.

4    Q.    WHAT HOTEL WERE YOU STAYING AT?

5    A.    ROCHELLE.

6    Q.    AND THEN HOW WOULD THE -- HOW WOULD THE DRUGS BE

7    DELIVERED TO YOU?

8    A.    WHOEVER WAS DELIVERING IT AT THE TIME WOULD GO TO THE

9    ROOM, RENT A ROOM, AND ONCE THEY RENTED THE ROOM, THEY WOULD

10   CALL ME ON THE PHONE AND TELL ME WHERE THE DRUGS WERE AT,

11   AND I WOULD GO IN AND PICK IT UP.   THEY WOULDN'T BE IN THE

12   ROOM.   THEY WOULD JUST LEAVE THE DRUGS AND LEAVE.

13   Q.    THEY WOULD CONTACT YOU ON THE TELEPHONE?

14   A.    YES.   THE INTERCOM OR YOU KNOW, THE TELEPHONE WITHIN

15   THE HOTEL.

16   Q.    AND DURING THE YEAR OF 19 -- LET'S SAY THE FALL OF 1982

17   OR THE FALL OF 1983, APPROXIMATELY HOW MANY TIMES DID YOU

18   RECEIVE COCAINE FROM MIGUEL FELIX GALLARDO?

19   A.    I DON'T REMEMBER EXACTLY HOW MANY TIMES.   I KNOW IT WAS

20   A LOT.   EIGHT TO TEN.   I AM NOT QUITE SURE EXACTLY HOW MANY

21   TIMES IT WAS TO BE HONEST WITH YOU.

22   Q.    HOW WOULD YOU RECEIVE IT?

23   A.    EACH TIME WOULD BE THE SAME.   I WOULD GO TO THE

24   ROCHELLE HOTEL.

25   Q.    YOU WOULD TRAVEL FROM PHOENIX TO THE ROCHELLE HOTEL?

000098

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA



- - -

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
        PLAINTIFF,             )
                               )
    VS.                        )      CR 88-129-WJR
                               )
JUAN RAMON MATTA-BALLESTEROS,   )
                               )
        DEFENDANT.             )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

THURSDAY, OCTOBER 11, 1990

DONNA BOWERS, C.S.R., R.P.R.
OFFICIAL COURT REPORTER
430 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 621-2400

1      MATERIAL?

2              MR. CONNOLLY:  YES.

3              MR. STOLAR:  YOU SAID YOU WERE BACKING UP TO

4      BACKGROUND.

5              MR. CONNOLLY:  I FINISHED WITH THE BACKGROUND.  I

6      AM NOW BACK TO THE CASE IN CHIEF.

7              THE COURT:  WHAT IS YOUR QUESTION AGAIN?

8              MR. STOLAR:  WHAT TIME PERIOD.

9      BY MR. CONNOLLY:

10     Q.   DID YOU EVER DETERMINE AFTER OCTOBER 1983 WHO OWNED THE

11     SUITES DEL REAL HOTEL?

12     A.   I WAS TOLD IT WAS MIGUEL, OR HE TOLD ME IT WAS HIS.

13     Q.   WHAT DID HE TELL YOU?

14     A.   IT WAS HIS HOTEL.

15     Q.   THIS IS MIGUEL FELIX GALLARDO; IS THAT CORRECT?

16     A.   YES.

17     Q.   NOW, IN OCTOBER OF 1983, DID YOU TRAVEL TO GUADALAJARA

18     AND HAVE A MEETING WITH MIGUEL FELIX GALLARDO?

19     A.   YES, I DID.

20     Q.   AND WHO HAD ARRANGED THIS MEETING?

21     A.   I BELIEVE I HAD.

22     Q.   WHAT WAS THE PURPOSE OF YOUR GOING DOWN TO GUADALAJARA?

23     A.   TO TALK BUSINESS ABOUT POSSIBLY GETTING INTO SMUGGLING,

24     YOU KNOW, OR HAVING THE LOADS BROUGHT -- DELIVERED THOUGH

25     ME.

000010

1   Q.   HAD YOU EVER MENTIONED THIS PREVIOUSLY TO YOUR -- TO

2   OCTOBER OF 1983?

3   A.   I DON'T BELIEVE SO.

4   Q.   OKAY.  DID THERE COME A TIME WHEN YOU ACTUALLY HAD A

5   MEETING WITH FELIX ABOUT THIS SUBJECT?

6   A.   YES.

7   Q.   WHERE DID THIS MEETING TAKE PLACE?

8   A.   IN THE HOTEL SUITES DEL REAL.

9   Q.   WHERE IN THE HOTEL SUITES DEL REAL?

10  A.   IN HIS SUITE, HIS ROOM.

11  Q.   WHERE IS THAT LOCATED?

12  A.   IT'S THE FIRST APARTMENT DOWNSTAIRS, OR NOT THE FIRST

13  ONE BUT ABOUT THE THIRD APARTMENT ACTUALLY.

14  Q.   CAN YOU DESCRIBE WHAT IT LOOKS LIKE?

15  A.   IT'S A PRETTY GOOD SIZED ROOM WITH A PETITION BETWEEN

16  THE LIVING ROOM AREA AND THE BEDROOM.  A SMALL PETITION.

17  HAD A COUPLE OF COUCHES AND SOME CHAIRS AND A BIG COFFEE

18  TABLE IN IT WITH A TV.

19  Q.   OKAY.  AND YOU HAD A MEETING WITH HIM AT THAT TIME?

20  A.   YES.

21  Q.   WAS ANYBODY ELSE PRESENT AT THAT MEETING?

22  A.   THAT WAS THE FIRST TIME THAT I MET MR. MATTA.

23  Q.   OKAY.  WOULD YOU TELL ME IF YOU CAN IDENTIFY ANYBODY IN

24  THIS ROOM WHO WAS THERE AT THAT MEETING IN OCTOBER OF 1983?

25  A.   DON JUAN.  DON WAS THERE.

1    Q.   WOULD YOU POINT THE PERSON OUT THAT YOU ARE TALKING

2    ABOUT?

3    A.   THE SECOND GENTLEMEN SITTING AT THE TABLE THERE.

4         MR. STOLAR:  INDICATING MR. MATTA.

5         MR. CONNOLLY:  WOULD THE RECORD REFLECT AN

6    IDENTIFICATION OF THE DEFENDANT?

7         THE COURT:  THE RECORD WILL SO REFLECT.

8    BY MR. CONNOLLY:

9    Q.   WOULD YOU TELL US ABOUT WHAT HAPPENED AT THE MEETING?

10   A.   I HAD SO MANY MEETINGS, AND USUALLY AT THE MEETINGS WE

11   HAD A TENDENCY TO PARTY.  I DON'T RECOLLECT EVERYTHING THAT

12   WENT ON AT THE MEETING OTHER THAN WE DID AGREE ON THE FIRST

13   LOAD AND WHERE IT WOULD BE.  I WAS TO HAVE THE PILOTS COME

14   UP AND MEET ME SO I COULD SHOW THEM THE LANDING STRIP.  I

15   WOULD BE CONTACTED LATER ON, AND THAT IS ABOUT IT.

16   Q.   OKAY.  NOW, DID MR. GALLARDO INTRODUCE YOU TO MR. MATTA

17   DURING THE MEETING?

18   A.   YES, HE DID.

19   Q.   AND BY WHAT NAME DID HE INTRODUCE YOU TO MR. MATTA

20   DURING THE MEETING?

21   A.   I BELIEVE IT WAS DON JUAN.

22   Q.   OKAY.  DID YOU KNOW HIM BY ANY OTHER NAMES WHEN YOU

23   WERE IN MEXICO?

24   A.   NO.  DON JUAN.  DON JOSE.

25   Q.   OKAY.  AND DURING THIS PERIOD -- DO YOU KNOW WHETHER OR

Q00012

1    NOT MR. MATTA SPEAKS ENGLISH?

2    A.    NOT VERY GOOD, NO.

3    Q.    DID HE PARTICIPATE IN THIS MEETING?

4    A.    HE TALKED THROUGH AN INTERPRETER, YES.

5    Q.    DID HE TALK TO YOU THROUGH THE INTERPRETER?

6    A.    YES, SIR.

7    Q.    AND DID MR. GALLARDO TELL YOU WHAT MR. MATTA'S FUNCTION

8    IN THIS BUSINESS WOULD BE?

9    A.    YES.  HE WAS THE SUPPLIER.

10   Q.    THE SUPPLIER OF WHAT?

11   A.    OF COCAINE.

12   Q.    TO WHOM?

13   A.    I DON'T THINK I QUITE UNDERSTAND WHAT YOU ARE SAYING.

14   Q.    TO WHOM WOULD MR. MATTA SUPPLY THE COCAINE?

15   A.    TO -- THAT I WAS NOT SURE.  I NEVER KNEW EXACTLY WHO IT

16   WAS GOING TO.

17   Q.    WHO DID MR. GALLARDO GET IT FROM?

18   A.    HE WAS GETTING IT FROM MATTA.

19   Q.    OKAY.  NOW, HOW LONG DID THIS MEETING LAST?

20   A.    OH, BOY.

21   Q.    IF YOU RECALL.

22   A.    I DON'T RECALL HOW LONG IT TOOK PLACE.

23   Q.    OKAY.  NOW, AT THE MEETING, WAS IT DECIDED THAT DRUGS

24   WOULD BE DELIVERED TO YOU?

25   A.    YES, SIR.

72

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )     Case No.   CR-88-129-WJR
                                   )     AFTERNOON SESSION
JUAN RAMON MATTA,                  )
                                   )
          Defendant.               )
_____    )

COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

FRIDAY, OCTOBER 5, 1990

MARY TUCKER, CSR 9308
Official Court Reporter
429-D U.S. Courthouse
312 North Spring Street
Los Angeles, Calif. 90012
213/687-0530

000014

136

1          MR. KENETY:   I ask Ms. Dillard to hand the witness

2     the remaining two photographs, Government's Exhibit 7E and

3     7F.

4          THE CLERK:   Government's Exhibit 7E and 7F placed

5     before the witness.

6     BY MR. KENETY:

7     Q      I ask you to look at Exhibit 7E, Major Mills.

8     A      Yes.

9     Q      Can you tell the Court what that is a photograph of?

10    A      That's a photograph of the suitcases, the plastic

11    bags and the cardboard boxes inside the criminal

12    investigation division office with some of the suitcases

13    open showing the contents of them.

14    Q      What were the contents of those suitcases and those

15    boxes?

16    A      They were all completely full of clear plastic

17    baggies containing that white cake.

18    Q      Was anything imprinted on those baggies?

19    A      Yes, there was.

20    Q      What was that?

21    A      There was a gold or yellow llama printed on each of

22    the plastic baggies.

23    Q      Major Mills, would you please look at photograph 7F?

24    A      Yes.

25    Q      What is that?

**000015**

137

1    A      That is a photograph of one of the plastic baggies

2    containing the cake, white cake with the gold llama

3    imprinted on there.

4    Q      Major Mills, the background on photograph 7F is

5    different from the floor of photograph 7E what is that?

6    A      That is because I took the photograph of 7F in the

7    seat of the chair rather than on the floor shown in 7E.

8            MR. KENETY:  Your Honor, I ask that Government's

9    Exhibit 7A through F be admitted.

10           MR. STOLAR:  No objection.

11           THE COURT:  They will be received.

12       (Exhibits 7A through F received into evidence).

13   BY MR. KENETY:

14   Q      Other than the white powdered substance you found,

15   did you find anything else in the blue and white pickup?

16   A      Yes.

17   Q      What was that?

18   A      Found a walkie-talkie, found two walkie-talkies, a

19   recharger for the walkie-talkies, found binoculars, two

20   pair of binoculars, and also found a paper napkin.

21   Q      Do you remember what, if anything, was written on

22   the paper napkin?

23   A      Yes, I do.

24   Q      What was that, Major Mills?

25   A      It was inscribed with Beckett.

000016

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CR 88-129-WJR |
| JUAN RAMON MATTA-BALLESTEROS, | ) | |
| DEFENDANT. | ) | |

*Charles Lager*

REPORTER'S PART            .OCEEDINGS

LOS ANGELES, CALIFORNIA

TUESDAY, OCTOBER 9, 1990

DONNA BOWERS, C.S.R. 3591
OFFICIAL COURT REPORTER
430 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA  90012
(213) 621-2400

11

1   PACKAGE, AND I'D FLY RIGHT BACK.

2   Q    OKAY.  NOW, DO YOU KNOW HOW LONG, PRIOR TO MOVING IN

3   WITH YOU, MONTE EARLS HAD BEEN USING OR DEALING DRUGS?

4   A    MR. EARLS -- AROUND THE CONSTRUCTION COMPANY EVERYBODY

5   KNEW THAT HE WAS A SUPPLIER OF THE MARIJUANA AND COCAINE.

6   EVER SINCE I'D REALLY KNOWN HIM, HE WAS SUPPLYING COWORKERS

7   WITH DRUGS.

8   Q    OKAY.  AND HOW ABOUT YOURSELF, HOW LONG HAD YOU BEEN

9   SUPPLYING PEOPLE WITH DRUGS?

10  A    EVER SINCE MR. EARLS MOVED IN WITH ME, PROBABLY

11  NOVEMBER OF '83.

12  Q    AND APPROXIMATELY HOW MANY CUSTOMERS DID YOU HAVE

13  DURING THAT PERIOD OF TIME?

14  A    DID I HAVE?

15  Q    YES.

16  A    I HAD VERY FEW BECAUSE MONTE WAS USUALLY RIGHT THERE

17  WITH ME ALL THE TIME.  HE HAD ALL THE CUSTOMERS.

18  Q    DO YOU KNOW HOW LONG JOHN DRUMMOND HAD BEEN SUPPLYING

19  MONTE EARLS WITH COCAINE IN NOVEMBER OF 1983?

20  A    NOT REALLY HOW LONG.  I KNOW HE WAS SUPPLYING IT JUST

21  BEFORE I -- MONTE MOVED IN WITH ME IN NOVEMBER OF '83.

22  Q    DID THERE COME A TIME WHEN YOU DID SOME WORK FOR

23  MR. DRUMMOND?

24  A    YES.

25  Q    AND DID YOU DO SOME CARPENTRY WORK FOR MR. DRUMMOND?

000018

12

1   A    YES.   MR. DRUMMOND HAD A -- BOUGHT SOME LAND OUT AT, I

2   BELIEVE THE ADDRESS WAS 421 GALVIN IN CAREFREE AREA.

3   Q    AND WHERE IS CAREFREE, WHAT STATE IS THAT?

4   A    IN THE SAME AREA AS PHOENIX, ARIZONA.

5   Q    AND HOW FAR FROM PHOENIX IS CAREFREE, ARIZONA?

6   A    OH, I'D ESTIMATE 20 MILES TO THE NORTH.

7   Q    SO IT WOULD BE FAIR TO SAY IT'S A SUBURB OF PHOENIX?

8   A    YES, SIR.

9   Q    OKAY.   AND WHEN DID YOU DO THAT CARPENTRY WORK FOR .

10  MR. DRUMMOND?

11  A    I CAN'T REMEMBER THE ACTUAL DATE, BUT IT WAS DURING --

12  I'D SAY DURING JULY AND AUGUST OF '84.

13  Q    OKAY.   DID MONTE EVER TELL YOU -- MONTE EARLS.   DID

14  MONTE EARLS EVER TELL YOU FROM WHERE JOHN DRUMMOND RECEIVED

15  HIS DRUGS?

16  A    HE MENTIONED A FEW TIMES THAT THEY GET IT FROM MEXICO.

17  Q    DID HE EVER MENTION ANYBODY'S NAME OR NAMES OF PEOPLE

18  IN MEXICO?

19  A    MR. EARLS?

20  Q    YES.

21  A    NO, HE DIDN'T.

22  Q    OKAY.   NOW, DURING THE MONTHS OF MAY, JUNE, JULY AND

23  AUGUST, DID YOU HAVE OCCASION TO DO SOME CRIMINAL ACTIVITY

24  WITH SOME OF THE INDIVIDUALS THAT I PREVIOUSLY MENTIONED?

25  A    YES, SIR.

13

1    Q    AND DURING THAT PERIOD OF TIME, DID YOU PARTICIPATE IN

2    RECEIVING SOME LOADS OF A WHITE POWDERY SUBSTANCE FROM AN

3    AIRPLANE IN YOUNG, ARIZONA?

4    A    YES, SIR.

5    Q    AND HOW MANY DIFFERENT TIMES DURING THAT PERIOD OF TIME

6    DID YOU PARTICIPATE IN OBTAINING THIS SUBSTANCE?

7    A    I WOULD SAY FIVE TIMES.

8    Q    OKAY.  AND AT WHOSE DIRECTION DID YOU PARTICIPATE THESE

9    FIVE TIMES?

10    A    UNDER MR. DRUMMOND'S.

11    Q    OKAY.  NOW, DID THERE COME A TIME WHEN YOU WERE

12    ARRESTED FOR YOUR ACTIVITIES, YOUR CRIMINAL ACTIVITIES?

13    A    YES, SIR.  AUGUST 14TH.

14    Q    OKAY.

15          MR. CONNOLLY:  EXCUSE ME, YOUR HONOR.  COULD I

16    APPROACH THE BENCH, PLEASE?

17          THE COURT:  YES.  IT'S NOW 12 O'CLOCK.  SHALL WE

18    TAKE OUR RECESS AND THEN WE WON'T --

19          MR. CONNOLLY:  I JUST WANTED TO KNOW THE SCHEDULE

20    OF THE COURT SO I COULD BEGIN THE -- WHETHER OR NOT IT WOULD

21    BE THE PROPER TIME TO BREAK OR TO BEGIN ANOTHER AREA.

22          THE COURT:  IS THAT WHY YOU WANTED TO APPROACH?

23          MR. CONNOLLY:  YES, YOUR HONOR.

24          THE COURT:  IS THIS A GOOD TIME TO BREAK?

25          MR. CONNOLLY:  YES.

14

1          THE COURT:  ALL RIGHT.  WE'LL TAKE OUR NOON

2   RECESS, LADIES AND GENTLEMEN.  WE WILL RECONVENE AT 1:30.

3   REMEMBER THE ADMONITION.

4          THE CLERK:  ALL RISE.  THE COURT IS NOW IN RECESS

5   UNTIL 1:30.

6      (NOON RECESS.)

7                    - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

15

1    LOS ANGELES, CALIFORNIA; TUESDAY, OCTOBER 9, 1990; 1:30 P.M.

2         (IN THE PRESENCE OF THE JURY:)

3              THE COURT:  ALL RIGHT.  MR. LAGER, WOULD YOU

4    RESUME THE WITNESS STAND.

5              THE WITNESS:  YES, SIR.

6              MR. CONNOLLY:  YOUR HONOR, COULD I HAVE THE LAST

7    QUESTION AND ANSWER READ BACK, PLEASE.

8              THE COURT:  ALL RIGHT.  READ IT BACK, PLEASE.

9         (RECORD READ.)

10                  DIRECT EXAMINATION [RESUMED.]

11   BY MR. CONNOLLY:

12   Q    WOULD YOU PLEASE RELATE TO THE LADIES AND GENTLEMEN OF

13   THE JURY FROM APPROXIMATELY -- IN APPROXIMATELY MID-APRIL

14   DID YOU HAVE CONTACT OR DID YOU HAVE BUSINESS RELATIONS WITH

15   JOHN DRUMMOND?

16   A    YES, SIR.

17   Q    AND WOULD YOU TELL US HOW THAT CAME ABOUT?

18   A    I WAS CALLED BY MR. DRUMMOND TO COME OVER TO HIS

19   MOTHER'S HOUSE, MAE BLANCHETTE'S, HE'D LIKE TO TALK TO ME.

20   AT THAT TIME, I WENT OVER THERE AND MET WITH MR. DRUMMOND

21   AND MR. KROGSLUND IN HIS MOTHER'S KITCHEN AT THE KITCHEN

22   TABLE.

23   Q    AND DID YOU HAVE A CONVERSATION AT THAT TIME WITH

24   MR. DRUMMOND AND MR. KROGSLUND?

25   A    YES.  THAT'S WHEN MR. DRUMMOND ASKED ME IF I WOULD LIKE

16

1    TO JOIN THE ORGANIZATION.

2    Q    AND WHAT DID HE SAY, IF YOU RECALL?

3    A    OH, TO THE BEST I REMEMBER, IT WAS:  HOW WOULD YOU LIKE

4    TO COME TO WORK FOR ME?  AND WHAT YOU'D BE DOING IS UNLOAD

5    AIRPLANES AND DELIVERING SOME -- WHATEVER WAS IN THE

6    AIRPLANE TO MY -- TO THE PHOENIX AREA.

7    Q    OKAY.  DID KROGSLUND PARTICIPATE IN THIS CONVERSATION?

8    A    YES, SIR.  HE WAS PRESENT.

9    Q    AND WHAT DID HE SAY, IF ANYTHING?

10    A    WELL, HE MORE OR LESS SAT THERE AND LISTENED.  AFTER IT

11    WAS ALL OVER, HE TOLD ME, YEAH, JOHN APPROACHED ME TOO AND

12    ASKED ME THE SAME, AND I MORE OR LESS TOLD JOHN I WANTED YOU

13    TO BE IN WITH IT.

14    Q    SO MR. KROGSLUND VOUCHED FOR YOU; IS THAT CORRECT?

15    A    YES, SIR.

16    Q    OKAY.  NOW, DID YOU ASK ANYBODY, EITHER KROGSLUND OR

17    DRUMMOND, WHAT WAS GOING TO BE ON THESE AIRPLANES?

18    A    NO.  MR. DRUMMOND'S BROTHER, MONTE EARLS, HE TOLD ME IT

19    WOULD BE DRUGS.

20    Q    DID HE TELL YOU WHAT KIND OF DRUGS?

21    A    NO.  HE TOLD ME IT COULD BE ANYTHING, MARIJUANA TO

22    COCAINE.

23    Q    OKAY.  NOW, AT THIS TIME YOU ARE LIVING IN CALIFORNIA;

24    IS THAT CORRECT?

25    A    YES, SIR.

17

1    Q    AND YOU'RE LIVING -- ARE YOU STILL LIVING WITH MONTE

2    EARLS?

3    A    MONTE EARLS WAS STILL STAYING WITH ME OFF AND ON.

4    Q    OKAY.  DOES THERE COME A TIME AFTER YOU'RE INVITED TO

5    JOIN THE ORGANIZATION THAT YOU TAKE AN AIRPLANE RIDE WITH

6    MR. DRUMMOND?

7    A    YES, SIR.

8    Q    AND WHEN DOES THAT HAPPEN APPROXIMATELY?

9    A    AROUND THE END OF APRIL, MYSELF, MR. KROGSLUND AND I

10   BELIEVE ONE OF THE BLANCHETTE BOYS DROVE MR. KROGSLUND'S

11   MOTOR HOME OVER TO PHOENIX.  AND THERE WE MET MR. DRUMMOND,

12   AND HE FAMILIARIZED US WITH THE CAREFREE AREA WHERE HIS

13   PROPERTY WAS.  AND FROM THERE WE WENT TO, I BELIEVE IT WAS

14   SCOTTSDALE AIRPORT AND TOOK OUT A CESSNA AIRPLANE THAT

15   MR. DRUMMOND HAS.

16        HE FLEW US UP TO THE YOUNG AREA AND SHOWED US THE

17   LANDING STRIP; TOLD US HOW THE PLANE WOULD BE COMING IN,

18   WHAT SIGNAL TO LOOK FOR.  AND WE LANDED THERE AND HE TOLD US

19   -- HE FOLLOWED ME RIGHT IN TO PICK UP, WHEREVER, WHEN I LAND

20   HERE, AND IF IT LANDS HERE.  AND THEN WE FLEW AROUND AND HE

21   SHOWED US THE ROUTE OUT AND STUFF, AND RETURNED BACK TO THE

22   AIRPORT.

23   Q    OKAY.  NOW, PRIOR TO THIS TIME, HAD YOU EVER BEEN TO

24   JOHN DRUMMOND'S PROPERTY IN CAREFREE, ARIZONA?

25   A    NO, I HAVEN'T.

18

1  Q    WERE THERE ANY STRUCTURES ON THE PROPERTY WHEN YOU WERE

2  THERE?

3  A    NO.  WHEN WE FIRST GOT THERE, THERE WAS A -- I BELIEVE,

4  A FENCE UP AROUND THE PROPERTY.  SOME VEHICLES WERE PARKED

5  OUT THERE.  THERE WAS A SLAB THAT HAD BEEN POURED, BUT NO

6  CONSTRUCTION WAS DONE ON IT.

7  Q    BY "SLAB" WHAT DO YOU MEAN?

8  A    A CONCRETE SLAB FOR A FOUNDATION.

9  Q    DID THERE COME A TIME IN THE NEXT COUPLE OF MONTHS WHEN

10  A BUILDING WAS BUILT ONTO THAT SLAB?

11  A    I REMEMBER COMING BACK TO THAT PROPERTY THE NEXT TIME,

12  AND I DON'T REMEMBER IF IT WAS THE NEXT TIME OR THE TIME

13  AFTER THAT; THERE WAS A CONSTRUCTION BEING STARTED.  IT WAS

14  BEING BUILT WRONG.  SO MR. KROGSLUND THEN ASKED

15  MR. DRUMMOND, I CAN SEND MR. LAGER AND EARLS BACK TO YOU IN

16  A COUPLE OF WEEKS WHEN I'M FINISHED WITH THEM.  IF YOU WAIT

17  THEN, I CAN HAVE THEM COME BACK AND BUILD THIS RIGHT FOR

18  YOU.  MR. DRUMMOND AGREED TO IT.

19  Q    AND DID YOU COME BACK AND BUILD IT RIGHT FOR HIM?

20  A    YES, SIR.

21  Q    WHAT DID YOU PUT UP THERE?

22  A    IT'S A -- WHAT IT WAS IS A STORAGE UNDERNEATH THE --

23  THE FIRST FLOOR WAS LIKE A STORAGE AREA AND THE OTHER HALF

24  WAS A GARAGE; AND ABOVE THE STORAGE AREA WE PUT AN APARTMENT

25  FOR MR. DRUMMOND AND HIS WIFE.

000025

19

1   Q    AND APPROXIMATELY WHEN WAS THIS STRUCTURE COMPLETED?

2   A    TO THE BEST OF MY KNOWLEDGE, THE ROUGH FRAMING PART,

3   WHICH I DID, WAS MORE OR LESS COMPLETED IN I'D SAY THE END

4   OF JULY.

5   Q    OKAY.  NOW, DID THERE COME A TIME AFTER MR. DRUMMOND

6   TOOK YOU UP TO THE YOUNG AIRPORT, WHEN YOU AGAIN WENT UP TO

7   THE YOUNG AIRPORT?

8   A    YES, SIR.

9   Q    AND WHAT WAS THE -- WHEN DID YOU NEXT GO UP TO THE

10  YOUNG AIRPORT?

11  A    THAT WAS TO RECEIVE A SHIPMENT FROM AN AIRPLANE THAT

12  FLEW IN.

13  Q    AND WHEN DID THIS HAPPEN?

14  A    THAT WAS TOWARDS THE END OF MAY.

15  Q    OF WHAT YEAR?

16  A    OF '84.

17  Q    AND COULD YOU TELL US HOW YOU WERE NOTIFIED TO GO UP

18  THERE?

19  A    I WAS WORKING FOR MR. KROGSLUND AT THE TIME, AND WE

20  STARTED WORK ABOUT 7 O'CLOCK IN THE MORNING, AND

21  MR. KROGSLUND SHOWED UP AND SAID TO ME AND MR. EARLS, WE

22  HAVE TO LEAVE, THAT OUR PHONE CALL CAME IN.  AND FROM THERE,

23  WE WENT BACK TO MR. KROGSLUND'S HOUSE AND PACKED OUR BAGS

24  AND WENT TO, I BELIEVE IT WAS ORANGE COUNTY AIRPORT, CAUGHT

25  AN AIRPLANE RIDE TO PHOENIX SKY HARBOR.  THERE WE MET WITH

20

1    MR. DRUMMOND, AND I'M NOT SURE IF WE RENTED ROOMS OR IF WE

2    WENT -- GOT INSTRUCTIONS TO GO STRAIGHT UP TO THE YOUNG

3    AIRFIELD.

4    Q    OKAY.  NOW, YOU TOOK THIS TRIP APPROXIMATELY FIVE

5    TIMES; IS THAT CORRECT?

6    A    YES, SIR.

7    Q    WE'RE COUNTING OTHER TIMES --

8    A    THERE'S OTHER TIMES WE WENT UP THERE, BUT THE PLANE

9    NEVER SHOWED.

10   Q    AND WHAT WAS THE PROCEDURE?  WOULD YOU STAY AT PHOENIX

11   OR NOT STAY AT PHOENIX?

12   A    IT'D DEPEND ON THE PHONE CALL THAT MR. DRUMMOND GAVE

13   US; EITHER COME RIGHT NOW, WE'RE READY TO GO, OR COME, AND

14   IT'S COMING IN A FEW DAYS.

15   Q    AND WHERE WOULD YOU STAY WHEN YOU STAYED AT PHOENIX?

16   A    USUALLY WE'D STAY AT THE "KONTIKI" HOTEL; IT'S OFF OF

17   VAN BUREN IN PHOENIX.

18   Q    OKAY.  NOW, THIS PARTICULAR TIME, DID YOU ULTIMATELY

19   ARRIVE AT YOUNG AIRPORT?  DID YOU GET UP THERE?

20   A    HOW DID WE GET UP THERE?

21   Q    NO.  DID YOU GET UP THERE?

22   A    YES, SIR.

23   Q    AND DO YOU REMEMBER HOW MANY TRUCKS WENT UP, OR HOW

24   MANY VEHICLES WENT UP?

25   A    THERE WAS THREE VEHICLES WENT UP.


000027

21

1   Q     AND WHO ACCOMPANIED YOU UP THERE?

2   A     IT WAS MYSELF, MR. KROGSLUND, MR. EARLS AND THE TWO

3   BLANCHETTE BROTHERS.

4   Q     OKAY.  NOW, DID MR. DRUMMOND COME ALONG?

5   A     NO, SIR.

6   Q     PRIOR TO GOING UP THERE, DID YOU RECEIVE ANY

7   INSTRUCTIONS EITHER FROM MR. DRUMMOND OR MR. KROGSLUND?

8   A     FROM BOTH.

9   Q     WHAT DID MR. DRUMMOND TELL YOU?

10  A     HE TOLD US HE WAS -- HAS BEEN CONTACTED THAT THE PLANE

11  WILL BE ARRIVING EITHER TODAY OR TOMORROW; THAT WE WERE

12  SUPPOSED TO HEAD UP THERE AND WAIT FOR A SIGNAL.  USUALLY

13  THE SIGNAL WOULD COME IN ON A GROUND-TO-AIR RADIO.  WE HAD

14  THREE OF THOSE.  EACH ONE -- EACH ONE WAS IN A VEHICLE SO WE

15  COULD KEEP IN CONTACT WITH EACH OTHER.

16  Q     AND WHAT DID MR. KROGSLUND -- WHAT INSTRUCTIONS DID

17  MR. KROGSLUND GIVE YOU, IF ANY?

18  A     HE WAS -- MR. KROGSLUND WAS PUT IN CHARGE ONCE WE WERE

19  UP THERE.

20  Q     SO IN OTHER WORDS, MR. DRUMMOND WAS NOT IN CHARGE WHILE

21  YOU WERE UP THERE, MR. KROGSLUND WAS?

22  A     YES, SIR.

23  Q     AND WHILE YOU WERE AT YOUNG, MR. KROGSLUND DIRECTED

24  YOUR ACTIVITIES; IS THAT CORRECT?

25  A     YES, SIR.

22

1  Q    OKAY.  NOW, WHAT WAS YOUR JOB SUPPOSED TO BE ONCE THE

2  PLANE CAME IN?

3  A    MY JOB WAS TO FOLLOW THE PLANE IN -- I WAS THE DRIVER

4  OF THE TRUCK.  I'D FOLLOW THE PLANE IN DOWN THE RUNWAY, WAIT

5  FOR IT TO END ITS TAXI, AND TURN AROUND; AND I'D PULL IN

6  BEHIND IT AND SUPPOSED TO LOAD WHATEVER CAME OFF THE

7  AIRPLANE.

8  Q    AND WHAT WERE THE OTHER INDIVIDUALS SUPPOSED TO DO

9  WHILE YOU WERE HELPING WITH THE UNLOADING OF THE AIRPLANE?

10  A    MR. KROGSLUND AND EDDIE BLANCHETTE WERE WITH ME THERE

11  TO HELP UNLOAD.  MR. EARLS WAS TO TAKE ONE OF THE OTHER

12  VEHICLES, I BELIEVE IT WAS AN EL CAMINO PICKUP, AND BLOCK

13  THE ROAD TOWARDS YOUNG, WHILE MR. BLANCHETTE, I MEAN JEFFREY

14  BLANCHETTE, WAS TO BLOCK THE ROAD TOWARDS HAGLER CREEK.

15  Q    OKAY.  NOW, WAS ANY ONE SPECIFIC VEHICLE USED BY YOU?

16  A    YES.  WE USUALLY USED MR. DRUMMOND'S -- IT WAS A BLUE

17  SILVERADO HALF-TON OR THREE-QUARTER-TON PICKUP WITH A CAMPER

18  ON THE BACK, THE WINDOWS WERE ALL BLACKED OUT IN IT.

19  Q    AND WERE YOU THE DRIVER OF THIS VEHICLE?

20  A    YES, I WAS.

21  Q    NOW, COULD YOU TELL US APPROXIMATELY -- YOU SAID THE

22  FIRST TIME YOU WENT UP THERE WHEN A LOAD CAME IN WAS IN THE

23  END OF MAY.

24  A    YES, SIR.

25  Q    DID YOU GO UP THERE ANY OTHER TIMES WHEN LOADS CAME IN?

23

1   A    YES.  I WENT UP FOUR OTHER TIMES.

2   Q    OKAY.  COULD YOU ESTIMATE FOR THE LADIES AND GENTLEMEN

3   OF THE JURY APPROXIMATELY WHAT PERIOD OF TIME YOU WENT UP

4   THERE FOR THESE OTHER LOADS?

5   A    THE SECOND LOAD WAS APPROXIMATELY A WEEK TO TEN DAYS

6   LATER.  THE THIRD LOAD WAS APPROXIMATELY A WEEK TO TWO WEEKS

7   LATER.  THE FOURTH LOAD WAS THE FIRST WEEK IN JULY.  AND THE

8   LAST LOAD I WENT ON WAS AUGUST 14TH.

9   Q    OKAY.  IS THAT WHEN YOU WERE CAUGHT?

10  A    YES, SIR.

11  Q    NOW, THE FIRST LOAD WAS WHEN?

12  A    THE END OF MAY OF '84.

13  Q    SO YOU'RE ESTIMATING THAT THE SECOND LOAD WAS SOMEWHERE

14  BETWEEN JUNE 7TH AND JUNE 10TH; IS THAT CORRECT?

15  A    YES, SIR.

16  Q    IS THIS MORE OR LESS?

17  A    MORE OR LESS.  IT WAS A WEEK TO TEN DAYS.

18  Q    OKAY.  AND HOW ABOUT THE NEXT LOAD, WHEN WOULD YOU SAY

19  THAT CAME IN?

20  A    APPROXIMATELY ABOUT THE SAME SPACING, A WEEK TO TEN

21  DAYS, TWO WEEKS.

22  Q    OKAY.  NOW, YOU HAVE TWO DATES THAT YOU CAN PINPOINT

23  THAT CORRECTLY FOR US; IS THAT THE DATE OF THE FIRST LOAD

24  AND THE DATE OF YOUR ARREST?

25  A    YES, SIR.

24

1    Q    AND ARE THE OTHER TIME PERIODS YOU'RE GIVING US

2    ESTIMATES?

3    A    YES, SIR.

4    Q    OKAY.  DID THERE COME A TIME WHEN YOU WENT UP TO YOUNG

5    AIRPORT WITH YOUR CODEFENDANTS AND WAITED FOR LOADS TO COME

6    IN THAT DID NOT COME IN?

7    A    YES, SIR.  BETWEEN THE FOURTH LOAD AND THE LAST LOAD,

8    FIFTH LOAD.

9    Q    AND HOW MANY TIMES DID YOU GO UP THERE WHEN NO PLANE

10   LOADS CAME IN?

11   A    I'D ESTIMATE THREE TO FOUR TIMES.

12   Q    AND HOW LONG WOULD YOU STAY UP THERE?

13   A    WE'D STAY OVERNIGHT A COUPLE OF TIMES.

14   Q    NOW, DURING THE COURSE OF YOUR CONVERSATIONS UP THERE,

15   DID ANY OF THE OTHER INDIVIDUALS THAT YOU WENT UP THERE WITH

16   EVER TELL YOU WHERE THE PLANES WERE COMING IN FROM?

17   A    YES.  THE REASON THAT WE WERE WAITING WAS BECAUSE

18   MR. DRUMMOND TOLD US THEY'RE HAVING A STORM IN MEXICO RIGHT

19   NOW AND HE DOESN'T THINK THE PLANES CAN GET THROUGH.

20   Q    OKAY.  NOW, IS THE AREA AROUND YOUNG, THE YOUNG

21   AIRSTRIP, REMOTE, DESERTED?

22   A    YES.  I WOULD SAY IT IS.

23   Q    AND WAS THERE MUCH VEHICLE TRAFFIC WHEN YOU WENT UP

24   THERE?

25   A    NO, HARDLY ANY.

25

1   Q     HOW ABOUT AIRPLANE TRAFFIC?

2   A     HARDLY ANY.

3   Q     OKAY.  NOW, THE FIRST TRIP YOU WENT UP THERE, DESCRIBE

4   WHAT HAPPENED WHEN THE PLANE CAME IN AND DESCRIBE THE PLANE.

5   A     WELL, WHEN WE FIRST WERE UP THERE, WE STAYED AT THE END

6   OF THE RUNWAY WHICH IS -- THERE'S A BARBED-WIRE FENCE AROUND

7   IT, AND WE'D STAY HIDDEN IN THE BRUSH JUST IN CASE ANY

8   TRAFFIC DID COME BY OR SOMETHING SO WE WOULDN'T BE SPOTTED.

9   WE GOT A SIGNAL, THERE WAS A WHISTLE OVER THE RADIO, AND WE

10  WERE INSTRUCTED -- MR. KROGSLUND WAS INSTRUCTED TO SAY "IT'S

11  ALL CLEAR," OR "HELLO, LON," OR "HELLO, JOHN."  AND THAT

12  WOULD GIVE THE PILOT THE INDICATION THAT IT WAS CLEAR.

13        AND THEN APPROXIMATELY THREE TO FIVE MINUTES

14  LATER, THE PLANE, WE COULD SEE IT COMING IN.  WE'D SEND OUT

15  OUR ROADBLOCKS AND I'D FOLLOW THE PLANE IN AS SOON AS IT

16  TOUCHED THE RUNWAY; I'D BE RIGHT BEHIND IT.  IT WOULD TAXI

17  ALL THE WAY TO THE END OF THE RUNWAY AND TURN AROUND SO IT

18  WOULD BE READY TO TAKE OFF.

19        I'D PULL IN BEHIND IT AND BACK UP AS CLOSE AS I

20  COULD TO THE AIRPLANE ON THE LEFT-HAND SIDE.  AS SOON AS I

21  JUMPED OUT OF THE TRUCK -- THERE WAS A DOOR BEHIND THE

22  COCKPIT OPENED UP AND ONE BEHIND THE WING, AND DUFFEL BAGS

23  WERE STARTING TO BE THROWN OUT.

24        IT WAS A -- THE AIRCRAFT WAS A HIGH-WING

25  DOUBLE-ENGINE; THE COLOR WAS WHITE WITH BLACK AND RED

26

1    STRIPES.

2    Q    OKAY.  NOW, I SHOW YOU WHAT --

3         MR. DONNOLLY:  I ASK THE CLERK TO SHOW YOU WHAT

4    HAS BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT EXHIBIT 12.

5         THE CLERK:  GOVERNMENT'S EXHIBIT 12 PLACED BEFORE

6    THE WITNESS.

7    BY MR. CONNOLLY:

8    Q    NOW, I ASK YOU DOES GOVERNMENT'S EXHIBIT 12 LOOK

9    FAMILIAR TO YOU?

10   A    YES.  IT LOOKS LIKE THE AIRPLANE THAT WAS USED.

11   Q    OKAY.  NOW, DOES THAT AIRPLANE HAVE ANY IDENTIFICATION

12   NUMBERS ON IT?  CAN YOU SEE FROM THAT PICTURE?

13   A    NO, IT DOESN'T.

14   Q    IS THERE AN ARROW POINTING TO THE UPPER LEFT-HAND SIDE?

15   A    YES, THERE IS.  TO THE TAIL WING?

16   Q    YES.  IS THERE A NUMBER ON THAT?

17   A    YES, THERE'S SOME NUMBERS THERE.

18   Q    CAN YOU READ THEM?

19   A    IT LOOKS LIKE A T-A-K-ZERO-ZERO.

20   Q    NOW, DO YOU KNOW ANYTHING ABOUT AIRPLANES?

21   A    I WORKED ON THEM IN THE SERVICE, HELICOPTERS, BUT VERY

22   LITTLE ABOUT AIRPLANES, REALLY.

23   Q    OKAY.  NOW, THE PICTURE THAT YOU IDENTIFIED, COMPARE IT

24   TO THE PLANE THAT LANDED BACK IN 1984.  DESCRIBE FOR THE

25   JURY HOW YOU THINK IT'S SIMILAR.

27

1          MR. STOLAR:  THE PICTURE IS NOT IN EVIDENCE YET,

2    YOUR HONOR.  I OBJECT TO HAVING HIM DESCRIBE THE PHOTO.

3    BY MR. CONNOLLY:

4    Q    OKAY.  WOULD YOU --

5          MR. CONNOLLY:  YOUR HONOR, I WOULD MOVE TO ADMIT

6    GOVERNMENT'S EXHIBIT 12 IN EVIDENCE.

7          MR. STOLAR:  I DON'T SEE A BASIS YET.  IT HASN'T

8    BEEN IDENTIFIED AS HAVING ANY BASIS WHATSOEVER.

9          MR. CONNOLLY:  COULD THE COURT TAKE IT SUBJECT TO

10   CONNECTION?

11         THE COURT:  WOULD THE COURT DO WHAT?

12         MR. CONNOLLY:  TAKE THE EVIDENCE ADMISSION SUBJECT

13   TO CONNECTION LATER ON TODAY.

14         THE COURT:  DO YOU WANT TO TAKE THE WITNESS ON

15   VOIR DIRE AT THIS TIME, MR. STOLAR?

16         MR. STOLAR:  JUST FOR A MOMENT.

17         THE COURT:  ALL RIGHT.

18                    VOIR DIRE EXAMINATION

19   BY MR. STOLAR:

20   Q    SIR, LET ME ASK YOU, DO YOU RECALL THE TAIL NUMBER?

21   A    NO, I DON'T, SIR.

22   Q    WAS IT THE SAME PLANE THAT CAME IN ON THE SECOND LOAD?

23   A    IT WAS THE SAME TYPE OF PLANE.

24   Q    SAME TYPE OF PLANE?

25   A    YES, SIR.

28

1  Q    AND THE THIRD LOAD, SAME TYPE?

2  A    SAME TYPE.

3  Q    AND THE FOURTH LOAD, SAME TYPE?

4  A    SAME TYPE, DIFFERENT COLOR.

5  Q    FIFTH LOAD?

6  A    SAME TYPE, DIFFERENT COLOR.

7  Q    DID YOU GET THE TAIL NUMBERS ON ANY OF THOSE PLANES?

8  A    ON THE LAST LOAD I GOT IT, BUT I DON'T REMEMBER THE

9  NUMBER.

10         MR. STOLAR:  I OBJECT TO IT.  THE PICTURE IS

11  NOT -- IT PURPORTS TO BE SOMETHING LIKE IT, BUT IT'S NOT THE

12  AIRPLANE THAT WE'RE TALKING ABOUT.

13         MR. CONNOLLY:  YOUR HONOR, THE GOVERNMENT DID NOT

14  MAKE --

15         THE COURT:  IS THIS GOING TO BE TIED UP WITH

16  SOMETHING ELSE?

17         MR. CONNOLLY:  YES.  THE GOVERNMENT DID NOT MAKE

18  THAT REPRESENTATION.  I JUST WANTED HIM TO COMPARE.

19         THE COURT:  YOU MEAN IT'S BEING OFFERED TO SHOW

20  THE TYPE OF PLANE THAT WAS USED, NOT THE EXACT PLANE?

21         MR. CONNOLLY:  YES, YOUR HONOR.

22         THE COURT:  ALL RIGHT.  FOR THAT PURPOSE IT WILL

23  BE RECEIVED.  THE JURY IS ADMONISHED THAT THIS IS NOT THE

24  PLANE IN QUESTION OR HASN'T BEEN ESTABLISHED THAT IT IS, BUT

25  IT IS A PLANE THAT IS SIMILAR.  SUBSTANTIALLY SIMILAR?

29

1      THE WITNESS:  SIMILAR IN LOOKS AND COLOR, YES,

2  SIR.

3      THE COURT:  IN COLOR AND CONFIGURATION?

4      THE WITNESS:  YES, SIR.

5      THE COURT:  ALL RIGHT.

6      THE WITNESS:  IT LOOKS LIKE THE EXACT PLANE, BUT I

7  CAN'T BE SURE.  I'M SURE THEY MADE TWO OR THREE HUNDRED

8  DIFFERENT PLANES JUST LIKE THAT.

9      THE COURT:  ALL RIGHT.  IT'S BEING OFFERED TO

10  DEMONSTRATE WHAT THE PLANE LOOKED LIKE, LADIES AND

11  GENTLEMEN.  IT WILL BE RECEIVED FOR THAT LIMITED PURPOSE.

12      MR. CONNOLLY:  THANK YOU, YOUR HONOR.

13      (PLAINTIFF'S EXHIBIT 12 RECEIVED FOR LIMITED PURPOSE.)

14           DIRECT EXAMINATION [RESUMED.]

15  BY MR. CONNOLLY:

16  Q    NOW, WHO WAS IN THE VEHICLE WITH YOU WHEN THE PLANE WAS

17  UNLOADED?

18  A    MR. KROGSLUND AND EDDIE BLANCHETTE.

19  Q    AND DURING THE NEXT SEVERAL LOADS, WERE THESE PEOPLE,

20  BLANCHETTE AND KROGSLUND, THE UNLOADERS OF THE PLANE?

21  A    YES, SIR.

22  Q    AND WERE YOU THE DRIVER OF THE CAR?

23  A    I WAS THE DRIVER AND ALSO THE UNLOADER, TOO.

24  Q    AND DID YOU ON EACH TRIP SEE THE PLANE?

25  A    YES, SIR.

30

1   Q    OR THE PLANES?

2   A    THE PLANES.

3   Q    COULD YOU TELL HOW MANY DIFFERENT PLANES LANDED DURING

4   THOSE FIVE LOADS?

5   A    TWO DIFFERENT TYPES LANDED.

6   Q    TWO DIFFERENT TYPES THAT YOU KNOW OF?

7   A    TWO DIFFERENT -- EXACT PLANE TYPE, BUT TWO DIFFERENT

8   COLORS.

9   Q    OKAY.  AND DID YOU HAVE OCCASION TO SEE THE INDIVIDUALS

10  WHO WERE THE OCCUPANTS OF THIS VEHICLE?  OF THIS PLANE?

11  A    YES, SIR.

12  Q    AND DID YOU HAVE OCCASION TO SEE THE PILOT?

13  A    YES, SIR.

14  Q    AND --

15  A    I USUALLY LOADED -- THAT'S WHERE I USUALLY WENT TO

16  UNLOAD WAS BY THE FRONT CARGO DOOR; HE'D USUALLY SIT IN THE

17  PILOT'S SEAT.

18  Q    NOW, THESE WERE NOT LEISURELY UNLOADINGS, I TAKE IT; IS

19  THAT CORRECT?

20  A    WHAT DO YOU MEAN BY --

21  Q    WERE THESE DONE SLOWLY OR FAST?

22  A    IT WAS DONE FAST.

23  Q    AND WAS EVERYBODY HUSTLING AS FAST AS THEY COULD?

24  A    AS FAST AS THEY COULD.

25  Q    AND APPROXIMATELY HOW LONG DID IT TAKE YOU TO UNLOAD

31

1    THE PLANE EACH TIME?

2    A    I'D SAY THREE TO FOUR MINUTES.

3    Q    OKAY.  NOW, WAS THERE ANY CONVERSATION BETWEEN YOU AND

4    ANY OF THE OCCUPANTS OF THE PLANE?

5    A    NO.  THERE WAS SOME -- THEY TALKED IN SPANISH, BUT I

6    NEVER UNDERSTOOD THEM.

7    Q    AND DID THEY --

8    A    THEY ASKED US ONCE FOR CIGARETTES.

9    Q    AND WAS THERE EVER ANY EXCHANGES BETWEEN DRUMMOND'S

10   EMPLOYEES ON THE GROUND AND THE PEOPLE -- DID THE DRUMMOND'S

11   EMPLOYEES ON THE GROUND EVER GIVE ANYTHING TO THE OCCUPANTS

12   OF THESE PLANES?

13   A    MR. KROGLUND WAS GIVEN A PISTOL TO GIVE TO THEM ONE

14   TIME.  ALSO A -- I DON'T KNOW IF YOU WOULD CALL IT A NIGHT

15   VISION GOGGLE, I MEAN, SCOPE.  ON THE LAST LOAD HE GAVE THEM

16   SOME NIGHT VISION GOGGLES.

17   Q    OKAY.  HOW DO YOU KNOW WHAT HE GAVE THEM?

18   A    I SEEN IT.  I SAW THE GUN AND THE SCOPE.  I WAS THERE.

19   Q    AND DID YOU HANDLE THE SCOPE, OR THE GUN, OR THE

20   GOGGLES?

21   A    YES, SIR.

22   Q    WHICH ITEMS?

23   A    I HANDLED ALL THREE OF THEM FOR HIM.

24   Q    AND DID YOU LOOK THROUGH THEM?

25   A    YES.  THE SMALL SCOPE, WHICH IS NOT VERY BIG, WE TOOK

32

1   IT OUT BY SKY HARBOR AIRPORT ONE NIGHT, MR. DRUMMOND,

2   MR. KROGSLUND AND I; AND MR. DRUMMOND SHOWED US HOW IT

3   WORKED.  IT WORKS OFF OF THE STARLIGHT.  THE DARKER AREA YOU

4   GET TO, THE BETTER YOU CAN SEE.  IT LIGHTS UP BRIGHTER.

5   Q    HOW ABOUT THE GOGGLES, HOW DID THEY WORK?

6   A    THE GOGGLES, THEY'RE REGULAR FLIGHT GOGGLES, LIKE YOU

7   PUT THEM OVER AND THERE'S TWO LENSES THERE.  IT WORKS OFF

8   THE STARLIGHT I BELIEVE AGAIN, AND IT MAKES EVERYTHING LOOK

9   LIKE DAYLIGHT.

10  Q    SO HOW WOULD YOU -- WHAT WOULD YOU CALL THESE ITEMS?

11  ARE THESE NIGHT VISION EQUIPMENT?

12  A    YES, SIR.

13  Q    AND WHO PURCHASED THESE ITEMS?

14  A    MYSELF AND MR. KROGSLUND WERE PRESENT WITH MR. DRUMMOND

15  WHEN HE PURCHASED THE SMALL SCOPE.  I FORGET THE NAME OF THE

16  COMPANY.  I BELIEVE IT WAS PURCHASED IN MY NAME.

17  MR. DRUMMOND PAID CASH FOR IT.

18  Q    DO YOU REMEMBER WHICH LOADS THE GUNS AND THE SCOPES AND

19  THE GOGGLES WERE DISTRIBUTED?

20  A    THE GUN AND THE GOGGLES I BELIEVE WERE ON THE FOURTH

21  LOAD.  MR. DRUMMOND TOLD BOB TO GIVE THIS TO THE PILOT AND

22  ASK HIM ALSO IF HE HAS SOMETHING FOR HIM.  HE WAS EXPECTING

23  A GOLD BRACELET FOR HIS WIFE FOR HER BIRTHDAY OR SOMETHING.

24  Q    DID DRUMMOND EVER TELL YOU WHO THESE ITEMS WERE MEANT

25  FOR?

33

1    A    NO, HE NEVER DID.

2    Q    DID KROGSLUND EVER TELL THE PILOT IN YOUR PRESENCE WHO

3    THE ITEMS WERE MEANT FOR?

4    A    NO, HE DIDN'T.

5    Q    OKAY.  NOW, AFTER THE FIRST LOAD CAME IN, WHERE DID YOU

6    GO?

7    A    AFTER WE RECEIVED THE LOAD, WE HEADED BACK TOWARD

8    YOUNG, BUT WE'D GO UP TO PAYSON AND BACK TO THE PHOENIX

9    AREA, AND WE'D END UP AT MR. DRUMMOND'S LOT THAT HE OWNED

10    OUT THERE ON CAREFREE.

11    Q    OKAY.  NOW, HOW FAR OF A DRIVE IS IT FROM DRUMMOND'S

12    LOT IN CAREFREE TO THE YOUNG AIRPORT?

13    A    OH, IT'S A GOOD THREE-HOUR DRIVE.  I WOULDN'T KNOW BY

14    MILEAGE.

15    Q    OKAY.  APPROXIMATELY THREE HOURS; IS THAT WHAT YOU

16    WOULD ESTIMATE?

17    A    YES, SIR.

18    Q    AND DID ALL THESE LOADS COME IN ANY PARTICULAR TIME OF

19    DAY?

20    A    NO.  THEY ALL CAME IN AT RANDOM.

21    Q    DID THEY ALL COME IN DURING DAYLIGHT HOURS?

22    A    YES, SIR.

23    Q    OKAY.  NOW, THE FIRST LOAD YOU TAKE BACK TO THE

24    CAREFREE AREA; IS THAT CORRECT?

25    A    YES, SIR.

34

1    Q    AND WHAT HAPPENS TO THE LOAD ONCE IT ARRIVES AT

2    CAREFREE?

3    A    THE FIRST LOAD, MR. DRUMMOND -- I MEAN, MR. KROGSLUND

4    HAD HIS MOTOR HOME THERE.  WHEN WE GOT THERE, MR. DRUMMOND

5    WAS THERE AND HIS WIFE ANDREA.  WE UNLOADED HALF OF IT TO

6    MR. KROGSLUND'S MOTOR HOME AND THE OTHER HALF OF IT IN THE

7    TRUCK; AND THEN WE PROCEEDED TOWARDS CALIFORNIA.

8    Q    OKAY.  NOW, DID YOU ACCOMPANY THIS LOAD TO CALIFORNIA?

9    A    YES, I DID.

10   Q    AND ON THE OTHER LOADS THAT YOU BROUGHT IN, DID YOU

11   ACCOMPANY ANY OF THOSE LOADS TO CALIFORNIA?

12   A    NO, I DIDN'T.

13   Q    DID YOU HAVE ANY UNDERSTANDING WITH MR. DRUMMOND AS TO

14   HOW MUCH MONEY YOU WOULD RECEIVE FOR YOUR ASSISTANCE IN

15   THIS?

16   A    YES.  I WAS TO RECEIVE 5,000 A LOAD.

17   Q    OKAY.  DID YOU HAVE OCCASION ON THE FIRST LOAD TO SEE

18   WHAT WAS IN THE CONTAINERS THAT CAME OFF THE PLANE?

19   A    YES.  SOME WERE BROKE OPEN.  YOU COULD TELL THAT IT WAS

20   COCAINE.  THERE WAS ALSO THREE --

21            MR. STOLAR:  OBJECT AND MOVE TO STRIKE, YOUR

22   HONOR.

23            THE COURT:  YES.  THAT WILL BE STRICKEN AS

24   COCLUSION ON THE PART OF THE WITNESS.

25   /////

000041

35

1  BY MR. CONNOLLY:

2  Q    WOULD YOU DESCRIBE WHAT THE SUBSTANCE WAS THAT YOU SAW?

3  A    IT WAS A WHITE, HARD, FLAKY TYPE ROCK.

4  Q    AND BASED UPON YOUR --

5  A    USE.

6  Q    -- USE OF COCAINE, ARE YOU FAMILIAR WITH COCAINE?

7  A    YES, SIR.

8  Q    AND DURING THIS PERIOD OF TIME, DID YOU USE IT?

9  A    YES, SIR.

10 Q    DID YOU KNOW WHAT IT LOOKED LIKE?

11 A    YES, SIR.

12 Q    DID YOU KNOW WHAT IT TASTED LIKE?

13 A    YES, SIR.

14 Q    DID YOU KNOW WHAT IT SMELLED LIKE?

15 A    YES, SIR.

16 Q    OKAY.  BASED UPON YOUR OBSERVATIONS, DO YOU HAVE AN

17 OPINION WHETHER OR NOT THIS WAS COCAINE?

18       MR. STOLAR:  OBJECTION, YOUR HONOR.

19       THE COURT:  WELL, LET'S FIND OUT IF HE TASTED IT,

20 OR IF HE SMELLED IT.

21       THE WITNESS:  AFTER WE UNLOADED THE VEHICLE, THERE

22 WAS ALWAYS SOME THAT SPILLED IN THERE, AND MR. DRUMMOND TOLD

23 US WE COULD HAVE IT.  SO WE DID DIVIDE IT UP.  IT WAS --

24 THERE WAS A LOT OF RED DUST AND CLAY FROM THE ROAD TRIP WE

25 TOOK, BUT IT WAS COCAINE.  IT WAS PURE.

000042

36

1    BY MR. CONNOLLY:

2    Q    OKAY.  SO YOU TESTED IT?

3    A    YES, SIR.

4    Q    OKAY.  NOW, WHO ACCOMPANIED YOU ON THE TRIP TO

5    CALIFORNIA?

6    A    UH --

7    Q    IF YOU RECALL?

8    A    IT WAS MR. BLANCHETTE DROVE WITH ME.  I DROVE THE TRUCK

9    TO BLYTHE, CALIFORNIA.

10   Q    AND WHERE IS BLYTHE, CALIFORNIA?

11   A    IT'S JUST ACROSS THE BORDER FROM ARIZONA TO CALIFORNIA.

12   IT IS ON THE CALIFORNIA SIDE.

13   Q    OKAY.  AND WHAT HAPPENED IN BLYTHE?

14   A    IN BLYTHE, WE STOPPED TO GET FUEL AND SOMETHING TO EAT.

15   AND MR. DRUMMOND THEN ASKED ME TO DRIVE THE MOTOR HOME.  HIM

16   AND ANDREA WERE GOING TO GO TO BED IN THE BACK.

17   MR. KROGSLUND WAS TIRED, AND I TOLD THEM I WAS STILL AWAKE.

18   SO I DROVE THE MOTOR HOME WITH MR. KROGSLUND NEXT TO ME, AND

19   JEFFREY BLANCHETTE DROVE THE PICKUP THE REST OF THE WAY.

20   Q    OKAY.  AND WHERE DID YOU GO ONCE YOU ARRIVED IN

21   CALIFORNIA?

22   A    WE WENT TO MR. KROGSLUND'S HOUSE IN GARDEN GROVE.

23   Q    AND THAT IS IN ORANGE COUNTY?

24   A    YES, SIR.

25   Q    AND DID THE OTHER VEHICLE ALSO GO TO MR. KROGSLUND'S

*42a*

37

1  HOUSE?

2  A    YES, SIR.

3  Q    AND WHAT HAPPENED ONCE YOU ARRIVED AT MR. KROGSLUND'S

4  HOUSE?

5  A    ONCE WE ARRIVED THERE, WE LOCKED THE VEHICLES UP,

6  BACKED THE MOTOR HOME BACK INTO ITS PARKING PLACE, AND WENT

7  INTO THE HOUSE, WAITED FOR MR. KROGSLUND'S WIFE TO GO PICK

8  UP HIS DAUGHTER AT SCHOOL SO SHE DIDN'T KNOW WHAT WAS GOING

9  ON.  AND THEN WE UNLOADED THE MOTOR HOME BACK TO THE PICKUP

10  AND LOCKED IT UP, AND I WENT HOME.

11  Q    AND WHERE WERE YOU LIVING AT THAT TIME THEN?

12  A    APPROXIMATELY FIVE MILES AWAY.

13  Q    DID YOU EVER SEE THAT LOAD OF COCAINE AGAIN?

14  A    NO, I DIDN'T.

15  Q    NO?

16  A    NO.

17  Q    OKAY.  DID YOU RECEIVE PAYMENT FOR YOUR SERVICES?

18  A    ABOUT A WEEK LATER I DID.

19  Q    WHO PAID YOU?

20  A    MR. KROGSLUND PAID ME THAT TIME.

21  Q    AND HOW MUCH WAS GIVEN TO YOU?

22  A    FIVE THOUSAND DOLLARS.

23  Q    DID YOU HAVE OCCASION AFTER THAT FIRST LOAD TO AGAIN GO

24  ON ANOTHER LOAD, THE SECOND LOAD?

25  A    YES, I DID.

42b

38

1    Q    AND APPROXIMATELY HOW LONG WAS THAT AFTER?

2    A    APPROXIMATELY A WEEK TO TEN DAYS.

3    Q    AND WHO ACCOMPANIED YOU ON THAT LOAD?

4    A    IT WAS THE SAME PEOPLE AS THE FIRST LOAD.

5    Q    AND DID YOU AGAIN GO UP TO YOUNG?

6    A    YES, SIR.

7    Q    NOW, PRIOR TO GOING UP TO YOUNG ON THIS SECOND TRIP,

8    DID YOU STOP SOMEPLACE?

9    A    EVERY TRIP WE TAKE, USUALLY STOPPED AT A -- THIS LITTLE

10   TOWN OUT OF PAYSON, CALLED STAR VALLEY, AND GAS UP SO WE'D

11   KNOW WE HAD ENOUGH FUEL TO MAKE IT BACK.

12   Q    OKAY.  DID YOU EVER HAVE OCCASION TO STOP AT A

13   DEPARTMENT STORE TO MAKE SOME PURCHASES?

14   A    YES, SIR.  WE STOPPED --

15   Q    AND WHEN WAS THAT?

16   A    EITHER THE SECOND OR THE THIRD LOAD, WE STOPPED AT A

17   "CIRCLE" -- I MEAN, A "YELLOW FRONT" AND PURCHASED FISHING

18   POLES, SLEEPING BAGS, SOME CAMPING EQUIPMENT, JUST TO MAKE

19   IT LOOK LIKE WE'RE ON A FISHING TRIP.  THIS ONE TIME WE HAD

20   TO WAIT OVERNIGHT AND IT GOT PRETTY COLD UP THERE.  SO WE

21   GOT SLEEPING BAGS AND OTHER STUFF.

22   Q    AND WAS THE MONEY USED TO PURCHASE THE CAMPING

23   EQUIPMENT SUPPLIED BY ANYONE?

24   A    BY MR. DRUMMOND.

25   Q    WAS THAT PRIOR TO THE TRIP?

42C

39

1   A    YES, SIR.

2   Q    OKAY.  AND ONCE YOU ARRIVED UP THERE, ON THAT SECOND

3   LOAD, WHAT HAPPENED?

4   A    ON THE SECOND LOAD, WE CAMPED OUT IN THE SAME AREA.  I

5   CAN'T REMEMBER IF THE PLANE CAME IN RIGHT AWAY OR WE WAITED

6   A WHILE.  THE SAME SIGNAL CAME OVER, AND WE DID THE SAME

7   EXACT SAME THING.

8   Q    SAME TYPE OF PLANE?

9   A    YES, SIR.

10  Q    WERE ANY ITEMS GIVEN BY MR. KROGSLUND TO THE CREW ON

11  THAT TRIP?

12  A    ON THE SECOND LOAD?

13  Q    YES.

14  A    NO, SIR.

15  Q    OKAY.  AND WHAT DID YOU DO WITH THE CARGO THAT WAS

16  OFF-LOADED OFF THE PLANE THE SECOND TIME?

17  A    WE TOOK IT BACK TO MR. DRUMMOND'S PLACE AT CAREFREE.

18  Q    AND WHAT HAPPENED TO IT THERE?

19  A    THE SECOND LOAD, WE GOT THERE, MR. DRUMMOND WAS THERE.

20  HE TOLD US JUST LOCK IT UP, LEAVE IT, I'LL TAKE YOU GUYS

21  BACK TO THE AIRPORT.  AND HE FLEW US -- TOOK US BACK TO SKY

22  HARBOR, BOUGHT US PLANE TICKETS, AND WE FLEW HOME.

23  Q    NOW, THE VEHICLES THAT WERE USED ON THESE TRIPS, WHOM

24  DID THEY BELONG TO?

25  A    THE FIRST TWO TRIPS, THE VEHICLES BELONGED TO -- THE

42a

40

1   TRUCK WAS MR. DRUMMOND'S.  IT WAS A BLUE SILVERADO PICKUP

2   TRUCK WITH A CAMPER.  THE EL CAMINO BELONGED TO MONTE EARLS.

3   AND THERE WAS A LITTLE TOYOTA PICKUP WITH A CAMPER THAT

4   BELONGED TO EITHER EDDIE OR JEFFREY BLANCHETTE.

5   Q    OKAY.  NOW, ON THE OTHER TRIPS, THE OTHER THREE TRIPS,

6   WERE OTHER TRUCKS USED?

7   A    YES, THERE WAS.  WE SOMETIMES PURCHASED -- NOT

8   PURCHASED, BUT RENTED VEHICLES FROM EITHER "COURTESY" OR

9   "BUDGET" RENTAL BY THE AIRPORT.

10  Q    THAT'S BY THE PHOENIX AIRPORT?

11  A    YES, SIR.  AND THEN MR. DRUMMOND LATER BOUGHT SOME

12  VEHICLES, PURCHASED SOME VEHICLES FOR US TO USE.

13  Q    AND FROM TIME TO TIME YOU WOULD STAY AT HOTELS IN

14  PHOENIX; IS THAT CORRECT?

15  A    YES, SIR.

16  Q    AND WHAT HOTELS DID YOU STAY AT?

17  A    WE STAYED AT THE "KONTIKI" MOSTLY.  AND THEN AT THE

18  LAST TRIP I STAYED, OR WE STAYED AT THE -- I BELIEVE IT WAS

19  THE "ARIZONA 8" OR "MOTEL 8" ON SCOTTSDALE BOULEVARD.

20  Q    OKAY.  NOW, LOAD NUMBER THREE, HOW WERE YOU NOTIFIED TO

21  PARTICIPATE IN THAT LOAD?

22  A    IT WAS THE SAME.  WE'D RECEIVE A PHONE CALL FROM

23  MR. DRUMMOND -- MR. KROGSLUND WOULD.  HE WOULD GET IN

24  CONTACT WITH US.  I BELIEVE BY THIS TIME WE HAD BEEPERS NOW

25  BECAUSE MR. DRUMMOND WAS -- DIDN'T WANT US MISSING OUT OR

41

1    NOTHING, YOU KNOW, MISSING OUR TIME SCHEDULE AND STUFF; SO

2    HE GOT US BEEPERS.

3    Q    OKAY.  HOW WOULD THE BEEPERS WORK?

4    A    THEY WERE -- I DON'T KNOW IF THEY'RE VOICE ACTIVATED OR

5    IF THEY WERE A PUNCH IN YOUR NUMBER.  I BELIEVE THEY WERE

6    VOICE ACTIVATED.  THEY WERE JUST -- IT WOULD GO OFF, AND

7    THEN THERE'D BE A SHORT MESSAGE LIKE "GIVE BOB A CALL."

8    Q    AND THAT WAS HOW YOU KNEW THE NEXT LOAD WAS COMING IN?

9    A    YES, SIR.  THAT'S HOW I KNEW TO GET A HOLD OF

10   MR. KROGSLUND, AND HE'D TELL US, YEAH, WE HAD TO BE AT THE

11   AIRPORT IN A HALF HOUR, TO GET OVER HERE.

12   Q    OKAY.  NOW, ON THIS THIRD LOAD, WHO PARTICIPATED IN

13   THIS?

14   A    IT WAS THE SAME PEOPLE:  MR. KROGSLUND, MYSELF, MONTE

15   EARLS, AND THE TWO BLANCHETTE BROTHERS.

16   Q    OKAY.  NOW, DID THERE COME A TIME WHEN YOU WENT UP AND

17   ACTUALLY STARTED WORKING AND LIVING IN ARIZONA DURING THE

18   SUMMER?

19   A    YES, SIR, WHEN WE WERE FIXING HIS HOUSE UP.

20   Q    NOW, WHEN THE THIRD LOAD HAPPENED, WERE YOU LIVING IN

21   CALIFORNIA OR IN ARIZONA AT THAT TIME?

22   A    I ALWAYS LIVED IN CALIFORNIA.  THERE CAME A TIME WHEN I

23   WAS STAYING THERE AT MR. DRUMMOND'S PLACE.

24   Q    DO YOU RECALL WHERE YOU WERE ON THE THIRD LOAD?

25   WHETHER YOU WERE STAYING IN CALIFORNIA OR STAYING IN

42

1   ARIZONA?

2   A    NO.  I DON'T REALLY RECALL.

3   Q    OKAY.  NOW, WHAT HAPPENED ON THE THIRD LOAD?  DID THE

4   PLANE COME IN?

5   A    YES, SIR.

6   Q    AND WOULD YOU DESCRIBE THE PLANE?

7   A    ON THE THIRD LOAD, THE PLANE WAS -- EXCUSE ME.  IT WAS

8   A WHITE WITH THE RED AND BLACK STRIPES.

9   Q    OKAY.  AND WHAT HAPPENED ONCE IT LANDED?

10  A    THE PLANE LANDED THE SAME WAY, AND WE BACKED THE TRUCK

11  UP, IT THREW OFF ITS DUFFEL BAGS.  WE LOAD THEM ON THE TRUCK

12  AND WE HEAD BACK TO JOHN'S PLACE.

13  Q    OKAY.  WAS THE CONTENTS OF THE AIRPLANE ALWAYS KEPT IN

14  DUFFEL BAGS, OR WERE THERE OTHER CONTAINERS?

15  A    THEY WERE ALWAYS KEPT IN DUFFEL BAGS, OR ONCE IN A

16  WHILE THERE WOULD BE SOME IN CARDBOARD BOXES.  ON THE LAST

17  TRIP IT WAS ALL SUITCASES.

18  Q    OKAY.  AND ON THE THIRD TRIP, DID YOU HELP TRANSPORT

19  THE STUFF, THE CONTENTS OF THE CARGO BACK TO MR. DRUMMOND'S

20  PROPERTY?

21  A    YES.  I DROVE THE TRUCK BACK TO MR. DRUMMOND'S

22  PROPERTY.

23  Q    OKAY.  AND WHO WAS AT MR. DRUMMOND'S PROPERTY WHEN YOU

24  ARRIVED THERE?

25  A    MR. DRUMMOND AND HIS WIFE ANDREA WERE THERE THIS TIME.

429

43

1   AND THEY HAD A -- A NEW MOTOR HOME.  I REMEMBER MR. DRUMMOND

2   TOLD HIS WIFE ANDREA, WHY DON'T YOU RUN DOWN TO THE STORE

3   AND GET SOME CHICKEN AND SODA AND BEERS, WE'LL HAVE A SHORT

4   BREAK.  WHEN SHE CAME BACK, WE SAT AROUND AND DRANK SOME

5   BEER AND SODA AND EAT SOME CHICKEN AND STUFF, AND

6   MR. DRUMMOND ASKED ME TO BACK THE TRUCK UP TO THE MOTOR HOME

7   AND START UNLOADING IT.  ASKED ME TO TAKE COUNT ON HOW MANY

8   DUFFEL BAGS THERE WAS; SO I DID.

9   Q    OKAY.

10        MR. CONNOLLY:  I WOULD ASK THE CLERK AT THIS TIME

11  TO SHOW THE WITNESS GOVERNMENT EXHIBIT 11, PLEASE.

12        THE CLERK:  GOVERNMENT'S EXHIBIT 11-A AND -B

13  PLACED BEFORE THE WITNESS.

14  BY MR. CONNOLLY:

15  Q    I SHOW YOU WHAT HAS BEEN ADMITTED INTO EVIDENCE AS

16  GOVERNMENT'S EXHIBITS 11-A AND -B AND ASK YOU IF YOU CAN

17  IDENTIFY THOSE.

18  A    IT'S MR. DRUMMOND'S NEW MOTOR HOME HE JUST PURCHASED.

19  Q    AND THOSE ARE PICTURES OF THE MOTOR HOME?

20  A    YES, SIR.

21  Q    OKAY.  AND THEY FAIRLY AND ACCURATELY PORTRAY THE MOTOR

22  HOME AS IT APPEARED THAT SUMMER?

23  A    YES, SIR.

24  Q    OKAY.  DO YOU KNOW WHO OWNED THAT MOTOR HOME?

25  A    MR. DRUMMOND OWNED IT, BUT HE PUT IT IN HIS MOTHER'S

44

1    NAME.

2    Q    OKAY.  DO YOU KNOW WHEN IT WAS PURCHASED?

3    A    IN THE -- I THINK TOWARDS THE MIDDLE OR THE END OF JUNE

4    OF '84.

5    Q    DO YOU KNOW WHAT THE PURPOSE OF THE PURCHASE OF THAT

6    MOTOR HOME WAS?

7    A    TO TRANSPORT THE COCAINE.

8    Q    OKAY.  NOW, WHAT HAPPENED TO THE CONTENTS OF THE CARGO

9    ON THE THIRD TRIP AFTER YOU ARRIVED BACK AT MR. DRUMMOND'S?

10   A    WE LOADED IT INTO THE MOTOR HOME, AND MR. DRUMMOND AND

11   HIS WIFE ANDREA THEN DROVE IT TO CALIFORNIA.

12   Q    OKAY.  WERE YOU PRESENT WITH THEM ON THE TRIP?

13   A    NO, I WASN'T.

14   Q    DO YOU KNOW, ONCE THE CARGO WAS RECEIVED IN CALIFORNIA,

15   WHERE OR TO WHOM MR. DRUMMOND DELIVERED IT?

16   A    NO, I DON'T.  HE TOLD ME IT'S SOMEWHERE IN L.A.

17   Q    DID HE EVER TELL YOU TO WHOM HE DELIVERED IT?

18   A    NO, HE DIDN'T.

19   Q    OKAY.  NOW, DID THERE COME A TIME ON EITHER THE THIRD

20   OR THE FOURTH LOAD THAT YOU WERE INVOLVED IN WHERE YOU MET

21   JACK AND JACKIE HUNT?

22   A    YES, SIR.  THE --

23   Q    EXCUSE ME, WHO ARE JACK AND JACKIE HUNT?

24   A    THAT IS ANDREA'S PARENTS, MR. DRUMMOND'S WIFE'S

25   PARENTS.

A21

45

1   Q    SO MR. DRUMMOND'S IN-LAWS?

2   A    YES, SIR.

3   Q    AND WHERE DID YOU MEET THEM?

4   A    I MET THEM AT THEIR HOUSE IN PHOENIX A COUPLE OF TIMES,

5   AND THEN ONE TIME, I DON'T KNOW WHICH LOAD OR -- I'M NOT

6   SURE IF A LOAD CAME IN THIS TIME, WE MET THEM UP AT YOUNG

7   AIRFIELD.  WE WERE LATE GETTING THERE, AND MR. DRUMMOND SENT

8   THEM UP THERE TO UNLOAD THE PLANE IF IT CAME IN.

9   Q    HOW OLD ARE THESE PEOPLE?  OR HOW OLD WERE THEY THEN?

10  A    IN THEIR 50s OR 60s.

11  Q    AND UPON YOUR ARRIVAL AT THE YOUNG AIRFIELD, WHAT DID

12  THEY DO?

13  A    WHAT DID THEY DO?

14  Q    YES, JACK AND JACKIE HUNT.

15  A    I DON'T KNOW WHAT THEY DID.  I WASN'T THERE.

16  Q    AFTER YOU WERE THERE -- WHEN YOU SAW THEM UP AT THE

17  YOUNG AIRFIELD THE ONE TIME.

18  A    THEY WERE WAITING THERE FOR THE PLANE TO COME IN.  THEY

19  JUST SAID, THANK GOD IT DIDN'T COME IN.  WE WOULDN'T KNOW

20  WHAT TO DO WITH IT.

21  Q    AND AFTER YOU ARRIVED, DID THEY STAY THERE UNTIL THE

22  PLANE ARRIVED?

23  A    NO, THEY TOOK OFF.

24  Q    OKAY.  NOW, DID YOU EVER SEE THEM AT JOHN DRUMMOND'S

25  CAREFREE PROPERTY AT THE SAME TIME A LOAD WAS THERE?

A2j

46

1   A    YES.  WHEN THE FOURTH LOAD CAME IN, WE LOADED IT INTO

2   THE NEW MOTOR HOME AGAIN, AND ABOUT A HALF HOUR AFTER THAT,

3   THEY SHOWED UP TO DRIVE THE TRUCK -- TO DRIVE THE MOTOR

4   HOME.

5   Q    AND WHEN WOULD YOU ESTIMATE THAT HAPPENED?

6   A    WHEN WOULD I ESTIMATE THAT HAPPENED?

7   Q    THE TIME PERIOD.

8   A    IT WOULD BE THE FOURTH LOAD, AROUND THE 1ST OF JULY,

9   FIRST WEEK IN JULY.

10  Q    OKAY.  AND DO YOU KNOW, DID THEY DRIVE AWAY WITH THE

11  MOTOR HOME?

12  A    YES, SIR.

13  Q    WAS ANYBODY ELSE IN THE MOTOR HOME WITH THEM?

14  A    NO, THERE WASN'T.

15  Q    OKAY.  NOW, AFTER EACH LOAD OF THE FIRST FOUR LOADS YOU

16  PARTICIPATED IN, WERE YOU PAID?

17  A    WAS I PAID FOR THE OTHER?

18  Q    PAID, YES.

19  A    YES, I WAS PAID.  USUALLY A WEEK LATE.

20  Q    AND WERE YOU ALWAYS PAID $5,000?

21  A    YES, SIR.

22  Q    AND WHO PAID YOU?

23  A    EITHER MR. KROGSLUND OR MR. DRUMMOND HIMSELF.

24  Q    OKAY.  NOW, THE FOURTH LOAD THAT CAME IN WAS THE SAME

25  PLANE THAT WAS USED IN THE FIRST THREE LOADS, OR THE SIMILAR

47

1  PLANE TO THE FIRST THREE LOADS USED?

2  A    IT WAS THE SAME EXACT TYPE, BUT THE PAINT WAS DIFFERENT

3  -- DIFFERENT PAINT.  IT COULD HAVE BEEN A DIFFERENT PLANE OR

4  A PAINTED PLANE.

5            MR. CONNOLLY:  AT THIS TIME I WOULD ASK THE CLERK

6  TO SHOW THE WITNESS GOVERNMENT EXHIBIT 2 FOR IDENTIFICATION.

7            THE CLERK:  GOVERNMENT'S EXHIBIT 2 PLACED BEFORE

8  THE WITNESS.

9  BY MR. CONNOLLY:

10 Q    OKAY.  I ASK YOU TO LOOK AT GOVERNMENT EXHIBIT 2 FOR

11 IDENTIFICATION AND TELL ME IF YOU CAN IDENTIFY THAT.

12 A    IT LOOKS LIKE THE SAME PLANE, SAME COLORS.

13 Q    EXCUSE ME?

14 A    SAME COLORS, SAME TYPE PLANE.

15 Q    SAME COLORS, SAME TYPE PLANE?

16 A    THAT'S RIGHT.

17 Q    HOW ABOUT THE TAIL NUMBER?

18 A    LIKE I SAY, I DIDN'T REMEMBER THEM.  SO I DON'T KNOW.

19 Q    SO YOU CAN'T TELL WHETHER THAT'S THE EXACT SAME PLANE;

20 IS THAT CORRECT?

21 A    NO, I CAN'T.

22 Q    CAN YOU TELL US HOW THAT PICTURE COMPARES TO THE PLANE

23 THAT YOU SAW?

24 A    HOW IT COMPARES?

25 Q    YES.

48

1    A    IT LOOKS EXACTLY LIKE THE SAME TYPE PLANE.

2    Q    THE SAME TYPE PLANE.  OKAY.  NOW, DID YOU EVER SEE THAT

3    PLANE AGAIN AFTER THE FOURTH LOAD?

4    A    ON THE FIFTH LOAD.

5    Q    WHO PARTICIPATED IN THE FOURTH LOAD, UNLOADING?

6    A    THE FOURT LOAD, IT WAS THE SAME PEOPLE:  MR. KROGSLUND,

7    MYSEL, MR. EARLS AND THE TWO BLANCHETTE BROTHERS.

8    Q    OKAY.  NOW, YOU HAVE A BROTHER-IN-LAW BY THE NAME OF

9    RIDENHOUR; IS THAT CORRECT?

10    A    YES, SIR.

11    Q    AND WHEN DID YOU MEET HIM?

12    A    WHEN DID I MEET MR. RIDENHOUR?

13    Q    YES.

14    A    I BELIEVE IT WAS IN THE LATER PART OF '83, NOVEMBER.

15    Q    DID YOU TESTIFY EARLIER THAT IT WAS 1979?

16    A    YES, BUT I WAS MISTAKEN.

17    Q    OKAY.  NOW, HAVE YOU MORE OR LESS FOR THE LAST SIX

18    YEARS LIVED WITH MR. RIDENHOUR AND HIS SISTER?

19    A    YES, SIR.  NO.  HE HAS LIVED WITH ME.

20    Q    HE HAS LIVED WITH YOU?

21    A    YES, SIR.

22    Q    AND IN ADDITION TO BEING YOUR BROTHER-IN-LAW, HE IS A

23    FRIEND OF YOURS; IS THAT CORRECT?

24    A    HE IS A FRIEND AND WE WORK TOGETHER A LOT.

25    Q    HE IS ALSO A CARPENTER?

49

1   A    YES, SIR.

2   Q    ARE YOU PRESENTLY EMPLOYED NOW?

3   A    YES, I AM.

4   Q    NOW, IN THIS FIFTH LOAD, HOW WERE YOU NOTIFIED TO GO UP

5  TO YOUNG?

6   A    MR. EARLS AND I WENT CAMPING THAT WEEKEND.  AND WE JUST

7  GOT BACK, AND MY NEIGHBOR CAME OVER TO ME AND SAID, BOB

8  CALLED YOU, HE WANTS YOU TO GIVE HIM A CALL AS SOON AS YOU

9  GET BACK.  SO I WENT AND USED HER PHONE AND GAVE

10  MR. KROGSLUND A CALL BACK.  HIS WIFE DARLENE ANSWERED AND

11  SAID HE WENT TO PHOENIX A COUPLE OF DAYS AGO.  AND I SAID,

12  OKAY, THANKS.

13       I THEN CALLED MR. DRUMMOND ON HIS BEEPER.  AND HE

14  RETURNED MY CALL AND I TOLD HIM WE HAD BEEN CAMPING, WE JUST

15  GOT BACK, DID HE WANT US TO COME OVER.  HE SAID, NO, WE HAVE

16  IT HANDLED RIGHT NOW.  AND I TOLD HIM WE'VE BEEN WAITING AND

17  WAITING FOR THIS; IT FINALLY COMES IN, AND WE'RE GONE.  HE

18  SAID, ALL RIGHT, COME ON OVER, WE CAN PROBABLY USE YOU,

19  HURRY UP.  WHEN YOU GET TO THE AIRPORT IN PHOENIX, GIVE ME A

20  CALL AGAIN ON THE BEEPER.

21       SO ME AND MR. EARLS GOT THE PLANE OUT OF ORANGE

22  COUNTY AND FLEW OVER THERE.  WE GOT THERE, WE BEEPED HIM.

23  MR. DRUMMOND TOLD US, STAY THERE, I'LL SEND JEFFREY OVER,

24  HE'LL SHOW YOU WHERE WE'RE AT.  JEFFREY SHOWED UP AND HE

25  TOLD ME, YOU'RE SUPPOSED TO GO RENT A VEHICLE AND WE WERE TO

50

1 MEET AT THE "MOTEL 8" OR "ARIZONA 8" ON SCOTTSDALE.

2 　　　MR. EARLS AND MR. BLANCHETTE THEN WENT AHEAD AND

3 PROCEEDED TO GO THERE. AND I DIDN'T KOW MY WAY AROUND VERY

4 WELL, SO I HAD TO CALL MR. DRUMMOND BACK UP AGAIN AND ASK

5 HIM FOR DIRECTIONS. HE TOLD ME HOW TO GET THERE. HE SAID,

6 STAY THERE, WHEN YOU GET THERE, STAY THERE. I'LL BE THERE

7 IN A LITTLE WHILE. I WANT TO TALK TO YOU GUYS.

8 　　　WE WENT THERE AND FOUND MR. KROGSLUND THERE, AND I

9 WENT TO HIS ROOM, AND HE SAID JOHN IS ON HIS WAY, STICK

10 AROUND. THEN MR. DRUMMOND SHOWED UP. HE HAD A LITTLE PEP

11 TALK FOR US, LIKE. HE SAID, THE MEXICANS WERE COMPLAINING

12 BECAUSE WE'RE TAKING TOO LONG IN LOADING THE PLANE AND

13 THEY'RE NOT GETTING AWAY AS FAST AS THEY WANT TO. AND HE

14 SAID, JUST BE CAREFUL, WE'VE BEEN DOING THIS TOO MANY TIMES,

15 AND AFTER THIS LOAD, WE'RE GOING TO SLOW IT DOWN A BIT. AND

16 HE SAID, THAT'S ABOUT IT.

17 　　　SO AFTER THAT, I TOLD BOB I'M GOING TO GO SEE MY

18 GIRL FRIEND THAT WAS RON'S SISTER. AND I HEADED OVER THERE.

19 AND BOB SAID, BE BACK BY THREE BECAUSE WE'VE GOT TO HEAD UP

20 THERE, GOT TO LEAVE HERE AT THREE. I SAID, OKAY. BUT I RAN

21 A LITTLE BIT LATE; I GOT BACK ABOUT 3:30 AND THEIR WAKE-UP

22 CALL NEVER DID COME. SO I WOKE THEM ALL UP AND SAID, I

23 THOUGHT WE WERE SUPPOSED TO BE UP THERE. AND HE SAID, YEAH,

24 WHAT TIME IS IT? I SAID, ABOUT 3:30. SO HE SAID, LET'S GET

25 GOING. SO WE ALL GOT IN OUR VEHICLES AND HEADED UP THERE.

A20

51

1    Q    OKAY.  NOW, HOW MANY VEHICLES WENT UP THERE THAT TIME?

2    A    THAT TIME IT WAS FOUR VEHICLES.

3    Q    AND IS THIS 3:30 A.M.?

4    A    YES, SIR.

5    Q    ON AUGUST 14TH, 1984?

6    A    YES, SIR.

7    Q    AND WHAT TIME DID YOU ARRIVE AT YOUNG?

8    A    IT WAS ABOUT 6:30.

9    Q    DID THERE COME A TIME WHEN THE PLANE CAME IN?

10   A    THE PLANE CAME IN ABOUT BETWEEN NINE AND TEN.

11   Q    OKAY.  AND WHAT POSITION WERE YOU TO DO ON THE GROUND?

12   WHAT WAS YOUR JOB SUPPOSED TO BE?

13   A    IT WAS THE SAME, TO UNLOAD THE AIRCRAFT.  I WAS THE

14   DRIVER OF THE VEHICLE THAT UNLOADED THE AIRCRAFT.

15   Q    AND WHAT ABOUT THE OTHER VEHICLES THAT WERE UP THERE,

16   WHAT WERE THEY SUPPOSED TO DO?

17   A    MR. EARLS HAD BLOCKED THE ROAD FROM YOUNG AGAIN.

18   MR. JEFFREY BLANCHETTE WOULD BLOCK THE ROAD FROM THE HAGLER

19   CREEK AREA.  AND BOB, MR. RIDENHOUR, WAS WITH US; HE WAS TO

20   BE A ROVER GOING BETWEEN.

21   Q    OKAY.  SO WHEN THE PLANE ARRIVED, WHICH PLANE WAS IT?

22   OR DESCRIBE THE PLANE FOR US.

23   A    IT WAS THIS LAST AIRPLANE, THAT TYPE.

24   Q    THAT TYPE?

25   A    THAT TYPE AND COLOR.

A2P

52

Q    WHAT HAPPENED WHEN THE PLANE LANDED?

A    IT LANDED, I FOLLOWED IT DOWN IN AND BACKED UP INTO IT AS USUAL.  THIS TIME THERE WAS THREE LATIN AMERICANS ABOARD, AND THEY STARTED THROWING OUT SUITCASES THIS TIME INSTEAD OF DUFFEL BAGS.  SO WE LOADED ALL OF THEM UP, AND THEY THREW OUT SOME CARDBOARD BOXES THAT HAD SOME PACKAGES AND STUFF IN IT, TOO.  WE LOADED THEM ABOARD TOO, AND THIS TIME I JUST DECIDED TO LOCK THE CAMPER.  SO I LOCKED THE CAMPER AND JUMPED BACK IN THE TRUCK.

THE PLANE WOULDN'T TAKE OFF, SO I PULLED OUT IN FRONT OF IT AND TOOK OFF, AND THE PLANE LEFT SHORTLY AFTER THAT.

Q    OKAY.  NOW, DID YOU GET A CHANCE TO LOOK AT THE CREW ON THE FIFTH TRIP, FIFTH LOAD?

A    YES.

Q    DID YOU GET A CHANCE TO LOOK AT THE CREW ON THE OTHER LOADS?

A    ALL THE LOADS.

Q    OKAY.  NOW, WERE ANY OF THE INDIVIDUALS THE SAME ON ANY OF THESE LOADS, AS FAR AS CREW MEMBERS?

A    ONE PARTICULAR PERSON WAS THE SAME ON ALL THE LOADS.  I COULDN'T REALLY SAY ABOUT THE OTHER TWO PEOPLE.

Q    AND WHO WAS THAT?

A    IT WAS A LATIN AMERICAN, BALDING, HEAVY IN WEIGHT, SORT OF STOCKY.  HE WAS THE PILOT EACH TIME.

429

53

1    Q    OKAY.  TALL OR SHORT?

2    A    HE WAS SHORT.

3    Q    APPROXIMATELY HOW OLD, IF YOU RECALL?

4    A    OH, I WOULD SAY LATE 30s.

5    Q    OKAY.  NOW, HOW ABOUT THE OTHER MEMBERS OF THE CREW,

6    WERE THEY THE SAME OR DIFFERENT?

7    A    I REALLY COULDN'T TELL YOU ON THAT.

8    Q    OKAY.  NOW, WHEN DID YOU REALIZE ON THE FIFTH LOAD THAT

9    YOU HAD PROBLEMS?

10   A    THAT WE HAD PROBLEMS?  AFTER WE TOOK OFF, FIRST OF ALL,

11   WE NOTICED WE COULDN'T GO BACK THE SAME ROUTE BECAUSE WE

12   READ IN THE PAPER AND THEY HAD SIGNS PUT UP THAT THE ROAD

13   WAS CLOSED FROM YOUNG TO PAYSON WAY.  THEY WERE WORKING ON

14   THE ROAD.  WE HAD TO GO THROUGH YOUNG, WHICH WAS A COMPLETE

15   NEW EXPERIENCE FOR US.  AS WE REACHED THE OTHER SIDE OF

16   YOUNG, WE DROPPED OFF MR. BLANCHETTE, EDDIE BLANCHETTE.  HE

17   WAS TO MAKE A PHONE CALL TO MR. DRUMMOND, AND JEFFREY WOULD

18   PICK HIM UP IN TOWN.

19              AND JUST AS WE REACHED THE OTHER SIDE OF TOWN,

20   MR. RIDENHOUR INFORMED ME THAT JEFFREY LED A CAR THROUGH THE

21   ROADBLOCK AGAIN AND THAT HE -- THAT THE PERSON HAD PULLED A

22   WEAPON ON MR. RIDENHOUR AND TOLD HIM TO MOVE OUT OF THE WAY

23   OR HE'D SHOOT HIM.

24   Q    OKAY.  NOW, WHAT WAS THE PURPOSE OF THE BLANCHETTE BOY

25   GETTING OFF -- GETTING OUT OF THE VEHICLE TO MAKE A PHONE

54

1   CALL?

2   A    SO THAT THERE WOULDN'T BE THREE OF US RIDING IN THE

3   SAME VEHICLE, PLUS HE WAS TO GIVE A CALL TO MR. DRUMMOND AND

4   TELL HIM THE FISHING WAS ALL RIGHT.  THAT MEANT THE LOAD

5   CAME IN OKAY.

6   Q    AND HAD THIS BEEN DONE ON THE PREVIOUS LOADS THAT YOU

7   WERE INVOLVED IN?

8   A    YES, SIR.  IT WAS EITHER BY MR. EARLS OR BY ONE OF THE

9   BLANCHETTE BROTHERS.

10  Q    AND WAS THE LANGUAGE ALWAYS THE SAME?

11  A    AFTER THE FIRST TRIP IT WAS.  THAT'S WHEN WE PICKED UP

12  THE FISHING GEAR AND STUFF, AND JOHN SAID, OH, THAT'S A GOOD

13  ONE; JUST TELL ME IF THE FISHING IS GOOD OR NOT, I'LL KNOW.

14  Q    YOU'RE TALKING ABOUT JOHN DRUMMOND?

15  A    YES, SIR.

16  Q    HE HAD INSTRUCTED YOU, OR WHOM, TO SAY WHAT?

17  A    HE INSTRUCTED WHOEVER MADE THE PHONE CALL, HE TOLD BOB

18  TO TELL THEM THAT -- JUST HAVE THEM SAY THE FISHING IS GOOD,

19  OR THE FISHING WENT BAD, WEREN'T CATCHING ANYTHING; THEN

20  I'LL KNOW SOMETHING WENT WRONG.  IF YOU SAY THE FISHING IS

21  GOOD, THEN I'LL KNOW THE LOAD CAME IN.

22  Q    OKAY.  NOW, IS THIS THE FIRST LOAD THAT YOUR

23  BROTHER-IN-LAW WORKED ON WITH YOU?

24  A    YES, SIR.

25  Q    OKAY.  NOW, WAS THE BLANCHETTE VEHICLE IN A CONVOY WITH

55

1    THE OTHER VEHICLES WHEN YOU LEFT THE YOUNG AIRPORT?

2    A    REPEAT THAT AGAIN?

3    Q    WAS THE BLANCHETTE VEHICLE WITH THE OTHER THREE

4    VEHICLES WHEN YOU LEFT THE YOUNG AIRPORT?

5    A    NO.   IT WAS -- HE WAS -- HE WAS DOING HIS ROADBLOCKS

6    ABOUT TWO OR THREE MILES DOWN THE ROAD.

7    Q    OKAY.   DID HE CATCH UP WITH YOU EVENTUALLY?

8    A    AFTER WE'D BEEN STOPPED AT A ROADBLOCK BY THE POLICE,

9    ABOUT AN HOUR LATER HE DROVE THROUGH.

10   Q    AND DID HE DRIVE BY?

11   A    YES, SIR.

12   Q    AND WHICH BLANCHETTE WAS DRIVING?

13   A    I BELIEVE IT WAS -- I DON'T REMEMBER WHICH ONE WAS

14   DRIVING.

15   Q    DID YOU DETERMINE LATER HOW -- WHAT JEFFREY BLANCHETTE

16   AND EDDIE BLANCHETTE DID TO ESCAPE FROM ARREST THAT DAY?

17   A    THE WAY THEY ESCAPED IS, THEY CAME THROUGH AN HOUR

18   LATER, WHICH NOBODY ELSE WAS EXPECTING THEM, I GUESS.   AND

19   THEN AFTER I GOT OUT ON BAIL, I TALKED TO JEFFREY AND HE

20   SAID, YES --

21            MR. STOLAR:  OBJECTION.

22            THE COURT:  SUSTAINED.

23   BY MR. CONNOLLY:

24   Q    WHEN DID YOU TALK TO JEFFREY BLANCHETTE?

25   A    AFTER I GOT OUT ON BAIL.

72

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )
                                     )
      vs.                            )      Case No.   CR-88-129-WJR
                                     )      AFTERNOON SESSION
JUAN RAMON MATTA,                    )
                                     )      COPY
            Defendant.               )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

FRIDAY, OCTOBER 5, 1990

MARY TUCKER, CSR 9308
Official Court Reporter
429-D U.S. Courthouse
312 North Spring Street
Los Angeles, Calif. 90012
213/687-0530

000043

76

1    LOS ANGELES, CALIFORNIA; FRIDAY, OCTOBER 5, 1990, 1:30 P.M.

2        (The following proceedings were had

3            in the presence of the jury).

4            THE COURT:  All right.  You may call your next

5    witness, Mr. Kenety.

6            MR. KENETY:  United States calls Agent Dan Penrod.

7                DANNY PENROD,

8        having been duly sworn, testified as follows:

9            THE CLERK:  Please state your full name and spell

10    it for the record.

11            THE WITNESS:  Danny Penrod, P-e-n-r-o-d.

12                DIRECT EXAMINATION

13    BY MR. KENETY:

14    Q    Sergeant Penrod, could you identify yourself to the

15    members of the jury and tell them who you are and what you

16    do?

17    A    I'm a Sergeant with the Gila County Sheriff's

18    Department in Arizona.

19    Q    And were you employed by the Gila County Sheriff's

20    office on August 14, 1984?

21    A    Yes.

22    Q    Sergeant, on that day where were you stationed?

23    A    Roosevelt Lake Substation.

24    Q    Using the map that is tacked to the board to your

25    left, could you indicate to the jury where the Roosevelt

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

1      Lake Substation is?

2              THE COURT:  Will you push that back just a little

3      bit so I can see.  Thank you.  That's fine.   All right.

4      You are pointing to what now?

5              THE WITNESS:   Roosevelt Lake Substation.

6              THE COURT:  All right.

7              MR. KENETY:  You may sit down.

8      BY MR. KENETY:

9      Q      Who else was at the substation on that date?

10     A      Sergeant Ted Holeman.

11     Q      Of your own personal knowledge, do you know if

12     Sergeant Ted Holeman received a radio call?

13     A      Yes.

14     Q      And after receiving that radio call did Sergeant

15     Holeman give you any instructions?

16     A      Yes, he did.

17     Q      And in response to those instructions what did you

18     do?

19     A      I got in my vehicle and I proceeded on Highway 88 to

20     288 towards the city, the town of Young, Arizona.

21     Q      Now, could you trace that route with your finger to

22     the members of the jury.

23     A      (Witness complies).

24     Q      Which compass direction were you heading?

25     A      Approximately north.

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

1    Q      And as you were heading north on State Route 288,

2    did you see any vehicles approaching?

3    A      Yes.

4    Q      Do you remember what kind of vehicles they were?

5    A      Pickup trucks and blazers.

6    Q      Sergeant Penrod, what did you do when you observed

7    those vehicle approaching?

8    A      When I observed those vehicles, I turned around on

9    the "A" crossroad and parked my unit right beside the

10   Highway 88 or 288.

11   Q      Sergeant Penrod, could you take the magic marker and

12   indicate with an "A" -- why don't we do it with a "P" --

13   where you stopped.  Could you show the members of the jury

14   where that is in relationship to Young Airport?

15   A      (Indicating).

16   Q      You may sit down again.

17   A      (Witness complies).

18   Q      What did you see, Sergeant Penrod, as you were

19   stopping at the intersection of 288 and the "A" crossroad?

20   A      Three vehicles passed me.

21   Q      Do you remember what those three vehicles were?

22   A      There were two Chevrolet pickup trucks with campers

23   and a Blazer.

24   Q      Do you remember what color the Blazer was?

25   A      White.

FORM LASER BOND A PENGAD/INDY 1-800-531-6989

79

1    Q      As you observed these vehicles what did you do?

2    A      As soon as they went by me I got on the radio and

3    called Sergeant Holeman and told him to come back to

4    Highway 288.

5    Q      What did you do next?

6    A      I proceeded to follow the vehicles.

7    Q      And did the vehicles continue to drive?

8    A      Yes.

9    Q      Did there come a time when they stopped?

10   A      Yes.

11   Q      What did you observe when the vehicles stopped?

12   A      The two vehicles were in one lane, the other vehicle

13   pulled up beside them.  There were subjects outside of the

14   vehicles.

15   Q      Now when you talk about "subjects" in lay language,

16   for all of us who are not law enforcement officers, what do

17   you mean?

18   A      Men.

19   Q      Do you remember how many there were?

20   A      Not at this time.

21   Q      Was there anything in the air at this time?

22   A      Yes, an airplane.

23   Q      Did you know at that time who the airplane belonged

24   to?

25   A      No.

80

1    Q      What, if anything, did the airplane do as the

2    vehicles were stopped along the side of the road?

3    A      The airplane came in very low over the vehicles.

4    Q      What did the vehicles do next?

5    A      They left the area proceeding south on Highway 288.

6    Q      Did you make any further radio calls?

7    A      Yes.

8    Q      To whom was that?

9    A      Sergeant Holeman.

10   Q      And what did you do as the vehicles proceeded

11   southbound?

12   A      I followed them.

13   Q      What happened next?

14   A      As I was following the vehicles by the area, I knew

15   that I was getting close to Sergeant Holeman, so I told him

16   to pick a spot to make a stop.

17   Q      And when you say "pick a spot to make a stop," what

18   exactly do you mean?

19   A      Place in the highway where the vehicles can't go

20   around on either side.

21   Q      Would it be fair to characterize that in lay

22   language as a roadblock?

23   A      Yes.

24   Q      Did you come across this roadblock yourself?

25   A      Yes.

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

1   Q      What did you see when you arrived?

2   A      When I arrived, Sergeant Holeman had his vehicle

3   pulled across the road.  The three vehicles I'd been

4   following were stopped and Sergeant Holeman was ordering

5   men out of the vehicles.

6   Q      How many men did you see get out of the vehicles?

7   A      Four.

8          MR. KENETY:  I ask the clerk, Ms. Dillard, to hand

9   to Sergeant Penrod Govenment's Exhibit 5.

10         THE CLERK:  Government's Exhibit 5 placed before

11  the witness.

12  BY MR. KENETY:

13  Q      Do you recognize those four individuals, Sergeant

14  Penrod?

15  A      Yes, I do.

16  Q      And where do you recognize them from?

17  A      These were the four individuals in the vehicles.

18         THE COURT:  These are photographs of the persons;

19  right?

20         THE WITNESS:  Yes.

21         MR. KENETY:  Thank you, Sergeant Penrod.  I'd ask

22  if Ms. Dillard could give Sergeant Penrod --

23         THE COURT:  Are you offering this into evidence?

24         MR. KENETY:  I was not, Your Honor.  I move this

25  be introduced into evidence.

82

1          THE COURT:  Any objection?

2          MR. STOLAR:  At this time I would have an

3     objection if it were going in.  We have no identification

4     of the individuals.

5          THE COURT:  All right.  Hold it for identification

6     only.  Do you want to ask him any further questions now

7     with that objection?

8          MR. KENETY:  I do plan on introducing it through

9     Major Mills when he returns to the stand.

10          THE COURT:  Very well.

11          MR. KENETY:  Ms. Dillard, could you hand Sergeant

12     Penrod Government's Exhibit 7, I'm sorry, Government's

13     Exhibit 6.

14          THE CLERK:  Government's Exhibit 6 placed before

15     the witness.

16     BY MR. KENETY:

17     Q     At this time do you recognize what has been marked

18     as 6A, 6B, and 6C?

19     A     Yes, I do.

20     Q     Are they familiar to you?

21     A     Yes.

22     Q     Can you tell the Court what they -- can you tell the

23     Court what it is?

24     A     Photograph A is a pickup truck that was proceeding

25     ahead of me and stopped at the roadblock.  Photograph B is

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

1    a Blazer that was stopped at the roadblock.    And

2    photograph C is a Chevrolet pickup that was stopped at the

3    roadblock, pictures of.

4             MR. KENETY:  Your Honor, could I ask the clerk to

5    now --

6             THE COURT:  Are you going to offer this?

7             MR. KENETY:  Not yet, Your Honor.  That would

8    likewise come through Major Mills.  There's an additional

9    photograph on that sheet, 7D.

10            Ms. Dillard, could you hand the Sergeant what has

11   been marked 7 with four photographs.

12            THE CLERK:  Government's Exhibit 7 placed before

13   the witness.

14   BY MR. KENETY:

15   Q    Sergeant Penrod, I ask you to look at what has been

16   marked as 7A and 7B; do you recognize that?

17   A    Yes, I do.

18   Q    Could you tell the Court what it is?

19   A    Photograph A is a picture of the roadblock from

20   behind Sergeant Holeman's truck.  Photograph B is a picture

21   of the roadblock and subjects out of the vehicles in

22   handcuffs at the roadblock.

23   Q    You may put that down.  As you arrived at the

24   roadblock, what did you personally do?

25   A    I parked my vehicle behind a tan Chevrolet pickup

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

84

1    and proceeded to the front of the cab, the door was opened

2    and I looked in the door to see if all the subjects were

3    out of it, and I immediately went to Sergeant Holeman's

4    position where he had four subjects, men, standing off the

5    side of the road.

6    Q    At this time did you observe the air traffic again?

7    A    No.

8    Q    Did anyone else from the Gila County Sheriff's

9    office arrive?

10   A    Yes.  Detective Mills, Byron Mills at that time, and

11   Detective Jim Davis.

12   Q    Did another vehicle at any time pass through this

13   roadblock?

14   A    Yes.

15   Q    What kind of vehicle was that?

16   A    Small Chevrolet Blazer.

17   Q    Was it coming from the north or from the south?

18   A    North.

19   Q    Sergeant Penrod, could you look at what has been

20   marked as Exhibit 6D?

21   A    Yes.

22   Q    Can you identify that?

23   A    That is identical to the small Blazer that went

24   around the roadblock or tried to go around.

25   Q    Did that vehicle successfully go through the

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

1    roadblock?

2    A    Yes.

3    Q    Did it go through by force or was it waived through?

4    A    It was waived through.

5    Q    By whom?

6    A    Sergeant Holeman and Detective Davis.

7    Q    What ultimately happened to the four men?

8    A    Detective Mills and Detective Davis interviewed the

9    men, placed them under arrest and handcuffed them.

10   Q    Where they taken from the scene?

11   A    Yes.

12   Q    Did there come a time when you ever saw inside of

13   the three vehicles?

14   A    Yes.

15   Q    Can you tell the members of the jury how that

16   happened?

17   A    The tan pickup I looked in myself to make sure there

18   was nobody in the cab part of it, and then I opened the

19   back to make sure there was no one hiding in that vehicle.

20        The white Blazer I could see in the forward part

21   of it.  There was no one in there.

22        And the front of the blue and white pickup, I

23   looked in there with Sergeant Holeman and we were checking

24   for other subjects in that vehicle.

25   Q    Could you see in the rear camper part of the blue

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

000053

1    and white pickup?

2    A      No.

3    Q      Why was that?

4    A      The windows were tinted very dark.

5    Q      Did there come a time when that was opened?

6    A      Yes.

7    Q      Were you present?

8    A      Yes.

9    Q      Who opened that blue and white pickup camper?

10   A      Detective Mills.

11   Q      Did you see what was inside?

12   A      Yes.

13   Q      Could you tell the ladies and gentlemen of the jury

14   exactly what you saw inside that vehicle?

15   A      It was completely packed with large suitcases and

16   loose bags, plastic bags, with a white substance in it.

17   Q      How full was the camper?

18   A      It was almost to capacity.

19   Q      The white substance that was in the plastic bag did

20   you see anything imprinted on the bag of the substance?

21   A      All I can remember is an imprint of a llama on the

22   bag.

23   Q      Do you remember what color it was, Sergeant?

24   A      It's been a long time.  I think it was a brown or a

25   gold.

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                    - - -

4      HONORABLE WILLIAM J. REA, JUDGE PRESIDING

5                    - - -

6   UNITED STATES OF AMERICA,      )
                                   )
7           PLAINTIFF,             )
                                   )
8       VS.                        )   NO. CR 88-129-WJR
                                   )
9   JUAN RAMON MATTA-BALLESTEROS,  )
                                   )
10          DEFENDANT.             )
                                   )
    _____)

11

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            LOS ANGELES, CALIFORNIA

17           TUESDAY, DECEMBER 4, 1990

18

19

20

21

22

23              DONNA BOWERS, C.S.R., R.P.R.
                OFFICIAL COURT REPORTER
24              430 UNITED STATES COURTHOUSE
                312 NORTH SPRING STREET
25              LOS ANGELES, CALIFORNIA 90012
                (213) 621-2400

205

1    Q    DO YOU HAVE ANY IDEAS AS TO WHAT THE MOTOR HOME IS

2    GOING TO BE USED TO TRANSPORT?

3    A    NO.  HE JUST SAID THAT HE WANTED TO LIVE IN IT AND

4    TAKE TRIPS WITH ANDREA AT THAT POINT.

5    Q    OKAY.  NOW, LATER ON THAT MONTH DID THERE COME A TIME

6    WHEN YOU WERE AGAIN CALLED BY MR. DRUMMOND AND ASKED TO

7    DRIVE THE MOTOR HOME TO LOS ANGELES, CALIFORNIA?

8    A    YES.  HE CALLED THE HOUSE, AND HE SAID, "I WANT YOU

9    TO COME OVER TO THE FARM" -- AND HE REFERRED TO THE PLACE

10   IN CAREFREE AS "THE FARM."  HE SAID, "I WANT YOU TO GO

11   WITH ME.  I WILL SHOW YOU WHERE I WANT YOU TO DRIVE THE

12   MOTOR HOME TO LATER AND BE SURE THAT YOU KNOW HOW TO GET

13   THERE AND WHAT TO DO.  AND STOP AT KENTUCKY FRIED CHICKEN

14   AND GET ENOUGH FOOD FOR EVERYBODY."

15        AND I DID, AND --

16   Q    DID HE SAY WHO "EVERYBODY" WAS?

17   A    NO.  I JUST -- I PRETTY WELL KNEW, AFTER MEETING

18   EVERYBODY UP AT THE YOUNG AIRSTRIP, WHO HE WAS REFERRING TO.

19   Q    YOU'RE TALKING ABOUT THE FRIENDS AND THE BROTHERS?

20   A    YES.

21   Q    SO WHAT DID YOU DO?

22   A    WE WENT TO KENTUCKY FRIED CHICKEN, AND WE GOT FOOD

23   FOR HIS FRIENDS AND BROTHERS, AND WE WENT OUT TO CAREFREE.

24   AND THERE WASN'T ANYBODY THERE AT THAT POINT.  AND WE

25   WAITED A LITTLE WHILE, AND A PICKUP TRUCK CAME IN.  AND

1    BOB KROGSLAND AND ONE OF THE OTHERS -- I DON'T REMEMBER.

2    JEFF OR EDDIE WAS WITH HIM.  AND THEY COME IN, AND A LITTLE

3    WHILE LATER, MONTY CAME IN WITH SOME OF THE OTHERS.  I

4    CAN'T REMEMBER WHO WAS IN WHAT PICKUP OR WHO WAS WITH WHO,

5    BUT THEY WERE ALL TOGETHER.

6                   AND THEN THEY STARTED UNLOADING DUFFEL BAGS.

7    Q    DO YOU KNOW NOW WHAT THEY WERE UNLOADING?

8    A    NO.  NOT AT THAT POINT EITHER.

9    Q    NOW?

10   A    NOW I KNOW WHAT THEY WERE UNLOADING, YES.

11   Q    AND THE DUFFEL BAGS WERE FILLED WITH WHAT?

12   A    THEY WERE FILLED WITH SMALL BOXES, PACKAGES, VERY

13   SECURELY, TIGHTLY MADE, ABOUT THE SIZE OF WHAT YOUR CHECKS

14   COME IN.  THEY WERE SEALED AND PACKED TIGHTLY IN DUFFEL

15   BAGS.  I DON'T KNOW HOW MANY DUFFEL BAGS, BUT THERE WAS

16   TWO TRUCK LOAD FULLS.

17   Q    AND WHAT DID THE MEN DO WITH THE DUFFEL BAGS?

18   A    PLACED THEM IN THE MOTOR HOME IN THE BEDROOM, IN

19   THE SHOWER, AND OVER THE DRIVER'S AREA, WHERE THERE WAS

20   A BED THAT PULLED DOWN.

21   Q    NOW, AT THIS TIME DID YOU KNOW THAT THE DUFFEL BAGS

22   HAD COME IN THROUGH THE YOUNG AIRPORT?

23   A    YES, YES, FROM THE TALK.  AND I KNEW THAT THIS IS

24   WHERE THEY HAD CAME FROM.

25   Q    AND AT THIS TIME YOU ALSO KNEW THAT THEY WERE HIDING

1    THE DUFFEL BAGS IN THE MOTOR HOME?

2    A    YES.

3    Q    AND DID YOU HAVE AN IDEA AT THAT TIME WHAT WAS IN THE

4    DUFFEL BAGS?

5    A    I THINK I REALLY CLOSED MY EYES TO IT, EXCEPT THIS

6    BANKER AND TRANSFERRING MONEY AND STUFF, BECAUSE IT WAS

7    NEAT, PACKAGED, ABOUT IN THE SHAPE.  AND IN MY MIND I

8    THOUGHT, "WELL, YES, CERTAINLY IT IS ILLEGAL.  IT IS WRONG."

9    BUT YOU KNOW, IF HE'S INTO SOMETHING LIKE THAT WHERE HE'S

10   WORKING WITH BUSINESSMEN, GETTING LARGE SUMS OF MONEY INTO

11   THE UNITED STATES FOR INVESTMENT, I REALLY DIDN'T EVEN

12   QUESTION MYSELF AS TO HOW THOSE PEOPLE MIGHT HAVE GOT THE

13   MONEY OR WHAT THEY WERE SENDING IT BACK TO BUY.  I WAS

14   JUST ACTING.

15   Q    DID YOU SEE ANYBODY OPEN ANY OF THE PACKAGES?

16   A    NOBODY OPENED ANY PACKAGES.

17   Q    DID ANYBODY MENTION THE WORD "COCAINE" IN YOUR

18   PRESENCE?

19   A    NOBODY, NO.

20   Q    WAS THERE ANY SMELL COMING FROM THE PACKAGES?

21   A    THERE WAS NO ODOR.

22   Q    AND WHERE WERE THE DUFFEL BAGS HIDDEN IN THE MOTOR

23   HOME?

24   A    OH, THEY WERE PACKED IN THE BEDROOM IN THE BACK.  IT

25   TOTALLY FILLED THE BACK AREA WHERE THE BED WAS.  AND IN

1   THE SHOWER THERE WAS TWO OR THREE, AND I THINK THERE WAS

2   PROBABLY HALF A DOZEN OVER THE DRIVER'S AREA.  WE PULLED

3   THE CURTAINS SO JUST UPON ENTERING THE MOBILE HOME, IT

4   WOULD NOT BE VISIBLE IF THESE THINGS WERE PACKED IN THERE.

5   Q    AND WAS THIS MOTOR HOME EVENTUALLY DRIVEN TO

6   CALIFORNIA?

7   A    YES, IT WAS, THAT EVENING.

8   Q    AND WHO DROVE IT?

9   A    JOHN DRUMMOND.

10  Q    AND WHO ACCOMPANIED HIM?

11  A    ANDREA WAS WITH HIM, MYSELF, AND MY HUSBAND.

12  Q    AND WHERE WERE YOU PLACED IN THE MOTOR HOME?

13  A    I WAS SITTING IN THE MIDDLE ON A SOFA-TYPE THING.

14  Q    IN OTHER WORDS, YOU WEREN'T IN THE FRONT OF THE

15  MOTOR HOME?

16  A    NO, I WASN'T.

17  Q    AND YOUR HUSBAND WAS WHERE?

18  A    HE WAS SITTING WITH ME.

19  Q    OKAY.  NOW, DID YOU KNOW AT THAT TIME THAT YOU WERE

20  DOING ANYTHING ILLEGAL?

21  A    I ASSUMED I WAS, INDEED, BECAUSE OF THE NERVOUSNESS

22  AND THE FACT THAT IT WAS BEING DONE IN THIS MANNER, YES.

23  Q    AND WHERE DID YOU ARRIVE IN SOUTHERN CALIFORNIA AFTER

24  THE MOTOR HOME WAS DRIVEN HERE?

25  A    WE WENT STRAIGHT TO THE SANDMAN HOTEL IN -- I BELIEVE

1    THAT'S WESTMINSTER.

2           MR. CONNOLLY:  I'M ASKING AT THIS TIME FOR THE

3    CLERK TO PUT IN FRONT OF -- I'M SORRY.  WITHDRAWN.

4    Q    WHO PICKED THE SANDMAN HOTEL?

5    A    JOHN.  HE SEEMED TO KNOW EXACTLY WHERE TO GO.

6    Q    AND DID YOU REGISTER AT THE SANDMAN OR DID JOHN

7    REGISTER?

8    A    JOHN REGISTERED FOR ALL OF US.

9    Q    AND DO YOU KNOW HOW MANY ROOMS WERE OBTAINED?

10   A    WE HAD A ROOM AND THEY HAD A ROOM.

11   Q    NOW, "THEY" IS JOHN AND ANDREA?

12   A    JOHN AND ANDREA.

13   Q    AND HOW LONG DID YOU STAY AT THE SANDMAN HOTEL?

14   A    JUST OVERNIGHT.

15   Q    AND WHERE DID THE MOTOR HOME STAY -- OR WHERE WAS THE

16   MOTOR HOME PLACED WHILE YOU WERE IN THE SANDMAN?

17   A    IN THE PARKING LOT.

18   Q    AND DID YOU SEE WHAT WAS DONE WITH THE MOTOR HOME

19   AFTER YOUR ARRIVAL AT THE SANDMAN?

20   A    NO.  I THINK JOHN TOOK IT AWAY BEFORE WE GOT UP.  I

21   DIDN'T SEE IT THAT MORNING.

22   Q    OKAY.  WHERE DID YOU GO THAT MORNING?

23   A    WE HAD BREAKFAST.  AND I CAN'T REMEMBER WHETHER

24   BOB KROGSLAND CAME OVER THAT MORNING OR NOT, BUT JOHN TOOK

25   US THEN TO THE AIRPORT.  THEY WERE GOING TO GO TO

1    DISNEYLAND, DO SOME THINGS, AND THEY WANTED US TO GO ALSO,

2    BUT WE DECIDED THAT WE WOULD COME BACK TO PHOENIX BECAUSE

3    JOHN HAD BEEN TALKING ABOUT WHEN WE DID GO BACK, TO GO UP

4    NORTH AND LOOK FOR SOME LAND -- WAIT A MINUTE.  SO WE

5    THOUGHT LET'S JUST GO BACK TO PHOENIX.  WE HAD A LITTLE

6    DOG THAT WAS THERE IN THE HOUSE, AND WE DIDN'T WANT TO

7    LEAVE IT LONG.  AND WE'LL GO ON UP NORTH, AND WE'LL LOOK

8    AT SOME OF THE LAND THAT WE HAD SEEN ADVERTISED.

9    Q    NOW, WHAT KIND OF LAND DID JOHN SAY THAT HE WAS

10    LOOKING FOR?

11    A    HE WANTED LAND THAT WAS LARGE ENOUGH TO BUILD AN

12    AIRSTRIP, AND HE WANTED IT SOMEWHERE IN THE YOUNG AREA,

13    BUT THE LAND THAT WE WERE LOOKING AT WAS UP IN THE

14    SHOW LOW, ARIZONA AREA, WHICH IS NORTHEAST OF YOUNG, ABOUT

15    THREE AND A HALF HOURS' DRIVE FROM PHOENIX.

16              AND WE DID LOCATE SOMETHING THAT WAS PRETTY

17    INTERESTING.

18    Q    WHAT DID YOU LOCATE?

19    A    AS I RECALL, IT WAS LIKE ABOUT 40 ACRES OF LAND, AND

20    SOME OF IT WAS FLAT AND HAD BUILDING SITES.  I THINK WHAT

21    WE LOCATED MIGHT NOT HAVE BEEN WHAT HE WAS INTERESTED IN

22    WHEN HE CAME UP LATER.  IT SEEMS LIKE MAYBE THERE WAS

23    ANOTHER PARCEL OF LAND THAT HE LIKED BETTER, MORE FOR HIS

24    NEEDS.

25    Q    OKAY.  NOW, AT HIS DIRECTION YOU WERE SCOUTING OUT

211

1    THE REAL ESTATE; IS THAT CORRECT?

2    A    THAT'S RIGHT.

3    Q    AND DID THERE COME A TIME WHEN YOU AND YOUR HUSBAND

4    AND JOHN DRUMMOND AND ANDREA ALL TOOK A TRIP TO SHOW LOW?

5    A    YES.  WHEN THEY RETURNED FROM CALIFORNIA AND WE TOLD

6    THEM ABOUT THE LAND, HE WAS INTERESTED IN, AND SO HE WANTED

7    TO GO SEE IT.  AND SO HE TOOK HIS PLANE, AND ANDREA FLEW

8    SOME OF THE WAYS, AND --   .

9    Q    HOW WAS THE TRIP?

10   A    BEG YOUR PARDON?

11   Q    HOW WAS THE TRIP?

12   A    PRETTY CHAOTIC.  ANDREA WAS NOT FEELING WELL, AND HE

13   WANTED HER TO FLY.  SHE DID NOT WANT TO FLY.  SHE DIDN'T

14   WANT TO TAKE OFF.  SO HE STARTED YELLING AT HER, AND SHE

15   STARTED YELLING BACK.  AND THIS KIND OF WENT ON ALL THE

16   WAY TO SHOW LOW, BUT -- BUT ONCE WE GET INTO SHOW LOW,

17   HE -- I BELIEVE HE CALLS FROM THERE TO THE REAL ESTATE MAN,

18   WHO COMES AND PICKS US UP TO GO LOOK AT THE PROPERTY.

19        AND THEN WHEN WE -- WE GET OUT, AND WE LOOK AT --

20   SEEMED LIKE TWO PIECES OF PROPERTY, AND HE LIKES ONE THAT

21   HAS WHAT HE'S LOOKING FOR.  AND THEN AS HE'S PACING IT OFF

22   AND DISCUSSING HIS AIRPLANE AND THE LANDING STRIP WITH

23   THE SALESMAN AND WHAT HE WANTS TO DO AND BUILD, WHEN

24   ANYONE SAYS ANYTHING TO HIM, IF ANDREA OFFERS ANY IDEAS,

25   THEN HE SAYS, "WELL, THIS IS MY BUSINESS.  IT ISN'T YOURS,"

1    AND HE JUST CUTS EVERYBODY OFF.

2         HE'S KIND OF LIKE, YOU KNOW, "THIS IS MY

3    CONCERN," BIG EGO TRIP.  "I WILL LET YOU BE IN ON WHAT I

4    WANT YOU TO BE IN ON, AND OTHERWISE, DON'T INTERFERE WITH

5    ME."

6         SO THAT'S WHAT HE LIKED.  AND HE HAD A CAMERA,

7    AND HE TOOK NUMEROUS PICTURES FROM ALL ANGLES.  AND HE

8    SAID THAT HE WAS REALLY ANXIOUS TO GO AND SHOW THEM TO

9    HIS BOSS AND THE TOP MAN, WHO HE REFERRED TO AS MIKE AND

10   "THE DON," HE SAID.

11   Q    OKAY.  NOW, DID THERE COME A TIME WHEN MONEY WAS PUT

12   DOWN AS A DOWN PAYMENT ON PROPERTY IN SHOW LOW?

13   A    YES.  YES.

14   Q    AND WHO WAS THE PURCHASER OF RECORD ON THAT DOWN

15   PAYMENT THAT WAS MADE?

16   A    I WAS.

17   Q    AND WHAT NAME DID YOU USE ON THAT PURCHASE?

18   A    I WAS GETTING A LITTLE SKITTISH BY THIS TIME.  I

19   DIDN'T WANT TO DOWNRIGHT LIE ABOUT SOMETHING, BUT I DIDN'T

20   WANT TO PUT MY OWN ACTUAL NAME, SO I PUT MY MAIDEN NAME.

21   Q    WHICH IS?

22   A    LEONARD.

23   Q    AND DO YOU KNOW HOW MUCH MONEY WAS PUT DOWN?

24   A    NOT VERY MUCH.  HE DIDN'T APPEAR TO HAVE A LOT OF

25   EXTRA CASH RIGHT AT THAT POINT OR CASH THAT HE WANTED TO

213

1    TIE UP IN PROPERTY.  HE WANTED TO BUY EQUIPMENT --

2    GRADERS, TRACTORS, ALL KINDS OF STUFF -- AND HE WANTED TO

3    TRY TO GET THE EXTRA MONEY WHEN HE WENT TO SHOW THE

4    PICTURES TO FURTHER THIS PROJECT.

5    Q    OKAY.  NOW, YOU SAID SHOW LOW IS ABOUT THREE AND A

6    HALF HOURS FROM PHOENIX?

7    A    YES, IT'S A GOOD THREE AND A HALF HOURS.

8    Q    IS THIS AREA ALSO KNOWN AS SNOWFLAKE, OR NEAR

9    SNOWFLAKE?

10   A    WELL, IT LAYS WITHIN THIS AREA.  THE AIRPORT IS AT

11   SHOW LOW, AND THE REAL ESTATE OFFICE IS IN SHOW LOW.

12   THE LAND ITSELF LIES, WHEN YOU LEAVE SHOW LOW, BEHIND

13   SNOWFLAKE, GOING ALL THE WAY INTO ALMOST HOLBROOK, DOWN

14   THE LITTLE COLORADO PLATEAU.  SO IT GOES FOR MILES, THIS

15   PARTICULAR AREA DOES.

16   Q    OKAY.  NOW, AFTER LOOKING AT THE PROPERTY IN SHOW LOW,

17   DID YOU TAKE A TRIP?

18   A    YES, WE DID.

19   Q    OKAY.  TELL THE LADIES AND GENTLEMEN OF THE JURY WHERE

20   YOU WENT ON THAT TRIP?

21   A    OKAY.  WE WENT TO GUADALAJARA.  JOHN WANTED TO TAKE

22   THE PICTURES DOWN.  HE WANTED TO TAKE MY HUSBAND AND

23   MYSELF, ACCOMPANY ANDREA AND HIM.  HE WANTED US TO MEET

24   HIS BOSSES; HIS BANKERS, HE STILL REFERRED, BASICALLY,

25   MORE OFTEN AS.  AND HE WANTED TO SHOW THEM -- HAVE THEM

000064

1  MEET US; THAT WE WERE GOING TO BE WORKING WITH HIM OR FOR

2  HIM, HOWEVER HE PUT IT.  AND HE WAS VERY EXCITED WITH HIS

3  PLANS.

4  Q    AND DID HE TELL YOU WHAT HIS PLANS WERE PRIOR TO

5  GOING DOWN TO GUADALAJARA?

6  A    YES.  HE WANTED TO SHOW THESE PICTURES AND IMPRESS

7  UPON MIKE AND DON JOSE, THAT HE WAS GOING TO MEET, AND HE

8  WANTED TO SHOW THEM THESE PICTURES AND TELL THEM THAT THEY

9  COULD SEND AS MUCH -- YOU KNOW, AS MANY PLANES -- THAT IS

10  THE WAY HE PUT IT -- SEND AS MANY PLANES AS THEY WANT TO.

11  "I CAN HANDLE ANYTHING THAT THEY SEND BECAUSE I'M GOING TO

12  DIG LIKE A BUNKER OR A BIG CELLAR, AND THEN I WON'T HAVE

13  TO GO TO CALIFORNIA ALL THE TIME.

14       "AND I WANT THEM TO MEET YOU SO THAT THEY'LL

15  UNDERSTAND THAT THIS IS A VERY SAFE BUSINESS, THAT YOU'LL

16  BE DRIVING THIS R.V. ACROSS, AND YOU WON'T BE STOPPED LIKE

17  A LOT OF PEOPLE," AND THIS KIND OF -- YOU KNOW, "JUST

18  MAKE A LITTLE CLASS TO THIS BUSINESS" TYPE THING.  HE

19  WANTED TO TALK TO THESE PEOPLE AND --

20  Q    OKAY.  NOW, WAS THIS SURPRISING, THAT JOHN WOULD TELL

21  YOU WHAT WAS GOING ON IN HIS BUSINESS?

22  A    I THINK IT WAS -- IT WAS LIKE HE WAS GIVING US A GIFT.

23  YOU KNOW, "I'M GOING TO TAKE YOU AND SHOW YOU THESE VERY

24  IMPORTANT PEOPLE OF WHOM I'M SO CLOSELY ASSOCIATED WITH.

25  AND YOU'RE CLOSELY ASSOCIATED WITH ME, AND YOU SHOULD FEEL

215

1   VERY GOOD ABOUT THIS. AND YOU'RE GOING TO SEE SOME VERY

2   GRAND PEOPLE THAT I THINK A LOT OF, AND THEY LIKE ME. AND

3   THIS IS A BIG BUSINESS. WE'RE GOING TO MAKE A LOT OF

4   MONEY," AND THAT TYPE OF THING.

5           AND THAT'S WHY I THINK FOR ONCE HE DID TELL US

6   WHAT HE WAS DOING, BECAUSE THIS WAS A BIG PROJECT TO HIM.

7   Q    OKAY. NOW, HOW DID YOU GET DOWN TO GUADALAJARA?

8   A    WELL, WE FLEW. I THINK THAT WE WENT TO SAN DIEGO AND

9   TOOK THAT LITTLE TROLLY ACROSS TO THE BORDER AND THEN SOME

10  KIND OF CONVEYANCE OVER TO TIJUANA AND FLEW FROM THERE.

11  I'M PRETTY SURE THAT'S IT.

12  Q    OKAY. NOW, THEN YOU ARRIVED IN THE GUADALAJARA

13  AIRPORT; IS THAT CORRECT?

14  A    CORRECT.

15  Q    AND WHERE DID YOU GO FROM THERE?

16  A    WE TOOK A TAXI, AND WE WENT TO THE SUITES REAL, HOTEL

17  SUITES REAL, ON SAN MATEO, AS I REMEMBER.

18          MR. CONNOLLY: I WOULD ASK AT THIS TIME THAT THE

19  WITNES BE SHOWN GOVERNMENT EXHIBIT 17-A THROUGH -C, PLEASE.

20          THE CLERK: GOVERNMENT'S EXHIBIT 17-A THROUGH 'C

21  PLACED BEFORE THE WITNESS.

22          THE WITNESS: YES, THAT'S THE PLACE THAT HE TOOK

23  US TO MEET MIKE AND DON JOSE.

24  BY MR. CONNOLLY:

25  Q    NOW, 17-A IS WHAT?

1   A    THAT'S THE ENTRANCE, AND THERE'S A RESTAURANT HERE ON

2   THE FAR LEFT.  THE LOBBY IS ON THE RIGHT.  THE HOTEL ROOMS

3   THAT WE HAD AND THAT MIKE HAD IS IN THE CORNER, THE RIGHT-

4   HAND CORNER -- THE FAR, OUT OF SIGHT.

5   Q    OKAY.  NOW, PRIOR TO ARRIVING IN GUADALAJARA, DID

6   MR. DRUMMOND TELL YOU WHO OWNED THE HOTEL?

7   A    HE SAID THAT MIKE OWNED THE HOTEL.

8   Q    MS. HUNT, YOU'RE GOING TO HAVE TO SPEAK INTO THE

9   MICROPHONE.

10  A    SORRY.  HE SAID THAT MIKE OWNED THE HOTEL.

11  Q    OKAY.  WAS MIKE'S LAST NAME DISCLOSED TO YOU BY

12  MR. DRUMMOND AT ANY TIME?

13  A    NO.  HIS NAME WAS NEVER -- NOTHING WAS -- IT WAS

14  ALWAYS JUST MIKE.  THE REASON HE SAID THAT IS, HE SAID,

15  "I DON'T HAVE TO PAY.  EVERYONE ELSE STAYS FREE, BUT I PAY

16  BECAUSE I DON'T WANT ANYTHING GIVEN TO ME."

17  Q    OKAY.  NOW, WHAT HAPPENED UPON YOUR ARRIVAL AT THE

18  HOTEL?

19  A    OKAY.  WE WERE MET BY CECE, THE INTERPRETER.

20  Q    OKAY.  NOW, THIS CECE, CAN YOU SPELL IT FOR US,

21  PLEASE.

22  A    I REALLY DON'T KNOW.  I'VE NEVER SEEN IT WRITTEN,

23  ONLY SAID.  I DON'T KNOW IF THESE ARE INITIALS OR HER

24  NAME OR IF IT'S A NICKNAME OR WHAT.  EVERYONE CALLED HER

25  CECE.

```
1   Q     OKAY.  AND WHAT WAS HER JOB?

2   A     SHE WAS THE INTERPRETER FOR MIKE.

3   Q     OKAY.  NOW, HAD YOU -- YOU MENTIONED PREVIOUSLY A

4   TELEPHONE CALL ABOUT THE FAMILY ARRIVING?

5   A     YES.

6   Q     FROM A CECE?

7   A     YES.

8   Q     DID YOU PUT TOGETHER THAT TELEPHONE CALL AND THIS

9   INDIVIDUAL?

10  A     YES, I DID, UH-HUH.  SAME VOICE.

11  Q     DID YOU TALK TO HER ABOUT THE TELEPHONE CALL, OR DID

12  YOU MENTION ANYTHING TO HER ABOUT IT?

13  A     I DON'T RECALL THAT I SAID ANYTHING.  IT'S POSSIBLE.

14  SHE TALKED A LOT.  WE WERE TOGETHER A LOT.

15  Q     AND WAS SHE LATER ON OR AT THAT TIME -- WAS SHE AT

16  THAT TIME FRIENDLY WITH ANDREA?

17  A     APPEARED TO BE.

18  Q     AND DO YOU KNOW WHETHER OR NOT THAT FRIENDSHIP

19  EXTENDED TO TRAVEL TOGETHER IN THE UNITED STATES IN THE

20  FALL OF 1984?

21  A     YES, IT DID.

22  Q     DO YOU KNOW WHERE THEY WENT?

23  A     THEY WENT TO LAS VEGAS.

24  Q     AND WHO WENT ON THE TRIP?

25  A     JOHN, ANDREA, AND CECE.
```

1    Q    OKAY.  NOW, DID SHE WELCOME YOU TO THE HOTEL?

2    A    YES, SHE DID.

3    Q    AND WHERE DID YOU GO UPON ARRIVAL AT THE HOTEL?

4    A    SHE SHOWED US OUR ROOM, WHICH WAS UPSTAIRS. AND THEN

5    WE WENT WITH JOHN AND ANDREA TO THEIR ROOM, WHICH WAS IN

6    THE CORNER DIRECTLY ABOVE MIKE'S, WHICH WAS BELOW.  AND

7    SHORTLY AFTER, MIKE COME, AND WE WENT DOWNSTAIRS.  AND HE

8    WAS GLAD TO SEE JOHN, AND CECE INTERPRETED THE

9    INTRODUCTIONS AND EVERYTHING.

10   Q    OKAY.  WHEN YOU SAY MIKE CAME, WHO ADVISED YOU THAT

11   MIKE HAD ARRIVED?

12   A    CECE.

13   Q    AND YOU WENT DOWN TO WHICH PART OF THE HOTEL?

14   A    TO HIS ROOM, WHICH WAS DIRECTLY BELOW IN THE CORNER,

15   A SUITE-TYPE ROOM.

16   Q    OKAY.  NOW, CAN YOU DESCRIBE FOR THE LADIES AND

17   GENTLEMEN OF THE JURY WHAT THE ROOM LOOKED LIKE.

18   A    UH-HUH.  IT WAS A LARGE ROOM.  IT WASN'T PARTITIONED

19   OFF, BUT ON THE RIGHT-HAND SIDE THERE WAS A BIG ROUND

20   TABLE.  THERE WERE TWO SOFAS, A TELEVISION, VCR.  ON THE

21   OTHER SIDE, LIKE A LITTLE BOOKCASE OR A WAIST-HIGH

22   DIVIDER.  THEN THERE WAS A LARGE BED AND SORT OF A

23   REFRIGERATOR-SINK AND THE ONLY BATHROOM KIND OF BACK IN

24   THE CORNER.

25   Q    AND WERE YOU INTRODUCED TO MIKE AT THIS TIME?

1    A    YES.

2    Q    AND CAN YOU DESCRIBE WHAT HE LOOKED LIKE.

3    A    YES.  HE WAS A FAIRLY TALL FELLOW, CLOSE TO SIX FOOT,

4    VERY WELL DRESSED.  SLENDER, DARK EYES, DARK HAIR, OLIVE

5    COMPLEXION.  ACTUALLY, A VERY THIN PERSON.  HE WAS VERY

6    WELL MANNERED, PLEASANT.  HE WORE SIMPLE JEWELRY, JUST A

7    GOLD WATCH, A RING, UNPRETENTIOUS PERSON.

8    Q    AND DID YOU HAVE A CONVERSATION WITH HIM?

9    A    WELL, HE DOESN'T SPEAK ENGLISH, SO EVERYTHING THAT'S

10   SAID TO HIM OR THAT HE SAID TO US HAD TO GO THROUGH 'CECE.

11   BUT HE ACKNOWLEDGED THE INTRODUCTION AND -- VERY PLEASANT,

12   UH-HUH.

13            MR. CONNOLLY:  EXCUSE ME.  I'M GOING TO REQUEST

14   THAT THE CLERK FIND EXHIBIT 15 FOR FUTURE REFERENCE FOR

15   THE WITNESS.

16   Q    NOW, CAN YOU TELL US APPROXIMATELY WHEN THIS TRIP

17   TOOK PLACE?

18   A    OH, IT WAS IN JUNE 1984, THE LATTER PART.  THE LATTER

19   PART OF JUNE, POSSIBLY VERY EARLY JULY.  IT WAS RIGHT IN

20   THAT AREA.

21   Q    OKAY.  NOW, AFTER YOU MET MIKE -- EXCUSE ME.

22            DO WE HAVE THAT EXHIBIT?

23            THE CLERK:  SHE HAS IT.

24            MR. CONNOLLY:  THANK YOU.  SORRY.

25            COULD WE HAVE EXHIBIT 15 PLACED IN FRONT OF THE

220

1    WITNESS, PLEASE.

2            THE CLERK:  GOVERNMENT'S EXHIBIT 15 PLACED BEFORE

3    THE WITNESS.

4            THE WITNESS:  THAT'S THE MAN THAT I KNEW AS MIKE,

5    THE MAN THAT JOHN DRUMMOND INTRODUCED THROUGH CECE AS MIKE.

6            MR. CONNOLLY:  AND THAT IS GOVERNMENT EXHIBIT 15?

7    IS THAT MARKED?

8            THE CLERK:  YES.

9    BY MR. CONNOLLY:

10   Q    TODAY DO YOU KNOW HIS FULL NAME?

11   A    I REALLY DON'T.  I'VE NEVER EVEN THOUGHT ABOUT IT.  I

12   HAVE HEARD IT SPOKEN.

13   Q    BUT TODAY YOU CANNOT TELL US HIS NAME?

14   A    I KNOW HIM AS FELIX, AND THEN I CAN'T EVEN BRING UP

15   THE LAST NAME.  I'VE REALLY TRIED TO TURN ALL THIS OFF

16   SINCE THIS HAPPENED AND WHEN WE WERE THROUGH WITH IT.

17   Q    OKAY.  NOW, AT THE TIME YOU MET MIKE IN LATE JUNE OR

18   EARLY JULY 1984, WERE THERE ANY DISCUSSIONS ABOUT DRUGS?

19   A    NO DISCUSSIONS ABOUT DRUGS, NO.

20   Q    WERE THERE ANY DISCUSSIONS ABOUT PRODUCT?

21   A    PRODUCT, YES.

22   Q    OKAY.  NOW, WHEN DID THE FIRST DISCUSSIONS WITH MIKE

23   ABOUT BUSINESS OR PRODUCT TAKE PLACE?

24   A    OKAY.  LATER WE HAD SUPPER THERE, AND THEN WE WENT TO

25   OUR ROOM.  AND THEN WE WERE CALLED BACK DOWN, AND THERE

1   WAS ANOTHER PERSON THERE THAT WE WERE INTRODUCED THEN.

2   AS JOHN DRUMMOND SAID -- HE WAS VERY EXCITED AND HAPPY.

3   HE SAID, "THIS IS THE TOP MAN.  THIS IS THE HEAD MAN."

4   AND HE SAID, "PEOPLE SELDOM GET AN OPPORTUNITY TO MEET HIM,"

5   YOU KNOW.

6           AND SO WHEN CECE INTRODUCED US, HE WAS DON JOSE.

7   AND HE WAS WITH MIKE.  AND WE ALL SAT DOWN AROUND THE TABLE,

8   AND WE ALL SAT ON THE TWO SOFAS, AND MIKE HAD A CHAIR ON

9   THE OTHER SIDE OF THE TABLE.  AND AS I RECALL, HE SAT AND

10  DON JOSE STOOD NEXT TO HIM, AND THEY LOOKED AT THE PICTURES.

11  AND JOHN --

12  Q    WHO IS "THEY"?

13  A    OKAY.  DON JOSE AND MIKE, THEY LOOKED AT THE PICTURES.

14  CECE LOOKED AT THE PICTURES.  JOHN SHOWED THEM AND HE

15  EXPLAINED TO CECE WHAT HE WAS GOING TO DO AND THE LAY OF

16  THE LAND AND HOW HE COULD PUT THE AIRSTRIP AND THE HEAVY

17  EQUIPMENT HE WAS GOING TO NEED AND HOW HE WAS GOING TO

18  BUILD THE HOUSE.  AND PEOPLE COULD COME UP AND HAVE A

19  VACATION.

20          AND IT WAS AT THAT POINT THAT HE SAID "AS MUCH

21  STUFF AS YOU WANT TO SEND BECAUSE I DON'T HAVE TO WORRY

22  ABOUT TAKING IT OVER AS SOON AS I GET IT ON THE PLACE.

23  I CAN STORE IT.

24          AND THEN HE TRIED TO TALK TO THEM ABOUT HOW MUCH

25  IT WOULD COST.  I THINK THAT'S WHAT DON JOSE WONDERED:

1  HOW MUCH THIS WAS GOING TO COST TYPE THING.  AND CECE

2  SAID, AND THEN JOHN WOULD TELL HER, AND THEN MIKE AND

3  DON JOSE WOULD DISCUSS ALL OF THIS.  AND THEY WERE VERY,

4  VERY PLEASED WITH IT.

5       AND JOHN INTRODUCED ME AS -- ALONG WITH MY

6  HUSBAND, WHO WAS UPSTAIRS BECAUSE HE WASN'T FEELING GOOD --

7  INTRODUCED ME AS BEING THE PERSON WHO, ALONG WITH MY

8  HUSBAND, WOULD BE DRIVING THE R.V. TO CALIFORNIA, WHICH

9  WOULD ENSURE NOT BEING STOPPED OR BOTHERED BECAUSE RETIRED

10 OLDER PEOPLE. AND THE WHOLE THING WAS JUST A BIG, ROSY

11 PROJECT THE HE SOLD THEM ON.

12      AND THEY AGREED TO GIVE HIM EXTRA MONEY FOR IT,

13 AND EVERYBODY WAS VERY HAPPY WITH IT.

14 Q   AND THIS DON JOSE, I'D ASK YOU TO LOOK AROUND THE

15 COURTROOM AND TELL US WHETHER OR NOT YOU SEE THE INDIVIDUAL

16 PRESENT HERE IN COURT THAT YOU SAW ON THAT DAY IN LATE JUNE

17 OR EARLY JULY IN GUADALAJARA, MEXICO.

18 A   WELL, I SEE A VERY WELL-DRESSED MAN WITH A MUSTACHE

19 THAT REALLY RESEMBLES HIM IN SOME WAYS.  I REALLY DON'T

20 THINK I SEE HIM, THOUGH, UNLESS THAT'S HIM.

21 Q   WHO IS THE PERSON YOU'RE REFERRING TO?

22 A   THE FOURTH GENTLEMAN TO THE RIGHT.

23 Q   THE FOURTH GENTLEMAN TO THE RIGHT, WHERE?

24 A   AT THE TABLE, RIGHT -- WITH THE GREEN TIE.

25 Q   MRS. HUNT, DO YOU WEAR GLASSES?

1    A    YES.

2    Q    DO YOU HAVE YOUR GLASSES WITH YOU?

3    A    YES.

4    Q    WOULD IT HELP IF YOU WERE ABLE TO PUT ON YOUR GLASSES

5    AND WALK AROUND THE COURTROOM?

6    A    IT MIGHT HELP.  IT'S BEEN A LONG TIME.

7              MR. CONNOLLY:  WITH THE PERMISSION OF THE COURT?

8              THE COURT:  WHAT DO YOU WANT HER TO DO?

9              MR. CONNOLLY:  I ASK HER IF SHE COULD WALK

10    AROUND THE COURTROOM AND INSPECT ANY PERSON AT CLOSE RANGE

11    THAT SHE WANTS TO, TO SEE IF THAT WOULD AID HER IN MAKING

12    AN IDENTIFICATION.

13              MR. STOLAR:  I HARDLY THINK THAT'S --

14              THE COURT:  WHY DON'T YOU JUST STEP INTO THE

15    WELL, HERE, MRS. HUNT, AND LOOK AT THE PEOPLE THAT ARE

16    DOWN IN THIS AREA AND SEE IF YOU CAN RECOGNIZE ANYONE.

17    JUST RIGHT OUT IN FRONT OF THE CLERK THERE.

18              (WITNESS COMPLIES.)

19              THE WITNESS:  I'M AFRAID THE ONLY PERSON WHO

20    COMES ANYWHERE NEAR TO LOOKING LIKE DON JOSE WOULD BE THIS

21    GENTLEMAN NEXT TO THE LADY.  I'M SORRY. THE ONLY PERSON

22    THAT BEARS ANY RESEMBLANCE TO DON JOSE IS THE GENTLEMAN

23    SITTING NEXT THERE TO THE LADY.

24              THE COURT:  ALL RIGHT.  YOU MAY RESUME YOUR SEAT.

25    / / /

BY MR. CONNOLLY:

Q    THANK YOU.

A    I'M SORRY.  HE DIDN'T HAVE A MUSTACHE WHEN I KNEW HIM OR ANYTHING OF THAT NATURE.

Q    OKAY.  NOW, I ASK YOU TO RECALL TO MIND WHETHER OR NOT DURING THE COURSE OF YOUR COOPERATION WITH THE GOVERNMENT YOU WERE EVER SHOWN PHOTOGRAPHIC SPREADS.

        MR. STOLAR:  OBJECTION, YOUR HONOR.  IMPROPER DIRECT.

        THE COURT:  OVERRULED.

        YOU MAY ANSWER.

        THE WITNESS:  YES, I WAS.

BY MR. CONNOLLY:

Q    OKAY.  NOW, DO YOU RECALL TESTIFYING IN FRONT OF A FEDERAL GRAND JURY?

A    YES.

Q    DO YOU RECALL WHEN THAT WAS, MRS. HUNT?

A    I BELIEVE THAT WAS IN 1987, SOMETIME DURING THE SUMMER.

Q    WOULD THE DATE MAY 14TH, 1987 --

A    I BELIEVE THAT WAS ABOUT IT.

Q    -- REMIND YOU, WHEN YOU CAME OVER FROM --

A    FROM PHOENIX, ARIZONA.

Q    AND YOU CAME WITH YOUR DAUGHTER ANDREA; IS THAT CORRECT?

A    CORRECT.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
          PLAINTIFF,           )
                               )
     VS.                       )   NO. CR 88-129-WJR
                               )
JUAN RAMON MATTA-BALLESTEROS,  )
                               )
          DEFENDANT.           )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

FRIDAY, DECEMBER 7, 1990


DONNA BOWERS, C.S.R., R.P.R.
OFFICIAL COURT REPORTER
430 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 621-2400

1    THE SALE OR DISTRIBUTION OF DRUGS?

2    A    NOT DOWN IN GUADALAJARA, NO.

3    Q    OKAY.  DID THERE COME A TIME WHEN YOU CAME BACK TO THE

4    UNITED STATES?

5    A    THAT IS CORRECT.

6    Q    AND WHEN WOULD THAT HAVE BEEN?

7    A    THAT WAS IN SEPTEMBER.  I MEAN --

8         THE COURT:  WHEN DID YOU COME BACK TO THE UNITED

9    STATES?

10        THE WITNESS:  THAT WAS IN JUNE OF '82.  I STAYED

11   IN THE AREA FOR ALL THE SUMMER, LIKE, YOU KNOW, JULY AND

12   AUGUST, AND THEN I WENT BACK IN SEPTEMBER.  AND THE REASON

13   WHY I WENT BACK, IT WAS JUST TO PICK UP MY HOUSEHOLD GOODS,

14   AND I JUST RETURNED TO THE STATES AND STAYED HERE UP UNTIL

15   NOW.

16   BY MR. CONNOLLY:

17   Q    OKAY.  NOW, UPON ARRIVING BACK IN THE UNITED STATES,

18   HAD YOU RECEIVED OR HAD YOUR MOTHER RECEIVED THE MONIES

19   FOR THE PROPERTY THAT MIGUEL WAS SUPPOSED TO PAY?

20   A    NO.  I MADE QUITE A FEW ATTEMPTS DURING THE SUMMER

21   BECAUSE I WAS TRYING TO DETERMINE WHETHER I WANTED TO GO

22   BACK FOR THE NEXT SCHOOL YEAR OR NOT.  BUT NO, I DID NOT

23   GET THOSE MONIES THAT HE WAS SUPPOSED TO PAY MY MOM AND

24   MYSELF.

25        SO IN SEPTEMBER I JUST WENT BACK AND PICKED UP

25

1   MY HOUSEHOLD GOODS AND RETURNED HERE.

2   Q   ALL RIGHT.  NOW, BUT HE DID GIVE YOU ENOUGH MONEY TO

3   LIVE ON WHILE YOU WERE DOWN IN MEXICO THAT YEAR; IS THAT

4   CORRECT?

5   A   YES, THAT IS CORRECT.

6   Q   UPON YOUR ARRIVAL BACK IN THE UNITED STATES, WERE YOU

7   GIVEN THE SUM OF $20,000 BY ANYONE?

8         THE COURT:  BY WHOM?

9         MR. CONNOLLY:  BY ANYONE.

10  Q   WERE YOU GIVEN ANY MONEY BY MIGUEL TO --

11  A   YES, YES.  I REMEMBER NOW.

12  Q   -- PURCHASE ANYTHING?

13  A   YES.  I REMEMBER THERE WAS SOME MONEY THAT HE GAVE ME.

14  Q   AND WHAT WERE YOU SUPPOSED TO PURCHASE WITH IT, OR

15  WHAT DID YOU PURCHASE WITH IT?

16  A   COMMUNICATION EQUIPMENT, RADIOS, THINGS LIKE THAT.

17  COMMUNICATIONS -- ELECTRONIC COMMUNICATIONS EQUIPMENT.

18  Q   COULD YOU DESCRIBE FOR THE LADIES AND GENTLEMEN OF THE

19  JURY WHAT KIND OF COMMUNICATION EQUIPMENT.

20  A   WELL, THERE IS THESE RADIOS THAT THEY'RE CALLED FM

21  TWO-BAND RADIOS.  I'M NOT REALLY -- I DON'T KNOW VERY MUCH

22  ABOUT THESE SYSTEMS, YOU KNOW, BUT THEY CAN BE HOOKED UP

23  IN A CAR, AND YOU CAN CALL FROM ONE CAR TO ANOTHER WITHIN

24  QUITE A FEW MILES IF YOU HAVE WHAT THEY CALL A REPEATER --

25  REPEATING SYSTEM SOMEWHERE HIGH IN THE CITY OR IN THE

26

1    MOUNTAIN. YOU KNOW, YOU HAVE AN ANTENNA AND A REPEATER,

2    A REPEATING MACHINE. I DON'T KNOW REALLY WHAT IT DOES,

3    BUT IT REPRODUCES THE FREQUENCY THAT IS SENT TO THIS

4    MACHINE, AND IT SENDS IT BACK TO ANOTHER RADIO. THAT'S

5    ABOUT WHAT IT IS.

6    Q    OKAY. NOW, DID THERE COME A TIME AFTER YOU PURCHASED

7    THE PROPERTY THAT YOU DELIVERED IT TO MIGUEL?

8    A    YES, THAT IS CORRECT. I TOOK THEM UP THERE AT THE

9    TIME WHEN I WENT THERE TO PICK UP MY HOUSEHOLD GOODS, I

10    TOOK THEM WITH ME, THOSE RADIOS.

11    Q    DID YOU RECEIVE ANY OF THAT $20,000 FOR YOUR OWN

12    BENEFIT?

13    A    I PROBABLY JUST MADE MY EXPENSES WITH THAT, JUST LIKE

14    PAID FOR THE TRIP AND --

15    Q    OKAY. NOW, RETURNING TO THE FALL OF 1982, AFTER YOUR

16    ARRIVAL BACK FROM GUADALAJARA, WERE YOU GIVEN TWO KILOGRAMS

17    OF COCAINE BY ANYONE?

18    A    YES, I DID.

19    Q    AND WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE

20    JURY HOW YOU HAPPENED TO OBTAIN POSSESSION OF THESE TWO

21    KILGRAMS OF COCAINE.

22    A    WELL, AFTER I RETURNED FROM GUADALAJARA WITH MY

23    HOUSEHOLD GOODS, I WENT AND LIVED WITH MY MOTHER-IN-LAW,

24    AND I ALSO TALKED TO MY MOTHER-IN-LAW ABOUT THE SITUATION.

25    AND SHE WAS LIVING IN MY HOUSE, AND I NEVER RECEIVED

27

000079

1    PAYMENT FOR THE HOUSE.  AND THEY WERE RUNNING BEHIND IN

2    THE PAYMENTS OF THE MORTGAGE.

3             AND I KIND OF TRIED TO WORK OUT, YOU KNOW, HOW

4    WE WERE GOING TO -- TO RESOLVE THIS PROBLEM, AND I ASKED

5    MY MOM TO LEAVE THE HOUSE AND GO TO ENSENADA OR SOMEWHERE

6    WHERE SHE COULD LIVE WITH LESS MONEY, YOU KNOW.  AND I WAS

7    PROMISING THAT WHENEVER I COULD, I WOULD HELP HER, BUT I

8    NEEDED MY HOUSE BECAUSE, ON THE OTHER HAND, I HAD MY WIFE

9    CLAIMING THE HOUSE.

10            AND MY MOM WOULDN'T AGREE TO THAT BECAUSE -- HER

11   ARGUMENT WAS THAT IF SHE MOVED OUT OF THE HOUSE, THEN SHE

12   WOULD NEVER GET ANY MONEY FROM MIGUEL.  SO SHE DIDN'T.  SO

13   I CALLED MIGUEL MANY TIMES, ASKING HIM TO EITHER PAY ME OR

14   AT LEAST PAY THE MORTGAGE OR DO SOMETHING, YOU KNOW, TO

15   KIND OF RESOLVE THE PROBLEM.

16            AND HE SAYS, "YES, WELL, IN THE NEXT FEW DAYS

17   I'M GOING TO RESOLVE IT.  JUST WAIT AND THERE'LL BE A

18   PERSON THAT WILL CONTACT YOU," OR SOMETHING, YOU KNOW.  AND

19   ONE DAY HE CALLS ME AND TELLS ME TO CALL THIS GIRL, THIS

20   NUMBER.  AND I DID, AND APPARENTLY THIS GIRL WAS SUPPOSED

21   TO DELIVER TO ME MONEY, THE MONEY HE OWED ME AND MY MOM.

22            BUT INSTEAD, YOU KNOW, WHEN WE ARRANGED TO MEET,

23   THE GIRL SAID THAT SHE WANTED TO MEET WITH ME IN A

24   RESTAURANT SOMEWHERE IN HOLLYWOOD.  AND WE MET, AND INSTEAD

25   OF HANDING ME THE MONEY, SHE HANDED ME TWO KILOS.  AND

28

1    THAT'S HOW I CAME OUT.

2    Q     TWO KILOS OF WHAT?

3    A     COCAINE.

4    Q     OKAY.  NOW, AFTER YOU RECEIVED THE TWO KILOS, WHAT DID

5    YOU DO?

6    A     I WENT BACK TO MY MOTHER-IN-LAW'S HOUSE, AND I CALLED

7    HIM.  AND I ASKED HIM, YOU KNOW --

8    Q     WHO DID YOU CALL?

9    A     -- "WHAT DO YOU WANT ME TO DO WITH THIS?"

10          I CALLED MIGUEL AND ASKED HIM WHAT HE WANTED ME

11   TO DO WITH THOSE TWO KILOS.  I SAID, "THIS IS WHAT YOU

12   CALL THE PAYMENT?  I DON'T KNOW ANYBODY.  I HAVE NO IDEA

13   HOW TO GET RID OF THIS STUFF."

14          AND HE SAYS, "WELL, YOU WANT ME TO DO EVERYTHING

15   FOR YOU?  YOU HAVE TO DO YOUR PART.  IF YOU WANT ME TO

16   HELP YOUR MOTHER, YOU'RE ALSO HER SON.  YOU HELP HER TOO,"

17   YOU KNOW.  "I BET IF YOU TRY, YOU COULD MAKE -- YOU COULD

18   SELL THAT STUFF."

19          SO THERE WAS NOT VERY MUCH MORE I COULD DO, YOU

20   KNOW.

21   Q     SO DID YOU, AFTER GETTING OFF THE PHONE, ATTEMPT TO

22   SELL THE TWO KILOGRAMS OF COCAINE?

23   A     NO, I DID NOT, BECAUSE I DIDN'T KNOW WHERE TO START.

24   I COULDN'T -- YOU KNOW, IT'S NOT LIKE A TACO STAND, WHERE

25   YOU JUST SAY, "I'VE GOT TACOS HERE."  I DIDN'T KNOW ANY

29

1    PEOPLE.

2    Q     WHERE DID YOU KEEP THE COCAINE?

3    A     IN THE CAR THAT I WAS DRIVING AT THE TIME.

4    Q     AND HOW LONG DID YOU KEEP IN YOUR CAR FOR?

5    A     I WOULD SAY A MONTH, TWO WEEKS, THREE WEEKS,

6    SOMETHING LIKE THAT.  I'M NOT REALLY SURE ABOUT THAT.

7    Q     AND DID THERE COME A TIME WHEN YOU DID SOMETHING WITH

8    THE COCAINE?

9    A     YES.  AFTER A FEW DAYS, YOU KNOW, I THOUGHT AND THOUGHT

10   ABOUT HOW TO GO ABOUT THAT, AND I DECIDED TO CALL MIGUEL

11   AGAIN.  AND HE THEN RECOMMEND TO ME THAT -- HE SAID TO ME

12   THAT, "WELL, I'M GOING TO GET YOU SOMETHING, YOU KNOW,

13   THAT CAN HELP YOU WITH THAT."  AND HE GAVE ME A TELEPHONE

14   NUMBER.

15          I CALLED, AND THEN WE MEET; THIS GUY AND MYSELF

16   MEET SOMEPLACE.  AND HE SAID, "WELL, MY 'TOCAYO' SAID" --

17   "TOCAYO" MEANS NAMESAKE.  YOU KNOW, HIS NAME WAS MICHAEL,

18   THE SAME AS MY COUSIN.  AND HE SAID, "YOU'RE SUPPOSED TO

19   GIVE ME SOME COCAINE."  AND SO I -- YES, I HANDED HIM THE

20   TWO KILOS.

21   Q     DID HE TELL YOU WHETHER OR NOT HE WAS GOING TO PAY

22   YOU FOR THE TWO KILOS?

23   A     OF COURSE, YES, HE WAS GOING TO PAY ME, UH-HUH.

24   Q     AND DID YOU HAVE A RECEIPT OF PAYMENT FOR THE TWO

25   KILOS?

30

000082

1   A    OH, NO.  NO.

2   Q    DID YOU TRY TO FIND MIKE TO COLLECT THE MONEY FROM HIM?

3   A    YES.  I CALLED THE SAME NUMBER, AND WE MET ONCE MORE

4   AFTER I HANDED THE TWO KILOS.

5   Q    AND WHAT DID HE SAY?

6   A    WELL, THIS TIME WE MET IN A BODY SHOP IN GARDENA.  AND

7   HE SAYS, "NO, YOU DON'T HAVE NOTHING TO WORRY ABOUT.  THESE

8   THINGS TAKE TIME SOMETIMES.  BUT LOOK, THIS IS MY BODY SHOP

9   HERE.  I'M A BUSINESSMAN.  I'M NOT GOING ANYWHERE.  YOU

10  HAVE YOUR MONEY SECURE HERE.  AS SOON AS I GET·RID OF THIS,

11  YOU'LL GET YOUR MONEY."  AND THAT WAS THE LAST I HEARD

12  FROM HIM.

13  Q    AND WHAT DID YOU DO AFTER RECEIVING NO MONEY FOR THE

14  TWO KILOGRAMS?

15  A    WELL, I TALKED TO MIGUEL AGAIN, MY COUSIN.

16  Q    AND WHAT DID YOU SAY TO HIM?

17  A    THAT I COULDN'T FIND HIS "TOCAYO," YOU KNOW, THE

18  PERSON HE REFERRED ME TO.  AND HE TOOK IT ON ME.  I MEAN,

19  HE WAS CURSING AT ME, YOU KNOW, SAYING HOW DUMB I WAS AND

20  THAT -- WELL, SOME THINGS LIKE THAT, YOU KNOW.

21  Q    OKAY.  NOW, DID HE AT THAT TIME SUGGEST ANYTHING

22  REGARDING FUTURE SHIPMENTS OF COCAINE TO YOU?

23  A    WELL, YES.  AFTER, YOU KNOW, HE REALLY GOT ON MY

24  NERVES, HE SAID THAT HE WAS GOING TO GIVE ME ONE MORE

25  CHANCE AND THAT HE WAS WILLING TO DELIVER SOME MORE COCAINE

31

1    TO ME.  "AND THIS TIME," HE SAYS, "YOU GO ON YOUR OWN."

2            AND I REMEMBER HE MENTIONED, YOU KNOW, THAT IF I

3    WAS -- "IF YOU'RE DUMB, YOU'RE DUMB, AND YOU'LL BE -- YOU

4    LOOSE IN THIS BUSINESS.  SO YOU HAVE TO REALLY OPEN YOUR

5    EYES AND BE AWARE OF THE PEOPLE YOU DEAL WITH."

6            I TOLD HIM AGAIN, YOU KNOW, I DIDN'T KNOW ANY

7    PEOPLE, SO -- BUT HE SAYS, "WELL, THAT'S ALL I CAN DO FOR

8    YOU.  SO DO IT."

9            AND HE GAVE ME A NUMBER TO CALL, AND I CALLED,

10   AND I PICKED UP SOME MORE COCAINE.

11   Q    OKAY.  NOW, WHAT HAPPENED -- THE FIRST TWO KILOGRAMS

12   OF COCAINE THAT HE GAVE YOU, WAS THAT SUPPOSED TO REPRESENT

13   PAYMENT FOR PART OF THE DEBT OR ALL OF THE DEBT, OR WHAT

14   WAS IT SUPPOSED TO REPRESENT?

15   A    WELL, IT WAS SUPPOSED TO PAY ME MY EQUITY, WHICH IT

16   WAS $50,000.  AND ALSO, IT WAS SUPPOSED TO BE SUFFICIENT

17   TO PAY THE MORTGAGE ON THE HOUSE.

18   Q    AND DID HE GIVE YOU A PRICE PER KILO?

19   A    YES.  55,000.  THAT'S WHAT IT WAS.

20   Q    SO IT WOULD BE $110,000 IN PAYMENT?

21   A    YES.

22   Q    OKAY.  NOW, AND APPROXIMATELY WHEN DID YOU GET THE

23   ADDITIONAL TWO KILOS IN 1982?

24   A    I BELIEVE THAT IT WAS SOMEWHERE AROUND DECEMBER;

25   LATE NOVEMBER, MAYBE.

32

1    Q    HOW DID YOU GET YOUR HANDS ON THE ADDITIONAL KILOS?

2    A    I CALLED THIS PERSON, AND WE ARRANGED TO MEET IN THIS

3    HOTEL SOMEWHERE.  I'M NOT REALLY SURE IF IT WAS SOUTH GATE

4    OR -- I THINK IT'S LYNWOOD, SOMEWHERE AROUND THERE.  I

5    DON'T REMEMBER, BUT SOMEWHERE OVER THERE.

6    Q    SOUTH GATE OR --

7    A    SOMEWHERE TO THE SOUTH -- I MEAN THE NORTHEAST OF

8    SAN PEDRO, SOMEWHERE OVER THERE.  I REMEMBER THAT I TOOK

9    THE FREEWAY, THE LONG BEACH FREEWAY.

10   Q    AND WHAT WAS THE NAME OF THE PERSON THAT YOU MET WITH?

11   A    I BELIEVE THAT AT THE TIME WHEN I WENT AND PICKED UP

12   THIS COCAINE, I NEVER GOT TO KNOW A NAME.  I FOUND OUT

13   ABOUT HIS NAME LATER.  BUT AT THIS TIME I DIDN'T KNOW HIS

14   NAME.

15   Q    OKAY.  WHAT WAS HIS NAME THAT YOU FOUND OUT LATER?

16   A    HIS NAME WAS CHICO FUENTES.  "CHICO" IS NOT A NAME,

17   YOU KNOW, BUT THAT'S HOW HE CALLED HIMSELF.  CHICO,

18   CHICO FUENTES.

19   Q    AND WHAT DID CHICO GIVE YOU?

20   A    HE GAVE ME EIGHT PACKAGES OF COCAINE CONTAINING EACH

21   ONE HALF A KILO.

22   Q    DID YOU HAVE A CONVERSATION WITH HIM WHEN YOU MET HIM?

23   A    WELL, VERY LITTLE.  NOT VERY MUCH.  I MEAN, HE WAS --

24   HE WAS IN THIS ROOM, AND THERE WERE SOME OTHER PEOPLE THERE;

25   SOME OTHER PEOPLE.  AND NO, IT WAS NOT THAT BIG OF A

33

1  CONVERSATION.  JUST, HE KNEW WHAT I WAS COMING FOR, AND HE

2  DIDN'T SAY VERY MUCH.

3  Q    OKAY.  NOW, WAS THERE A PRICE QUOTED BY MIGUEL FOR

4  THESE FOUR KILOGRAMS OF COCAINE?

5  A    YES.  IT WAS THE SAME PRICE AS THE FIRST ONE.

6  Q    THAT'S 55,000 A KILO?

7  A    THAT'S CORRECT.

8  Q    OKAY.  NOW, AFTER RECEIVING THE FOUR KILOGRAMS OF

9  COCAINE FROM CHICO FUENTES, WHAT DID YOU DO WITH THEM?

10  A    I ATTEMPTED TO SELL THEM.

11  Q    OKAY.  WHO DID YOU ATTEMPT TO SELL THEM TO?

12  A    ON ONE PART, I CALLED MY BROTHER-IN-LAW FROM TIJUANA,

13  AND I ASKED HIM IF HE KNEW ANYBODY.  AND HE SAID, "YES, I

14  THINK I DO.  LET ME MAKE, YOU KNOW, A FEW CALLS, AND I'LL

15  GET BACK TO YOU."  AND THAT WAS ONE PERSON.

16         AND THERE WAS ANOTHER PERSON HERE IN THE AREA.

17  Q    WHAT IS HIS NAME?

18  A    HECTOR GONZALES.

19  Q    OKAY.  AND IS HECTOR RELATED TO YOU?

20  A    YES, HE IS MY -- HE'S MARRIED TO MY SISTER-IN-LAW.

21  Q    HAD YOU TRIED TO USE HIM TO SELL THE FIRST TWO KILOS?

22  A    YES.  YES, I DID.

23  Q    AND HOW MUCH -- DID YOU EVER GIVE HIM ANY TO SELL IN

24  THIS BATCH?

25  A    YES.  I THINK HE SOLD LIKE ONE PACKAGE, A HALF A KILO.

34

000086

1   Q    AND HOW ABOUT YOUR BROTHER-IN-LAW IN TIJUANA?

2   A    I THINK HE SOLD LIKE ANOTHER TWO PACKAGES, MAYBE

3   ANOTHER TWO HALF KILOS.  YOU KNOW, I MEAN -- ONE KILO, TWO

4   PACKAGES.

5   Q    SO HECTOR SOLD A KILO OR A HALF A KILO?

6   A    HALF A KILO.

7   Q    AND YOUR --

8   A    AND MY BROTHER-IN-LAW SOLD --

9   Q    ONE KILO?

10  A    -- ONE KILO.

11  Q    WHICH WOULD LEAVE YOU HOW MANY KILOS LEFT?

12  A    ONE HALF -- I MEAN, TWO AND A HALF.

13  Q    WHAT DID YOU DO WITH THEM?

14  A    THERE WAS ANOTHER PERSON THAT I CONTACTED THAT HE --

15  HE WAS SUPPOSED TO SELL ONE KILO.  BUT THIS GUY, YOU KNOW,

16  HE RIPPED ME OFF.

17  Q    DO YOU KNOW HIS NAME?

18  A    YES.  HIS NAME WAS MIGUEL ABRAHAM, LIKE ABRAHAM LINCOLN.

19  AT LEAST THAT'S WHAT HE SAID HIS NAME WAS.

20  Q    OKAY.  NOW, HOW MUCH MONEY DID YOU GET FROM THE

21  PROCEEDS OF THE SALE OF THE DRUGS THAT YOU RECEIVED FROM

22  MIGUEL?

23  A    EXCUSE ME?

24  Q    HOW MUCH MONEY DID YOU GET FROM THE SALE OF THOSE

25  DRUGS?

35

1    A    WELL, I DIDN'T PAY MIGUEL ANYTHING.  SO WHAT I GOT, I

2    KEPT.  AND IT WAS AROUND $50,000.

3    Q    OKAY.  AND WHAT DID YOU USE THE MONEY FOR?

4    A    I PUT A DOWN PAYMENT ON MY HOUSE.

5    Q    AND THAT IS THE HOUSE AT WHAT ADDRESS?

6    A    1214 244TH STREET IN HARBOR CITY.

7    Q    AND DID YOU HAVE ANY COCAINE LEFT OVER THAT YOU

8    COULDN'T SELL?

9    A    OH, YES.  I HAD A KILO LEFT, AND I DIDN'T WANT TO MAKE

10   ANY MORE ATTEMPTS BECAUSE I WAS GETTING IN TROUBLE.  YOU

11   KNOW, SO FAR I ATTEMPTED TO SELL THREE KILOS, AND ALL I GOT

12   IN RETURN WAS 50,000, SO I WAS IN TROUBLE ALREADY.  SO I

13   DECIDED NOT TO ATTEMPT TO SELL THIS KILO NO MORE.  SO I

14   KEPT IT.

15   Q    AND WHAT DID YOU DO WITH IT?

16   A    WELL, BY NOW MIGUEL IS SENDING SOME MORE COCAINE TO

17   ME.  AND ONE TIME WHEN I MADE A DELIVERY OF THIS COCAINE

18   I WAS HANDLING FOR HIM, I JUST TOLD HIM THAT THIS KILO THAT

19   I HAD LEFT, I WAS GOING TO JUST PUT IT BACK IN THE PILE.

20   Q    OKAY.  NOW, AFTER TRYING TO SELL THE SECOND BATCH OF

21   COCAINE, DID YOU CALL UP MIGUEL OR HAVE ANY PHONE

22   CONVERSATIONS WITH HIM REGARDING WHAT YOU HAD DONE WITH THE

23   FOUR KILOS?

24   A    I THINK SO.  I THINK I DID.  AND I THINK HE REQUESTED

25   HIS MONEY.  HE WANTED ME TO PAY HIM, YOU KNOW, FOR THE

36

1    THREE THAT I CLAIMED THAT I'D SOLD SO FAR.

2    Q    AND HOW MUCH DID HE WANT?

3    A    FIFTY-FIVE EACH.

4    Q    AND WHAT DID YOU SAY?

5    A    WELL, I DON'T HAVE THE MONEY, YOU KNOW.  I'M STILL

6    WAITING FOR SOME PEOPLE TO PAY ME SOME MONEY.

7    Q    AND DID HE ACCEPT THAT?

8    A    KIND OF, YES.  I MEAN, HE WAS PATIENT, ACCORDING TO

9    WHAT I COULD FEEL THEN.

10   Q    OKAY.  NOW, DOES THERE COME A TIME WHERE HE OFFERS

11   YOU AN OPPORTUNITY TO DO SOMETHING ELSE IN THE NARCOTICS

12   BUSINESS OTHER THAN SELL COCAINE?

13   A    YES.  AFTER I, YOU KNOW, TOLD HIM THAT I WAS GOING TO

14   RETURN TO HIM THAT ONE KILO, YOU, HE SAID THAT I WASN'T

15   ANY GOOD FOR THE BUSINESS.  AND -- BUT HE SAYS, "DON'T YOU

16   WORRY.  YOU'LL BE DOING SOMETHING ELSE THAT IT WON'T

17   REQUIRE YOU TO SELL.  YOU KNOW, YOU JUST DO WHAT I TELL YOU,

18   AND YOU'LL BE ALL RIGHT."

19        SO, YES, I WAS DOING SOMETHING ELSE.  AFTER THAT

20   I NEVER SOLD ANY.  NOTHING, NOT EVEN A GRAM; NOTHING.

21   Q    DID HE TELL YOU DURING THAT CONVERSATION WHAT YOUR

22   FUTURE JOB WAS GOING TO BE?

23   A    OH, YEAH, BECAUSE BY NOW HE IS ALREADY SENDING, YOU

24   KNOW, MORE COCAINE THAT I AM HANDLING FOR HIM.

25   Q    OKAY.  NOW, WHEN YOU SAY HE'S SENDING MORE COCAINE,

37

000089

1   HOW DOES THIS COME ABOUT?

2   A   WELL, IT ALL STARTED WHEN HE CALLS ME AND HE TELLS ME

3   TO CALL THIS  TELEPHONE NUMBER.  AND THAT TELEPHONE NUMBER

4   WAS A HOTEL NUMBER, AND HE ALSO GAVE ME A ROOM NUMBER.  I

5   CALLED, AND IT WAS THIS LADY.  AND HE ASKED ME TO GO AND

6   SEE THIS LADY, AND THIS LADY WAS GOING TO EXPLAIN TO ME

7   WHAT ELSE THERE WAS THERE TO FOLLOW, YOU KNOW.

8        AND I DID.  AND THIS LADY SAID, "WELL, YOU ARE

9   SUPPOSED TO TAKE THIS CAR AND UNLOAD IT."  IT WAS ONE OF

10   THOSE GRAND MARQUIS, FORD GRAND MARQUIS.

11   Q   OKAY.  NOW, LET ME STOP YOU RIGHT THERE.  WHAT IS THE

12   NAME OF THIS LADY?

13   A   HER NAME WAS GLORIA IBARRA.

14   Q   OKAY.  AND WHERE WAS SHE FROM?

15   A   SHE WAS FROM AROUND CULIACAN, SINALOA.

16   Q   AND APPROXIMATELY WHEN --

17   A   CULIACAN, C-U-L-I-A-C-A-N, SINALOA.

18   Q   NOW, APPROXIMATELY WHEN DO YOU FIRST MEET GLORIA IBARRA?

19   A   I THINK IT WAS IN VERY EARLY 1983, LIKE AROUND

20   JANUARY, SOMETHING LIKE THAT.

21   Q   AND FOR APPROXIMATELY THE NEXT TEN MONTHS OR SO, DO

22   YOU SEE HER OFTEN?

23   A   YES, I DID.

24   Q   HOW OFTEN?

25   A   WELL, I KEPT IN CONTACT.  TWICE A WEEK.

38

1    Q    NOW, EXPLAIN TO THE LADIES AND GENTLEMEN OF THE JURY

2    WHAT WAS SAID AFTER MRS. IBARRA TOLD YOU THAT YOU WERE

3    SUPPOSED TO UNLOAD THE CAR.

4    A    WHAT WAS SAID AFTER?

5    Q    YES.  DID YOU KNOW HOW TO UNLOAD CARS AT THAT TIME?

6    A    OH, NO.  NO, NO.  I WAS TOLD -- AGAIN, BY MIGUEL --

7    BECAUSE THE LADY DIDN'T KNOW EITHER, YOU KNOW, HOW TO

8    UNLOAD IT.  SHE KNEW THAT THE COKE WAS IN THE GAS TANK,

9    THE FUEL TANK OF THE CAR, BUT SHE DIDN'T KNOW HOW TO DO IT.

10   SO I DON'T REMEMBER IF MIGUEL CALLED ME OR I CALLED HIM,

11   BUT HE TOLD ME HOW TO DO IT.

12         YOU KNOW, HE SAID, "YOU KNOW, THERE IS A TUBE

13   WHERE -- THE OUTLET WHERE YOU PUT THE GAS IN.  THERE IS

14   FOUR SCREWS.  TAKE THEM OUT AND PULL THE TUBE OUT, AND

15   THAT WAY IT WILL BE OUT OF YOUR WAY WHEN YOU TAKE THE

16   STRAPS, YOU KNOW, THAT ARE UNDERNEATH THE TANK.  JUST TAKE

17   THEM, AND THAT FUEL TANK IS GOING TO BE COMING DOWN."

18         BUT SINCE IT'S HEAVY, YOU KNOW, I USED THIS FLOOR

19   JACK.  I WAS ALSO ADVISED TO USE A FLOOR JACK, TO PUT IT

20   RIGHT UP AGAINST THE TANK, SO THAT WHEN THE STRAPS WERE

21   BROKEN LOOSE, THAT THING WOULDN'T COME DOWN, YOU KNOW,

22   HARD.

23         AND THEN AFTER, YOU KNOW, YOU BREAK LOOSE THE

24   STRAPS, THEN YOU START LOWERING THE JACK, AND THE TANK

25   COMES DOWN.  YOU KNOW, BY NOW YOU'VE GOT THAT CAR UP IN

39

000091

1  THE AIR, YOU KNOW.  LIKE YOU USE SOME JACKS TO PUT THE CAR

2  UP IN THE AIR, WITH THE BACK, YOU KNOW, STANDING LIKE THAT,

3  KIND OF LIKE AT AN ANGLE, YOU KNOW.

4  Q    AND WHERE DID YOU TAKE THE GAS TANK OUT?  WHERE WERE

5  YOU LOCATED?

6  A    THE FIRST TANK, I DON'T REMEMBER EXACTLY, BECAUSE I

7  DON'T REMEMBER IF I HAD A HOUSE ALREADY OR NOT.  SO IF I

8  DID NOT, I PROBABLY USED SOMEBODY ELSE'S HOUSE, A FRIEND

9  OF MINE'S HOUSE.

10  Q    OKAY.  NOW, WHAT DID YOU FIND IN THE GAS TANK?

11  A    THERE WERE LIKE 36 PACKAGES, ALL HALF-KILO PACKAGES.

12  Q    COCAINE?

13  A    COCAINE.  WELL, YES, I THINK IT WAS COCAINE.

14  Q    OKAY.  AND WERE YOU ADVISED WHAT TO DO WITH THESE --

15  A    YES, I --

16  Q    WHAT?

17  A    WELL, HE JUST TOLD ME TO, YOU KNOW, HOLD ONTO THOSE

18  PACKAGES.

19  Q    OKAY.  AND DID THERE COME A TIME WHEN YOU WERE ASKED

20  TO DISTRIBUTE THESE PACKAGES?

21  A    YES.  ONCE, YOU KNOW, IT WENT TO A NUMBER OF PACKAGES

22  THAT HE NEEDED TO -- PILED UP, YOU KNOW.  YES, I WAS

23  INSTRUCTED THEN TO DELIVER THEM.

24  Q    NOW, HOW OFTEN WOULD GLORIA IBARRA BRING LOADS OF

25  COCAINE TO YOU DURING 1983?

40

000092

1   A    LIKE I SAY, YOU KNOW, IT CAME A TIME THAT SHE CAME

2   TWICE A WEEK.

3   Q    AND WOULD ANYBODY ELSE DELIVER COCAINE TO YOU DURING

4   1983?

5   A    WELL, IT WAS JUST HER, YOU KNOW, BUT SHE WAS ALWAYS

6   ACCOMPANIED BY TWO OF HER CHILDRENS, ONE MALE AND ONE

7   FEMALE, AND THEY WERE ALSO DRIVING A CAR, YOU KNOW.  SO

8   IT WAS LIKE THREE.  AND I THINK THERE WERE ALSO OCCASIONS

9   WHERE THERE WERE FOUR CARS.

10  Q    WELL, WOULD THREE CARS COME A WEEK, FILLED WITH

11  COCAINE?

12  A    AGAIN, YOU KNOW, SOMETIMES IT WAS TWICE A WEEK.

13  Q    WERE THERE SOME WEEKS WHEN THEY DIDN'T COME AT ALL?

14  A    YES, THAT IS CORRECT ALSO.

15  Q    OKAY.  NOW, COULD YOU ESTIMATE FOR THE LADIES AND

16  GENTLEMEN OF THE JURY, IF YOU CAN, JUST HOW MANY KILOGRAMS

17  OF COCAINE DURING 1983 WERE DELIVERED TO YOU BY

18  GLORIA IBARRA AND HER RELATIVES HERE IN THE SOUTHERN

19  CALIFORNIA AREA.

20  A    I HAVE AN ESTIMATE OF AROUND FIVE TO SIX HUNDRED

21  KILOS.

22  Q    OKAY.  AND DID YOU DISTRIBUTE THESE KILOGRAMS OF

23  COCAINE?

24  A    YES, I DID.

25  Q    AND AT WHOSE DIRECTION DID YOU DISTRIBUTE THEM?

41

000093

1   A    ALL MIGUEL'S DIRECTION.

2   Q    HOW WOULD HE CONTACT YOU?

3   A    HE WOULD CALL MY HOME.

4   Q    AND APPROXIMATELY HOW MANY DIFFERENT PEOPLE DID YOU

5   DISTRIBUTE THE COCAINE TO DURING 1983?

6   A    OH, SOMEWHERE AROUND 20 PEOPLE, MAYBE.

7   Q    OKAY.  CAN YOU DESCRIBE FOR THE LADIES AND GENTLEMEN

8   OF THE JURY WHO THE PEOPLE WERE AND WHERE THEY WERE

9   LOCATED, WHO YOU REMEMBER THAT YOU DISTRIBUTED THE COCAINE

10  TO HERE IN SOUTHERN CALIFORNIA DURING '83.

11  A    THERE WERE -- MOST OF THEM, YOU WOULD DELIVER 50,

12  100 KILOS, YOU KNOW; BUT THERE WERE ALSO SOME OTHER PEOPLE

13  THAT WOULD COME AROUND AND JUST, YOU KNOW, REQUEST ONE

14  KILO OR HALF A KILO, YOU KNOW, AND -- BUT YOU KNOW, THE

15  BIG BUYS THAT I CAN REMEMBER -- I MEAN, I CALL THE "BIG

16  GUYS" THE ONES THAT TOOK MORE THAN HALF A KILO -- THERE

17  WAS, FOR THE MOST PART, PANCHO'S PEOPLE.  THERE WAS THIS

18  GUY -- I DON'T KNOW HIS NAME,  BUT IT WAS PANCHO'S PEOPLE.

19  Q    DO YOU KNOW WHERE PANCHO'S PEOPLE WERE FROM?

20  A    THEY WERE FROM AROUND THE AREA OF -- I DIDN'T KNOW AT

21  THIS TIME.  I KNEW LATER, YOU KNOW.  BUT THEY WERE ALL FROM

22  THE VALLEY, SAN JOAQUIN VALLEY OR SOMEWHERE AROUND THERE.

23  Q    AND WHO ELSE DID YOU DISTRIBUTE TO?

24  A    THERE WAS A COSTA RICAN GUY THAT I CAN ALSO REMEMBER.

25  HIS NAME WAS WARDEN, SOMETHING LIKE THAT.  WARDEN -- PILOT,

42

000094

1   I REMEMBER.

2   Q    AND WHO ELSE?

3   A    I ALSO REMEMBER A GUY FROM SINALOA, TRINI QUINTERO,

4   FROM SINALOA; CULIACAN, SINALOA.

5   Q    WHO ELSE?

6   A    THERE WAS SOME OTHER GUY IN GARDEN GROVE.  HIS NAME

7   WAS BENJAMIN.  THAT'S ALL I KNOW ABOUT HIM, YOU KNOW.  HE

8   WAS -- HE SAID TO ME THAT HIS NAME WAS BENJAMIN, AND HE HAD

9   ONE OF THOSE TORTILLA FACTORY PLACES.

10          MR. STOLAR:  WHAT KIND OF FACTORY?

11          THE WITNESS:  TORTILLA FACTORY, YOU KNOW.  THAT'S

12  ALL, YOU KNOW.  I ALWAYS MET HIM THERE.  I WAS -- THAT'S

13  ABOUT IT.

14          THEN THERE WERE ALSO SOME OTHER PEOPLE THAT CAME

15  AND GOT A KILO, HALF A KILO, SOMETHING LIKE THAT.

16  Q    THEY'D COME BY YOUR HOUSE, OR YOU WOULD DELIVER IT TO

17  THEM?

18  A    NO. I WOULD BE ADVISED TO CALL A HOTEL, AND IT WAS

19  ABOUT, YOU KNOW, THIS KIND OF PROCEDURE.  MIGUEL WOULD

20  CALL ME AND SAY, YOU KNOW, "CALL NO. 2 ROOM NUMBER," OR A

21  NUMBER, YOU KNOW, OR SOMETHING LIKE THAT.  AND THEN I WOULD

22  CALL.

23  Q    WHEN YOU SAY MIGUEL WOULD SAY, "CALL NO. 2," WHAT

24  DOES "NO. 2" MEAN?

25  A    WHAT IT MEANS IS THAT BY NOW, MIGUEL -- YOU KNOW, ON

43

1  THE PHONE, HE DIDN'T WANT TO SAY WHAT NUMBER IT WAS THAT

2  HE WANTED ME TO CALL.  SO WHAT WE DID IS, HE ASKED ME TO

3  BRING BUSINESS CARDS FROM DIFFERENT HOTELS IN THE AREA,

4  LOTS OF THEM, YOU KNOW, LIKE 30 OR 40 CARDS.  AND SO THEN

5  ME AND HIM, TOGETHER WE NUMBERED THE HOTELS.  LIKE LET'S

6  SAY THE VAGABOND IN SAN PEDRO WOULD BE NO. 1 OR NO. 2.

7  AND THE -- THERE IS ANOTHER ONE -- WELL, THERE'S MANY ON

8  THE PACIFIC COAST HIGHWAY.

9        THE AREA OF HARBOR CITY, YOU KNOW, THERE WERE

10  ALSO LIKE FIVE OR SIX HOTELS THERE, AND WE NUMBERED THE

11  HOTELS.  AND SO, WHEN HE INSTRUCTED SOMEBODY ELSE TO COME

12  AND PICK UP SOME COCAINE FROM ME, HE WOULD GIVE THEM A

13  BUSINESS CARD FROM THAT HOTEL SO THAT THEY WOULD CHECK INTO

14  THIS HOTEL.

15        AND THEN, WHEN THEY WERE ALREADY THERE, THEN HE

16  WOULD CALL ME AND SAY, "CALL NO. 2, ROOM 240," PERHAPS,

17  YOU KNOW, AND THEN I WOULD DO THAT, SO HE DIDN'T HAVE TO

18  GIVE ME THE NUMBER OF THE HOTEL.

19  Q    DID YOU HAVE OCCASION DURING 1983 TO HAVE ANYONE HELP

20  YOU WITH THE DELIVERIES TO ANY OF MIGUEL'S CUSTOMERS?

21  A    YES, YES.  I HAD SOME FRIENDS THAT HELPED.

22  Q    WHO WAS THAT?

23  A    MAINLY, HECTOR GONZALES AND MIGUEL SANMAJOR (PHONETIC).

24  Q    OKAY.  NOW, DID YOU PERSONALLY MAKE ANY DELIVERIES OF

25  COCAINE FOR MIGUEL TO THE ROCHELLE HOTEL IN LONG BEACH,

44

CALIFORNIA?

A    YES, I DID.

Q    AND TO WHOM DID YOU DELIVER TO AT THAT TIME?

A    I REMEMBER DELIVERING TO THE ROCHELLE, JUST TWO

PEOPLE.  THAT'S WHAT I REMEMBER.  ONE WAS WARDEN, AND THE

OTHER ONE WAS A GUY, AN AMERICAN NATIONAL.  I KNEW HIM BY

JOHN, BUT THAT'S ALL I KNOW.

Q    OKAY.  NOW, WOULD MIGUEL CALL YOU UP AND INSTRUCT YOU

AS TO WHOM TO DELIVER THE DRUGS TO?

A    YES, YES.  ALWAYS, HE DID THAT.

Q    AND REGARDING THE INDIVIDUAL AT THE ROCHELLE HOTEL

YOU KNEW AS JOHN, WOULD YOU DESCRIBE TO THE LADIES AND

GENTLEMEN OF THE JURY HOW YOU DISTRIBUTED TO THIS PERSON.

A    WELL, I WOULD -- I THINK I DELIVERED TO THIS GUY LIKE

TWICE OR MAYBE THREE TIMES.  AND ON EVERY OCCASION THE

PROCEDURE WAS TO CALL THIS GUY; THAT HE WAS CHECKED IN, AND

HE WAS STAYING AT THIS HOTEL.  AND THE PROCEDURE WAS FOR

ME TO BRING EVERY TIME TWO KILOS, OR FOUR PACKAGES.  AND I

WOULD ALSO CHECK INTO ONE OF THE ROOMS THERE, GET THE KEY,

GO TO THE ROOM, BRING THE COCAINE INSIDE, PUT IT IN ONE OF

THE DRAWERS.  THERE WAS A DRESSER THERE.  PUT IT IN THERE

AND THEN CAME OUT.

THEN I CALLED JOHN, AND I SAY, "IN ROOM SO-AND-

SO."  AND THAT'S IT, YOU KNOW.  IT WAS NOT MUCH TO SAY.

AND THEN THIS GUY -- I STAYED, YOU KNOW.  USUALLY IT WAS

45

000097

1    DARK.  SO I STAYED, YOU KNOW, A REASONABLE DISTANCE SO THAT

2    I COULDN'T BE SEEN BY HIM, BUT I COULD SEE HIM GOING INTO

3    THE ROOM AND COMING OUT.

4         ONCE HE DID THAT, I JUST WENT HOME.  THAT IS ALL.

5    Q    OKAY.  SO YOUR CONTACT WITH HIM WAS OVER THE PHONE;

6    IS THAT CORRECT?

7    A    YES, THAT IS CORRECT.

8    Q    NOW, AT YOUR DIRECTION DID HECTOR GONZALES MAKE ANY

9    DELIVERIES TO THE ROCHELLE HOTEL?

10   A    YES, MAYBE ONCE OR TWICE.

11   Q    NOW, DURING THIS PERIOD OF TIME COULD YOU TELL US HOW

12   MIGUEL REFERRED TO JOHN, HIS CUSTOMER?

13        MR. STOLAR:  OBJECT TO THE HEARSAY, YOUR HONOR.

14        THE COURT:  SUSTAINED.

15   BY MR. CONNOLLY:

16   Q    OKAY.  NOW, YOU'VE NAMED ABOUT 5 PEOPLE OUT OF THE 20

17   THAT YOU DISTRIBUTED TO.  THERE'S ABOUT 15 OTHER PEOPLE.

18   DO YOU REMEMBER OTHER NAMES OR NOT?

19   A    YES, I COULD REMEMBER SOME OTHER NAMES.  BUT LIKE I

20   SAY, THEY WERE -- THE 50-KILO PEOPLE WERE THE BIG-TIMERS,

21   AND THE ONES WHO GOT A HALF A KILO OR A KILO WERE LITTLE

22   PEOPLE.  SO THE ONES I NAMED ARE THE ONES, YOU KNOW, THAT

23   TOOK THE 50, THE 25 KILOS AT A TIME.

24        BUT THERE WERE -- YOU KNOW, LIKE THERE WAS THIS

25   LADY THAT CAME OUT OF, I THINK, THE ARIZONA AREA.  HER

46

000098

1    NAME WAS VICKIE.  IT WAS ANOTHER MEXICAN NATIONAL.

2            AND THEN THERE WAS -- THERE WAS ONE GUY THAT HIS

3    NAME WAS ROBERT.  AND THEN THERE WAS THIS GUY THAT WE'RE

4    TALKING ABOUT, JOHN -- THAT THEY REFERRED TO AS

5    JOHNNIE GRINGO, OR SOMETHING LIKE THAT.

6            AND THEN THERE WAS -- THERE WAS -- WHO ELSE.

7    AND THAT'S ABOUT IT.  I DON'T REALLY REMEMBER.

8    Q    WHERE DID YOU KEEP THE KILOGRAMS STORED WHILE YOU WERE

9    WAITING TO DISTRIBUTE THEM?

10   A    AT FIRST, I DID IT AT MY HOUSE, JUST HIDE THEM IN ONE

11   OF THOSE TRASH CANS.  YOU KNOW, IT WOULD TAKE MAYBE 50

12   KILOS, EACH BARREL -- EACH CAN, YOU KNOW, ONE OF THOSE

13   39-GALLON CANS, YOU KNOW, ABOUT FOUR-FEET-TALL CANS.

14   Q    NOW, IN ADDITION TO DISTRIBUTING COCAINE FOR MIGUEL,

15   DID YOU HAVE ANY OTHER JOBS FOR HIM?

16   A    OH, YEAH.  I WAS ALSO PICKING UP THE MONEY FROM ABOUT

17   THE SAME PEOPLE THAT I WAS DELIVERING COCAINE TO.  AND I

18   WAS ALSO SUPPOSED TO GET THIS MONEY AND PUT IT BACK IN THE

19   FUEL TANKS AFTER TAKING OUT THE COCAINE.

20   Q    AND CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY

21   HOW MUCH MONEY YOU CAN PUT IN A FUEL TANK?

22   A    I WAS INSTRUCTED TO ONLY PUT IN THE FUEL TANK, IF I

23   COULD, ONLY THE LARGE DENOMINATION, LIKE $100 BILL'S AND

24   50'S.  AND AFTER I RAN OUT OF THOSE, THEN I WAS SUPPOSED

25   TO PUT IN 20'S.  AND AFTER I RAN OUT OF THOSE, THEN 10'S,

47

1    AND LIKE THAT.  SO USUALLY I COULD FIT LIKE $800,000 AT A

2    TIME.

3    Q    NOW, THE MONEY WOULD GO BACK TO MEXICO WITH GLORIA?

4    A    IT WENT BACK.  I DON'T KNOW.  I ASSUME THAT IT WENT

5    BACK, BUT I DON'T KNOW WHO IT WENT BACK TO.

6    Q    WHAT ELSE DID YOU DO WITH THE MONEY?

7    A    OKAY.  LIKE ALL THE 10'S AND 20'S AND 5'S THAT I KEPT

8    BECAUSE THE FUEL TANKS WERE FULL, I JUST PILING THEM UP

9    AT HOME.  AND SOMETIMES I TOOK MONEY OUT OF THE PILE TO

10   BUY SOME MORE EQUIPMENT, CLOTHES, SHOES, PERFUMES, THINGS

11   LIKE THAT.  AND THEN THE REMAINDER, THERE WOULD BE

12   SOMEBODY, YOU KNOW, TO COME AROUND.  AND I WAS INSTRUCTED

13   THEM TO GIVE THEM THE REST, AND THEN THEY WOULD TAKE IT.

14   I DON'T KNOW WHERE.  BACK TO MEXICO.

15   Q    DO YOU KNOW THE NAME OF THE PERSON THAT PICKED UP THE

16   MONEY BESIDES GLORIA IBARRA?

17   A    YES.  IN 1983 I ONLY KNEW ONE GUY AND --

18   Q    WHAT'S HIS NAME?

19   A    -- HIS COMPANION.  HIS NAME?  THE GUY WHO WAS ALWAYS,

20   YOU KNOW, LIKE THE BOSS, YOU KNOW, WAS MARDOQUEO ALFARA.

21   DO YOU WANT ME TO SPELL THAT?  OKAY.  THEY USED TO CALL HIM

22   MARDO ONLY, SO TO MAKE IT SHORT IT WAS M-A-R-D-O, MARDO,

23   AND HIS LAST NAME WAS ALFARO, A-L-F-A-R-O.

24   Q    OKAY.  NOW, PRIOR TO 1983 HAD YOU MET MARDOQUEO ALFARO?

25   A    PRIOR TO 1982?

                                                              48

000100

1   Q    '83.

2   A    '83? NO, I DIDN'T KNOW THIS MAN.

3   Q    OKAY. NOW, WHEN DID YOU MEET HIM IN 1983?

4   A    I DON'T KNOW THE DATE, BUT ONE OF THOSE OCCASIONS

5   WHERE -- WHEN I HAD, YOU KNOW, A LOT OF MONEY AT HOME, AND

6   I NEEDED TO GET RID OF THE MONEY. SOMEBODY HAD TO COME

7   AND GET IT.

8   Q    NOW, YOU JUST SAID A MINUTE AGO THAT YOU PURCHASED

9   CERTAIN EQUIPMENT, PERFUMES, SHOES, CLOTHES.

10  A    OH, YES, I DID.

11  Q    WHO DID YOU PURCHASE THESE FOR?

12  A    FOR MIGUEL AND SOME GIRLS AND FRIENDS, MAYBE.

13  ASSOCIATES. I DON'T KNOW.

14  Q    THESE WERE PERSONAL ITEMS FOR MIGUEL?

15  A    SOME OF THEM WERE, I'M PRETTY SURE.

16  Q    OKAY. NOW, APPROXIMATELY HOW MANY TIMES WOULD YOU

17  SAY YOU GAVE MONEY TO MARDOQUEO ALFARO DURING 1983?

18  A    MAYBE FIVE TIMES. FIVE TIMES, MAYBE.

19  Q    AND WOULD HE COUNT THE MONEY IN YOUR PRESENCE?

20  A    OH, NO, NOW. I'D JUST DELIVER THE MONEY AND GO.

21  Q    HOW WAS THE MONEY DELIVERED?

22  A    WELL, HE WOULD BE STAYING IN A HOTEL. I WOULD COME TO

23  THE HOTEL AND BRING THE SUITCASES UP TO THE ROOM. THAT'S

24  IT.

25  Q    AND WAS THERE EVER ANY RECORDS KEPT AS TO HOW MUCH

49

1   MONEY YOU RECEIVED FROM THE CUSTOMERS OF MIGUEL THAT YOU

2   WERE HANDING OVER TO MARDOQUEO ALFARO?

3   A    NO, NO.  I NEVER KEPT ANY RECORDS.  I WAS NEVER TOLD

4   HOW MUCH THE BOXES OR SUITCASES CONTAINED.  NEVER.  NOT

5   NOW.

6   Q    SO AT THAT TIME YOU HAD NO RESPONSIBILITY TO COUNT

7   THE MONEY; IS THAT CORRECT?

8   A    THAT IS CORRECT.

9   Q    BESIDES ALFARO AND IBARRA, DID ANYBODY ELSE PICK UP

10  MONEY FROM YOU DURING '83?

11  A    OH, YES.  SMALL AMOUNTS, MAINLY BY MIGUEL'S MISTRESSES

12  OR RELATIVES, YES.

13  Q    OKAY.  NOW, DURING THIS PERIOD OF TIME WERE YOU BEING

14  PAID MONEY BY MIGUEL FOR DOING ALL OF THIS WORK FOR HIM?

15  A    I WAS -- YES.  A TIME CAME WHEN HE -- BECAUSE I WOULD

16  ASK, YOU KNOW.  AND HE WOULD SAY, "WELL, OKAY.  TAKE

17  5,000.  TAKE 10,000."  AND THEN HE WOULD SAY I WAS ALSO

18  CREDITING MY DEBT WITH HIM, YOU KNOW, LIKE I OWED HIM FROM

19  THE THREE KILOS THAT I LOST, YOU KNOW.  I NEVER PAID ANY

20  MONEY ON THOSE THREE KILOS.

21       SO WITH THAT JOB I WAS KIND OF PAYING THAT DEBT,

22  BUT I WAS ALSO ALLOWED TO TAKE A LITTLE BIT FOR SURVIVING --

23  YOU KNOW, FOR LIKE MAKING THE PAYMENTS ON MY HOUSE.

24  Q    OKAY.  COULD YOU ESTIMATE FOR US HOW MUCH MONEY YOU

25  COLLECTED FOR MIGUEL DURING 1983?

50

000102

1  A    NOT VERY MUCH.  IT WAS LIKE MAYBE $2 OR $3 MILLION,

2  MAYBE.

3  Q    OKAY.  AND DURING THAT --

4  A    I'M NOT REALLY SURE OF THAT.  LIKE I SAY, I NEVER

5  COUNTED THE MONEY.  I DON'T KNOW HOW MUCH MONEY IT WAS.

6  I ONLY COULD TELL YOU APPROXIMATELY WHAT I FIT IN THE FUEL

7  TANKS.  WHATEVER ELSE I PICKED UP AND DELIVERED, I HAVE

8  NO KNOWLEDGE, YOU KNOW, OF HOW MUCH IT WAS.

9  Q    OKAY.  NOW, MOVING AHEAD PAST 1983, '84, '85, '86, AND

10  GOING INTO 1987, DID YOU HAVE OCCASION DURING 1987 TO

11  BECOME INVOLVED IN THE TRANSPORTATION OF SOME DRUG MONEY

12  FROM THE UNITED STATES TO MEXICO?

13          MR. STOLAR:  YOUR HONOR, COULD WE HAVE A STATEMENT

14  THAT THIS INFORMATION, ALSO, IS NOT ANYTHING TO DO WITH

15  THIS INDICTMENT?

16          THE COURT:  AGAIN, THIS IS NOT BEING OFFERED

17  AGAINST THE DEFENDANT BUT JUST TO SHOW THE TOTALITY OF THE

18  AGREEMENT THAT WAS REACHED WITH THE WITNESS AS TO WHAT HE

19  HAS BEEN GIVEN IMMUNITY FOR; IS THAT CORRECT?

20          MR. CONNOLLY:  YES, YOUR HONOR.

21          THE COURT:  VERY WELL.  THE JURY IS SO ADVISED.

22          THE WITNESS:  WHAT WAS THE QUESTION AGAIN?

23  BY MR. CONNOLLY:

24  Q    WERE YOU INVOLVED IN SOME CRIMINAL ACTIVITY IN THE

25  AREA OF 1987 AND 1988?

51

000103

1    A    YES, I WAS.

2    Q    DID THIS ACTIVITY INVOLVE TAKING DRUG PROCEEDS FROM

3    CALIFORNIA TO MEXICO AND ULTIMATELY DELIVERING THEM TO

4    PLACES IN MEXICO?

5    A    YES, THAT IS THE CASE.

6    Q    AND APPROXIMATELY HOW MUCH WOULD YOU SAY YOU TOOK

7    DURING THIS PERIOD OF TIME?

8    A    WELL, AROUND $8 MILLION, MAYBE.

9    Q    AND WAS THIS MONEY GIVEN TO ASSOCIATES OF MIGUEL

10   FELIX GALLARDO?

11   A    YES, THAT IS CORRECT.

12   Q    AND APPROXIMATELY HOW MANY TRIPS INTO MEXICO DID YOU

13   TAKE CONCERNING THE DELIVERY OF THIS MONEY?

14   A    ABOUT 15, 16 TRIPS, MAYBE.

15   Q    AND ALSO, DURING THIS SAME PERIOD OF TIME, WERE YOU

16   INVOLVED IN THE TRANSFER OF A HUNDRED KILOS OF COCAINE HERE

17   IN THE SOUTHERN CALIFORNIA AREA?

18   A    YES, ABOUT A HUNDRED KILOS.

19   Q    OKAY.  NOW, WHEN DID YOUR CRIMINAL ACTIVITY REGARDING

20   DRUG TRANSACTIONS END?

21   A    I'D SAY 1988, 1989 -- 1989.

22   Q    OKAY.  NOW, CONCERNING -- DO YOU HAVE CERTAIN

23   INFORMATION REGARDING CRIMINAL ACTIVITIES YOU DID BETWEEN

24   THE FALL OF 1983 AND JUNE -- EXCUSE ME -- THE FALL OF 1983

25   AND FEBRUARY OF 1985?

52

1    Q    CAN YOU STATE THAT AGAIN?

2    A    DID YOU DO ANY CRIMINAL ACTIVITY BETWEEN THE FALL OF

3    '83 AND FEBRUARY OF 1985?

4    A    YES.

5    Q    AND DID THIS ACTIVITY ALSO INVOLVE THE DISTRIBUTION OF

6    COCAINE AND OBTAINING PROCEEDS OF COCAINE SALES?

7    A    THAT IS CORRECT, YES.

8    Q    OKAY.  NOW, THE INFORMATION YOU MENTIONED ABOUT YOUR

9    ACTIVITIES WITH FELIX IN 1983 AND 1987 AND 1988, WERE YOU

10   GIVEN IMMUNITY BY THE UNITED STATES GOVERNMENT FOR THE

11   CRIMES YOU COMMITTED DURING THAT PERIOD OF TIME?

12   A    YES.

13   Q    AND THAT MEANS YOU WERE TOLD YOU WERE NOT BEING

14   PROSECUTED?

15   A    YES.

16   Q    WERE YOU ALSO GIVEN IMMUNITY FOR THE CRIMES THAT YOU

17   COMMITTED REGARDING DRUG OFFENSES AND TRANSPORTATION OF

18   MONEY DURING THE FALL OF '83 THROUGH FEBRUARY OF '85?

19   A    THAT IS CORRECT.

20   Q    AND YOU HAVE NOT SPENT ONE DAY IN JAIL; IS THAT CORRECT?

21   A    THAT IS CORRECT.

22   Q    AND IT IS YOUR EXPECTATION THAT YOU WILL SPEND NO DAYS

23   IN JAIL FOR YOUR CRIMINAL ACTIVITIES; IS THAT CORRECT?

24   A    I CERTAINLY HOPE SO.

25        MR. CONNOLLY:  YOUR HONOR, I'M DONE WITH THE

53



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

– – –

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

– – –

UNITED STATES OF AMERICA,    )
                            )
        PLAINTIFF,          )
                            )
    VS.                     )    NO. CR 88-129-WJR
                            )
JUAN RAMON MATTA-BALLESTEROS, )
                            )
    DEFENDANT.              )
                            )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

FRIDAY, DECEMBER 7, 1990

DONNA BOWERS, C.S.R., R.P.R.
OFFICIAL COURT REPORTER
430 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 621-2400

000106

1    1984, WERE YOU ASKED BY ANYONE TO PERFORM CERTAIN DRIVING

2    CHORES FOR SOMEONE?  IN OTHER WORDS, WERE YOU ASKED TO

3    DRIVE SOMEONE SOMEPLACE?

4    A    WHERE?  WHERE?

5    Q    WELL --

6    A    YOU MEAN, HERE IN THE STATES?

7    Q    YES.

8    A    SURE.

9    Q    OKAY.  NOW, SPECIFICALLY --

10   A    MY WIFE.  I MEAN, WHAT DO YOU MEAN?

11   Q    OKAY.  DID YOU HAVE OCCASION TO MEET WITH CHARLIE AND

12   SOME EMPLOYEES OF MIGUEL FELIX GALLARDO HERE IN THE UNITED

13   STATES?

14   A    YES.  NOW, YES, YES.  I WAS INSTRUCTED BY MIGUEL ONE

15   TIME DURING THE MONTH OF JANUARY IN 1984, AFTER THESE

16   INDIVIDUALS HAD CALLED ME TO THE SHOP WHERE I WORKED.  AND

17   I MET WITH THEM IN A LITTLE RESTAURANT IN THE BACK OF THE

18   SHOP, AND THEY ASKED ME TO DRIVE THEM.

19        AND SO BECAUSE OF THIS, I CALLED MIGUEL, AND I

20   ASKED HIM, YOU KNOW, WHAT IT WAS ALL ABOUT.  AND HE SAID,

21   "WHY DON'T YOU JUST DO AS THEY ASK YOU."  AND YES, I DROVE

22   THEM AROUND A LOT OF MILES.

23   Q    WHO WERE THE PEOPLE THAT YOU DROVE AROUND?

24   A    ONE OF THEM WAS THIS INDIVIDUAL HERE IN ONE OF THE

25   EXHIBITS, AND THE OTHER TWO WERE PILOTS THAT I -- THAT CAME

78

1    WITH CHARLIE, OR CHARLIE CAME WITH THEM.

2    Q    OKAY.  NOW, IT WAS CHARLIE AND TWO PILOTS; IS THAT

3    CORRECT?

4    A    THAT IS CORRECT.

5    Q    AND DO YOU KNOW THE NAMES OF THE TWO PILOTS?

6    A    YES.  ONE OF THEM WAS FRANCISCO JARAMILLO, AND THE

7    OTHER ONE WAS ALFREDO ALVAREZ-AGUILAR -- ALFREDO AGUILAR.

8    Q    AND WERE THEY CALLED FRANCISCO AND ALFREDO, OR WHAT

9    WERE THEY CALLED?

10   A    NO, THEY WERE CALLED FREDDIE AND PANCHO. .

11   Q    NOW, DO YOU KNOW HOW FREDDIE AND PANCHO CAME INTO THE

12   UNITED STATES ON THAT TRIP?

13   A    I DON'T REMEMBER FOR SURE, BUT I BELIEVE THEY CAME --

14   THEY CROSSED THE BORDER DRIVING OR MAYBE WALKING OR

15   SOMETHING.

16   Q    OKAY.  CAN YOU TELL US WHETHER OR NOT, PRIOR TO MEETING

17   FREDDIE AND PANCHO, YOU EVER MET CARLOS OR CHARLIE BEFORE

18   THAT?

19   A    NO, NOT EVER.

20   Q    OKAY.  NOW, WHAT WERE YOU ASKED TO DO BY THESE

21   INDIVIDUALS?

22   A    THESE INDIVIDUALS WANTED ME TO DRIVE UP TO THE AREA OF

23   THE SAN JOAQUIN VALLEY, AND SPECIFICALLY TO THE AREA,

24   FIRST -- THE FIRST AREA WE WENT, IT WAS THE MARICOPA AREA.

25   THE COUNTY OF MARICOPA, I THINK THAT'S WHAT IT IS.

79

1    Q      AND DID THESE INDIVIDUALS TELL YOU WHY THEY WANTED

2    YOU TO DRIVE THEM TO THE MARICOPA AREA?

3    A      OH, YEAH.  RIGHT AFTER, YOU KNOW -- OR EVEN WHEN WE

4    MET, YOU KNOW, HAVING BREAKFAST IN THIS RESTAURANT, THEY

5    TOLD ME, YOU KNOW, WHAT IT WAS ALL ABOUT, BUT I HAD TO

6    CONFIRM, YOU KNOW, WHAT THEY WERE ASKING ME WITH MIGUEL.

7          SO YES, THEY DID ASK ME TO DRIVE THEM AROUND,

8    TO GO AND SEE SOME -- SOME LANDING STRIPS THAT THEY -- THEY

9    KNEW.  SEE, THEY KNEW FROM THE AIR; THEY WANTED TO DRIVE

10   TO THEM NOW.

11   Q    OKAY.  NOW, WHAT DID THEY TELL YOU, WHEN YOU SAID

12   THEY TOLD YOU WHAT IT WAS ALL ABOUT?  WHAT DID THEY TELL

13   YOU IT WAS ALL ABOUT?

14   A    THAT THEY NEEDED TO SEE THE LANDING STRIPS.  THAT'S

15   WHAT IT WAS.  AND WITHIN THE CONVERSATION I LEARNED THAT

16   THE REASON WHY THEY WANTED TO LEARN WHERE THEY WERE, WHERE

17   THESE LANDING STRIPS WERE, IT WAS BECAUSE THEN AFTER, THEY

18   WERE GOING TO BE USING THE LANDING STRIP TO LAND AN

19   AIRPLANE THERE.

20   Q    DID THEY MENTION WHAT WAS GOING TO BE IN THE AIRCRAFT,

21   OR DID YOU ASK?

22   A    OH, YES.  YES.

23   Q    WHAT DID THEY SAY?

24   A    DRUGS.

25   Q    DID THEY TELL YOU HOW OFTEN THE AIRCRAFT WERE GOING TO

80

1    BE COMING IN?

2    A    AFTER -- YOU KNOW, BECAUSE I DROVE A WEEK, YOU KNOW,

3    EVERY DAY.  I DROVE THESE GUYS LIKE A WEEK, A WHOLE WEEK,

4    SO WE HAD A LOT OF TIME, YOU KNOW, THAT WE TALKED MANY

5    THINGS, YOU KNOW.  AND ON THE CONVERSATIONS, YOU KNOW, A

6    LOT OF TIMES -- BECAUSE, YOU KNOW, THE THIRD OR FOURTH DAY

7    THAT WE DROVE AROUND, I SAID, "ISN'T THIS ENOUGH, YOU KNOW?

8    I MEAN, ISN'T IT ENOUGH LANDING SITES THAT WE HAVE SEEN SO

9    FAR?"

10        AND HE SAYS, "OH, NO.  YOU DON'T UNDERSTAND THIS.

11   I MEAN, THIS IS A BIG JOB."

12        AND I REMEMBER CHARLIE SAYING, "OH, NO, NO.  WE

13   ONLY HAVE FOR LIKE THE FIRST FEW MONTHS -- WE HAVE LIKE

14   5,000 KILOS WE NEED TO MOVE."

15        AND SO I SAID, "OKAY.  LET'S GET GOING THEN."

16   AND WE DROVE MORE.  WE DROVE TO THE SAN JOAQUIN VALLEY, AND

17   WE DROVE TO THE APPLE VALLEY ON THE OTHER SIDE, ON THE EAST

18   SIDE, AND THEN TO THE MOJAVE DESERT, AND A LOT OF PLACES.

19   Q    OKAY.  NOW, DURING THE TRIP DID YOU FIND ANY LANDING

20   PLACES THAT WOULD BE ACCEPTABLE, OR THAT WERE ACCEPTABLE?

21   A    YES, YES.  AND THERE WERE -- YOU KNOW, PUT NAMES OR CODES

22   ON THE LANDING STRIPS.

23   Q    WHO WAS THAT?

24   A    THE PILOTS.

25   Q    AND APPROXIMATELY HOW MANY LANDING STRIPS DID YOU FIND?

81

000110

1  A    WELL, THE FIRST TIME, I THINK, IT WAS LIKE THREE OR

2  FOUR.

3  Q    AND HOW ABOUT AFTER THAT?

4  A    AFTER THAT THEY CAME BACK, AND WE DROVE AROUND AGAIN,

5  AND THEN THEY PICKED SOME MORE.

6          MR. STOLAR:  COULD WE FIX A DATE ON THE SECOND

7  ONE?

8          THE COURT:  WHEN WAS THAT, THE TIME FRAME?

9          THE WITNESS:  WELL, THE FIRST TIME THEY SHOWED

10  UP, THAT WAS AROUND JANUARY.

11          THE COURT:  WHEN WAS THE SECOND TIME?

12          THE WITNESS:  THE SECOND TIME COULD HAVE BEEN IN

13  MARCH OR SOMETHING LIKE THAT.  THEY SHOWED UP MORE THAN

14  TWICE, I KNOW.  THEY CAME BACK LIKE FIVE, SIX TIMES, MAYBE.

15  Q    OKAY.  NOW, DURING THE CONVERSATIONS WHEN YOU WERE

16  DRIVING THEM AROUND IN JANUARY 1983, DID CARLOS, OR CHARLIE,

17  TELL YOU WHO HE WORKED FOR?

18  A    WELL, AMONG THEMSELVES THEY TALKED A LOT ABOUT

19  DON JOSE.  THAT'S -- AND YES, CARLOS -- CARLOS MENTIONED,

20  YOU KNOW, THAT HE WORKED FOR DON JOSE.  AS A MATTER OF FACT,

21  HE BRAGGED ABOUT BEING THE SECOND ON BOARD, SOMETHING LIKE

22  THAT.

23  Q    OKAY.  NOW, AT THIS TIME DID YOU KNOW WHO DON JOSE

24  WAS?

25  A    NO, I HADN'T MET DON JOSE YET.  NO.

82

1    Q    DOES CARLOS TELL YOU WHAT HIS JOB IS?

2    A    I DON'T THINK SO.  I DON'T THINK HE DID.  HE JUST --

3    I REMEMBER HE SAID THAT HE WAS, YOU KNOW, THE SECOND ON

4    BOARD.  HE ALSO SAID STORIES ABOUT BEING SOMEPLACE ELSE,

5    YOU KNOW, DOING THE SORT OF BUSINESS -- OR SORT OF THINGS

6    THAT WE WERE DOING THEN, YOU KNOW.

7             MR. CONNOLLY:  I'D ASK AT THIS TIME FOR THE CLERK

8    TO SHOW THE WITNESS GOVERNMENT EXHIBIT 93, PLEASE.

9             THE CLERK:  GOVERNMENT'S EXHIBIT 93 PLACED BEFORE

10   THE WITNESS.

11   BY MR. CONNOLLY:

12   Q    CAN YOU IDENTIFY ANY OF THE DOCUMENTS IN EXHIBIT --

13   A    I SURE DO, YES.

14   Q    ANY OF THE PIECES OF PAPER IN EXHIBIT 93?

15   A    THERE IS A LEASE AGREEMENT HERE, AND IT HAS MY

16   HANDWRITING.  THERE'S ALSO A CASHIER'S CHECK RECEIPT, AND

17   THAT'S ALSO MY SIGNATURE.

18   Q    AND WHERE IS THE LEASE AGREEMENT FOR?

19   A    WELL, AS I REMEMBER, CHARLIE NEEDED TO RENT A HOUSE,

20   AND I WAS INSTRUCTED TO HELP HIM.  AND I TOOK HIM TO A

21   REALTOR, AND THIS REALTOR SHOWED HIM A LOT OF HOUSES, AND

22   HE PICKED ONE.  BUT HE NEEDED TO THEN FILL OUT ONE OF THESE

23   AGREEMENTS, YOU KNOW, AND HE DIDN'T KNOW HOW, OR AT LEAST

24   HE SAID HE DIDN'T.

25             AND SINCE I WAS SUPPOSED TO HELP HIM, I FILLED IT

83

1    OUT FOR HIM.  BUT THEN, WHEN -- I ALSO HAD TO SIGN.  THE

2    GUY DIDN'T HAVE NO CREDIT AND NOTHING TO -- YOU KNOW.  I

3    HAD TO SIGN THIS THING, BUT IT WAS FOR HIM; THE HOUSE WAS

4    FOR HIM.

5    Q    AND DID YOU -- WHO WERE YOU INSTRUCTED TO HELP HIM BY?

6    A    MIGUEL, MY COUSIN, DID.

7    Q    AND WERE YOU INSTRUCTED BY MIGUEL TO SIGN YOUR OWN

8    NAME?

9    A    NO.  I DON'T EXACTLY REMEMBER -- I REMEMBER CALLING

10   HIM ABOUT THIS, AND I REMEMBER HE SAID, "ALL YOU HAVE TO

11   DO IS JUST TAKE HIM AROUND.  HELP HIM PICK OUT A HOUSE,"

12   YOU KNOW.

13          I REMEMBER SAYING TO HIM THAT IT WASN'T JUST THAT

14   EASY.

15          HE SAYS, "WHAT DO YOU MEAN?  YOU KNOW, WE RENT

16   HOUSES EVERY DAY."

17          I GO, "YOU DO IT OVER THERE, NOT HERE.  HERE IT'S

18   NOT JUST AS SIMPLE AS THAT.  THIS GUY DON'T HAVE NO

19   EMPLOYMENT."

20          "BUT HE'S GOT MONEY, DON'T HE?"

21          "WELL, HE DOES."

22          WELL, ANYWAYS, I TOOK HIM AROUND, BUT I DON'T

23   REMEMBER EXACTLY IF THEN, WHEN HE CAME TO SIGN FOR THE

24   AGREEMENT, I WAS EITHER ORDERED -- I MEAN, INSTRUCTED

25   SPECIFICALLY TO DO IT OR IF I JUST DID IT BECAUSE I KNEW

84

1    I HAD TO DO IT.  EVEN IF I CALLED BACK AND SAID, "HEY, I

2    HAVE TO SIGN," "WELL, SIGN IT," SEE?  I KNEW WHAT WAS GOING

3    TO HAPPEN.

4           SO I DON'T REMEMBER IF I DID OR NOT -- CALL BACK.

5    Q    WHAT IS THE ADDRESS ON THAT LEASE AGREEMENT, PLEASE?

6    A    IT'S 1043 VIA CORDOVA.  YEAH, THAT'S WHAT IT IS.

7    Q    IS THERE A TOWN?

8    A    WHAT?

9    Q    A TOWN, A CITY.

10   A    OH, YES.  I KNOW IT'S IN SAN PEDRO.  OKAY?  BUT IN

11   THIS AGREEMENT I DON'T SEE THE NAME OF THE CITY.

12   Q    OKAY.  NOW, DOES THAT AGREEMENT HAVE A DATE ON IT?

13   A    YES, IT DOES.  IT'S FEBRUARY 18, 1984.

14   Q    OKAY.  AND IS THERE A LAST NAME LISTED FOR CARLOS ON

15   THAT?

16   A    YES, THERE IS, AND ALSO FOR A LADY, YES.

17   CARLOS FERNANDEZ AND CLAUDIA FERNANDEZ.

18   Q    OKAY.  NOW, DID YOU KNOW HIM BY THAT NAME AT ALL?

19   A    YES, UH-UH.

20          MR. CONNOLLY:  NOW, I'M GOING TO ASK AT THIS TIME

21   FOR THE WITNESS TO BE SHOWN EXHIBIT 92.

22          NOW, MR. STOLAR HAS A PROBLEM WITH THIS, YOUR

23   HONOR.

24   Q    DO YOU KNOW THE ADDRESS OF THE HOUSE THAT CARLOS LIVED

25   IN?

85

1  A    YOU MEAN, THIS ADDRESS?

2  Q    YES.

3  A    IT SAYS HERE ON THIS --

4  Q    OTHER THAN FROM READING IT THERE.

5  A    OH, NO.  I DON'T REMEMBER THE ADDRESS.  I KNOW WHERE

6  THE HOUSE IS, BUT I DON'T REMEMBER THE ADDRESS.  I KNOW

7  IT'S IN THE TARAGONA AREA IN SAN PEDRO.  IT'S A VERY NICE

8  AREA IN SAN PEDRO.  IT'S CALLED TARAGONA.  BUT NOT -- I

9  WOULDN'T BE ABLE TO TELL YOU THE NUMBER OF THE HOUSE.  IF

10 I DIDN'T SEE IT HERE, I DON'T REMEMBER.

11 Q    OKAY.  NOW --

12        THE CLERK:  GOVERNMENT'S EXHIBIT 92 IS BEFORE THE

13 WITNESS.

14 BY MR. CONNOLLY:

15 Q    COULD YOU LOOK AT EXHIBIT 92.

16 A    YES.

17 Q    OKAY.  NOW, CAN YOU TELL US WHETHER OR NOT YOU CAN

18 IDENTIFY THAT PICTURE.

19 A    OH, THIS IS THE HOUSE THAT WE ARE TALKING ABOUT HERE

20 IN THIS AGREEMENT.

21 Q    OKAY.  IS THAT THE HOUSE THAT YOU RENTED FOR CARLOS?

22 A    THAT IS CORRECT.

23 Q    AND DID YOU EXPRESS ANY CONCERN TO CARLOS THAT YOU

24 DIDN'T WANT YOUR NAME ON THE LEASE?

25 A    OF COURSE, I DID, YES.

86

1  Q    TELL THE LADIES AND GENTLEMEN OF THE JURY EXACTLY WHAT

2  YOU SAID TO CARLOS AND WHAT HE SAID TO YOU ABOUT YOUR NAME

3  BEING ON THAT LEASE.

4  A    OH, WHEN IT CAME DOWN TO SIGNING THE NAME, I SAID,

5  "YOU SIGN YOUR NAME," YOU KNOW. BUT I BELIEVE THAT THERE

6  WAS SOME INTERVENTION BY THE PART OF THE REALTOR THAT SAID,

7  "DOES CARLOS HAVE ANY CREDIT, OR SOMETHING LIKE THAT?"

8           AND I SAID, "NO," BECAUSE I KNEW HE DIDN'T, YOU

9  KNOW.

10          AND THEN HE SAID, "WELL, CAN YOU CO-SIGN FOR

11 HIM?"

12          AND THEN WE TALKED, YOU KNOW, IN SPANISH BETWEEN

13 HIM AND I, AND HE SAYS, "HEY, IT'S OKAY. YOU DON'T HAVE

14 TO WORRY ABOUT ANYTHING, YOU KNOW. DIDN'T YOU SEE? THIS

15 IS WHERE MY WIFE AND MY KIDS ARE GOING TO LIVE, SO IT'S

16 GOING TO BE ALL RIGHT. NO PROBLEM. WE'RE NOT GOING TO

17 BURN THE HOUSE. IT'S OKAY."

18          SO I SAID, "WELL, IF THE WIFE AND THE KIDS ARE

19 GOING TO LIVE HERE, I BELIEVE HE'S TELLING ME THE TRUTH,"

20 YOU KNOW. SO I SIGNED. BUT THAT WAS THE ARGUMENT, YES.

21 Q    DURING THE COURSE OF THE NEXT SEVERAL MONTHS, DID YOU

22 HAVE OCCASION TO VISIT THAT HOUSE REGULARLY?

23 A    YES. YES.

24 Q    AND DURING YOUR TRIPS TO THE HOUSE, WOULD YOU MEET WITH

25 PEOPLE?

87

1   A    YES.

2   Q    AND WHO WOULD YOU MEET WITH?

3   A    THE LADY THAT WAS SUPPOSED TO BE HIS WIFE; AND HIS

4   BROTHER AND HIS WIFE AND THE KIDS; AND I THINK THIS OTHER

5   GUY THAT'S IN ONE OF THE EXHIBITS, SIGI -- SIGILFREDO;

6   AND SOME OTHER PEOPLE THAT I DON'T KNOW.  I NEVER KNEW

7   WHO THEY WERE, YOU KNOW.  BUT PEOPLE THAT WERE IN THE HOUSE.

8   Q    OKAY.  NOW, WERE THESE MEETINGS THAT YOU HAD AT THE

9   SAN PEDRO ADDRESS BUSINESS OR PLEASURE?

10  A    EXCUSE ME.  I DIDN'T GET THAT.

11  Q    WERE THE MEETINGS FOR BUSINESS OR PLEASURE?

12  A    AT FIRST, IT WAS BOTH.  WE JUST CAME DOWN THERE.  WE

13  ATTENDED A BIRTHDAY PARTY ONCE.  AND THEN AFTERWARDS, IT

14  WAS JUST STRICTLY BUSINESS.

15  Q    OKAY.  AND WHAT WERE THE DISCUSSIONS, THE BUSINESS

16  DISCUSSIONS, ABOUT?

17  A    OH, JUST MONEY.  THAT'S ALL.  DOCUMENTS THAT I PICKED

18  UP.

19  Q    THAT YOU PICKED UP FROM WHOM?

20  A    FROM CHARLIE AND DIEGO.

21  Q    OKAY.  WAS THERE EVER ANY MENTION OF DRUGS?

22  A    IT COULD HAVE BEEN, BUT I DIDN'T HAVE NOTHING TO DO

23  WITH THE DRUGS.  IF THERE WAS ANY DISCUSSIONS, IT WASN'T

24  LIKE "BRING ME SOME DRUGS" OR "I'LL GIVE YOU SOME DRUGS."

25  NO, NO.  I MEAN, MAYBE THEY -- THEY TALKED ABOUT IT, MAYBE,

88

1    BUT NOT BECAUSE IT MATTERS TO ME.

2    Q    OKAY.  DID THERE COME A TIME IN FEBRUARY 1984 WHEN

3    YOU WERE INVOLVED IN THE UNLOADING OF AN AIRPLANE FUI

4    COCAINE IN MARICOPA, CALIFORNIA?

5    A    YES.

6    Q    COULD YOU TELL THE LADIES AND GENTLEMEN OF THE JI

7    HOW YOU BECAME INVOLVED IN THAT EVENT.

8    Q    WELL, AFTER THE PILOTS LEFT AND AFTER THEY DID TH

9    CODING, YOU KNOW, THEY NAMED THE LANDING STRIPS, LIKE FOUR

10   OR FIVE.  ONE WAS NAMED ONE WAY AND THE OTHER ONE ANOTHER

11   WAY.  AND THEN THEY TALKED TO CHARLIE ABOUT COMING THE

12   FOLLOWING WEEK AT A CERTAIN DATE AND A CERTAIN TIME, BUT

13   THEY DIDN'T -- THEY WERE NOT QUITE SURE WHICH ONE THEY

14   WERE GOING TO USE.

15        BUT THEY SAID THAT "IF WE CALLED YOU OR SOMEBODY

16   CALLED YOU AND TELLS YOU 'LA BONITA,' THAT MEANS THIS ONE.

17   AND IF HE TELLS YOU 'LAS PALOMAS,' IT MEANS THIS OTHER ONE.

18   IF HE TELLS YOU 'THE CORNFIELDS,' IT MEANS THIS ONE," AND

19   LIKE THAT.

20        SO AFTER THEY LEFT, THE FOLLOWING WEEK OR THE

21   WEEK AFTER, THEY CAME.  AND I WENT TO THE MEETING WITH --

22   I MEAN, I WENT TO RECEIVE THE LOAD IN THE PLANE ALONG WITH

23   SOME OTHER GUYS, YOU KNOW, INCLUDING CHARLIE.

24   Q    OKAY.  NOW --

25        THE COURT:  WHAT TIME WAS THIS?  CAN YOU GIVE US

89

000118

1   A TIME FRAME?

2   BY MR. CONNOLLY:

3   Q    CAN YOU GIVE US AN ESTIMATE AS TO WHEN THIS HAPPENED?

4   A    IT WAS LATE JANUARY OR EARLY FEBRUARY.

5   Q    OF WHAT YEAR?

6   A    1984.

7   Q    OKAY.  NOW, WHO WERE YOU -- EXCUSE ME.

8        I WOULD ASK AT THIS TIME FOR THE CLERK TO SHOW

9   THE WITNESS GOVERNMENT EXHIBIT 136.  I BELIEVE IT'S ONE OF

10  THE LARGE POSTERS.

11       THE CLERK:  GOVERNMENT'S EXHIBIT 136 PLACED

12  BEFORE THE WITNESS.

13  BY MR. CONNOLLY:

14  Q    OKAY.  WITHOUT SHOWING THE EXHIBIT TO THE JURY, COULD

15  YOU LOOK AT THAT AND TELL ME IF YOU CAN IDENTIFY THAT.

16  A    YES, I COULD.

17  Q    WHAT IS IT?

18  A    WELL, THIS IS WHAT WAS CALLED LA BONITA BECAUSE IT WAS

19  SUCH -- IT WAS LARGE AND SURROUNDED BY MOUNTAINS, AND THEY

20  THOUGHT IT WAS BEAUTIFUL.  SO THAT'S WHY THEY CALLED IT

21  LA BONITA.

22  Q    OKAY.  WAS THAT ONE OF THE LANDING STRIPS THAT WAS

23  FOUND?

24  A    THAT IS CORRECT.  THIS IS IT.  THIS IS ONE OF THEM.

25  Q    OKAY.  NOW, WHEN THE FIRST LOAD CAME IN, TELL THE

90

000119

1    MR. STOLAR:  I HAVE NO OBJECTION, YOUR HONOR.

2    THE COURT:  IT WILL BE RECEIVED IN EVIDENCE.

3    MR. CONNOLLY:  THANK YOU, YOUR HONOR.

4    MR. STOLAR:  I THINK IT OUGHT TO BE EXHIBITED TO

5 THE JURY TOO.

6    THE COURT:  DO YOU WANT TO EXHIBIT IT TO THE JURY,

7 MR. CONNOLLY?

8    MR. CONNOLLY:  I'LL LET MR. STOLAR DO THAT IN

9 CROSS-EXAMINATION, YOUR HONOR.

10    MR. STOLAR:  YOU CAN'T CROSS-EXAMINE A PHOTO.

11    MR. CONNOLLY:  I DON'T HAVE ANY DESIRE AT THIS

12 TIME TO --

13    THE COURT:  ALL RIGHT.  ASK YOUR NEXT QUESTION.

14    MR. CONNOLLY:  THANK YOU.

15    THE COURT:  MR. STOLAR CAN DO THAT IF HE WISHES.
               DIRECT EXAMINATION (CONTINUED)
16 BY MR. CONNOLLY:

17 Q    WOULD YOU TELL US WHO WENT UP WITH YOU TO PICK UP THE

18 FIRST LOAD.

19 A    THERE WERE ABOUT EIGHT PEOPLE.

20 Q    OKAY.  TELL US WHO THE EIGHT PEOPLE WERE, AS MUCH AS

21 YOU REMEMBER.

22 A    OKAY.  IT WAS CHARLIE AND ME, AND THEN IT WAS -- LET

23 ME THINK -- PACHIN.  PACHIN, I DON'T KNOW ANYMORE ABOUT

24 THIS GUY PACHIN.  SOMEBODY THAT CAME OUT HERE FOR THAT ONE

25 PURPOSE THAT I KNEW OF.  AND ONE GUY THAT THEY CALLED

95

1    CHULETAS.  I DON'T KNOW HIS NAME -- CHULETAS.

2        AND THEN THERE WAS MIGUEL'S NEPHEWS, TWO OF THEM.

3    ONE IS KNOWN BY NICO; THE OTHER ONE BY GUSHI OR BUSHI,

4    SOMETHING LIKE THAT.  AND THEN THERE WAS CACHIRAS ALSO.

5    AND THAT IS ABOUT IT, AS I REMEMBER.

6    Q    OKAY.  HOW ABOUT WITH YOU?  WAS THERE ANYBODY WITH

7    YOU?  WAS HECTOR GONZALES THERE?

8    A    NO, NO.  HECTOR WAS NOT WITH ME.  I'M NOT REALLY SURE,

9    BUT I THINK TOSCANO WAS WITH ME.

10    Q    AND WHAT'S HIS FIRST NAME?

11    A    ALFREDO OR ALBERT.

12    Q    AND DID YOU ALL GO UP TOGETHER, OR DID YOU MEET UP

13    THERE, OR WHAT?

14    A    WE DROVE LIKE THREE DIFFERENT CARS, VEHICLES.

15    Q    AND DID YOU ALL LEAVE FROM YOUR AREA, YOUR HOUSE?

16    A    YES, YES -- NO, NOT FROM MY HOUSE.  I THINK WE MET

17    IN CACHIRAS'S PLACE, I THINK, IN THE HOUSE WHERE CACHIRA

18    WAS STAYING AT.  THAT IS WHERE WE MET.  AND FROM THERE WE

19    LEFT.

20    Q    OKAY.  NOW, HAD YOU BEEN INSTRUCTED BY ANYONE TO DO

21    THIS PRIOR TO GOING UP THERE?

22    A    YES.  I WAS INSTRUCTED TO GO WITH THE REST OF THE

23    GUYS, YES.

24    Q    WHO HAD INSTRUCTED YOU?

25    A    MY COUSIN, MIGUEL.

96

1    Q     AND WHAT HAD HE SAID TO YOU?

2    A     TO GO WITH THE GUYS.

3    Q     DID HE EXPLAIN TO YOU WHAT WAS GOING ON?

4    A     I KNEW BY NOW.  YOU KNOW, THERE WAS A LOAD COMING IN,

5    AND HE ASKED ME TO GO.

6    Q     DID HE SAY HOW BIG THE LOAD WAS OR --

7    A     I DON'T THINK HE DID.  I DON'T THINK HE DID.  BUT

8    YOU KNOW, FOR WHAT WE SPOKE TO THE PILOTS, I KNEW MORE OR

9    LESS THAT IT WAS OVER 500 KILOS.

10   Q     OKAY.  NOW, WHAT HAPPENED WHEN YOU GOT UP TO THE

11   LANDING STRIP?

12   A     OKAY.  WE LEFT A DAY BEFORE THIS HAPPENED, AND WE

13   STAYED IN A HOTEL NEARBY THE PLACE.  AND SOME OTHER GROUP

14   WENT TO THE ALTERNATE LANDING STRIP. AND THEY ALSO LEFT A

15   DAY BEFORE, AND THEY ALSO STAYED IN A HOTEL.

16   Q     ANOTHER GROUP OTHER THAN THE PEOPLE YOU HAVE TOLD US

17   ABOUT?

18   A     UH-HUH, RIGHT.  SOMEBODY ELSE WENT OVER THERE FOR --

19   I'M NOT REALLY SURE.  IT WAS ANOTHER GROUP OF PEOPLE.

20   Q     AND WHAT WAS THEIR PURPOSE?

21   A     OH, IF -- SEE, THE PLACE I WAS GOING TO WAS THE

22   PRIMARY LANDING STRIP.  THE LOAD WAS COMING THERE. BUT IF

23   FOR SOME REASON OR ANOTHER, YOU KNOW, IT COULDN'T MAKE IT

24   THERE, THEY WOULD GO TO THE NEXT ONE THAT IT WAS IN THE --

25   IN THE APPLE VALLEY AREA.

97

1   Q    OKAY. AND DID THERE COME A TIME WHEN A PLANE LANDED?

2   A    YES, IT DID.

3   Q    AND WHAT KIND OF PLANE?

4   A    IT WAS A CESSNA 402.

5   Q    AND DID YOU SEE WHO WAS PILOTING IT?

6   A    YES, I DID. IT WAS THE SAME GUYS THAT HAD BEEN IN

7   THE AREA, YOU KNOW, THE LAST WEEK OR THE WEEK BEFORE.

8   Q    AND THEIR NAMES AGAIN?

9   A    PANCHO AND FREDDIE.

10   Q    OKAY. AND WHAT HAPPENED WHEN THE PLANE LANDS?

11   A    WELL, A LITTLE BIT PRIOR TO THE LANDING, WE WERE RIDING

12   THESE MOTORCYCLES, TRYING TO GET THE PLACE CLEAR OF COWS,

13   YOU KNOW. THERE WERE A LOT OF COWS. SO WE KIND OF CLEARED

14   THE AREA FOR THE PLANE TO LAND. AND RIGHT AFTER THAT THE

15   PLANE LANDED.

16          AND THE PLANE, ONCE IT LANDED, I BELIEVE THAT

17   EVEN BEFORE IT TOUCHED THE GROUND, THE DOOR WAS ALREADY

18   OPENED, AND THEY WERE ALREADY THROWING DUFFLE BAGS OUT OF

19   THE PLANE. SO THREE MINUTES LATER THE AIRPLANE WAS UP IN

20   THE AIR AGAIN, AND THE VAN THAT WE HAD THERE WAS ALREADY

21   LOADED WITH ALL OF THE DUFFLE BAGS.

22   Q    OKAY. NOW, WHAT KIND OF VAN DID YOU HAVE?

23   A    IT WAS A FORD VAN, A 150.

24   Q    IS THIS AN ECONOLINE VAN?

25   A    AN ECONO 150; RIGHT.

98

1    Q    WHO OWNED THAT VAN?

2    A    WE HAD PURCHASED THAT VAN PRIOR TO THIS EVENT OR

3    EVEN -- I THINK WE PURCHASED THE VAN WHEN THE PILOTS WERE

4    LOOKING FOR THE PLACES.  I BELIEVE THAT WE RODE IN THAT

5    VAN OVER THERE TO SEE THE PLACES.

6    Q    WAS THAT VAN ALSO IN YOUR NAME?

7    A    NO, IT WAS NOT.  I WAS INVOLVED IN THE PURCHASE OF THE

8    VAN, BUT IT WAS NOT IN MY NAME.

9    Q    DO YOU KNOW WHOSE NAME IT'S IN?

10   A    IT WAS IN TOSCANO'S NAME, ABEL TOSCANO.

11   Q    OKAY.  DO YOU KNOW WHO IT WAS PURCHASED FROM?

12   A    FROM DON KOTT.

13   Q    DON --

14   A    DON KOTT FORD.

15   Q    AND WHERE IS THAT?

16   A    I THINK CARSON.

17   Q    OKAY.  NOW, AFTER THE PLANE LANDED AND THE DUFFLE BAGS

18   WERE THROWN OFF, WERE THEY LOADED INTO THE VAN?

19   A    YES, WE LOADED THEM INTO THE VAN.

20   Q    AND WHERE WERE THEY TAKEN?

21   A    DOWN FROM THE VALLEY -- FROM THE VALLEY -- AWAY, LIKE

22   FOUR OR FIVE MILES AWAY, YOU KNOW, BECAUSE WE HAD A

23   MOTORHOME WITH US, ALSO, WHERE WE WERE SUPPOSED TO TRANSFER

24   THE LOAD.

25        THE REASON WHY WE DIDN'T TAKE THE MOTORHOME UP

99

1   THERE IS BECAUSE, YOU KNOW, TO GET UP THERE WAS NOT EASY

2   FOR A MOTORHOME TO GO UP THERE.

3          SO WHEN WE CAME DOWN FROM THE VALLEY, THEN WE

4   TRANSFERRED THE LOAD TO THE MOTORHOME, AND THEN I DROVE OFF,

5   ME AND ALFREDO TOSCANO -- OR ABEL.  I DON'T KNOW HIS NAME,

6   BUT IT'S ONE OF THE TWO, ABEL OR ALFREDO.

7   Q    OKAY.  NOW, THE MOTORHOME, WHO OWNED THE MOTORHOME?

8   A    I DON'T KNOW WHO OWNS THE MOTORHOME.  THE MOTORHOME

9   CAME OUT OF MEXICO -- I MEAN, THEY BUILT IT HERE, I GUESS,

10  BUT I MEAN, SOMEHOW -- OR WHEN I KNEW OF IT, IT CAME FROM

11  MEXICO.

12  Q    OKAY.  NOW, WERE YOU INSTRUCTED PRIOR TO GOING UP TO

13  MARICOPA COUNTY THAT YOU WERE THE PERSON THAT WAS GOING TO

14  RECEIVE THE LOAD?

15  A    I WAS INSTRUCTED BY MIGUEL TO TAKE THE LOAD, TO TAKE

16  CHARGE OF THE LOAD, YES.

17  Q    DID YOU HAVE A DISCUSSION WITH CHARLIE ABOUT TAKING

18  CHARGE OF THE LOAD?

19  A    WELL, CHARLIE THOUGHT THAT THE LOAD -- HE WAS SUPPOSED

20  TO TAKE CHARGE OF THE LOAD, AND THERE WAS A BIG DISCUSSION

21  ABOUT IT, YOU KNOW.  BUT I SAID, "HEY, I DON'T KNOW WHO

22  YOU ARE, WHAT ROLE YOU PLAY HERE, BUT I'M TAKING IT."  AND

23  I TOOK IT, AND HE DIDN'T OBJECT TO THAT, AND I JUST DROVE

24  OFF WITH IT.

25          AND THE NEXT DAY HE FLEW DOWN TO GUADALAJARA --

100

1          MR. CONNOLLY:  EXCUSE ME, YOUR HONOR.  COULD WE

2      STOP NOW?

3          THE COURT:  ALL RIGHT.  WE'LL TAKE OUR NOON

4      RECESS.  LADIES AND GENTLEMEN, WE'LL BE IN RECESS UNTIL

5      1:30.  REMEMBER THE ADMONITION.

6          (LUNCHEON RECESS.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

101

LOS ANGELES, CALIFORNIA; FRIDAY, DECEMBER 7, 1990; 1:30 P.M.

1          (JURY PRESENT.)

2          THE COURT:  ALL RIGHT.  MR. CONNOLLY, YOU MAY

3  PROCEED.

4          MR. CONNOLLY:  THANK YOU, YOUR HONOR.

5    FRANK RETAMOZA, PLAINTIFF'S WITNESS, RESUMES THE STAND

6              DIRECT EXAMINATION (CONTINUED)

7  BY MR. CONNOLLY:

8  Q    MR. RETAMOZA, WHEN WE LAST LEFT YOU, YOU WERE

9  PROCEEDING FROM MARICOPY COUNTY, CALIFORNIA WITH A LOAD

10  OF COCAINE; IS THAT CORRECT?

11  A    THAT IS CORRECT.

12  Q    AND WHERE WERE YOU GOING?

13  A    I WAS GOING TO LAKE ELSINORE.

14  Q    OKAY.  NOW, WHERE IS LAKE ELSINORE LOCATED?

15  A    THAT'S SOMEWHERE SOUTHEAST.

16  Q    SOUTHEAST OF L.A.?

17  A    OF L.A.; RIGHT.

18  Q    ABOUT HOW FAR?

19  A    I WOULD SAY IT TAKES ABOUT AN HOUR AND 15 MINUTES.

20  Q    OKAY.  NOW, AT THAT TIME IN FEBRUARY 1984, WHAT WAS

21  LOCATED AT LAKE ELSINORE THAT YOU KNEW?

22  A    WE HAD A HOUSE THAT WE'D PREVIOUSLY RENTED FOR SOME

23  OTHER PURPOSE, NOT FOR THE PURPOSE OF BRINGING A LOAD THERE.

24  BUT AT THE VERY LAST MOMENT, MY INSTRUCTIONS -- I WAS

25  INSTRUCTED TO TAKE THIS LOAD TO THIS LOCATION.

102

1   Q    WHAT WAS THE HOUSE AT LAKE ELSINORE RENTED FOR?   WHAT

2   PURPOSE?

3   A    AT THAT TIME THERE WAS THIS POLITICIAN THAT WAS

4   ESCAPED -- ESCAPING THE REACH OF LAW, MEXICAN LAW, AND HE

5   WAS KIND OF HIDING IN THE AREA.   AND I WAS SUPPOSED TO

6   ALSO BABY-SIT THIS GUY.   HIS NAME WAS LEOPOLD SANCHEZ.   HE

7   WAS A POLITICIAN FROM MEXICO.

8   Q    AND WAS HE SUPPOSED TO HIDE AT THE LAKE ELSINORE HOUSE?

9   A    WELL, HE -- YES, HE ASKED US -- ASKED ME TO RENT THIS

10  HOUSE FOR HIM IN LAKE ELSINORE.

11  Q    OKAY.   DID HE EVER OCCUPY THE HOUSE?

12  A    HE NEVER DID.

13  Q    WHY?

14  A    WELL, FOR ONE THING, HE COULDN'T MAKE HIS MIND AS TO

15  WHERE HE WANTED TO LIVE.   THAT'S THE MAIN REASON.

16          MR. CONNOLLY:   OKAY.   NOW, I WOULD ASK AT THIS

17  TIME FOR THE CLERK TO SHOW THE WITNESS GOVERNMENT

18  EXHIBIT 135.

19          THE CLERK:   GOVERNMENT'S EXHIBIT 135 PLACED

20  BEFORE THE WITNESS.

21  BY MR. CONNOLLY:

22  Q    OKAY.   NOW, WOULD YOU LOOK AT THAT EXHIBIT, PLEASE,

23  MR. RETAMOZA, AND TELL US WHETHER YOU CAN IDENTIFY IT.

24  A    THAT LOOKS LIKE THE HOUSE, TO ME.

25  Q    LOOKS LIKE THE HOUSE, TO YOU, WHERE?

103

000128

1    A    IN LAKE ELSINORE.  IT'S RIGHT ON THE CORNER, RIGHT

2    THERE (INDICATING).  I DON'T SEE A CORNER, BUT IT LOOKS TO

3    ME LIKE THAT IS THE HOUSE.

4    Q    OKAY.  NOW, DO YOU KNOW WITHOUT LOOKING AT THE WRITING

5    ON THE EXHIBIT WHAT THE ADDRESS IS OF THE HOUSE IN

6    LAKE ELSINORE?

7    A    I DON'T.  I KNOW THAT THEY HAD -- ONE OF THE STREETS

8    HAD SOME SPANISH NAME, BUT I'M NOT REALLY -- I DON'T

9    REALLY REMEMBER.  LET ME SEE.  I THINK IT WAS SAN MIGUEL

10   OR SOMETHING.  I'M NOT REALLY SURE.

11   Q    OKAY.  DID YOU TAKE A TRIP WITH SOME DEA AGENTS IN

12   1989 OUT TO THE LAKE ELSINORE AREA?

13   A    YES, I DID.

14   Q    AND ON THAT TRIP DID YOU LOCATE THE HOUSE THAT YOU

15   HAD RENTED?

16   A    YES, I DID.  WE WENT INSIDE THE HOUSE.

17   Q    OKAY.  NOW, I'D ASK YOU TO PUT THAT EXHIBIT DOWN,

18   PLEASE.

19   A    (WITNESS COMPLIES.)

20   Q    DOES THAT PICTURE FAIRLY AND ACCURATELY REPRESENT THE

21   HOUSE IN LAKE ELSINORE AS YOU KNEW IT IN 1984?

22   A    I WOULD SAY SO.

23        MR. CONNOLLY:  YOUR HONOR, I'D OFFER GOVERNMENT

24   EXHIBIT 135 AT THIS TIME.

25        MR. STOLAR:  MAY I SEE IT.

104

000129

1                      VOIR DIRE EXAMINATION

2    BY MR. STOLAR:

3        Q     THE PICTURE SHOWS AN AUTOMOBILE IN THE DRIVEWAY.  DO

4    YOU SEE THAT?

5        A     YES.

6        Q     WAS THAT AUTOMOBILE IN THE DRIVEWAY WHEN YOU WERE

7    USING THE HOUSE?

8        A     NO.

9        Q     DO YOU KNOW WHOSE CAR THAT IS?

10       A     NO.

11       Q     DID YOU TAKE THE PICTURE?

12       A     NO, I DID NOT.

13       Q     DO YOU KNOW WHEN IT WAS TAKEN?

14       A     WELL, I KNOW THERE SOME PICTURES TAKEN AT THE TIME

15   I TOOK THESE AGENTS WITH ME, BUT I DON'T KNOW IF THAT WAS

16   ONE OF THE PICTURES.  I DON'T RECALL THAT CAR IN THE

17   DRIVEWAY, ANYWAYS.

18       Q     WHEN YOU WERE THERE SEEING IT?

19       A     WHEN I WAS THERE SEEING IT.

20       Q     SO YOU'RE NOT EVEN SURE THIS IS THE SAME HOUSE?

21       A     I'M SURE THE HOUSE, IT IS, BUT I DON'T REMEMBER THE

22   CAR THERE.

23             MR. STOLAR:  ALL RIGHT.  YOUR HONOR, I WOULD HAVE

24   NO OBJECTION TO THE PICTURE GOING IN, WITH THE UNDERSTANDING

25   THAT THE AUTOMOBILE DOESN'T BELONG THERE AND THAT THE

                                                              105

1    ADDRESS OF IT SHOULD BE BLOCKED OUT BECAUSE THERE HAS BEEN

2    NO TESTIMONY ABOUT THE ADDRESS.

3         THE COURT:  ALL RIGHT.  ARE YOU GOING TO COVER

4    THAT?

5         MR. CONNOLLY:  YOUR HONOR, COULD WE PUT THAT OFF

6    UNTIL ANOTHER OCCASION AS I DON'T RIGHT NOW INTEND TO --

7         THE COURT:  WE WON'T SHOW IT TO THE JURY.

8         MR. CONNOLLY:  RIGHT.

9         THE COURT:  THE PHOTOGRAPH WILL BE ADMITTED, WITH

10   THE ADMONITION TO THE JURY THAT THE CAR THAT'S SHOWN IN THE

11   PHOTOGRAPH HAS NO SIGNIFICANCE.

12        MR. CONNOLLY:  THANK YOU.  AND NOW, I'D LIKE

13   ADDRESS THE MATTER OF THE WRITING ON THE PICTURE AT SOME

14   LATER POINT.  IF THERE'S NO EVIDENCE INTRODUCED, WE WILL

15   STRIKE IT.

16        THE COURT:  ALL RIGHT.

17        MR. CONNOLLY:  THANK YOU.

18   Q    OKAY.  NOW, DID YOU DRIVE TO THE HOUSE THAT YOU

19   POINTED OUT IN LAKE ELSINORE WITH THE FIRST LOAD OF

20   COCAINE?

21   A    I DROVE TO LAKE ELSINORE, NOT TO THE HOUSE, THAT SAME

22   DAY THAT THE LOAD ARRIVED.

23   Q    OKAY.  NOW, WHY DIDN'T YOU GO TO THE HOUSE?

24   A    I COULDN'T FIND IT.

25   Q    OKAY.  AND DID YOU ARRIVE THERE AT NIGHT OR IN THE

106

1  DAYTIME?

2  A     DURING THE NIGHTTIME.

3  Q     AND WHAT DID YOU DO WITH THE MOTORHOME?

4  A     WELL, I KNEW -- I KNEW THE REAL ESTATE AGENCY OR OFFICE

5  THAT WE HAD USED TO GO THROUGH THE PROCEDURE TO RENT THIS

6  HOUSE.  SO AFTER TRYING TO LOCATE THE HOUSE AT NIGHT AND

7  NOT SUCCEEDING, THEN I WENT BACK TO THE OFFICE, THE

8  REALTOR'S OFFICE, AND I JUST PARKED THE MOTORHOME OUTSIDE,

9  AND I SLEPT IN IT UNTIL THE NEXT MORNING.

10  Q     THE NEXT MORNING DID YOU FIND THE REAL ESTATE AGENT'S

11  OFFICE OPEN?

12  A     I WAS -- VERY EARLY IN THE MORNING I WAS LOOKING OUT

13  THE WINDOW OF THE MOTORHOME TO SEE IF ANYBODY ARRIVED AT

14  THE OFFICE.  AND WHEN SOMEBODY FINALLY DID, THEN I CAME OUT

15  OF THE MOTORHOME, AND I INTRODUCED MYSELF TO THIS

16  GENTLEMAN.  AND I TOLD HIM, YOU KNOW, THAT WE HAD RENTED

17  THE HOUSE FOR -- FOR THIS GUY AND THAT I WASN'T SURE WHERE

18  THE HOUSE WAS AND, IF HE WANTED TO BE KIND, TO GIVE ME THE

19  DIRECTIONS TO GET TO THE HOUSE.

20        AND THE GUY, HE KNEW OF   --  HE  WASN'T THE GUY

21  THAT I HAD SPOKEN TO BEFORE, BUT HE KNEW OF THE

22  TRANSACTION, SO HE TOLD ME, "YES.  JUST TAKE THE" -- HE

23  GAVE ME DIRECTIONS, AND THEN I GOT TO THE HOUSE.

24  Q     AND WHAT DID YOU DO ON ARRIVAL AT THE HOUSE?

25  A     UPON THE ARRIVAL, I FIRST WENT INSIDE THE HOUSE.  AND

107

1   THEN LATER I JUST CAME OUT AGAIN TO THE HOUSE -- I MEAN, TO

2   THE MOTORHOME, AND WE UNLOADED IT.

3   Q    OKAY.  NOW, WHO WAS WITH YOU AT THAT TIME?

4   A    IT WAS HECTOR AND MYSELF AND ALFREDO TOSCANO.

5   Q    AND WHAT WAS UNLOADED FROM THE MOTORHOME?

6   A    ALL THE DUFFLE BAGS THAT WE HAD RECEIVED FROM THE

7   PLANE, YOU KNOW.

8   Q    DID YOU LOOK INSIDE THE DUFFLE BAGS AT ALL?

9   A    NO, I DID NOT.

10  Q    COULD YOU ESTIMATE FOR US HOW MANY DUFFLE BAGS THERE

11  WERE?

12  A    I WOULD SAY 11, 12 DUFFLE BAGS.

13  Q    AND WHAT WAS YOUR UNDERSTANDING AS TO WHAT YOU WERE

14  SUPPOSED TO DO WITH THE LOAD?

15  A    UP UNTIL NOW, I DON'T KNOW.  I DON'T KNOW WHAT I WAS

16  SUPPOSED TO DO AFTERWARDS.  I LEFT THE PLACE, AND I LEFT

17  SOMEBODY BEHIND TO KIND OF GUARD THE PLACE, YOU KNOW, STAY

18  WITH THE LOAD.  AND THEN LATER ON I WAS -- NO, I DIDN'T DO

19  NOTHING WITH THAT LOAD UNTIL LATER THAT WEEK.

20  Q    WHO DID YOU LEAVE BEHIND TO GUARD THE LOAD?

21  A    HECTOR GONZALES.

22  Q    AND HECTOR IS YOUR BROTHER-IN-LAW?

23  A    NO, HE'S NOT.  HE'S MY WIFE'S BROTHER-IN-LAW.

24  Q    HE'S YOUR WIFE'S BROTHER-IN-LAW.

25       AND WHERE DID YOU GO?

108

000133

1   A   I WENT HOME.

2   Q   AND ARE YOU IN CONTACT WITH MIGUEL ABOUT THE LOAD?

3   A   NOT YET.

4   Q   THAT NIGHT IS HECTOR LEFT IN CHARGE OF THE LOAD?

5   A   THAT IS CORRECT.

6   Q   ARE ANY COMMUNICATIONS HEARD FROM CHARLIE OR ANY OF

7   THE OTHER PEOPLE INTERESTED IN THE LOAD?

8   A   NO, NOT YET.

9   Q   AND DO YOU RECEIVE A PHONE CALL THAT NIGHT, OR EARLY

10   THE NEXT MORNING, FROM HECTOR?

11   A   YES, I DID.

12   Q   OKAY.  NOW, WOULD YOU PLEASE EXPLAIN TO THE LADIES AND

13   GENTLEMEN OF THE JURY WHAT HECTOR SAID TO YOU AND WHAT YOU

14   SAID TO HIM.

15   A   WELL, I REMEMBER THAT I WAS IN THE HOUSE ALONE WITH

16   MY KID.  MY WIFE WAS IN THE HOSPITAL.  AND SOMEBODY

17   CALLED -- I MEAN, HECTOR CALLED EARLY IN THE MORNING,

18   AROUND MAYBE 5:00 OR 4:00 O'CLOCK IN THE MORNING, SAYING

19   THAT SOMETHING HAD GONE WRONG IN THE HOUSE, THAT THE POLICE

20   WAS IN THE HOUSE, OR AROUND THE HOUSE, YOU KNOW; AND THAT

21   HE HAD ESCAPED.

22        AND HE ASKED ME ALBO TO LEAVE THE HOUSE MYSELF,

23   YOU KNOW, AND ESCAPE, YOU KNOW, SOMETHING LIKE THAT.  SO

24   YES, I GOT UP IN A HURRY.  BUT HE ALSO TOLD ME THAT THERE

25   WERE -- I ASKED HIM, YOU KNOW, "HOW DID YOU ESCAPE?  YOU

109

1    KNOW, HOW COME YOU DIDN'T GET CAUGHT?"

2            AND HE SAYS, "WELL, YOU KNOW, THESE GUYS, THEY

3    WERE -- THEY HAD MICROPHONES ALL OVER THE HOUSE, AND THEY

4    WERE WATCHING THE HOUSE.

5            "AND ALSO, THERE WERE -- I COULD SEE PEOPLE

6    THROUGH THE WINDOW, YOU KNOW, BUT I PRETENDED THAT I DIDN'T

7    NOTICE ANYTHING.  AND I JUST, YOU KNOW, VERY CASUAL, I WENT

8    OUT OF THE HOUSE, AND WHEN I HAD THE CHANCE, I JUST RAN

9    AWAY, YOU KNOW."

10            AND HE WAS -- HE HAD A GUN, A HANDGUN, AND HE

11    JUST THREW IT IN THE BUSHES.  THAT'S ABOUT THE STORY HE

12    GAVE ME RIGHT THERE.  I DIDN'T WANT TO HEAR NO MORE.  I

13    JUST GOT UP, I TOOK MY KID, AND I WENT OUT.  AND I TOOK MY

14    KID TO ONE OF MY RELATIVES, AND THEN I DROVE DOWN SOUTH TO

15    THE BORDER.

16    Q    DID YOU CROSS THE BORDER INTO ENSENADA?

17    A    BEFORE I DID THAT, I CALLED -- I CALLED MIGUEL, AND I

18    TOLD HIM, "HEY, LOOK.  THIS IS WHAT HAPPENED."  AND HE SAID,

19    "WELL, YOU'D BETTER MAKE SURE THAT THAT'S WHAT HAPPENED,

20    YOU KNOW, WHAT YOU'RE TELLING ME HAPPENED, HAPPENED, YOU

21    KNOW.  SO GO BACK AND TRY TO FIND OUT."

22            BUT NO, I DID NOT.  I DIDN'T DO THAT.  I JUST

23    CROSSED THE BORDER.

24    Q    DID YOU TALK TO HECTOR?

25    A    WELL, A LITTLE WHILE AFTER I CROSSED THE BORDER,

110

000135

1    HECTOR ARRIVED IN ENSENADA ALSO.  AND THEN, YOU KNOW, HE

2    TOLD ME MORE ABOUT WHAT HAPPENED -- WHAT HE THOUGHT HAD

3    HAPPENED THE NIGHT BEFORE.

4            THEN, WHEN HE DID THAT, YOU KNOW, I STARTED

5    REALIZING THAT, YOU KNOW, WHAT HE THOUGHT HAD HAPPENED, IT

6    DIDN'T.  AND ALSO, YOU KNOW, BECAUSE I COULD APPRECIATE THE

7    CONDITION HE WAS IN.  YOU KNOW, I COULD SENSE THAT HE WAS --

8    Q     WHAT CONDITION WAS HE IN?

9    A     WELL, I COULD SEE THAT HE WAS DOPED UP.

10   Q     DOPED UP?

11   A     YES.

12   Q     HE USED DRUGS; IS THAT CORRECT?

13   A     I THINK THAT'S WHAT HE DID, YES.

14   Q     AND BASED ON WHAT HE SAID TO YOU, COULD YOU DETERMINE

15   WHAT HAPPENED AT THE HOUSE?

16   A     YES, I COULD.

17   Q     WOULD YOU TELL US WHAT YOU DETERMINED HAPPENED AT THE

18   HOUSE FROM HECTOR.

19   A     WELL, FOR ONE THING, HE SAID THAT THERE WERE THESE

20   MICROPHONES UP ON THE ROOF WITH A LITTLE RED LIGHT.  AND

21   THEN I ASKED HIM WHEREABOUT.  AND HE SAID, "ALL OVER THE

22   HOUSE."

23            "DID IT LOOK SOMETHING LIKE THAT?"

24            "YES."

25            "THOSE ARE SMOKE DETECTORS."

111

1          "WHAT ABOUT THE PEOPLE PEEKING INSIDE THE HOUSE

2    THROUGH THE WINDOW?"

3          I SAID, "HOW DID THEY DO THAT?"

4          "WELL, EVERY TIME I LOOKED PUT THE WINDOW, YOU

5    KNOW, I WOULD SEE SOMEBODY THERE, STANDING, PRETENDING HE

6    DIDN'T SEE ME.  AND SO I DID THE SAME."

7          AND I SAID, "HOW DID THIS GUY LOOK?"

8          "WELL, LIKE THIS AND LIKE THAT."

9          "COULD IT HAVE BEEN YOURSELF, YOUR IMAGE IN THE

10   WINDOW?"

11         HE SAYS, "NO, NO WAY.  THESE GUYS, I KNOW THEY

12   WERE THE POLICE."

13         BUT I KNOW WHAT HAPPENED, YOU KNOW.  SO I SAID,

14   "I THINK YOU'RE MISTAKEN."

15         BUT ANYWAYS, WE CALLED MIGUEL AGAIN, AND THEN

16   WHEN HE -- WHEN I TALKED TO MIGUEL AGAIN, HE SAYS, "YOU KNOW,

17   I THINK WHAT HAPPENED IS THAT MIGUEL -- I MEAN, HECTOR USED

18   A LITTLE BIT TOO MUCH COCAINE.  THAT'S WHY."

19         AND I SAID, "YEAH, I THINK SO.  HE'S HERE WITH

20   ME NOW, AND I'M STARTING TO BELIEVE THAT THAT'S WHAT

21   HAPPENED."

22         HE SAYS, "WELL, GO BACK AND TRY TO FIND OUT AND

23   MAKE SURE."  BUT AS HE WAS SAYING THAT, HE TOLD ME, "WAIT

24   A MINUTE," YOU KNOW.  "DON'T GO BACK YET BECAUSE CHARLIE

25   IS GOING BACK.  BY NOW CHARLIE IS DOWN THERE."  HE HAD FLOWN

112

000137

1   THERE THAT DAY.

2   Q    BY "DOWN THERE," YOU MEAN GUADALAJARA?

3   A    YES.  YES.  HE WAS PRETTY UPSET THAT I TOOK CONTROL OF

4   THE LOAD.  SO THE VERY NEXT MORNING HE FLEW DOWN THERE.

5   Q    AND WHAT HAPPENED AFTER YOU HUNG UP THE PHONE WITH

6   MIGUEL?

7   A    I BELIEVE THAT THAT DAY WE STAYED IN ENSENADA, AND

8   WE WAITED FOR CARLOS FOR THE NEXT DAY -- UNTIL THE NEXT

9   DAY, WE PICKED CARLOS OVER IN THE TIJUANA AIRPORT, AND THEN

10  WE CROSSED THE BORDER.

11  Q    AND WHERE DID YOU DRIVE TO?

12  A    RIGHT STRAIGHT TO LAKE ELSINORE.

13  Q    WHAT WAS THE CONDITION OF THE HOUSE IN LAKE ELSINORE

14  WHEN YOU ARRIVED?

15  A    THERE WAS NOTHING OUT OF THE NORMAL. YOU KNOW,

16  EVERYTHING WAS THERE AND NO SIGNS THAT ANYBODY HAD BEEN TO

17  THE PLACE.

18       THEN WE DROVE AROUND, AND THEN WE WENT AND PICKED

19  UP THE GUN THAT HECTOR HAD THROWN IN THE BUSHES, AND WE

20  FOUND THE GUN.

21  Q    DID HECTOR EXPLAIN TO CARLOS WHAT HAPPENED?

22  A    WELL, UP UNTIL NOW -- I MEAN, AFTER WE CAME BACK TO

23  THE HOUSE, HE -- HE STARTED TO ADMIT THAT HE MADE A MISTAKE.

24  BUT UNTIL WE GOT TO THE HOUSE, HE WAS, YOU KNOW, SO SURE

25  THAT THERE WERE -- THERE WAS POLICE PEOPLE ALL OVER THE

113

000138

1    HOUSE AND INSIDE.

2    Q    AND THEN WHAT HAPPENED TO THE LO               TO

3    BACK THERE WITH CARLOS AND HECTOR?

4    A    WELL, FOR ONE THING, THAT -- I BELIEVE

5    SEE.  I THINK EITHER CHARLIE OR MYSELF -- I THINK

6    CHARLIE THAT STAYED WITH HECTOR THAT SAY.  WE DIDN'T

7    HIM ALONE.  BUT THE NEXT DAY I BROUGHT SOMEBODY ELSE TO

8    STAY WITH HECTOR, AND I TOOK CHARLIE.  AND THEN CHARLIE

9    BROUGHT SOMEBODY ELSE THAT I DON'T KNOW WHO HE WAS --

10   ANOTHER OF HIS FRIENDS, YOU KNOW -- AND HE LEFT HIM THERE

11   FOR A FEW DAYS UNTIL THE LOAD WAS DELIVERED TO DIFFERENT

12   PEOPLE.

13   Q    OKAY.  NOW, WAS THE LOAD TURNED OVER TO SOMEONE AT

14   LAKE ELSINORE?

15   A    WELL, FROM RIGHT THERE CHARLIE TOOK OVER THE LOAD, AND

16   THEN HE -- HE DELIVERED IT, ALL OF IT.

17   Q    DID YOU SEE IT AGAIN AFTER THAT DAY WHEN HE TOOK

18   CONTROL OF IT?

19   A    DID I SEE CHARLIE?

20   Q    NO.  DID YOU SEE THE LOAD AGAIN AFTER THAT DATE?

21   A    OH, NO.  NO.  HE DID -- FROM THERE ON HE WAS IN CHARGE,

22   AND HE DID IT.

23   Q    DO YOU KNOW HOW LONG HE KEPT IT AT THE LAKE ELSINORE

24   PROPERTY?

25   A    I THINK HE JUST DISTRIBUTED IT ALL IN MAYBE THREE OR

114

1   FOUR DAYS.

2   Q    DO YOU KNOW WHETHER OR NOT HE USED THE MOTORHOME TO

3   DISTRIBUTE THE DRUGS?

4   A    NO.  I DON'T THINK HE DID, NO.

5   Q    AFTER THAT FIRST LOAD, APPROXIMATELY A WEEK OR TWO

6   LATER WERE YOU INVOLVED IN A SECOND UNLOADING OF A PLANE

7   OF COCAINE?

8   A    YES.

9   Q    TELL THE LADIES AND GENTLEMEN OF THE JURY HOW YOU

10  HAPPENED TO BE IN THAT UNLOADING.

11  A    WELL, IT WAS ABOUT THE SAME WAY AS THE FIRST LOAD.

12  SOME PEOPLE SHOWED UP FROM MEXICO, AND THEN WE WENT ONE

13  DAY PRIOR TO THE ARRIVAL, YOU KNOW, LIKE THE DAY BEFORE,

14  AND WE STAYED IN THE SAME HOTEL IN GORMAN.  I FORGOT THE

15  NAME OF THE HOTEL, BUT THERE'S ONLY ONE HOTEL IN THE LITTLE

16  TOWN THERE.

17       AND THE SAME TIME, AT NOON. TEN MINUTES LATER IT

18  WAS UP IN THE AIR, AND WE WERE ON OUR WAY TO THE L.A. AREA.

19  Q    WHAT KIND OF PLANE LANDS THE SECOND TIME?

20  A    SAME PLANE, SAME PILOT.

21  Q    SAME AIRSTRIP?

22  A    SAME AIRSTRIP ALSO.

23  Q    AND SAME PEOPLE WAITING FOR THE COCAINE AS THE FIRST

24  LOAD?

25  A    YES, SAME PEOPLE.

115

1   Q    CHARLIE THERE?

2   A    YES, CHARLIE WAS THERE ALSO.

3   Q    WHAT HAPPENS TO THE SECOND LOAD?

4   A    CHARLIE HAD CONTROL OF IT, AND WE JUST DROVE THE LOAD

5   OVER TO A HOUSE IN SANTA MONICA WHERE SOMEBODY ELSE -- SOME

6   OTHER GROUP WAS WAITING FOR THE LOAD.

7   Q    OKAY.  NOW, I'D ASK YOU AT THIS TIME TO LOOK --

8        I'D ASK THE CLERK AT THIS TIME TO PLEASE SHOW THE

9   WITNESS GOVERNMENT EXHIBIT 110, PLEASE.

10       THE CLERK:  GOVERNMENT'S EXHIBIT 110 PLACED BEFORE

11  THE WITNESS.

12  BY MR. CONNOLLY:

13  Q    I WOULD ASK YOU TO LOOK AT GOVERNMENT EXHIBIT 110 AND

14  TELL ME WHETHER OR NOT YOU CAN IDENTIFY THAT PHOTOGRAPH.

15  A    WELL, THAT LOOKS LIKE THE HOUSE THAT WE DELIVERED THE

16  SECOND LOAD TO, YEAH.

17  Q    OKAY.  DO YOU KNOW THE ADDRESS OF THE PLACE WHERE YOU

18  DELIVERED THE SECOND LOAD TO?

19  A    I DON'T KNOW THE NUMBER.  I KNOW THE STREET.  I DON'T

20  REMEMBER THE NUMBER.  WELL, I DON'T THINK I EVER NOTICED

21  THE NUMBER ON THE HOUSE.

22  Q    OKAY.  WHAT'S THE NAME OF THE STREET?

23  A    CUSHTON OR SOMETHING CLOSE TO THAT.  CUSHTON OR

24  SOMETHING LIKE THAT.

25  Q    DO YOU KNOW WHAT TOWN IT'S IN, OR CITY?

116

1    A    I THINK SANTA MONICA.

2    Q    OKAY.  AND DO YOU WHO LIVED IN THAT HOUSE OR WHO USED

3    THAT HOUSE?

4    A    I DON'T KNOW WHO LIVED THERE OR WHO RENTED THE HOUSE.

5    ALL I KNOW IS THAT WHEN WE CAME INTO THIS HOUSE, IT WAS

6    DIEGO AND SOME OTHER PEOPLE WAITING FOR THIS ARRIVAL, YOU

7    KNOW.  AND I REMEMBER THAT SOMEBODY OPENED THE GATE, AND

8    WE DROVE THE VAN IN THERE.  AND THEN, AS WE WENT IN, THERE

9    WAS PEOPLE RIGHT THERE WAITING.  AND THEY OPENED THE

10   SLIDING DOOR OF THE VAN AND STARTED TAKING DUFFLE BAGS OUT.

11         AND I -- I REMEMBER I WENT INTO THE HOUSE FOR

12   SOME REASON VERY BRIEFLY, AND THERE WAS A CLOSET THERE THAT

13   THEY HAD -- SOMEBODY WAS DOWN BELOW OR DOWN IN THE HOLE

14   BECAUSE IT WAS LIKE REACHING FOR THE DUFFLE BAGS.  AND

15   APPARENTLY, THERE WAS SOMETHING UNDER THE HOUSE THAT THEY

16   HAD ARRANGED TO PUT THESE DUFFLE BAGS IN THERE.

17   Q    AND WHERE WAS CHARLIE AT THIS TIME?

18   A    I BELIEVE HE WAS TALKING TO DIEGO OR SOMETHING LIKE

19   THAT.  I MEAN, HE WAS IN THE HOUSE SOMEPLACE.

20         THE COURT:  CAN YOU FIX THE TIME OF THIS SECOND

21   FLIGHT?

22         THE WITNESS:  AT THE SAME TIME ARRIVED AND WE GOT

23   TO THIS PLACE --

24         THE COURT:  WHEN WAS THE SECOND FLIGHT?  WHEN DID

25   YOU MEET THE SECOND FLIGHT?

117

000142

1                    THE WITNESS:  IT WAS TWO WEEKS AFTER, ON A

2      SUNDAY.

3                    THE COURT:  TWO WEEKS AFTER WHAT?

4                    THE WITNESS:  AFTER THE FIRST ONE.

5                    THE COURT:  ALL RIGHT.

6                    THE WITNESS:  ON A SUNDAY, SAME TIME, AT NOON.

7      BY MR. CONNOLLY:

8      Q     AND WAS THE MOTORHOME USED AGAIN TO TRANSPORT --

9      A     I DON'T THINK THE MOTORHOME WAS USED EVER FOR THAT

10     PURPOSE.

11     Q     LET ME BACKTRACK.  WHEN THE LOAD WAS MOVED FROM

12     MARICOPA COUNTY TO LAKE ELSINORE, IT WENT IN THE MOTORHOME;

13     IS THAT CORRECT?

14     A     YES, THAT IS CORRECT.

15     Q     AND THE SECOND LOAD, WAS THE MOTORHOME USED?

16     A     I DON'T THINK THE MOTORHOME WAS USED.  I'M NOT EXACTLY

17     SURE, BUT I DON'T THINK IT WAS USED.  ONLY THE FIRST TIME.

18     Q     DO YOU KNOW WHO TOOK CUSTODY OF THE SECOND LOAD?

19     A     I KNOW THAT CHARLIE WAS IN CHARGE OF THE LOAD AS IT

20     ARRIVED, AND THE LANDING STRIP.  AND AS WE DROVE THE LOAD

21     OVER TO THIS HOUSE, ONCE IT WAS DELIVERED TO THIS HOUSE, I

22     THINK HIS BROTHER TOOK OVER, OR MAYBE THEY WERE WORKING IN

23     A KIND OF PARTNERSHIP OR SOMETHING.  I DON'T KNOW.  A

24     PARTNERSHIP OR -- THEY WERE PARTNERS OR SOMETHING.  I DON'T

25     KNOW WHO WAS IN CHARGE THEN AFTER IT WAS DELIVERED THERE,

                                                            118

1   BUT I KNOW THAT THE TWO OF THEM WORKED TOGETHER.

2   Q    BUT YOUR RESPONSIBILITY ENDED WHEN THE SECOND LOAD WAS

3   DELIVERED TO THE HOUSE ON CUSHTON; IS THAT CORRECT?

4   A    THAT IS CORRECT, YES.

5   Q    NOW, AFTER THE SECOND LOAD ARRIVES --

6   A    EXCUSE ME, MR. CONNELLY.  ALSO, ON THE SECOND LOAD, I

7   REMEMBER THAT THERE WERE AGAIN DISCUSSIONS ON WHO WAS GOING

8   TO TAKE CHARGE OF THIS LOAD.  YOU KNOW, MIGUEL CALLED ME.

9   HE WANTED ME TO TAKE CHARGE, BUT CHARLIE APPARENTLY CALLED

10   SOME OTHER NUMBER, AND HE WAS INSTRUCTED TO TAKE CHARGE.

11       MIGUEL WAS INSISTING ALWAYS THAT -- HE WANTED ME

12   TO TAKE CHARGE.  YOU KNOW, HE WANTED ME TO MEET THE PEOPLE

13   THAT ULTIMATELY THE COCAINE WAS GOING TO BE DELIVERED TO.

14   BUT SOMEHOW, I WAS CALLED OFF.  HE SAID, "LET HIM HAVE IT.

15   IF HE THINKS IT'S OKAY, LET HIM HAVE IT."

16   Q    NOW, THESE CONVERSATIONS TOOK PLACE OVER THE TELEPHONE?

17   A    YES, OVER THE TELEPHONE.

18   Q    AND DID MIGUEL TELL YOU WHAT THE PURPOSE OF YOUR TAKING

19   CONTROL OF THE LOAD WAS?

20   A    EXCUSE ME?

21   Q    DID MIGUEL TELL YOU WHAT THE PURPOSE OF YOUR GAINING

22   CONTROL OF THE LOAD WAS?

23   A    WELL, HE SAID THIS TO ME ON THE TELEPHONE.  HE WANTED

24   ME TO -- HE SAID, "YOU TRY THE BEST YOU CAN TO TAKE CONTROL

25   BECAUSE I WANT YOU TO MEET THE PEOPLE THAT YOU ARE GOING TO

119

1    BE DELIVERING THAT DOPE." HE WANTED ME TO GET TO KNOW

2    THESE PEOPLE. AND IF I LET CHARLIE TAKE CONTROL, THEN I

3    WOULDN'T HAVE BEEN ABLE TO MEET THESE OTHER PEOPLE.

4    Q    YOU MEAN, TO FIND OUT WHO THEY WERE?

5    A    YES, THAT IS WHAT HE WANTED ME TO DO.

6    Q    NOW, AFTER YOU DELIVERED THE SECOND LOAD TO THE

7    CUSHTON HOUSE, DID YOU TAKE A TRIP TO GUADALAJARA, MEXICO?

8    A    YES. THE VERY -- I'D SAY, WITHIN THE NEXT TWO OR

9    THREE DAYS, MAYBE EVEN THE VERY NEXT DAY OF THAT LOAD, I

10   TOOK A TRIP DOWN TO GUADALAJARA ALONG WITH CHARLIE.

11   Q    AND DID DIEGO ALSO GO ON THE TRIP?

12   A    NO, HE DID NOT.

13   Q    AND HOW DID YOU GET DOWN THERE?

14   A    WELL, WE -- ME AND CHARLIE, WE DROVE DOWN TO TIJUANA,

15   AND FROM THERE WE TOOK A PLANE TO GUADALAJARA.

16   Q    AND PRIOR TO YOUR GOING TO GUADALAJARA, HAD YOU

17   ADVISED MIGUEL FELIX GALLARDO THAT YOU WERE COMING DOWN?

18   A    I AM NOT SURE. I COULD HAVE GONE ON MY OWN, BUT I

19   COULD -- IT WAS ALSO POSSIBLE THAT I COULD HAVE TOLD

20   MIGUEL THAT I WAS COMING.

21   Q    WHAT WAS THE PURPOSE OF YOUR TRIP TO GO TO GUADALAJARA

22   ON THAT DATE?

23   A    WELL, FOR ONE THING, I WAS -- I WANTED TO DISCUSS WITH

24   MIGUEL WHAT -- WHAT I WAS DOING. YOU KNOW, I WANTED TO

25   KNOW WHAT KIND OF ROLE I WAS PLAYING IN THIS THING. YOU

120

1 KNOW, I DIDN'T LIKE THE WAY -- YOU KNOW, THERE WAS ALWAYS

2 DISCUSSION OF WHO WAS GOING TO BE TAKING CHARGE AND WHO

3 WAS NOT, AND I WANTED MORE INFORMATION ABOUT WHAT WAS

4 GOING ON.

5 Q    OKAY.  WAS ONE OF THE PIECES OF INFORMATION YOU WANTED

6 TO FIND OUT ABOUT THE PAYMENT?

7 A    THAT WAS ONE OF THEM.

8 Q    NOW, WHEN YOU GOT TO GUADALAJARA, DID YOU MEET WITH

9 MIGUEL FELIX GALLARDO?

10 A    THE VERY -- ONE DAY THAT FLEW OVER THERE, IT WAS VERY

11 LATE.  AND IT WAS DARK, I REMEMBER.  AND WE TOOK A TAX

12 AND WE FIRST STOPPED AT DON JOSE'S RESIDENCE.  AND I W

13 IN THE HOUSE WITH HIM.  THAT WAS THE FIRST TIME I MET

14 DON JOSE.

15 Q    OKAY.  AND DO YOU SEE THE DON JOSE HERE ON COURT TH

16 YOU SAW IN MEXICO IN 1984?

17 A    EXCUSE ME?

18 Q    DO YOU SEE THE PERSON HERE IN COURT THAT YOU KNEW IN

19 MEXICO AS DON JOSE IN 1984?

20 A    YES.

21 Q    OKAY.  WOULD YOU POINT HIM OUT TO US, PLEASE.

22 A    HE IS THE PERSON RIGHT THERE, RIGHT THERE IN THE GRAY

23 SUIT.

24          MR. STOLAR:  INDICATING MR. MATTA.

25          THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT

121

1    THE WITNESS HAS IDENTIFIED THE DEFENDANT.

2    BY MR. CONNOLLY:

3    Q    NOW, IS THAT THE FIRST TIME THAT YOU HAD EVER MET

4    MR. MATTA?

5    A    THAT IS THE FIRST TIME I EVER SAW HIM.  YOU KNOW, I

6    DIDN'T REALLY MEET HIM BECAUSE NOBODY TOLD ME HIS NAME;

7    NOBODY TOLD HIM MY NAME.  JUST CHARLIE WENT INSIDE, TALKED

8    TO HIM A LITTLE BIT, AND THEN WE WENT OUT.  AND THE TAXI

9    WAS WAITING FOR US OUT THERE, AND THE TAXI THEN TOOK US TO

10   THE HOTEL.  AND THE NEXT DAY IS WHEN I MET WITH HIM AGAIN.

11   Q    OKAY.  THE NEXT DAY WHERE DID YOU MEET WITH HIM AGAIN?

12   A    THERE WAS THIS HOUSE THAT MIGUEL WAS USING AT THE TIME

13   AS A MEETING HOUSE OR SOMETHING LIKE THAT, WHERE HE MET WITH

14   ALL KINDS OF PEOPLE.

15   Q    DO YOU KNOW THE ADDRESS OF THIS HOUSE?

16   A    NO, I DON'T.

17   Q    DO YOU KNOW WHERE IT IS IN RELATION TO THE HOTELS THAT

18   MIGUEL OWNS?

19   A    I LIVED IN GUADALAJARA LIKE A YEAR OR SO, YOU KNOW,

20   BUT IN MEXICO IT'S REALLY HARD TO KNOW THE ADDRESSES.  YOU

21   HARDLY EVER FIND THEM POSTED.  SO YOU KNOW THAT IS -- YOU

22   KNOW WHERE -- YOU HAVE OTHER KIND OF WAYS TO GET AROUND.

23   I MEAN, YOU DON'T KNOW THE ADDRESSES.  I MEAN, YOU PROBABLY

24   KNOW YOUR OWN; BUT NO, I DON'T -- I DON'T KNOW THE ADDRESS.

25   I KIND OF REMEMBER THE HOUSE, BUT I DON'T KNOW THE ADDRESS.

000147

1   Q   NOW, YOU WENT TO THE HOUSE, AND YOU MET WITH MIGUEL?

2   A   EXCUSE ME.  AND ABOUT EVERY TIME I MET WITH MIGUEL WAS

3 A DIFFERENT PLACE.  IT WAS REALLY NO USE FOR ME TO LEARN THE

4 ADDRESS FOR IT.

5   Q   SO MIGUEL HAD ACCESS TO A LOT OF HOUSES IN GUADALAJARA?

6   A   WELL, I WAS ALSO -- I KNEW ALSO THAT HE HAD A REAL

7 ESTATE AGENCY OVER THERE, YOU KNOW.  "BIENES RAICES"; WHAT

8 THEY CALL "BIENES RAICES."  THAT'S A REAL ESTATE AGENT.  SO

9 HE HAD ACCESS TO DIFFERENT PROPERTY.

10       BUT ONE THING I CAN SAY IS THAT EVERY TIME I WENT

11 THERE, IT WAS A DIFFERENT PLACE, BUT IT WAS WITHIN THE SAME

12 AREA, YOU KNOW, THAT IS CALLED CUIDAD EL SOL, CHAPALITA,

13 SOMEWHERE AROUND THERE, YOU KNOW.  ONE AREA IS -- IT'S

14 CONNECTED.  YOU KNOW, ONE IS CALLED CUIDAD EL SOL,

15 AND THE OTHER ONE WAS CHAPALITA.  THEY WERE -- THAT AREA

16 RIGHT THERE, YOU KNOW.  IF SOMEBODY IS FAMILIAR WITH THAT

17 AREA, THEY KNOW WHAT I'M TALKING ABOUT.

18   Q   THAT'S A NEIGHBORHOOD IN GUADALAJARA?

19   A   IT'S A VERY, VERY -- IT'S A NICE NEIGHBORHOOD.

20   Q   HOW FAR IS THAT FROM THE SUITES OR THE HOTEL LAS

21 AMERICAS; DO YOU KNOW?

22   A   VERY CLOSE; WITHIN, I'D SAY, FIVE MINUTES' DRIVE.

23   Q   NOW, DO YOU HAVE A MEETING THAT DAY WITH MIGUEL, THE

24 DAY AFTER YOUR ARRIVAL?

25   A   YES, I DID.  THE NEXT DAY WE WENT WITH HIM -- NOT ONLY

123

000148

UNITED  STATES  DISTRICT  COURT

CENTRAL  DISTRICT  OF  CALIFORNIA

HONORABLE WILLIAM J. REA, U.S. DISTRICT COURT JUDGE

THE UNITED STATES
OF AMERICA,

           Plaintiff

      -vs-

JUAN RAMON MATTA,

           Defendant

_ _ _ _ _ _ _ _ _ _ _ /

                           CR 88-129 WJR

                           Volume  XXVII


COURT  REPORTER'S  TRANSCRIPT

OF PROCEEDINGS HAD

THURSDAY, NOVEMBER 29, 1990


ALFRED G. JOHNSON, CSR
Official Court Reporter
United States District Court
Central District of California
402 U.S. Courthouse
312 North Spring Street
Los Angeles, California 90012

1   A    Yes.

2   Q    And, did you hear Mr. Suntaro's response?

3   A    Yes.

4   Q    And, was this conversation conducted in Spanish or

5   English?

6   A    English.

7   Q    Did Edgar Suntaro appear to understand English?

8   A    Yes.

9   Q    Did he give permission?

10  A    Yes.

11  Q    And, were you present and a participant in the search

12  of Edgar Rosa Suntaro's vehicle?

13  A    Yes.

14  Q    Did you look in the trunk of the vehicle?

15  A    Yes.

16  Q    Did you find anything in the trunk of the vehicle?

17  A    Yes.

18  Q    Will you tell the ladies and gentlemen of the jury what

19  you found in the trunk?

20  A    We found the brown paper bag.  In it was an orange

21  colored box.  Within the box was a -- a plastic bag containing

22  a white powdery substance resembling cocaine.

23  Q    Approximately what weight would you estimate that white

24  powdery substance to weigh?

25  A    Approximately one kilogram.

1  Q   Were there any unusual markings on that white powdery

2  substance?

3  A   On the plastic bag it had been printed in gold ink,

4  pen, what appeared to be a lama.

5         MR. KENETY:  I would ask Ms Dillard to show the

6  witness Government's exhibit 87.

7         THE CLERK:  Government's Exhibit 87 placed

8  before the witness.

9  Q   (by Mr. Kenety)  Detective Cranado, I ask if you

10  recognize what is depicted in those two photographs?

11  A   Yes.

12  Q   Is it something that you recognize?

13  A   Yes, that I saw that day.

14  Q   Can you tell us what that is?

15  A   It's a -- it's a printing of a -- a gold lama on the

16  clear plastic bag.

17  Q   Is that the one kilogram bag of white powdery substance

18  you found in Mr. Rosa Suntaro's trunk?

19  A   Yes.

20         MR. KENETY:  I ask that Ms Dillard show the

21  witness --

22         THE COURT:  What do you want to do with this?

23  Are you going to offer it, or not?

24         MR. KENETY:  Shortly, your Honor.  I can offer

25  it now.  I'll be happy to.

1          THE COURT:  That is up to you.

2          MR. KENETY:  Your Honor, I --

3          MR. STOLAR:  I don't want him to.

4          THE COURT:  I would like to have them offered

5    as you finish with them so we can keep up to date.

6          MR. KENETY:  I'll be happy to do that, Your Honor.

7    I will ask the Court to receive into evidence Government's

8    exhibit number 87.

9          MR. STOLAR:  May I take a look at it?  I may have

10   a question or two on it, your Honor.

11         THE COURT:  Do you have a question?

12         MR. STOLAR:  Yes.

13         THE COURT:  All right.

14         MR. STOLAR:  May I go --

15         THE COURT:  Yes.

16         MR. STOLAR:  Did you take that photograph?

17   A    No, I did not.

18         MR. STOLAR:  Is there any way that you can tell

19   us that that  photograph is a photograph of the particular

20   bag that you seized on that day?

21   A    Other than being present when it was taken at our

22   office.

23         MR. STOLAR:  Is there anything in the picture

24   that -- is there anything on the photo that is dated?  Is

25   there anything that you recognize that tells us that that --

1         UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3                  – – –

4    HONORABLE WILLIAM J. REA, JUDGE PRESIDING

5                  – – –

6   UNITED STATES OF AMERICA,      )
                                   )
7              Plaintiff,          )
                                   )
8        VS.                       )    CR 88-129-WJR
                                   )
9   JUAN RAMON MATTA-BALLESTEROS,  )
                                   )
10             Defendant.          )
                                   )
11   _____)

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15           LOS ANGELES, CALIFORNIA

16          FRIDAY, NOVEMBER 30, 1990

17

18

19

20

21

22        DONNA BOWERS, C.S.R., R.P.R.
          OFFICIAL COURT REPORTER
23        430 UNITED STATES COURTHOUSE
          312 NORTH SPRING STREET
24        LOS ANGELES, CALIFORNIA  90012
          (213) 621-2400

25

225

1  (phonetic.)  That's the only ones I can think of right

2  now.

3  Q.    Were there any occupants in the house when you

4  arrived?

5  A.    Yes.

6  Q.    Do you remember how many there were?

7  A.    There was a female Hispanic adult and a small child.

8  Q.    Was consent asked?

9  A.    Yes.

10  Q.    And was consent given?

11  A.    Yes.

12  Q.    And we are talking about consent to search the

13  residence, are we not?

14  A.    Yes.

15  Q.    And during the course of the search, did you find

16  any suitcases?

17  A.    Yes, I did.

18  Q.    Where were they?

19  A.    They were at the second-floor bedroom.  There were

20  three large suitcases, which were found to contain plastic

21  bags containing white powdery substance resembling cocaine.

22  Q.    What else did you find in that house?

23  A.    Also in another bedroom on the second floor I found

24  a bag containing U.S. currency.  The amount was a little

25  over thirty, thirty one thousand.

226

1   Q.   Did you find anything else?

2   A.   Also in the garage area I found four trash bags

3   containing crushed cardboard boxes.

4   Q.   Any markings on these cardboard boxes?

5   A.   Yes.  On the outside there was written numbers "35."

6   Q.   How many 35's were written?  Was there one on each

7   bag?

8   A.   Yes.  Each box was marked either with the numbers

9   35 or written in Spanish, 35.

10   Q.   "Trainte quatro," written out that way?

11   A.   "Trainte cinco."

12   Q.   "Trainte cinco," 35 in Spanish.

13   A.   Yes.

14   Q.   What was the condition of these boxes?

15   A.   The boxes were crushed and they were wet from within,

16   inside, what appeared to be the inside of the boxes.

17   Q.   Did you find anything else?  Any weighing devices?

18   A.   As I recall, no.

19   Q.   Now, what did you do with those suitcases?

20   A.   Those suitcases were placed inside of my car.

21   Q.   Where were they taken?

22   A.   They were transported to my office, police building.

23   Q.   And were the bags taken out --

24   A.   Yes.

25   Q.   -- of the suitcases?

227

1    A.    Yes.

2    Q.    How many bags were there?

3    A.    We had a total of 129 that came out of the residence.

4    Q.    Out of the three suitcases --

5    A.    Yes.

6    Q.    -- at the San Dimas house?

7    A.    Yes.

8    Q.    At the same time you took the suitcases containing

9    the bags of the apparent cocaine, what did you do with

10   the duffel bags that had been placed in your car that had

11   been taken from Mr. Walduraga's Ford LTD?

12   A.    They were also taken into our office in bags -- the

13   bags, plastic bags were taken out, and found to be 40,

14   40 bags containing the white powder.

15   Q.    Now, did you notice anything unusual about the bags?

16   Was there any markings?

17   A.    Yes, there was.

18   Q.    And what were the markings?

19   A.    It was a golden llama stamped on the plastic bags.

20   Q.    Was this true of the bags taken from the trunk of

21   the Ford LTD?

22   A.    Yes.

23   Q.    Was it true of the 129 kilos taken from 1154 Oakengate

24   in San Dimas?

25   A.    Yes.

000156

228

1  Q    What did you do with the bags, all 169 of them, after

2  they were taken to the office?

3  A    They were weighed, tested, and then released to DEA.

4  Q    Okay.  What was done with them -- how were they

5  transported to DEA?

6  A    They were transported by DEA agents, by vehicle.

7  Q    Was a helicopter involved?

8  A    That was the following day.  The following -- yes,

9  the following day.

10  Q    And what was transported via the helicopter on the

11  following day?

12  A    It was the total of a 169, the kilo quantities of

13  the white powder.

14  Q    Where did the helicopter land?

15  A    San Diego -- oh, I mean the helicopter met us at our

16  police station where we loaded it and left.

17  Q    Okay.  And where had the 169 kilos been kept prior

18  to it being loaded aboard the helicopter for the flight

19  to the DEA land?

20  A    They were kept -- they were in protective custody

21  of DEA agents.

22  Q    At LAPD headquarters?

23  A    No.  They were transported to the DEA office and put

24  in their vault.

25        MR. KENETY:  Now, I ask if Ms. Dillard could

1               UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                     - - -

4      HONORABLE WILLIAM J. REA, JUDGE PRESIDING

5                     - - -

6  UNITED STATES OF AMERICA,    )
                             )

7          PLAINTIFF,      )
                             )

8     VS.                )  NO. CR 88-129-WJR
                             )

9  JUAN RAMON MATTA-BALLESTEROS, )
                             )

10        DEFENDANT.      )
                             )

11

12

13

14

15       REPORTER'S TRANSCRIPT OF PROCEEDINGS

16           LOS ANGELES, CALIFORNIA

17         FRIDAY, DECEMBER 7, 1990

18

19

20

21

22

23            DONNA BOWERS, C.S.R., R.P.R.
              OFFICIAL COURT REPORTER

24            430 UNITED STATES COURTHOUSE
              312 NORTH SPRING STREET

25            LOS ANGELES, CALIFORNIA 90012
              (213) 621-2400

1    TIME THAT THE WITNESS BE SHOWN EXHIBIT 133.

2            MR. STOLAR:  EXCUSE ME, YOUR HONOR.  BEFORE THE

3    WITNESS IS SHOWN THE -- SHOWN SOMETHING WITH AN ADDRESS ON

4    IT, COULD HE BE ASKED WHETHER HE KNOWS THE ADDRESS?

5            THE COURT:  WHETHER HE KNOWS THE ADDRESSES?

6            MR. CONNOLLY:  I HAVEN'T GOTTEN TO THE ADDRESSES

7    YET.

8            MR. STOLAR:  IT'S ON THE EXHIBIT, THOUGH.

9            MR. CONNOLLY:  I HAVEN'T GOTTEN TO THE EXHIBIT

10   YET.

11           MR. STOLAR:  OH.  133 IS NOT --

12           MR. CONNOLLY:  WE'RE STILL DOING PICTURES.

13           MR. STOLAR:  OKAY.

14           THE CLERK:  GOVERNMENT'S EXHIBIT 133 PLACED

15   BEFORE THE WITNESS.

16   BY MR. CONNOLLY:

17   Q    DO YOU RECOGNIZE GOVERNMENT EXHIBIT 133?

18   A    (NO RESPONSE.)

19   Q    DO YOU RECOGNIZE ANYONE IN GOVERNMENT EXHIBIT 133?

20   A    WELL, THERE IS AN INDIVIDUAL THERE THAT I SAW IN MORE

21   THAN ONE OCCASION IN THE AREA.

22           THE COURT:  IS THIS A PHOTOGRAPH?

23           MR. CONNOLLY:  YES, YOUR HONOR.

24           THE WITNESS:  THERE ONE INDIVIDUAL THAT I THINK I

25   SAW.

                                                                68

1    Q    DO YOU KNOW THE INDIVIDUAL BY ANY NAME?

2    A    NO, I DON'T.  ALL I KNOW IS THAT WHEN I MET HIM, HE

3    DELIVERED ME SOME DOCUMENTS ALSO.  AND EVERY TIME SOMEBODY

4    DELIVERS SOME MONEY, OR DOCUMENTS, LIKE THAT, HE HAD TO TELL

5    ME WHO THEY BELONGED TO.  AND THIS GUY SAID THAT THAT MONEY

6    BELONGED TO CUCHO.

7            SO WITHIN THE PEOPLE THAT WAS ALSO HELPING ME IN

8    THE AREA TO DO THIS MONEY PICK-UPS, WE KNEW THIS GUY BY

9    CUCHO.  I DON'T KNOW IF HE IS OR NOT CUCHO, YOU KNOW.  BUT

10   HE SAID TO ME THAT THE MONEY WAS FROM CUCHO.  I DON'T KNOW

11   IF HE MEANT HIM WAS CUCHO OR NOT.

12   Q    ARE THERE MULTIPLE REPRESENTED -- ARE THERE SEVERAL

13   PEOPLE REPRESENTED IN THAT PHOTOGRAPH?

14   A    WHAT DO YOU MEAN?

15   Q    HOW MANY --

16   A    THERE'S FOUR PEOPLE HERE, AND I ONLY RECOGNIZE ONE OF

17   THEM.

18   Q    AND WHERE IS THE ONE THAT YOU RECOGNIZE?

19   A    IT'S ON THE LEFT-HAND SIDE OF THE PICTURE.

20   Q    THE LEFT-HAND SIDE OF THE PICTURE?

21   A    RIGHT.

22   Q    COULD YOU --

23   A    THIS GUY (INDICATING).

24           MR. CONNOLLY:  YOUR HONOR, AT THIS TIME I WOULD

25   ASK THAT THE WITNESS BE ALLOWED TO DRAW AN ARROW TO THE

69

1    PERSON THAT HE KNOWS AND ALSO TO LABEL IT AS WHATEVER NAME

2    HE KNOWS HIM BY.

3              MR. STOLAR:   THE WITNESS SAYS HE DOESN'T KNOW IF

4    THAT'S HIS NAME.

5              MR. CONNOLLY:   I SAID "WHATEVER NAME HE KNOWS HIM

6    BY."

7              MR. STOLAR:   HE SAID HE DOESN'T KNOW THE NAME.

8              THE COURT:   LET'S DETERMINE WHAT NAME HE KNOWS

9    HIM BY.

10   BY MR. CONNOLLY:

11   Q    DID THIS PERSON SAY ANYTHING TO YOU REGARDING A NAME

12   WHEN HE TALKED TO YOU?

13   A    NO, NO, NOT THAT I REMEMBER.   THIS GUY ONLY TALKED TO

14   ME ABOUT WHATEVER, YOU KNOW -- ANYTHING -- NOTHING TO DO

15   WITH HIS NAME.   THE ONLY THING IS, TOWARDS THE END OF THE

16   CONVERSATION, AFTER HE DELIVERED THE MONEY TO ME, I SAID,

17   "OKAY.  WHO'S GIVING ME THIS MONEY?  WHO DO I PUT THIS

18   MONEY -- UNDER WHICH ACCOUNT I PUT IT?"

19              AND HE SAID, "CUCHO."

20              THAT'S ALL I KNOW.

21   Q    OKAY.  SO THAT WAS THE ONLY NAME MENTIONED?

22   A    YES, THAT IS CORRECT.

23   Q    OKAY.  NOW --

24              THE COURT:   DO YOU WANT HIM TO PUT AN ARROW ON

25   THIS PHOTOGRAPH?

70

1    MR. CONNOLLY:  YES, PLEASE.

2    THE COURT:  POINTING TO THE PERSON THAT YOU

3 RECOGNIZE.  CAN YOU DO THAT?

4    (WITNESS COMPLIES.)

5    THE COURT:  HE'S ON THE EXTREME LEFT OF THE FOUR

6 PEOPLE?

7    THE WITNESS:  YES.

8    THE COURT:  ALL RIGHT.

9 BY MR. CONNOLLY:

10 Q NOW, WOULD YOU TELL US, IF YOU REMEMBER, HOW MANY

11 TIMES YOU'VE MET THE INDIVIDUAL IN THAT EXHIBIT?

12 A JUST ABOUT ONE -- TWICE, MAYBE THREE TIMES, OR

13 SOMETHING LIKE THAT.

14 Q AND ON EACH TIME WERE DOCUMENTS GIVEN TO YOU?

15 A THAT'S CORRECT.

16 Q COULD YOU TELL US WHERE YOU MET HIM.

17 A THE TWICE OR THREE TIMES THAT I MET HIM, I MET HIM IN

18 THE SAME PLACE, AND THAT WAS IN SAN PEDRO, IN A PLACE

19 CALLED TINY NAYLOR'S.  IT'S LIKE A LITTLE PLACE -- I THINK

20 IT'S A COFFEE SHOP -- RIGHT BY THE VAGABOND HOTEL.

21    AND THEN WE DROVE OFF TO THE YMCA IN SAN PEDRO.

22 IT'S UP THE STREET ON THIRD STREET.  AND THERE WAS A YMCA

23 THERE, AND THERE WAS A PARKING LOT THERE, AND WE BOTH

24 PARKED OUR CARS.  AND THEN HE OPENED THE TRUNK OF HIS CAR,

25 PULLED OUT THE SUITCASES, AND PUT THEM IN MY TRUNK -- THE

71

1  TRUNK OF MY CAR.  AND THAT WAS IT.  HE WENT HIS WAY, AND I

2  WENT MINE.

3  Q    OKAY.  NOW, OTHER THAN WHAT YOU'VE JUST TOLD US, DID

4  YOU HAVE ANY CONVERSATIONS WITH HIM AS TO WHERE HE

5  RESIDED?

6  A    OH, YES.  YOU KNOW, IN THE CONVERSATION, FOR SOME

7  REASON OR OTHER, HE SAID HE CAME OUT OF NEW YORK.  BUT

8  YOU KNOW, A LOT OF PEOPLE SAID THINGS, YOU KNOW, LIKE

9  THEY'RE FROM ENGLAND, YOU KNOW.  SO IT WAS NOTHING TO

10 REALLY PAY ATTENTION TO.  JUST SO THAT WE COULD TALK ABOUT

11 SOMETHING, YOU KNOW.

12 Q    OKAY.  NOW, DID HE HAVE A NEW YORK ACCENT?

13 A    OH, NO.  NO.

14 Q    COULD YOU TELL --

15 A    I MEAN, HE COULDN'T SPEAK ENGLISH.  SO PEOPLE FROM

16 NEW YORK SPEAKS ENGLISH, I THINK.

17 Q    OKAY.  COULD YOU TELL WHERE HE WAS FROM, FROM HIS

18 ACCENT?

19 A    AGAIN, YOU KNOW, I THINK IT WAS FROM SOUTH AMERICA,

20 BUT...

21 Q    DID YOU DETERMINE DURING THE COURSE OF YOUR WORKINGS

22 IN THE DRUG BUSINESS DURING 1983 AND '84 WHERE HE WAS FROM?

23 A    I COULD MORE OR LESS DETERMINE, YOU KNOW, WHERE A

24 PERSON WAS IF I TALKED TO HIM IN SPANISH, BUT NOT BECAUSE

25 I FOUND OUT IN THE DRUG BUSINESS.  I KNOW PEOPLE FROM

72

000163

1    PERU, FROM -- I KNOW HOW THEY TALK, HOW THEY SOUND LIKE.

2    AND I KNOW PEOPLE FROM CHILE AND FROM COLOMBIA AND FROM

3    MEXICO AND SOME DIFFERENT AREAS OF MEXICO.

4         SO YES, I COULD MORE OR LESS PIN HIM DOWN TO

5    WHAT PART OF THE WORLD HE IS FROM, IF THAT'S WHAT YOU MEAN.

6    Q    OKAY.  AND WHAT PART OF THE WORLD WAS HE FROM?

7    A    I BELIEVE HE WAS COLOMBIAN, BUT SEE, LIKE WITH THIS

8    INDIVIDUAL, I DIDN'T REALLY TALK THAT MUCH.  OKAY?  SO FOR

9    THE LITTLE PART THAT I COULD HEAR FROM YOU, YOU KNOW, HE

10   SOUNDED, TO ME, SOUTH AMERICAN AND COLOMBIAN.

11   Q    OKAY.  NOW, CAN YOU TELL THE LADIES AND GENTLEMEN OF

12   THE JURY, IF YOU REMEMBER, WHEN YOU MET THIS INDIVIDUAL.

13   A    NO.  I KNOW THAT IT WAS IN '84, BUT AS TO WHAT DATE

14   OR MONTH, I DON'T KNOW.

15   Q    CAN YOU TELL US WHAT YOU DID WITH THE MONEY HE GAVE

16   YOU?

17   A    I GAVE IT TO MARDOQUEO AGAIN.  YES, THAT IS WHAT I DID.

18   I GAVE IT TO MARDOQUEO.

19   Q    OKAY.  NOW, GOING BACK TO 1983, DID YOU KNOW AN

20   INDIVIDUAL BY THE NAME OF ARTURO IZQUIERDO?

21   A    YES.  THAT INDIVIDUAL, I MET HIM LIKE -- OKAY.  THIS

22   GUY, I SAW HIM.  I NEVER REALLY MET HIM.  I MEAN, I WAS

23   NEVER INTRODUCED TO HIM, "MR. IZQUIERDO, THIS IS SO-AND-

24   SO; AND SO-AND-SO, THIS IS MR. IZQUIERDO."  HE WAS JUST

25   HANGING AROUND WITH THE PEOPLE THAT SOMETIMES I HUNG AROUND

73

1   THE FIGURES, YOU KNOW.  I DIDN'T EVEN COUNT THE MONEY AFTER

2   I RECEIVED IT.  I JUST PUT IT IN THESE BRIEFCASES, I LOCKED

3   THEM, AND I WAITED FOR SOMEONE TO COME AND COUNT THE MONEY.

4   Q    FROM JULY 1984 TO FEBRUARY 1985, WHAT PROCEDURE DID

5   YOU USE IN TRANSPORTING THE MONEY THAT YOU COLLECTED OUT OF

6   THE COUNTRY?

7   A    FROM WHAT --

8   Q    FROM JULY OF '84 THROUGH FEBRUARY '85.

9   A    IT WAS ALWAYS THE SAME PROCEDURE, YOU KNOW.  I WOULD

10  LOAD UP THE VAN, OR WE HAD DIFFERENT VEHICLES WE USED BY

11  NOW, YOU KNOW, BECAUSE IT WAS SUCH A LARGE AMOUNT THAT WE

12  HAD TO USE DIFFERENT VEHICLES.  WE HAD TWO MOTORHOMES; AND

13  WE HAD A CAMPER; AND WE HAD ONE OF THOSE THERMAL KINGS, YOU

14  KNOW, ONE OF THOSE CARS THAT ARE REFRIGERATED.  THEY HAVE

15  THIS INSULATED BOX, AND THEN THEY HAVE THIS UNIT, YOU KNOW,

16  WHERE YOU KEEP IT COOL INSIDE, SOMETHING LIKE THAT.  ONE

17  OF THOSE TRUCKS, WE HAD THAT TOO.

18       BUT THE ROUTE WAS THE SAME ALL THE TIME, YOU KNOW,

19  FROM L.A. TO GUERRERO NEGRO, AND AT GUERRERO NEGO THE PLANE

20  WOULD COME AND GET US AND TAKE THE MONEY OVER TO

21  GUADALAJARA.

22  Q    AND WAS THE MONEY HIDDEN IN THE CARS?

23  A    OH, YES.  YES.  IT WAS PRETTY WELL STASHED IN THE CAR,

24  YES.

25  Q    AND WERE YOU INVOLVED IN ALL THE TRANSPORTATION?

191

1    A    WELL, NOT ALL THE TIME.  I COULDN'T DO IT ALL BY

2    MYSELF, YOU KNOW.  THERE WAS OTHER PEOPLE DOING THE PICKING

3    AND THE STASHING AND THE TRANSPORTATION.

4    Q    FROM JULY '84 UNTIL FEBRUARY 1985, TELL THE LADIES AND

5    GENTLEMEN OF THE JURY HOW MUCH MONEY YOU TOOK OUT OF THE

6    UNITED STATES.

7    A    WELL, I -- THIS IS A FIGURE THAT I KNOW, YOU KNOW,

8    BECAUSE NOW I'M COUNTING THE MONEY AND I'M GETTING PAID

9    FOR IT.  SO IF I DON'T KNOW HOW MUCH MONEY I'M TRANSPORTING,

10   I DON'T KNOW HOW MUCH I SHOULD BE GETTING PAID. .BUT I KNOW

11   THAT IT WAS $150 MILLION.

12   Q    AND WHO DID YOU DELIVER THIS MONEY TO?

13   A    SAME PEOPLE:  MIGUEL, TOMAS, PACHECO.  THOSE WERE THE

14   GUYS THAT WERE THERE TO RECEIVE THE PLANE WHEN I ARRIVED.

15   I THINK ON ONE OR TWO OCCASIONS I SAW MR. -- OR DON JOSE

16   WAS THERE.

17   Q    DID YOU RECEIVE PAPERWORK FROM THE PEOPLE THAT

18   CONTRIBUTED THE MONEY TO YOU?

19   A    I DID NOT RECEIVE PAPERWORK.  WHAT I RECEIVED WAS THE

20   MONEY, I MYSELF WRITE DOWN, YOU KNOW, THE FIGURE AND WHO

21   THE MONEY CAME FROM WHO THEY SAID, YOU KNOW, THE MONEY CAME

22   FROM, YOU KNOW.

23        SOMETIMES AS I RECEIVED MONEY FROM PEOPLE WHERE

24   NEVER REALLY LIKE -- LET'S SAY I RECEIVED MONEY FROM CUCHO.

25   THE GUY THAT DELIVERED THE MONEY TO ME, IT MIGHT NOT BE

192

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

BEFORE THE HONORABLE WILLIAM J. REA, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,    )

            Plaint:

vs.                                    'V-88-129-WJR

JUAN RAMON MATTA,           102 - 112

            Defendar

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL (15TH DAY)

TUESDAY, OCTOBER 23, 1990

VERNA R. MORÓN
COURT REPORTER PRO TEM
U.S. DISTRICT COURT HOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 894-3015

000167

102

1    of this case.

2            THE COURT:  All right.  Thank you, sir.

3                (JURY PRESENT).

4    JOSE  MANUEL  MARTINEZ  MORALES,  PLAINTIFF'S  WITNESS,

5    SWORN.

6            THE COURT:  Again, I would like the Interpreter

7    to state her name.

8            THE INTERPRETER:  My name is Alisia Harabín,

9    H-a-r-a-b-i-n.

10           THE COURT:  Ms. Harabín, you have heretofore

11   been sworn to translate English into Spanish and Spanish

12   into English?

13           THE INTERPRETER:  Yes, Your Honor.

14           THE COURT CLERK:  Would you state your name

15   for the record, and spell it?

16           THE WITNESS:  Jose Manuel Martinez Morales,

17   J-o-s-e  M-a-n-u-e-l M-a-r-t-i-n-e-z  M-o-r-a-l-e-s.

18   DIRECT EXAMINATION BY MR. CONNOLLY:

19   Q    Mr. Martinez, where are you from?

20   A    I am from Madrid, Spain.

21   Q    How old are you, sir?

22   A    I am 36 years old.

23   Q    And are you presently employed?

24   A    Yes.  I am an officer in the National Police Force.

25   Q    And how long have you been employed by the National

000168

103

1   Police Force?

2   A    From 1975.

3   Q    And are you still employed as a Narcotics --

4   by the National Police Force?

5   A    Yes, sir.

6   Q    And in approximately 1983, what were your duties as

7   a National Police Officer?

8   A    In 1983, I had already been working for three years

9   in the Central Narcotics Bureau, where we worked with

10  everything that related to the investigation of drug

11  related crimes.

12  Q    And does the National Police Force have authority

13  throughout the whole of Spain?

14  A    The National Police Force has authority over the

15  entire Spanish territory.  The Central Narcotics Brigade

16  centralizes everything related to narcotics.

17  Q    And -- now, was part of your duties at that time in

18  1983, to conduct investigations?

19  A    Yes, that is right.

20  Q    And was one of your tools in these investigations,

21  the use of wiretaps?

22  A    That is correct.

23  Q    Could you explain for the ladies and gentlemen of

24  the jury -- backtracking for one moment, are these

25  wiretaps obtained pursuant to a Court order?

104

1    A    Yes, of course.

2    Q    Now, during 1983 -- oh, excuse me.    Would you

3    please relate to the ladies and gentlemen of the jury,

4    what those procedures were in Spain, and what the

5    procedures were in 1983, for conducting a wiretap after

6    you received the Court order from a Judge?    What would

7    you do?

8             MR. STOLAR:    I object, Your Honor, to the

9    question on relevance grounds, but if it is altered for

10   this case, then I will withdraw the objection.

11            THE COURT:    Please read it back.

12            (QUESTION READ BACK BY REPORTER).

13            THE COURT:    It is a compound question.

14   Rephrase it.

15   Q    Mr. Martinez, after obtaining a Court order -- did

16   you obtain a Court order in this investigation that

17   we're talking about now?

18   A    Yes, sir.

19   Q    And when was that Court order obtained if you know?

20   A    In the middle of the month of September of 1983.

21   Q    And was that Court order for certain premises?

22   A    Are you talking about different addresses, or --

23   Q    Excuse me.    Let me rephrase the question.    Did you

24   obtain a Court order in this case for a residence?

25   A    Yes.    I did receive a Court order for a residence.

105

Q      And what was the address of that residence?

A      It was Avenida Prado Largo, No. 42 in Vozuelo (ph), Madrid.

Q      What was the duration of this wiretap order?

A      With the extensions required, it lasted from September 14, 1983 to June 26, 1984.  Then from November 6, 1984, to March 7, 1985, and from May 7, 1985 to May -- excuse me, from March 7, 1985 to May 3, 1985.

        MR. STOLAR:  May the record reflect, that the witness appeared to be reading from a document when he gave that answer.

        THE COURT:  Yes.  Did you make reference to some document as you answered the question?

        THE WITNESS:  Yes.  I have looked at the document, which earlier I was allowed to look at in the same Courtroom.

        MR. STOLAR:  May the document be marked as an exhibit for identification, Your Honor?

        THE COURT:  All right.  What is your next number?

        MR. KENATY:  71.

        THE COURT:  It will be marked 71 for identification.

Q    The document that you were referring to, Government's 71 for identification that you were reading from --

000171

106

1    A    This is a document from the Central District Court

2    in Madrid, which contains the dates in which the wiretaps

3    were authorized.  And it is duly signed by the Judge who

4    issued this order.

5    Q    Now, in addition to the house or residence that was

6    wiretapped, were other premises wiretapped during this

7    investigation?

8    A    Yes.  We tapped the line in an office that had been

9    rented by Mr. Matta on Avenida de la Moblaje (ph).

10   Q    Can you tell from Government's Exhibit 71, the

11   duration of the tap on the office?

12        MR. STOLAR:  Your Honor, the exhibit is not in

13   evidence.  If he is using it to refresh his recollection,

14   that is one thing.  If --

15        THE COURT:  Sustained.

16   Q    Can you tell from Government's Exhibit 71, when the

17   offices -- the phone office or phones were tapped?

18        MR. STOLAR:  Same objection.  Same question.

19        MR. CONNOLLY:  Your Honor, I'm attempting to

20   lay a foundation.

21        THE COURT:  The next question may be --

22   can you tell from looking at this document?  Yes or no.

23        THE WITNESS:  Yes, I can.

24   Q    Do you have an independent memory of the date on

25   which the office phones were tapped?

107

1    A    This (indicating) began in March of 1984.

2              THE COURT:   That is not an answer to the

3    question.

4              MR. CONNOLLY:   Your Honor, I would offer

5    Government's Exhibit --

6              MR. STOLAR:   Your Honor, I object to that

7    coming into evidence.  I don't think that the witness

8    answered the last question.

9              THE COURT:  You want to ask it again?

10   Q    Does Government's Exhibit 71 refresh your memory

11   as to when the taps began on the office in this inves-

12   tigation?

13             THE COURT:  Does it refresh your recollection?

14             THE WITNESS:   May I, Your Honor, look at the

15   document?

16             THE COURT:  Yes.  Don't read from it.  I don't

17   think he has answered the question.  The answer can be

18   answered yes or no.  By looking at this document, does

19   it refresh your recollection that the phone in the

20   office of Mr. Matta was wiretapped?

21             THE WITNESS:  Yes.

22             MR. CONNOLLY:  I would offer that, Your Honor.

23             MR. STOLAR:  I object to it.

24             THE COURT:  If it refreshes his memory, there

25   is no reason for it to come in.  Just ask him a question.

108

1   Q    When was the apartment -- when were the offices

2   tapped - or office tapped?

3   A    March 20, 1984.

4   Q    Is that when it began?

5   A    That was the date of the authorization.    If it

6   began that date or the following day, I am not quite

7   sure.

8   Q    And when did it terminate?

9   A    It stopped on June 24th of 1984 - the first time.

10  Then we requested the judiciary permission, and it began

11  again on November 6th of 1984, and continued til May 3rd

12  of 1985.

13  Q    How many telephones were tapped?

14  A    Two.

15  Q    Can you tell us what the numbers were - the

16  exchange numbers - that were tapped in the office?

17  A    The telephone numbers in Madrid, 254-3579 and 254-

18  3582.

19  Q    And regarding the house or the premises that he

20  mentioned before at Prado Largo --

21       THE COURT:    Now we're back to this third

22  person.  Keep it in the first person.

23       MR. CONNOLLY:    I'm sorry, Your Honor.

24  Q    Regarding the address that you mentioned before,

25  Prado Largo, can you tell us how many phones were tapped

000174

109

1   at that location?

2   A    We tapped two lines with one number, and later, the

3   number changed.

4   Q    Could you tell us what the number of the first two

5   lines that you tapped were?

6   A    In Madrid, 715-1545 and 715-1449.

7        THE WITNESS:    If Your Honor will allow me,

8   Your Honor, I would like to addend those.

9        THE COURT:    Yes.

10       THE WITNESS:    It is in Madrid, and is an area

11  called Porteño Villa Alcón (ph).    The area code is

12  Madrid.

13  Q    And when did these two lines get to begin being

14  intercepted, and when did the interception terminate?

15  A    With these two numbers, we requested authorization

16  for the tapping and received it.    And it began on

17  September 14th of 1983 til June 26th of 1984.

18  Subsequently, we requested the authorization, and --

19  which was granted, and began again on November 8th of

20  1984 until March 7, 1985.

21  Q    Okay.  And the telephone numbers the first time  --

22  the lines were tapped at the premises at Prado Largo,

23  what were they?

24  A    At first, they were 715-1545, and 715-1449.  Later

25  they were changed to 715-8997 and 715-8999.

110

Q    Once an application -- excuse me.   Once a Court order is received from a Judge in Spain to intercept a telephone located at a certain address, what is the next step that the investigator does?

MR. STOLAR:   Objection to the generalness of the question.   I want to know what happened in this case.

THE COURT:   Sustained.

Q    Okay.   Now, what address was intercepted on September 14th -- excuse me.   What address were you given authorization to intercept the telephones at on September 14, 1983?

A    On September 14, 1983, I received an authorization to tap the lines at Prado Largo.

Q    After receiving your authorization to tap the lines at Prado Largo, what did you do?

A    Once the judiciary authority grants this authorization to the Central Narcotics Bureau, then the National Telephone Company is called, so that they can carry out the necessary technical steps for the lines to be tapped.

Q    And was that done in this case?

A    Yes, sir.

Q    After that was done, were certain electronic devices placed on the lines by the telephone company?

000176

111

A    Yes.    Once that was done, certain electronic devices were installed on the line.

Q    And where was the line physically located?

A    The calls were registered in a building that belongs to the Spanish Central Narcotics Bureau that year, and that's where the calls were registered.

Q    And is this the same building in which you worked in?

A    The same building in which I worked at the time.

Q    Okay.    And what were the electronic devices that were attached to the line?

A    One of them was a ringer, and the other one was a recorder.

Q    What did the ringer do?

A    The ringer makes the tape recorder start working every time that the receiver is picked up at the residence of the line that is tapped.

Q    So the ringer activates the tape recorder?

A    Yes.    Every time it is picked up, it is activated.

Q    What was the procedure that was followed in listening to the tapes or obtaining the tapes in this case?

A    We substituted the tapes that we were interested in with another tape, and we would take the tape to our office, put it on the recorder, and we would start working on it.

112

Q    Would he work alone -- I'm sorry.  Would you work alone?

A    No.  I worked as a team - with a partner from the Central Narcotics Bureau.

Q    And what was his name?

A    My partner's name is Miguel Gormas-Cabada.

Q    And did you work as a team with Mr. Gormas from 1983 until approximately 1985?

A    Yes, we worked together.

Q    Did anyone physically monitor the tapes while the conversations were going on?

A    No.  Generally not.

Q    What is the practice - to record the conversations?

A    They were tapped automatically every time the receiver was picked up.

Q    And what kind of tapes were those telephone conversations taped onto?

A    I don't know the technical term for them, but bigger than cassette tapes.  They were wider.  They are much longer.

Q    Can you tell us how many hours of conversation they record?

A    I'm not a technician in the subject, but it depends on the speed at which it has been set.  So I would say that -- approximately two hours.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA
-oOo-

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

-oOo-

UNITED STATES OF AMERICA,          )
                                   )
                                   )
          PLAINTIFF,               )
                                   )     NO. CR-88-129-WJR
                                   )
JUAN RAMON MATTA,                  )
                                   )
          DEFENDANT.               )
-------------------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

WEDNESDAY, NOVEMBER 21, 1990

PATRICIA A. CHILES
OFFICIAL COURT REPORTER
412 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA
(213) 687-7905

000179

1    A    I DON'T UNDERSTAND WHAT YOU'RE TRYING TO ASK ME.

2    Q    LOOKING AT THE CHART FOR THE NUMBERS UNDER JAIR

3    ARE ALL THOSE TELEPHONE NUMBERS AS WRITTEN DOWN ON THE CHART

4    THE SAME AS WERE WRITTEN DOWN IN YOUR REPORT?

5    A    YES, THAT'S RIGHT.   AND IN FACT, EARLIER WE DID

6    REALIZE THAT THEY WERE THE SAME NUMBERS.

7    Q    ARE ALL OF THE FIVE NUMBERS THERE UNDER JAIR, OR

8    FIVE SERIES OF TELEPHONE NUMBERS UNDER JAIR AS LISTED ON THAT

9    CHART IDENTICAL?

10    A    NO.   THERE ARE CERTAIN VARIATIONS OF A NUMBER

11    ABOVE, A NUMBER BELOW.

12    Q    AND HOW DO YOU ACCOUNT FOR THOSE DISCREPANCIES?

13    A    WHEN WE WERE RECORDING THROUGH THE RECORDINGS,

14    THE TAPE RECORDINGS, THE NUMBERS THAT WERE BEING CALLED, AS I

15    PREVIOUSLY STATED, WE WOULD OBTAIN THESE NUMBERS THROUGH THE

16    CLICKS OR SOUNDS.   IT MIGHT WELL BE THAT AS WE WERE COUNTING

17    THE CLICKS OR SOUNDS WE MIGHT HAVE MADE AN ERROR.   MAYBE

18    THERE WAS ONE CLICK MORE OR ONE CLICK LESS WHEN WE WERE

19    COUNTING THE CLICKS.   AND I THINK THAT THIS IS WHAT WOULD

20    EXPLAIN THE MISTAKE OF ONE NUMBER ABOVE OR ONE NUMBER BELOW.

21    Q    NOW, REFERRING YOU BACK TO THE BEGINNING OF YOUR

22    EXAMINATION THIS MORNING.   AND WE WERE TALKING ABOUT HOW TO

23    DETERMINE THE NUMBERS CALLED.

24    A    YES.

25    Q    DO YOU RECALL ME ASKING YOU THE PROCEDURE USED

000180

1   BY YOUR OFFICE?

2        A      IN ORDER TO OBTAIN THE NUMBERS THAT WERE BEING

3   CALLED?

4        Q      YES.

5        A      YES.

6        Q      YOU MENTIONED THAT A ROTARY PHONE -- YOU COUNTED

7   THE CLICKS.

8        MR. STOLAR:  OBJECTION.  HE DID NOT TALK ABOUT A

9   ROTARY PHONE, YOUR HONOR.  HE SAID HE DIDN'T KNOW WHAT KIND

10  IT WAS.

11       THE COURT:  ALL RIGHT.  LET'S ASK A QUESTION INSTEAD

12  OF TRYING TO GO BACK TO SOMETHING YOU ASKED BEFORE.

13       MR. CONNOLLY:  I'M TRYING TO CLARIFY IT, YOUR HONOR.

14       THE COURT:  JUST ASK THE QUESTION INSTEAD OF TRYING TO

15  QUOTE WHAT HE SAID EARLIER.

16  BY MR. CONNOLLY:

17       Q      DO YOU KNOW WHAT A ROTARY PHONE IS?

18       A      YES, IN FACT.

19       Q      DID THEY HAVE ROTARY PHONES IN SPAIN IN 1983,

20  '84 AND '85?

21       A      YES.

22       Q      DID THEY ALSO HAVE PUSH BUTTON PHONES?

23       A      YES.

24       Q      AND HOW DO YOU DETERMINE A NUMBER CALLED WHILE

25  ON A WIRETAP FROM A ROTARY PHONE?

1        A      IN THE SAME WAY AS I EXPLAINED EARLIER.   THE

2    NUMBER WHICH IS BEING CALLED IS RECORDED THANKS TO THE

3    SOUNDS.  AND THAT WAS HOW WE OBTAINED THESE NUMBERS.

4        Q      HOW ABOUT FROM A PUSH BUTTON PHONE, HOW DO YOU

5    DETERMINE THE NUMBER CALLED?

6        A      IT'S THE SAME THING.  THE NUMBER IS RECORDED

7    ACCORDING TO THE SOUNDS.

8        Q      WHAT KIND OF SOUNDS OR CAN YOU DESCRIBE THE

9    SOUNDS THAT A PUSH BUTTON PHONE GIVES OFF AS YOU RECORD?

10       A      WELL, THE SOUNDS ON THESE RECORDINGS ARE

11   BEEP-BEEP-BEEP-BEEP-BEEP.  AND THIS IS DONE BY DECREASING THE

12   SPEED OF THE RECORDING.  IN THE ORIGINAL RECORDINGS WITHOUT

13   REDUCING THE SPEED IT'S CLACK-CLACK-CLACK-CLACK-CLACK.

14       Q      THANK YOU.  TURNING NOW TO GOVERNMENT EXHIBIT

15   82-E-1, E-2, -F AND -G.

16       A      YES.

17       Q      YOU HAVE THOSE IN FRONT OF YOU?

18       A      YES.

19       Q      DOES E-1, E-2, -F AND -G OF GOVERNMENT EXHIBIT

20   82 FOR IDENTIFICATION REPRESENT CALLS MADE TO THE SAME

21   NUMBER, FOUR DIFFERENT CALLS?

22       A      COULD YOU PLEASE REPEAT.

23       Q      DO THESE FOUR CALLS OR ARE THESE FOUR CALLS TO

24   THE SAME NUMBER?

25       A      IN ALMOST ALL OF THEM, YES, EXCEPT FOR A FEW

1    EXCEPTIONS IN WHICH, AS I STATED BEFORE, THERE IS A

2    DIFFERENCE IN ONE NUMBER.

3         Q    WOULD YOU PLEASE TELL US IN EXHIBIT 82-E-1 WHEN

4    THE TELEPHONE CONVERSATION TOOK PLACE?

5         A    IT TOOK PLACE BETWEEN MARCH 13 AND 14 OF 1984.

6         Q    WHAT WAS THE NUMBER CALLED?

7         A    TO 07-1-213-917-2285.  THIS IS A NUMBER THAT WE

8    RECORDED.

9         Q    NOW, HOW LONG IS THE CONVERSATION THAT ENSUED?

10        A    SIX LINES.

11        Q    WHO WERE THE PARTICIPANTS?

12        A    DON JOSE WITH A WOMAN.

13        Q    DO YOU KNOW THE IDENTITY OF THE WOMAN?

14        A    NO.

15        Q    NOW, DO YOU HAVE ANY -- CAN YOU PLACE FROM THE

16   AREA CODE THE LOCATION OF THE TELEPHONE?

17        A    SPECIFICALLY LOS ANGELES.

18        Q    DO YOU KNOW FROM YOUR OWN PERSONAL KNOWLEDGE WHO

19   RESIDES IN THE LOCATION WHERE THIS TELEPHONE IS LOCATED?

20   FROM YOUR OWN PERSONAL --

21        MR. STOLAR:  OBJECT AND MOVE TO STRIKE, YOUR HONOR.

22        THE COURT:  ARE YOU TALKING ABOUT THE TELEPHONE NUMBER

23   THAT'S BEING CALLED?

24        MR. CONNOLLY:  YES, YOUR HONOR.

25        THE COURT:  DOES HE KNOW OF HIS OWN PERSONAL KNOWLEDGE

44

1    WHO RESIDES AT THAT LOCATION WHERE THIS PHONE --

2           MR. CONNOLLY:  RIGHT.

3           THE COURT:  IS THAT THE QUESTION?

4           MR. CONNOLLY:  YES, YOUR HONOR.

5           THE COURT:  YOU HAVE AN OBJECTION?

6           MR. STOLAR:  THE OBJECTION IS THAT IT CAN ONLY BE

7    BASED ON HEARSAY, YOUR HONOR.

8           MR. CONNOLLY:  MY QUESTION WAS --

9           THE COURT:  WELL, DOES HE HAVE PERSONAL KNOWLEDGE.

10   WE'RE GOING TO RUN INTO HEARSAY.  I CAN SEE IT COMING.  BUT

11   THE QUESTION THAT'S PENDING MAY BE ANSWERED "YES" OR "NO."

12          THE WITNESS:  YES.

13   BY MR. CONNOLLY:

14          Q     REFERRING YOUR ATTENTION TO GOVERNMENT EXHIBIT

15   E-1.

16          A     YES.

17          Q     AND THAT IS RECORDED ON WHAT DATE?

18          A     BETWEEN MARCH 13 AND 14 OF 1984.

19          Q     WOULD YOU PLEASE READ THAT CONVERSATION FOR US.

20          A     DON JOSE CALLS 07-1-213-917-2285.  HE SPEAKS

21   WITH A WOMAN.

22              DON JOSE:  GOOD AFTERNOON.  IS COMPADRE AROUND?

23              THE WOMAN:  NO.  HE JUST WENT OUT.

24              DON JOSE:  TELL HIM WHY DOES HE LEAVE A MESSAGE

25   FOR ME TO CALL HIS BROTHER IF HE DOESN'T ANSWER AT BOTH

1    TELEPHONE NUMBERS THAT HE LEFT ME?  TELL HIM TO RECEIVE SOME

2    SENSE FROM THE MAN THAT GAVE HIM CHECK -- A CHECK FOR $3,000.

3             THE WOMAN:  YES, SIR.

4             THIS IS THE END.

5      Q    IN WHAT SENSE?

6      THE INTERPRETER:  PARDON ME?

7      Q    THE USE OF THE WORD "SENSE."

8      A    LIKE SOME SENSE.

9      Q    COULD YOU SPELL THAT FOR ME, PLEASE.

10    A    YOU MEAN THE WORD THAT IS RECORDED HERE?

11    Q    NO.  THE WORD "SENSE."  IS IT C-E-N-T-S OR IS IT

12    S-E-N-S-E?

13    A    THE WORD IS CENTAVOS HERE.

14    Q    DOES THAT MEAN MONEY?

15    A    IT MIGHT MEAN MONEY ALSO.

16    Q    MOVING ON TO 82-E-2.

17    A    YES.

18    Q    NOW, IS THERE AN ENTRY IN YOUR SYNOPSIS OR

19    SUMMARY SHOWING THAT A CALL WAS MADE?

20    A    YES.

21    Q    WHEN WAS THE CALL MADE?

22    A    ON MARCH 14 OF 1984.

23    Q    WHAT NUMBER WAS CALLED?

24    A    07, WHICH IS THE INTERNATIONAL NUMBER; 1, THE

25    UNITED STATES; 213, LOS ANGELES; AND THE NUMBER 917-2275.

1          Q     WAS THE CALL COMPLETED?

2          A     HE GOT THROUGH.

3          Q     WAS THERE A CONVERSATION.

4          A     NO, THERE WAS NO CONVERSATION.  THAT NUMBER WAS

5    DIALED AND THEY GOT THROUGH.

6          Q     WAS THE NUMBER ANSWERED?

7          A     NO, IT WAS NOT ANSWERED.

8          Q     NOW, REFERRING YOU TO GOVERNMENT EXHIBIT 82-F.

9          A     YES.

10         Q     WHO WAS THE PERSON THAT MADE THE CALL IN THE

11   LAST CONVERSATION, THAT PLACED THE CALL?

12         A     DON JOSE.

13         Q     AND HOW COULD YOU TELL THAT IF THERE WAS NO

14   CONVERSATION?

15         A     WELL, BECAUSE WHILE HE WAS CALLING HE SAID JUST

16   ENOUGH FOR ME TO REALIZE THAT IT WAS HIM.

17         Q     REFERRING YOU TO 82-F.

18         A     YES.

19         Q     IS THERE AN ENTRY OF ANOTHER PHONE CALL BEING

20   MADE BETWEEN THOSE DATES?

21         A     YES.  BETWEEN MARCH 11TH, '84 AND MARCH 13TH,

22   1984.

23         Q     WHAT NUMBER WAS CALLED?

24         A     07-213-917-2275.

25         Q     WAS THERE A CONVERSATION RECORDED?

1       A      NO, NOT A CONVERSATION.  THE CALL WAS RECORDED.

2       Q      WHO PLACED THE CALL?

3       A      DON JOSE DID.

4       Q      WHAT HAPPENED ON THE OTHER END OF THE LINE?

5       A      WELL, HE WAS GETTING THROUGH AND HE CALLED

6   SEVERAL TIMES AND HE KEPT ON GETTING THROUGH.

7       Q      AND WAS THE OTHER LINE NOT ANSWERED?

8       A      NO.   THERE WAS NO ANSWER BECAUSE THE PHONE WAS

9   BUSY.

10      Q      SO THE LINE WAS BUSY WHEN HE MADE THE CALL?

11      A      YES, INDEED.  THE PREVIOUS ONE AND THIS ONE.

12      Q      THE PREVIOUS ONE OF THE E-2-1?

13      A      YES, IN FACT.

14      Q      AND REFERRING YOUR ATTENTION TO EXHIBIT 82-G.

15      A      YES.

16      Q      WAS THERE A SIMILAR TELEPHONE ATTEMPT MADE ON

17  THAT DATE?

18      A      YES.  IN FACT, MANY TIMES.

19      Q      WHAT NUMBER WAS CALLED IN 82-G?

20      A      07-213-917-2275.  THIS IS THE NUMBER THAT WE

21  HAVE RECORDED HERE.

22      Q      WAS THAT ALSO A BUSY SIGNAL?

23      A      YES, SEVERAL TIMES.

24      THE COURT:  ON WHAT DATE WAS THAT CALL MADE?

25      THE WITNESS:  BETWEEN MARCH 11 AND 13 OF 1984.

1    BY MR. CONNOLLY:

2          Q     COULD YOU TELL FROM THE LINE NOISE WHO PLACED

3    THE CALL?

4          A     YES, INDEED.  DON JOSE.  HE IS MR. MATTA.

5          Q     AND IS THAT NOTED IN YOUR SUMMARY?

6          A     YES.  THAT IS WHY WE NOTED HIM DOWN AS DON JOSE.

7          Q     I WOULD ASK AT THIS TIME FOR YOU TO REACH DOWN

8    AND ONCE AGAIN PICK UP THE CHART, GOVERNMENT EXHIBIT 75.

9          A     YES.

10         Q     ASK YOU TO LOOK AT THE CHART AND SEE IF THE

11   CONVERSATION, THE CALLS, THE ONE COMPLETED CALL AND THE BUSY

12   SIGNAL CALLS ARE NOTED ON THAT CHART.

13         A     YES, CORRECT.

14         Q     DOES THE CHART ACCURATELY REFLECT -- FAIRLY AND

15   ACCURATELY REFLECT THOSE CALLS?

16         A     YES, CORRECTLY.

17         Q     AND COULD YOU TELL ME WERE ALL THE CALLS THAT

18   WERE NOT COMPLETED BUSY SIGNALS OR WAS ONE NOT ANSWERED?

19         A     THE FIRST ONE OF THOSE RECORDED HE SPEAKS WITH A

20   WOMAN.  WE ALREADY WENT OVER THE CONVERSATION.

21         Q     RIGHT.

22         A     THE THREE FOLLOWING ONES THE LINE IS BUSY.

23         Q     THANK YOU.  REFERRING TO THE FIRST CONVERSATION,

24   E-1.

25         A     YES.

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA.

- - -

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,           )
                                    )
            PLAINTIFF,              )
                                    )
            VS.                     )        CR 88-129-WJR
                                    )
JUAN RAMON MATTA-BALLESTEROS,       )
                                    )
            DEFENDANT.              )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

WEDNESDAY, OCTOBER 24, 1990

DONNA BOWERS, C.S.R., R.P.R.
OFFICIAL COURT REPORTER
430 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 621-2400

000189

65

1          MR. MATTA SAYS THAT HE IS GOING DOWNTOWN NOW, AND

2     THAT IN AN HOUR AND A HALF HE WOULD CALL.

3          THE OTHER PERSON SAID THAT DON UMBERTO HAD BEEN

4     CALLING THERE AT DON ARTURO'S.  HE HAS A CHIREITA,

5     C-H-I-R-E-I-T-A.  AND THAT THINGS ARE VERY GOOD FOR CATTLE

6     OVER THERE BECAUSE THERE ARE VERY GOOD ROADS FOR CATTLE TO

7     COME IN AND TO LEAVE BY.

8          AND THAT AT ANY RATE, HE OFFERS HIM ALL OF THAT SO

9     THAT THERE CAN BE ANOTHER ALTERNATIVE, ANOTHER RANCH OR

10    ANOTHER PLACE SO THAT THEY CAN PLACE MORE CATTLE.

11         MR. MATTA FINISHES BY SAYING THAT WE CAN DO THIS

12    BUT IN A SOCIETY, AN ASSOCIATION.  I WILL CONTRIBUTE THE

13    TRANSPORTATION, AND I AM GOING TO TAKE A TRIP WITH THESE

14    PEOPLE WHICH WILL LAST THREE OR FOUR DAYS.  AND AT ANY RATE,

15    HE WAS CALLING SO THAT THEY CAN HAVE IT AT DON ARTURO'S.

16    BY MR. CONNOLLY:

17    Q.   COULD YOU TELL FROM THE TELEPHONE NUMBER CALLED WHERE

18    DON ARTURO WAS WHEN HE RECEIVED THIS PHONE CALL FROM

19    MR. MATTA?

20    A.   EXCUSE ME.  BUT YOU SEE IN THIS INTERNATIONAL CALL, HE

21    DOES NOT TALK TO DON ARTURO.  HE TALKS TO ANOTHER PERSON,

22    AND HE SPEAKS OF DON ARTURO, AND WE WERE NOT ABLE TO -- OR

23    THE NUMBER THAT HE CALLED DOES NOT APPEAR HERE.  THERE MUST

24    HAVE BEEN SOME PROBLEM IN OBTAINING IT.

25    Q.   IS THERE A DATE ON THAT CONVERSATION?

000190

1    FINE.

2            MR. MATTA SPEAKS OF OTHER'S BULLS, BULLS BELONGING

3    TO OTHER PEOPLE.  AND DON JESUS ASKS WHERE HE IS.

4            THE INTERPRETER:  EXCUSE ME.  I AM SORRY.

5            THE WITNESS:  HE ASKED WHERE DON JESUS IS.

6            AFTER THAT MR. MATTA SAYS IT'S URGENT THAT I GET

7    THE PERMIT SO THAT I CAN TAKE OUT THOSE PURE COWS.  AND HE

8    GOES ON TO SAY THAT WHAT IS MOST IMPORTANT AT THE MOMENT IS

9    THAT 60 PURE COWS BE DELIVERED.

10   Q.   DURING THE COURSE OF YOUR INVESTIGATION DID YOU

11   DETERMINE THAT MATTA TALKS TO AN INDIVIDUAL BY THE NAME OF

12   DON JESUS?

13   A.   YES.

14   Q.   DID YOU FIND OUT DON JESUS' LAST NAME?

15   A.   I SUPPOSE WE DID FIND IT OUT, BUT I DON'T REMEMBER.

16   Q.   WAS THERE SURVEILLANCE IN MADRID, SPAIN IN THE SUMMER

17   OF 1983?

18   A.   YES, THERE WAS.

19   Q.   DO YOU KNOW WHETHER OR NOT MR. IZQUIERDO WAS OBSERVED

20   IN MADRID DURING THAT TIME PERIOD?

21   A.   YES, HE WAS.  HE WAS OBSERVED.

22           MR. STOLAR:  OBJECTION.  THIS WITNESS SAW HIM, NOT

23   THAT HE HEARD IT FROM SOMEBODY ELSE.

24           THE COURT:  YOUR OBJECTION IS?

25           MR. STOLAR:  HEARSAY.

88

1    BY MR. CONNOLLY:

2    Q.    CAN YOU FIND THAT SUMMARY IN FRONT OF YOU?

3    A.    I HAVE IT RIGHT HERE.

4    Q.    DOES IT HAVE A LETTER ON IT, AN IDENTIFICATION LETTER?

5    A.    YES.  C.

6    Q.    AND IS THAT A SUMMARY OF THE CONVERSATION THAT YOU

7    HEARD ON OR ABOUT OCTOBER 18TH, 1984?

8    A.    YES.  THIS IS IT.

9    Q.    COULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY

10   WHAT MR. MATTA SAID TO HIS WIFE AND WHAT HIS WIFE SAID TO

11   HIM DURING THAT CONVERSATION?

12   A.    FINE.  DON JOSE SAID TO NANCY FROM CUERNAVACA, HE IS

13   SPEAKING OF SOME PLATES WHICH HE WANTS TO SELL.  HE MENTIONS

14   THE NUMBER IN CUERNAVACA WHERE HE IS AT, SEVEN-THREE-ONE,

15   TWO-THREE, ONE-ONE-SEVEN.  BUT THAT HE WANTS TO MOVE.

16        HE SAYS THAT HE HAS SOLD THE PURE COWS, AND SO

17   THEN HE TELLS NANCY TO GO THERE.

18   Q.    TO GO WHERE?

19   A.    IF HE IS IN CUERNAVACA, I WOULD IMAGINE TO CUERNAVACA.

20   Q.    DO YOU KNOW WHERE CUERNAVACA IS?

21   A.    I HAVE BEEN TOLD IT IS IN MEXICO.  THIS IS WHAT I HAVE

22   BEEN TOLD.

23   Q.    AND DOES NANCY RESPOND IN THE CONVERSATION?

24   A.    THAT SHE HAS TO MAKE SOME ARRANGEMENTS WITH THE

25   CHILDREN AND THAT SHE WOULD GO THE FOLLOWING WEEK.

000192

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA
-oOo-

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

-oOo-

UNITED STATES OF AMERICA,       )
                                )
                                )
               PLAINTIFF,       )
                                )        NO. CR-88-129-WJR
                                )
JUAN RAMON MATTA,               )
                                )
               DEFENDANT.       )
_____ )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

THURSDAY, NOVEMBER 15, 1990


PATRICIA A. CHILES
OFFICIAL COURT REPORTER
412 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA
(213) 687-7905

000193

9

1        A    I THINK THAT I'VE ANSWERED THIS TO YOU EARLIER.

2   I DON'T KNOW IF THERE WAS AN INTERPRETATION PROBLEM, BUT I

3   SAID NO.

4        Q    OTHER THAN THIS CASE, HAVE YOU EVER HEARD THE

5   WORD "CARS" USED TO REFER TO COCAINE?

6        A    TO REFER TO COCAINE, NO.  BUT IN ORDER TO REFER

7   TO AIRPLANES, TRUCKS AND ON OTHER TRANSPORTATION MEANINGS,

8   YES.

9        MR. STOLAR:  YOUR HONOR, I'M FINISHED WITH THE VOIR

10  DIRE.  AND THE OBJECTION STANDS WITH RESPECT TO THE PROFFERED

11  TESTIMONY.

12       MR. CONNOLLY:  YOUR HONOR, I WOULD OFFER HIM AS AN

13  EXPERT AT THIS TIME.  I WOULD OFFER HIM AS AN EXPERT IN THE

14  NARCOTIC JARGON AT THIS TIME.

15       THE COURT:  ASK YOUR QUESTION AND SEE IF HE'S --

16       MR. CONNOLLY:  THANK YOU.

17              REDIRECT EXAMINATION (RESUMED)

18  BY MR. CONNOLLY:

19       Q    MR. MARTINEZ, BASED UPON YOUR LISTENING TO THE

20  TAPES OF MR. MATTA AND HIS ASSOCIATES FOR APPROXIMATELY 18

21  MONTHS IN 1983, 1984 AND 1985 DO YOU HAVE AN OPINION AS TO

22  THE USE OF THE TERM "CATTLE" BY MR. MATTA IN THE CONTEXT OF

23  THESE CONVERSATIONS?

24       MR. STOLAR:  OBJECTION.  NOT QUALIFIED.

25       THE COURT:  ALL RIGHT.  YOU MAY ANSWER THIS "YES" OR

000194

10

1    "NO." OBJECTION IS OVERRULED.

2              DO YOU HAVE AN OPINION?

3         THE WITNESS:  YES.

4    BY MR. CONNOLLY:

5         Q    WOULD YOU TELL THE COURT WHAT THAT OPINION --

6         THE COURT:  WHAT'S IT BASED UPON?

7    MR. CONNOLLY:

8         Q    WHAT IS IT BASED UPON?

9         A    I AM BASING MYSELF UPON THE FACT THAT THE WORD

10   "CATTLE" IS USED IN AN ODD CONTEXT.  IT'S AN UNUSUAL CONTEXT.

11   FOR EXAMPLE, THEY TALK ABOUT USING A TRUCK IN ORDER TO

12   TRANSPORT 100 HEAD OF CATTLE -- EXCUSE ME, A THOUSAND HEAD OF

13   CATTLE.  AND IN OTHER CONVERSATIONS THEY TALK ABOUT TAKING

14   THE CATTLE IN A CAR.  THEY TALK ABOUT PURE CATTLE.  THEY TALK

15   ABOUT NOT BEING TRICKED AS FAR AS THE QUALITY IS CONCERNED.

16              THEY MAKE REFERENCE TO CERTAIN EXPRESSIONS.  IN

17   OTHER WORDS, THEY DON'T USE THE USUAL TYPE OF LANGUAGE THAT

18   YOU'D NORMALLY USE WHEN YOU ARE TALKING ABOUT CATTLE AND

19   CATTLE FARMING.  THEY ALSO SAY THAT -- EXCUSE ME.  HE ALSO

20   SAYS THAT HE DOESN'T WANT HIS NAME TO APPEAR WHEN THEY ARE

21   TALKING ABOUT CATTLE FARES AND SO ON SEVERAL OTHER EXAMPLES.

22        Q    WHAT IS YOUR OPINION THAT CATTLE MEANS IN THIS

23   CONTEXT OF MR. MATTA?

24        MR. STOLAR:  OBJECTION.  THE MAN IS NOT QUALIFIED,

25   YOUR HONOR.

000195

1          THE COURT:  OBJECTION IS OVERRULED.

2               YOU MAY ANSWER.

3          THE WITNESS:  IN THIS CASE THE WORD "CATTLE" IS USED

4     IN CODE FOR COCAINE.

5     BY MR. CONNOLLY:

6          Q    DO YOU HAVE AN OPINION AS TO THE AMOUNT OF

7     COCAINE THAT ARE MENTIONED IN THE CONVERSATIONS?

8          MR. STOLAR:  OBJECTION.  NOT QUALIFIED.

9          THE COURT:  WELL, I DON'T UNDERSTAND THE QUESTION, IN

10    THE FIRST PLACE.

11         MR. CONNOLLY:  I'LL TRY TO REPHRASE IT, YOUR HONOR.

12         Q    THE TERM "CATTLE" IS MENTIONED IN NUMEROUS

13    CONVERSATIONS THAT MR. MATTA HAS, IS THAT CORRECT?

14         A    YES, THAT'S RIGHT.

15         Q    AND IT'S YOUR OPINION THAT THIS TERM REFERS NOT

16    TO REAL CATTLE BUT TO COCAINE?

17         A    YES, THAT'S RIGHT.

18         Q    BASED UPON THE CONVERSATIONS CAN YOU TELL HOW

19    THE AMOUNTS OF COCAINE ARE DESCRIBED TO THE PARTICIPANTS IN

20    THE TELEPHONE CONVERSATIONS?

21         A    THEY USUALLY SPEAK ABOUT VERY HIGH QUANTITIES.

22    THEY TALK ABOUT HUNDREDS, INCLUDING A THOUSAND.  THEY ARE

23    VERY HIGH QUANTITIES.

24         Q    HOW ABOUT THE TERM "MONEY," CAN YOU TELL US IF

25    YOU HAVE AN OPINION AS TO WHETHER OR NOT THERE ARE CODE WORDS

12

1  USED IN MATTA'S CONVERSATIONS TO DESCRIBE MONEY OR PAYMENTS

2  FOR THE COCAINE?

3          MR. STOLAR:  OBJECTION, NOT QUALIFIED.  MAY I HAVE A

4  CONTINUING OBJECTION, YOUR HONOR?

5          THE COURT:  YES.  OBJECTION OVERRULED.

6               YOU MAY ANSWER.

7          THE WITNESS:  EXCUSE ME.  ARE YOU REFERRING TO THE

8  WORDS THAT ARE USED TO DESIGNATE THE MONEY THAT IS USED TO

9  PAY FOR THE DELIVERIES?

10 BY MR. CONNOLLY:

11         Q    YES, I AM.

12         A    YES.  THEY USUALLY TALK ABOUT DOLLARS.  THEY

13 TALK ABOUT PESOS.  AND IT IS ALSO GATHERED FROM THESE

14 CONVERSATIONS THAT THEY HAVE AN ACCOUNTING SET UP.  THEY TALK

15 ABOUT DELIVERIES.  THEY TALK ABOUT HOW PAYMENTS ARE TO BE

16 MADE AND SO ON.

17         MR. CONNOLLY:  EXCUSE ME, YOUR HONOR.

18               (DISCUSSION OFF THE RECORD)

19 BY MR. CONNOLLY:

20         Q    MOVING ON TO SOME QUESTIONS ASKED YOU BY MR.

21 STOLAR IN HIS CROSS-EXAMINATION, MR. MARTINEZ.  DO YOU RECALL

22 THE LAST APPROXIMATELY FOUR OR FIVE DAYS OF QUESTIONING BY

23 MR. STOLAR?

24         MR. STOLAR:  OBJECTION, YOUR HONOR.  IT'S ONLY THREE

25 AND A HALF.

000197

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,          )
                                   )
                    PLAINTIFF,     )
                                   )
          VS.                      )
                                   )          CR 88-129-WJR
                                   )
JUAN RAMON MATTA-BALLESTEROS,      )
                                   )
                    DEFENDANT.     )
                                   )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

WEDNESDAY, JANUARY 2, 1991

DONNA BOWERS, C.S.R., R.P.R.
OFFICIAL COURT REPORTER
430 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 621-2400

000198

12

1  PERIOD OF TIME.  MATTA, WHILE HE WAS DOING THIS, ACTED IN

2  CONCERT WITH AT LEAST FIVE OTHER PEOPLE.

3       NOW, THERE ARE NUMEROUS PEOPLE NAMED IN THE

4  INDICTMENT.  TO ACT IN CONCERT WITH PEOPLE DOES NOT MEAN YOU

5  HAVE TO KNOW THEM.  AS I SAID AT BEGINNING OF THIS CASE,

6  THIS IS A CHAIN CONSPIRACY WHERE EVERYBODY FROM THE START TO

7  THE FINISH IS A LINK IN THE CHAIN, AND THERE ARE LITERALLY

8  SCORES OF PEOPLE INVOLVED IN THIS CASE UNDERNEATH MR. MATTA.

9       NOW, AS TO THE FOURTH ELEMENT, HE OCCUPIES AS

10 POSITION OF ORGANIZER, SUPERVISOR OR MANAGEMENT.  HE DOES

11 NOT EVEN HAVE TO BE THE PERSON IN CHARGE.  HE HAS TO BE ONE

12 OF THE MANAGERS.  THE EVIDENCE HAS SHOWN OVERWHELMINGLY THAT

13 THIS IS THE MAN PRIMARILY IN CHARGE OF THIS OPERATION, ALONG

14 WITH FELIX.

15      AND FROM THE CRIMES THAT HE COMMITTED, HE MUST

16 DERIVE SUBSTANTIAL INCOME OR RESOURCES.  AND THIS COUNT, THE

17 COURT WILL, I ANTICIPATE, CHARGE YOU, USUALLY YOU CAN ONLY

18 TAKE INTO ACCOUNT THE CRIMES CHARGED IN THE INDICTMENT IN

19 REACHING A DECISION AS TO WHETHER OR NOT THE DEFENDANT IS

20 GUILTY OF A CERTAIN COUNT.  IN THIS CASE, THERE ARE CERTAIN

21 CRIMES THAT WERE MENTIONED DURING THE COURSE OF THIS TRIAL,

22 FEDERAL DRUG FELONIES, THAT YOU WILL BE ABLE TO TAKE INTO

23 ACCOUNT TO DETERMINE THE DEFENDANT'S CONTINUING SERIES OF

24 CRIMINAL ACTIVITIES.  MAINLY, THE COUNTS TALKED TO YOU ABOUT

25 BY MR. RETAMOZA WHERE HE BROUGHT IN THE LOADS HERE IN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---oOo---

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA,<br>                    PLAINTIFF | )<br>)<br>) |  |
| V | )<br>) | CR 88-129 WJR |
| JUAN RAMON MATTA-BALLESTEROS,<br>                    DEFENDANT | )<br>)<br>) |  |

REPORTER'S TRANSCRIPT OF PROCEEDING

LOS ANGELES, CALIFORNIA

FRIDAY, DECEMBER 14, 1990

COPY

EDYTHE SCHWARTZ
OFFICIAL REPORTER PRO TEM
446 U. S. COURTHOUSE
312 NO. SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 617-7708

199a

4

LOS ANGELES, CALIFORNIA, FRIDAY, DECEMBER 14, 1990: 9:30 A.M.

1      THE COURT:   GOOD MORNING, LADIES AND

2  GENTLEMEN.

3      THE CLERK:  CRIMINAL 88-129, UNITED STATES OF

4  AMERICA VERSUS JUAN RAMON MATTA.

5      COUNSEL, PLEASE STATE YOUR APPEARANCES.

6      MR. KENETY:  FOR THE UNITED STATES OF AMERICA

7  WILLIAM H. KENETY AND KEVIN P. CONNOLLY.

8      MR. BURNS:  FOR MR. MATTA, MARTIN STOLAR,

9  MICHAEL BURN AND ADOLFO AGUILA.

10      THE COURT:   MR. LOZANO.

11          CARLOS ALBERTO LOZANO MONTOYA

12  RESUMED THE WITNESS STAND

13      THE CLERK:   SIR, YOU ARE REMINDED YOU'RE

14  STILL UNDER OATH.  PLEASE STATE YOUR NAME AGAIN FOR

15  THE RECORD.

16      THE WITNESS:   CARLOS ALBERTO LOZANO MONTOYA,

17      MR. BURN:  MR. LOZANO, IF YOU WOULD TURN THE

18  MICROPHONE A LITTLE TOWARDS YOU, WE WILL ALL BE ABLE

19  TO HEAR YOU BETTER.

20      MR. BURNS:  YOUR HONOR, WE WOULD OFFER WHAT

21  HAS BEEN MARKED AS DEFENSE EXHIBIT LL INTO EVIDENCE AT

22  THIS POINT IF WE DID NOT DO IT YESTERDAY.

23      THE COURT:  I THINK I ADMITTED IT.  IN ANY

24  EVENT IT WILL BE ADMITTED INTO EVIDENCE.

25          (DEFENDANT'S EXHIBIT LL RECEIVED)

199 b

1          MR. BURNS:  THANK YOU.

2                    DIRECT EXAMINATION

3    (THROUGH INTERPRETER)

4    BY MR. BURN:

5    Q          MR. LOZANO, WILL YOU TAKE THE CIGAR BOXES OUT

6    OF THE BOX?

7    A          ONE MOMENT.  IF YOUR HONOR PERMITS AND THE

8    MEMBERS OF THE JURY, YESTERDAY I WAS ASKED YESTERDAY

9    IF I COULD IDENTIFY A PERSON OR PERSONS WITHIN THIS

10   COURTROOM.  I SUPPOSED THAT IT WAS ONLY THOSE YOU

11   MEANT OF THE PEOPLE WITHIN THE CIRCLE AND NOT THE

12   PEOPLE SITTING BEYOND IN THE PUBLIC AREA WHERE MS.

13   MATTA IS SEATED WHOM I KNOW SINCE SHE WAS A SMALL

14   CHILD.  I ASK YOUR FORGIVENNESS FOR NOT HAVING NAMED

15   HER AT THAT TIME.

16   Q     SO YOU KNEW TWO PEOPLE IN THE COURTROOM

17   YESTERDAY ASIDE FROM THE LAWYERS?

18   A          YES, SIR.

19   Q          THANK YOU, MR. LOZANO.

20          MR. LOZANO, IF YOU COULD TAKE THE CIGAR BOXES

21   OUT OF THE BOX IN FRONT OF YOU AND TELL US THE TITLES

22   OR THE NAMES ON THE BOXES?

23          MAYBE YOU CAN SHOW THEM TO THE JURY AS YOU DO

24   THAT.

25   A          THE BRAND IS DONLI.

199 U

1        MR. BURNS:  YOUR HONOR, COULD I TAKE THE BOX?

2        THE COURT:   LET HIM FINISH.

3        GO AHEAD.

4        THE WITNESS:  IT SAYS IT IS MANUFACTURED BY

5   HONDURAS CUBAN TOBACCO SDERL.   BELOW THERE IS A SEAL

6   OF THE REPUBLIC OF HONDURAS.

7        THE COURT:  NOW WHAT ARE YOU --

8        MR. BURN:  I WOULD LIKE TO TAKE THE CARDBOARD

9   BOX DOWN SO THE JURY CAN SEE THE CIGAR BOXES MORE

10  CLEARLY.

11       THE COURT:  JUST PUT THAT ON THE FLOOR.

12       MR. BURNS:  IF I CAN JUST TAKE THE CIGAR

13  BOXES OUT AND PUT THEM ON THE STAND FOR HIM?

14       THE COURT:   ALL RIGHT.

15       THE WITNESS:   THIS IS A BOX OF CIGARS BRAND

16  NUMBER DON RAMON MANUFACTURED BY HONDURAS CUBAN

17  TOBACCO SDERL.

18       THIS IS ANOTHER BOX OF CIGARS.  THE BRAND

19  NAME IS LEMPIDA.  IT DOESN'T SHOW THE MANUFACTURER.

20  I SUPPOSE IT WAS MANUFACTURED BY THE HONDURAS CUBAN

21  TOBACCO.

22       HERE WE HAVE ANOTHER BOX, THE BRAND NAME

23  PARTICULARES.  I SUPPOSE IT WAS MANUFACTURED BY

24  HONDURAS CUBAN TOBACCO.

25  BY MR. BURNS:

199 d

1  Q        YOU CAN HAVE A SEAT, MR. LOZANO.

2          MR. LOZANO, WHY ARE THERE DIFFERENT NAMES TO

3  THE CIGARS?   DIFFERENT BRAND NAMES?

4  A        IN THE TOBACCO BUSINESS THE BUYERS ARE THE

5  OWNERS OF THE BRAND NAMES.   SO WHEN WE PUT IN AN

6  ORDER, THEY SAY:   MAKE SOME OF THIS BRAND THAT

7  PERTAINS TO THIS PARTICULAR BUYER.

8  Q        AND WHO MAKES THE BOXES FOR THE CIGARS?

9  A        HONDURAS CUBAN TOBACCO.

10 Q        AND ARE THERE PICTURES OF THAT IN THE ALBUM

11 MARKED FF?

12 A        YES.

13 Q        AND DO YOU KNOW TO HOW MANY DIFFERENT

14 COUNTRIES THESE CIGARS ARE SHIPPED?

15 A        UNITED STATES, GERMANY.   ANOTHER MARKET IS

16 OPENING IN SPAIN.   IT'S BEING PROMOTED.

17 Q        NOW IF YOU CAN OPEN ONE OF THE BOXES JUST TO

18 SHOW THE JURY?   TAKE A BOX AND JUST OPEN IT UP.   ANY

19 ONE.   WHY DON'T YOU OPEN THE BIGGEST ONE?

20          WHAT IS THAT SEAL THAT YOU'RE BREAKING THERE?

21 A        IT'S A SEAL OF THE REPUBLIC OF HONDURAS THAT

22 IS USED FOR THE EXPORTATION OF THE PRODUCT.

23 Q        IS THAT REQUIRED BY LAW TO BE PUT THERE?

24 A        YES.

25 Q        IF YOU COULD JUST SHOW THAT TO THE JURY AND

199 e

1  TILT IT AT AN ANGLE.

2          MR. LOZANO, TELL US YOUR DUTIES AT THE

3  HONDURAN CUBAN TOBACCO COMPANY.

4  A        TO GO OVER ALL THE DOCUMENTATION THAT

5  PERTAINS TO EXPENSES AND INCOME OF THE COMPANY SO THAT

6  IT WILL OPERATE IN A CORRECT WAY.  I FUNCTION AS AN

7  INTERNAL AUDITOR.  I SUPPOSE IN THE UNITED STATES ALSO

8  AN INTERNAL AUDITOR WHO IS RESPONSIBLE FOR THE

9  ADMINISTRATION OF THE FIRM AND TO WHOM LENDS ITS

10 SERVICES.

11 Q        WHAT SORT OF BUSINESS DOCUMENTS DO YOU LOOK

12 AT?

13 A        PAYROLL, THE EXPENSES ON FERTILIZERS, THE

14 PURCHASE OF FERTILIZERS, EXPORTATIONS, THE

15 EXPORTATIONS POLICIES.  ALL THE NECESSARY

16 DOCUMENTATION TO VERIFY IN ORDER TO OBTAIN BY YEAR'S

17 END A HEALTHY ADMINISTRATION OF THE FINANCIAL

18 STATEMENTS THAT THEY MAY REFLECT THE TRUE SITUATION,

19 THE COMPANY'S TRUE SITUATION.

20 Q        AND WHAT WAS YOUR JOB WHEN YOU WORKED FOR THE

21 MINISTRY DEPARTMENT OF HONDURAS?

22          IF YOU COULD TELL US AGAIN WHAT DEPARTMENT

23 THAT WAS?

24 A        IT WAS THE MINISTRY OF THE TREASURY AND

25 PUBLIC CREDIT.  I WORKED FOR THE AGENCY OF SUCH

199 f

1    MINISTRY WHICH IS CALLED THE LEGAL DEPARTMENT AND AS

2    SECRETARY AND AFTERWARDS IN THE GENERAL ADMINISTRATION

3    OF CUSTOMS IN THE CLAIMS DEPARTMENT.

4    Q        YOU WORKED THERE WHILE WERE YOU WORKING ON

5    SATURDAYS AT HONDURAN CUBAN TOBACCO?

6    A        AS I SAID, YES, SIR, ON SATURDAYS I WILL

7    TRAVEL TO THE CITY OF DONLI IN THE STATE OF EL PARAISO

8    TO CARRY OUT MY WORK.

9    Q        MR. LOZANO, DO YOU HAVE ANY TIES PERSONALLY

10   TO ANY OTHER COUNTRY?

11   A        NOT PERSONALLY.

12   Q        NOT EVEN TO MEXICO?

13   A        NO.

14   Q        DO YOU HAVE ANY CHILDREN?

15   A        WELL, TO TELL YOU THE TRUTH, THAT'S WHY I

16   COME TO THIS COUNTRY.  THE ONLY INTEREST THAT I HAVE

17   IN MEXICO HAS BEEN THE EDUCATION OF MY SON WHO

18   GRADUATED IN JUNE OF THIS YEAR AND HE REMAINS WORKING

19   FOR THE MEXICAN GOVERNMENT.

20   Q        MR. LOZANO, IN ALL THE TIME THAT YOU HAVE

21   BEEN WORKING IN HONDURAS AND FOR HONDURAN CUBAN

22   TOBACCO COMPANY, HOW MANY TIMES HAVE YOU SEEN COCAINE

23   IN CIGAR BOXES OR IN CIGARS?

24   A        IN ALL MY 55 YEARS OF AGE I'VE NEVER KNOWN

25   THAT.

199 9

```
 1   Q       IN YOUR JOB HAVE YOU EVER SEEN COCAINE

 2   LEDGERS?

 3   A       NO.

 4   Q       HAVE YOU EVER SEEN ANY COCAINE PLANTS?

 5   A       NO.

 6   Q       MR. LOZANO, WHO OWNS HONDURAN CUBAN TOBACCO?

 7   A       NANCY MALENA VASQUEZ, MARIA LATICIA PAVON

 8   MATTA.

 9   Q       AND WHAT IS THEIR RELATIONSHIP, IF ANY, TO

10   MR. MATTA?

11   A       THE WIFE IS NANCY.  THE SISTER, MARIA

12   LATICIA.

13   Q       AND WHAT IS MR. MATTA'S ROLE IN THE COMPANY,

14   IF ANY?

15   A       WELL, AS HEAD OF THE FAMILY, WELL, ONE

16   EXPECTS HIM AND CONSIDERS HIM AS ITS OWNER.

17           MR. KENETY:  I'M SORRY, I DIDN'T HEAR THAT

18   LAST WORD.

19           THE WITNESS:   CONSIDERS HIM AS OWNER.

20   BY MR. BURNS:

21   Q       HOW IS IT THAT, MR. LOZANO, HE IS CONSIDERED

22   AS THE OWNER?  IF YOU COULD EXPLAIN TO THE LADIES AND

23   GENTLEMEN OF THE JURY.

24           MR. KENETY:  OBJECTION.  CONSIDERED BY WHOM?

25   BY THIS WITNESS?
```

199 h

1           THE COURT:   SUSTAINED.

2    BY MR. BURNS:

3    Q       MR. LOZANO, WHO CONSIDERS MR. MATTA THE OWNER

4    OF THE COMPANY?

5    A       THE EMPLOYEES, THE WORKERS, THE LOWER CLASS

6    WORKERS, THE LABORERS, THE PEOPLE WHO WORK IN THE

7    FIELDS.

8    Q       WELL, WHOSE NAME IS THE COMPANY IN?

9    A       IT'S A CORPORATION.  THE NAME OF THE COMPANY

10   IS HONDURAS CUBAN TOBACCO INC.  THE OWNERS APPEAR AS

11   -- AS OWNERS OF CAPITAL -- I'M SORRY, YOUR HONOR.

12           THE COMPANY IS CALLED HONDURAS CUBAN TOBACCO,

13   INC.  THE OWNERS ARE NANCY MALENA VASQUEZ MARTINEZ,

14   MARIA LATICIA.  SO THE ANSWER IS THAT THE NAME OF THE

15   COMPANY IS HONDURAS CUBAN TOBACCO BUT IF YOU GO TO THE

16   TITLE, THE OWNERS, THE ONES WHO APPEAR AS OWNERS ARE

17   THE BEFORE-MENTIONED.

18   Q       WHEN DID NANCY MALENA VASQUEZ AND LATICIA

19   PAVON BECOME THE OWNERS?

20   A       I WOULD NEED TO LOOK AT A DOCUMENT.

21           ACCORDING TO TITLE NUMBER 249, WHICH REFERS

22   TO THE PURCHASE CONTRACT OF HONDURAS CUBAN TOBACCO,

23   INC. BY THE MESSRS. PABLO GONZALES BRIGANTI AND DON

24   ERNESTO PABLO GONZALES WHERE THEY ARE THE SELLERS OF

25   SAID COMPANY TO SONIA NANCY MALENA VASQUEZ MARTINEZ

199 i

1  AND MARIA LATICIA PAVON NOVEMBER 11, 1981.

2  Q        AND THEY HAVE OWNED THE COMPANY FOR THE PAST

3  19 YEARS; IS THAT CORRECT?

4  A        19 YEARS?

5  Q        I'M SORRY, NINE YEARS?

6  A        OF COURSE.

7           MR. BURNS:  NO MORE QUESTIONS AT THIS TIME.

8           THANK YOU, MR. LOZANO.

9           MR. KENETY:  YOUR HONOR, COULD I SEE THAT

10 DOCUMENT?

11          THE COURT:  YES.

12          MR. STOLAR:  YOUR HONOR, THE GOVERNMENT HAS

13 BEEN PROVIDED WITH A FULL SET OF THOSE DOCUMENTS.

14                    CROSS EXAMINATION

15 BY MR. KENETY:

16 Q        GOOD MORNING, MR. LOZANO.

17 A        GOOD MORNING, SIR.

18 Q        ARE YOU ENJOYING YOUR VISIT TO LOS ANGELES?

19 A        VERY HAPPY BECAUSE I AM COOPERATING SO THAT

20 THE CASE WILL COME OUT AS BEST IT CAN.

21 Q        YOU'RE HAPPY TO BE COOPERATING WITH YOUR

22 FRIEND MR. MATTA?

23 A        I WOULD LIKE TO COOPERATE BUT I AM ALSO

24 RESPECTFUL OF LAWS.  THAT IS THE REASON THAT WHEN I

25 CAME TO THIS COURTHOUSE, I RAISED MY HAND AND I MADE A

199

1          MR. BURNS:  OBJECTION, YOUR HONOR.

2          THE WITNESS:   AS I SAID PREVIOUSLY, IN THE

3   BUSINESS, IT IS DONNA NANCY'S NAME WAS THERE AS WELL

4   AS IN THE NAME OF MALENA PAVON.  LEGALLY DON RAMON'S

5   NAME DOES NOT APPEAR.

6          IN MY JOB AS AN ACCOUNTANT, I DON'T KNOW WHAT

7   OTHER THING I COULD SAY HERE, WHAT RELATIONSHIP I

8   COULD MAKE BETWEEN THESE ITEMS.

9   BY MR. KENETY:

10  Q       MR. LOZANO, WOULD YOU CAREFULLY LISTEN TO THE

11  QUESTION AND TRY TO ANSWER IT?

12         MR. BURNS:  OBJECTION TO THE TONE.

13         THE COURT:   SUSTAINED.

14  BY MR. KENETY:

15  Q       WHO RUNS HONDURAN CUBAN TOBACCO COMPANY?

16  A       MR. EBRAINE SALVERON (PHONETIC) CURRENTLY.

17  Q       DOES MR. MATTA RUN IT?

18  A       NO, IMPOSSIBLE.  HE'S HERE.  THE COMPANY IS

19  IN HONDURAS.

20  Q       DID MR. MATTA EVER RUN THE COMPANY?

21  A       NO.

22  Q       DID HE HAVE ANYTHING TO DO WITH THE

23  MANAGEMENT OF IT?

24  A       NO.

25  Q       DID NANCY VASQUEZ EVER RUN THE COMPANY?

199 K

1  A      SHE'S IN CHARGE.

2  Q      DID SHE ACTUALLY RUN THE COMPANY?

3  A      NO.  AS I SAID TO YOU BEFORE, THERE IS AN

4  ADMINISTRATOR BUT AS THE OWNER SHE HAS TO BE VIGILANT

5  OF HER OWN BUSINESS.

6  Q      BUT SHE DOESN'T RUN THE COMPANY; CORRECT?

7  A      CORRECT.

8  Q      TO YOUR KNOWLEDGE IS MR. MATTA INVOLVED IN

9  SOME BUSINESSES OTHER THAN THE HONDURAN CUBAN TOBACCO

10  COMPANY?

11  A      I DON'T KNOW.  I CAME TO THE UNITED STATES TO

12  TALK ABOUT THE HONDURAS CUBAN TOBACCO COMPANY, INC.

13  Q      BUT NOW THAT YOU'RE IN THE UNITED STATES,

14  COULD YOU PLEASE ANSWER MY QUESTION?

15  A      WELL, HE HAS OTHER RANCHES.  I'M NOT FAMILIAR

16  WITH THEM.  I DON'T EVEN KNOW WHAT THE CORPORATION IS

17  CALLED OR ANYTHING BECAUSE THAT HAS NOT BEEN MY

18  RELATIONSHIP BECAUSE I AM NOT INVOLVED IN THE

19  MANAGEMENT OF THAT ACTIVITY.

20  Q      BUT YOU ARE HIS PERSONAL FRIEND?

21  A      YES, SIR.

22  Q      COULD YOU TELL US IN WHAT COUNTRY THOSE

23  RANCHES ARE LOCATED?

24  A      IN HONDURAS.  I DON'T KNOW IF HE HAS SOME IN

25  ANOTHER COUNTRY.

199  1

1  Q        TO YOUR KNOWLEDGE IS MR. MATTA NOW OR HAS HE

2  EVER BEEN INVOLVED IN THE MANAGEMENT OF THOSE RANCHES?

3  A        IN HONDURAS -- WHEN MR. MATTA WAS IN

4  HONDURAS, HE WOULD VISIT THE TOBACCO COMPANY BUT HE

5  DID NOT MANAGE IT DIRECTLY.  IN OUR COUNTRY WE HAVE

6  WHAT IS CALLED THE ADMINISTRATOR MAY BE A GENERAL

7  MANAGER, AN ADMINISTRATIVE MANAGER, REPRESENTING THE

8  COMPANY.  THERE IS NO NEED FOR THE OWNER OF THE

9  COMPANY TO BE ADMINISTRATING OR MANAGING THE COMPANY

10        MR. KENETY:  YOUR HONOR, COULD I ASK THE

11 COURT TO INSTRUCT THE WITNESS TO ANSWER THE QUESTION,

12 THE QUESTION BEING:  WAS MR. MATTA INVOLVED IN THE

13 MANAGEMENT OF THE COMPANIES?

14        THE COURT:  DO YOU HAVE THAT QUESTION IN

15 MIND?  IF SO, WHAT IS YOUR ANSWER?

16        MR. BURNS:  THE WITNESS NEEDS THE QUESTION

17 REPEATED, YOUR HONOR.  I ASK THAT IT BE REPEATED.

18        THE COURT:  REPEAT IT.

19 BY MR. KENETY:

20 Q        MR. LOZANO, WAS MR. MATTA INVOLVED IN THE

21 CATTLE RANCHES IN HONDURAS AND/OR IN OTHER COUNTRIES?

22        MR. BURNS:  IF HE KNOWS, YOUR HONOR.

23        THE WITNESS:   NO.

24 BY MR. KENETY:

25 Q        DOES MR. MATTA LIVE IN SPAIN?

199 m

1          THE COURT:  ALL RIGHT.   ARE WE READY FOR THE

2    JURY?

3          MR. KENETY:  YES, YOUR HONOR.

4          THE COURT:   SUMMON THE JURY, PLEASE.

5          MOTION TO STRIKE IS DENIED.

6          (JURY ENTERS)

7          THE COURT:  YOU MAY CALL YOUR NEXT WITNESS.

8          MR. STOLAR:  YOUR HONOR, WE CALL HERNANDO

9    RODRIGUEZ CALIVARO.

10                 AUGUSTINO HERNANDO RODRIGUEZ

11   WAS CALLED AS A WITNESS

12         THE CLERK:   STATE YOUR FULL NAME AND SPELL

13   IT FOR THE RECORD.

14         THE WITNESS:   MY NAME IS AUGUSTINO HERNANDO

15   RODRIGUEZ, R-O-D-R-I-G-U-E-Z.

16                 DIRECT EXAMINATION

17   BY MR. STOLAR:

18   Q     SENOR RODRIGUEZ, HOW OLD ARE YOU, SIR?

19   A     43.

20   Q     ARE YOU MARRIED?

21   A     YES, OF COURSE.

22   Q     DO YOU HAVE ANY CHILDREN?

23   A     YES.

24   Q     HOW MANY AND WHAT ARE THEIR AGES?

25   A     THREE CHILDREN.  THE OLDEST IS 21.  MY GIRL

199  n

1  IS 17 AND THE LITTLE ONE WHO IS 8 YEARS OLD, A LITTLE

2  ONE.

3  Q        CAN YOU TELL ME WHRE YOU RESIDE?

4  A        I LIVE IN BOGOTA.

5  Q        AND ARE YOU A CITIZEN OF THE REPUBLIC OF

6  COLOMBIA?

7  A        YES, SIR.

8  Q        CAN YOU TELL US HOW YOU ARE EMPLOYED?

9  A        YES, OF COURSE.  I AM A CONSULTANT FOR

10  SEVERAL COMPANIES IN BOGOTA.

11  Q        DO YOU HAVE A BUSINESS IN BOGOTA?

12  A        YES, I DO.  I HAVE AN OFFICE WHERE I WORK

13  WITH MY BUSINESS ASSOCIATE.

14  Q        DOES THE BUSINESS HAVE A NAME?

15  A        IT'S CALLED AFS WHICH MEANS ADMINISTRATIVUS

16  ASSOCIATION ECONOMICUS.  IT'S LONG; RIGHT?

17  Q        AND HOW LONG HAVE YOU BEEN WITH THAT COMPANY?

18  A        FOUR YEARS APPROXIMATELY.

19  Q        AND WHAT DID YOU DO BEFORE THAT?

20  A        THE SAME THING.  I WORKED SAME TYPES OF

21  ACTIVITIES:  CONSULTING AT THE LEVEL OF PERSONNEL

22  DEPARTMENT.

23  Q        COULD YOU DESCRIBE FOR US YOUR EDUCATIONAL

24  BACKGROUND?

25  A        YES, OF COURSE.  I WAS IN ELEMENTARY SCHOOL

199 0

1   FOR FIVE YEARS.  SUBSEQUENTLY I DID SIX MORE YEARS OF

2   STUDIES.  THEN FIVE MORE YEARS STUDYING ACCOUNTING AND

3   THEN LATER ON I DID A SPECIALIZATION IN THE STUDY OF

4   SYSTEMS AND THEN SOME OTHER COURSES IN ORDER TO KEEP

5   UP TO DATE WITH MY SPECIALTY.

6   Q       ARE YOU A REGISTERED ACCOUNTANT IN COLOMBIA?

7   A       YES, OF COURSE.  THAT IS WHAT ONE WOULD BE

8   CALLED:  A CERTIFIED PUBLIC ACCOUNTANT.

9   Q       COULD YOU DESCRIBE FOR US SOME OF YOUR

10  PROFESSIONAL BACKGROUND, YOUR WORK EXPERIENCE?

11  A       YES, OF COURSE.  I BEGAN WITH A COMPANY WHICH

12  HAD TO DO WITH THE AGRICULTURE AND CATTLING RAISING

13  BUSINESS AND I WORKED FOR THEM FOR THIRTEEN YEARS.

14  IT'S A STATE ORGANIZATION.

15          AND AFTER THAT THEN I WORKED WITH A WATER AND

16  AQUEDUCT COMPANY IN BOGOTA AND THEN I WORKED FOR A

17  CONSTRUCTION COMPANY AND THEN I WENT INTO CONSULTING

18  SEVERAL DIFFERENT COMPANIES IN ORDER TO HELP SET UP

19  COMPANIES AND REORGANIZATION OF THE SYSTEMS,

20  ACCOUNTING TYPE OF WORK, AND TAX CONSULTING AS WELL.

21  IN OTHER WORDS WHATEVER HAS TO DO WITH ADMINISTRATION.

22  Q       HAVE YOU EVER WORKED FOR THE GOVERNMENT OF

23  THE REPUBLIC OF COLOMBIA OR ANY OF ITS DEPARTMENTS OR

24  AGENCIES?

25  A       YES.  INCORA, I-N-C-O-R-A.  IT'S AN

199 P

1   ORGANIZATION THAT HELPS FARM WORKERS OUT.

2   Q       ARE YOU A MEMBER OF ANY PROFESSIONAL

3   SOCIETIES OR ORGANIZATIONS?

4   A       YES.  I BELONG TO ASCOPES, A-S-C-O-P-E-S,

5   WHICH IS A GROUP OF POST GRADUATE STUDENTS FROM THE

6   SCHOOL WHERE I DID MY STUDIES.

7           I ALSO HAVE PERMANENTLY BELONGED TO DIFFERENT

8   ORGANIZATIONS FOR ACCOUNTANTS AND OTHER BODIES THAT

9   HELP OUT THOSE WHO ARE WORKING IN THE ACCOUNTING

10  FIELD.

11  Q       DO YOU KNOW THIS GENTLEMAN WHOM I'M STANDING

12  BEHIND?

13  A       NO, SIR.

14  Q       DO YOU KNOW A WOMAN BY THE NAME OF NANCY

15  VASQUEZ?

16  A       YES, I DO KNOW DONNA NANCY.

17  Q       DO YOU KNOW THE NAME OF NANCY VASQUEZ'S

18  HUSBAND?

19  A       YES.  HIS NAME IS JUAN RAMON MATTA.

20  Q       ARE YOU EMPLOYED BY ANY COMPANIES WITH WHICH

21  NANCY VASQUEZ IS AFFILIATED?

22  A       YES, SIR.  I AM HIRED BY A GROUP OF COMPANIES

23  WHICH BELONG TO DONNA NANCY AND HER FAMILY.

24  Q       DOES THE GROUP OF COMPANIES HAVE AN OVERALL

25  NAME?

199 8

1    A        YES.   WE KNOW IT AS INNOGROVAS WHICH WAS THE

2    FIRST ONE THAT WAS FOUNDED AND WE CALL IT THE VASQUEZ

3    GROUP.

4    Q        IF YOU WOULD, I WOULD LIKE YOU TO STEP DOWN

5    FROM THE WITNESS STAND AND GO OVER TO THE CHART AND

6    DRAW FOR US IN A DIAGRAM LARGE ENOUGH FOR US TO SEE

7    WHAT THE CORPORATE STRUCTURE IS OF THE VASQUEZ GROUP.

8        HOW ABOUT USING THE BLACK MAGIC MARKER, NOT

9    THE RED ONE?

10        (WITNESS COMPLIES)

11   A        THIS IS THE GROUP OF THE CORPORATION.

12   Q        ALL RIGHT.  DO THE CORPORATIONS EACH HAVE

13   DIFFERENT FUNCTIONS?

14   A        YES, OF COURSE.

15   Q        COULD YOU DESCRIBE FOR US BY GIVING US THE

16   NAME OF THE CORPORATION FIRST AND TELL US WHAT THE

17   OVERALL FUNCTION OF EACH OF THEM IS?

18   A        OF COURSE.  THE VASQUEZ S.C.A. -- SHOULD I

19   TELL YOU RIGHT NOW WHAT IT'S INVOLVED IN DOING?

20   Q        GENERALLY, YES.

21   A        THIS IS THE COMPANY IN CHARGE OF CATTLE, THE

22   MANAGEMENT OF CATTLE.  CIAR S.C.A., C-I-A-R S-C-A, IS

23   THE COMPANY THAT OWNS THE LAND AND IS INVOLVED IN

24   AGRICULTURAL ACTIVITIES.

25        COVAR S.C.A. IS INVOLVED IN CONSTRUCTION

199 V

1    GENERALLY SPEAKING ON THE LOTS OF THE COMPANY ITSELF.

2           MAQUE S.C.A. IS THE COMPANY IN CHARGE OF

3    HANDLING THE FARMING EQUIPMENT AND THE PURCHASE AND

4    SALES OF THE VEHICLES.

5           INNOVAS S.C.A. IS THE COMPANY WHICH IS IN

6    CHARGE OF THE MANAGEMENT OF URBAN REAL ESTATE AND THE

7    REAL ESTATE HERE IS OUR HOMES.

8           AND THERE'S ANOTHER WHICH IS CALLED ARENERA

9    DE VALLE S.C.A. LIMITED WHICH IS THE COMPANY WHICH

10   EXTRACTS SAND FROM THE RIVER FOR THE CONSTRUCTION.

11   Q       YOU CAN SIT BACK DOWN.

12          NOW BEFORE YOU ARE A NUMBER OF MANILA FILE

13   FOLDERS WITH --

14          MR. STOLAR:  YOUR HONOR, THE DIAGRAM HAS BEEN

15   MARKED AS EXHIBIT -- CAN YOU TELL ME WHAT THAT IS?

16          THE INTERPRETER:  XX.

17          MR. STOLAR:  I WOULD OFFER IT.

18          MR. CONNOLLY:  I HAVE NO OBJECTION IF MR.

19   STOLAR COULD FIT THIS INTO SOME KIND OF TIME PERIOD.

20          MR. STOLAR:  WE'RE ABOUT TO DO THAT.

21          THE COURT:   I'LL TAKE IT UNDER SUBMISSION

22   UNTIL HE DOES THAT.

23   BY MR. STOLAR:

24   Q       DO YOU SEE THE MANILA FILE FOLDERS IN FRONT

25   OF YOU?

199 S

1     UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA

3   HONORABLE WILLIAM J. REA, JUDGE PRESIDING

4

5

6  UNITED STATES OF AMERICA  )
        PLAINTIFF,  )

7            )
      VS.      )  CR-88-129-WJR

8            )
  JUAN RAMON MATTA BALLESTEROS )

9  DEL POZO      )
        DEFENDANT.  )  COPY

10  _____)

11

12

13

14

15

16     TRANSCRIPT OF PROCEEDINGS

17     LOS ANGELES, CALIFORNIA

18      MAY 4, 1989

19

20

21

22       CANDEE MARSH
        OFFICIAL COURT REPORTER

23       432 U.S. COURTHOUSE
        312 NORTH SPRING STREET

24       LOS ANGELES, CA. 90012
        (213) 625-2881

25

1   POINT IS JUST LET THE DUST SETTLE, SO TO SPEAK, AND SEE WHAT

2   HAPPENS IN HER COURT AND WE WILL HAVE TO ADJUST OUR DATES

3   ACCORDINGLY.

4        MR. STOLAR:   RIGHT.   TWO OTHER MATTERS, JUDGE.

5        ONE IS THAT THERE SHOULD BE NO QUESTION OF ANY BAIL

6   CONSIDERATIONS IN THIS CASE.   MR. MATTA IS CURRENTLY SERVING A

7   THREE-YEAR SENTENCE THAT WAS IMPOSED A WHILE AGO FOR ESCAPING

8   FROM EKLAND AIR FORCE BASE IN 1971, ONE OF THE CHARGES THAT

9   WAS BROUGHT AGAINST HIM WHEN HE WAS BROUGHT BACK TO THIS

10  COUNTRY.   SO WE WOULDN'T EVEN ASK FOR BAIL.

11       THE ONLY OTHER MATTER THEN THAT THE MAGISTRATE THIS

12  AFTERNOON DEFERRED TO YOUR JUDGMENT ON IS WHERE MR. MATTA IS

13  TO BE HOUSED DURING THE PENDENCY OF THE CASE BEFORE YOU AND

14  THE 1985 CASE.

15       WE UNDERSTAND THAT THE U.S. MARSHAL SERVICE, FOR ITS

16  SECURITY REASONS, WANTS TO TAKE MR. MATTA BACK TO MARION,

17  ILLINOIS AND KEEP HIM THERE UNTIL THE TRIAL OF THIS CASE TAKES

18  PLACE.

19       IT IS OUR POSITION THAT MR. MATTA'S PRESENCE IN LOS

20  ANGELES IS ABSOLUTELY NECESSARY FOR THE EFFECTIVE ASSISTANCE

21  OF HIS COUNSEL, MYSELF, MR. AGUILA AND FOR LOCAL COUNSEL, AND

22  INDEED, IN ORDER ALSO TO BE A FULL PARTICIPANT IN THE

23  SELECTION OF LOCAL COUNSEL, WHOSE PARTICIPATION MAY BE

24  MERELY -- OR IS EXPECTED TO BE SOMEWHAT MORE THAN MERELY A

25  NAME ON PAPER.

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    - - -

4    HONORABLE WILLIAM J. REA, JUDGE PRESIDING

5    - - -

6

7

8    UNITED STATES OF AMERICA,            )
                                          )
9            PLAINTIFF,                   )
                                          )
10       VS.                              )    CR 88-129-WJR
                                          )
11   JUAN RAMON MATTA BALLESTEROS,        )
                                          )
12           DEFENDANT.                   )
                                          )
13   _____     )

14

15

16

17    REPORTER'S TRANSCRIPT OF PROCEEDINGS

18       LOS ANGELES, CALIFORNIA

19      MONDAY, MARCH 12, 1990

20

21

22           DONNA BOWERS, C.S.R. 3591
             OFFICIAL COURT REPORTER
23           430 UNITED STATES COURTHOUSE
             312 NORTH SPRING STREET
24           LOS ANGELES, CALIFORNIA  90012
             (213) 621-2400
25

7

1    WHAT WE THOUGHT WAS, I GUESS, AN ON-THE-RECORD AGREEMENT

2    BETWEEN THE CENTRAL DISTRICT OF CALIFORNIA UNITED STATES

3    ATTORNEY AND THE JUSTICE DEPARTMENT ATTORNEYS WHEN WE HAD

4    THE CASE WITH JUDGE RYMER AND THE INDICTMENT WITH YOU, THAT

5    THE OLDER CASE WOULD GO FIRST.  AND WE WENT ALONG WITH THAT.

6            THE COURT:  WELL, THIS WAS A RECENT DEVELOPMENT.

7            MR. STOLAR:  YOU BET IT WAS.

8            THE COURT:  MR. MATTA BALLESTEROS WAS BROUGHT

9    INTO THAT CASE OF JUDGE RAFEEDIE'S.  THAT IS OF RECENT

10   ORIGIN.

11           MR. STOLAR:  THAT IS THE SIXTH SUPERSEDING

12   INDICTMENT, AND IN THE FIRST FIVE SUPERSEDERS HE WAS NOT

13   NAMED AS A DEFENDANT IN THE CASE.  I WILL SAY THIS, THOUGH,

14   AT LEAST WITH RESPECT TO THE CASE THAT IS PENDING BEFORE

15   YOUR HONOR, THAT WE HAVE CERTAINLY NO INTENTION OF WAIVING

16   ANY RIGHTS THAT WE MAY HAVE TO A SPEEDY TRIAL OR AS SPEEDY

17   TRIAL AS WE CAN OBTAIN AND HAVE BEEN EXPECTING THAT TO TAKE

18   PLACE WITH YOU.  AND YOU KNOW, THE RISK WITH RESPECT TO

19   WHAT THE GOVERNMENT IS TAKING AND WHAT THE COURT TAKES IN

20   THE PUBLIC INTEREST IS POTENTIALLY JEOPARDIZING A DISMISSAL

21   UNDER THE SPEEDY TRIAL ACT OF THIS INDICTMENT, IF THE CASE

22   BEFORE JUDGE RAFEEDIE GOES AND I'M ON TRIAL WITH MR. MATTA

23   AT THE SAME TIME THAT YOU ARE PREPARED TO TRY THE CASE AND

24   YOU FINISH WITH THE ONE THAT YOU ARE DOING NOW, BECAUSE WE

25   ARE CERTAINLY NOT IN A POSITION TO WAIVE THE SPEEDY TRIAL

8

1    ACT.

2              ON THE OTHER HAND, IF WE GO ON TRIAL WITH YOU

3    IN THIS CASE AND THE OTHER CASE HAS TO WIND UP WITH

4    MR. MATTA BEING SEVERED, AT LEAST THE PUBLIC INTEREST AND

5    THE GOVERNMENT DOES NOT LOSE THE POTENTIAL FOR TRYING

6    MR. MATTA ON ANOTHER CASE AGAIN, DOES NOT TAKE THE RISK OF

7    A DISMISSAL OF THE INDICTMENT.

8              THE COURT:  WELL, I THINK I CAN ASSURE YOU

9    THAT BEFORE THE CASE WOULD BE DISMISSED UNDER THE SPEEDY

10   TRIAL ACT, THERE WOULD BE A JUDGE FOUND TO TRY IT.

11             MR. STOLAR:  I'M PREPARED TO -- I'LL GO ON TRIAL

12   TOMORROW FOR THAT MATTER.

13             THE COURT:  NO.  IF THE SPEEDY TRIAL ACT IS

14   GOING TO PRESENT A PROBLEM, I HAVE CONSIDERABLE CONFIDENCE

15   THAT THEY ARE NOT GOING TO LET A CASE BE DISMISSED UNDER

16   THE SPEEDY TRIAL ACT BECAUSE I AM ENGAGED IN TRIAL.

17             MR. STOLAR:  NO, I UNDERSTAND THAT.  AND AT

18   THE MOMENT WE HAVE AN ORDER OF CONTINUANCE AND EXCLUSION UNDER

19   THE SPEEDY TRIAL ACT UNTIL APRIL THE 27TH.

20             THE COURT:  RIGHT.

21             MR. STOLAR:  IF ON APRIL THE 10TH, I COMMENCE

22   A TWO-TO-THREE-MONTH TRIAL WITH MR. MATTA BEFORE JUDGE

23   RAFEEDIE AND I AS HIS COUNSEL AND HE AS THE DEFENDANT ARE

24   NOT ABLE TO BE PRESENT REGARDLESS OF WHETHER YOU ARE READY

25   OR ANOTHER JUDGE IS READY ON APRIL THE 27TH, 28TH, OR THE



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,       )
                                )
        PLAINTIFF,              )
                                )
    VS.                         )    CR 88-129-WJR
                                )
JUAN RAMON MATTA BALLESTEROS,   )
                                )
        DEFENDANT.             )
                                )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, MARCH 12, 1990

DONNA BOWERS, C.S.R. 3591
OFFICIAL COURT REPORTER
430 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA  90012
(213) 621-2400

4

1   LOS ANGELES, CALIFORNIA; MONDAY, MARCH 12, 1990; 2:30 PM

2            THE CLERK:  ITEM NO. 12, CRIMINAL 88-129-WJR,

3   UNITED STATES OF AMERICA VS. JUAN RAMON MATTA BALLESTEROS.

4            COUNSEL, PLEASE STATE YOUR APPEARANCE.

5            THE COURT:  THE GOVERNMENT, PLEASE.

6            MR. CONNOLLY:  THANK YOU.  KEVIN P. CONNOLLY,

7   TRIAL ATTORNEY, NARCOTIC AND DANGEROUS DRUG SECTION,

8   WASHINGTON, D.C.

9            MR. SIMON:  BRADLEY SIMON, YOUR HONOR, TRIAL

10  ATTORNEY, NARCOTIC AND DANGEROUS DRUG SECTION, WASHINGTON,

11  D.C.

12           MR. STOLAR:  AND FOR THE DEFENDANT MARTIN R.

13  STOLAR, ADOLFO Z. AGUILA, AND WITH US TODAY IS MICHAEL J.

14  BURNS AS WELL.

15           THE COURT:  ALL RIGHT.  AND MR. MATTA

16  BALLESTEROS IS PRESENT WITH AN INTERPRETER.  HER NAME IS?

17           THE INTERPRETER:  IRMA LOURDES GARCIA.

18           THE COURT:  THANK YOU.

19           ALL RIGHT.  AT THE REQUEST OF COUNSEL, THIS

20  MATTER HAS BEEN SET FOR A STATUS CONFERENCE TODAY IN VIEW

21  OF A CONFLICT THAT HAS APPARENTLY ARISEN IN JUDGE RAFEEDIE'S

22  COURT.  I AM AWARE OF THE FACT THAT HE NOW HAS SCHEDULED IN

23  HIS COURT A TRIAL COMMENCING APRIL 10TH INVOLVING MR. MATTA

24  BALLESTEROS.

25           MR. STOLAR:  THAT'S CORRECT, YOUR HONOR.

5

1        THE COURT:  AND I THINK THE RECORD SHOULD

2   REFLECT THAT I HAVE TALKED TO HIM ABOUT THIS MATTER; AND

3   IN FACT, I HAVE TOLD HIM THAT I WOULD PERHAPS CALL HIM

4   AGAIN THIS AFTERNOON AFTER WE HAVE A HEARING.  AND HE TAKES

5   THIS POSITION, MR. STOLAR, THAT HE BELIEVES HE IS GOING TO

6   BE READY TO GO TO TRIAL ON APRIL 10TH IN HIS TRIAL.

7        HE HAS THREE OTHER DEFENDANTS.  AND HE SAYS

8   THAT AS FAR AS HE IS CONCERNED, THE CASE IS GOING TO

9   COMMENCE ON APRIL 10TH.  I HAVE NO WAY OF PREVENTING THAT

10  FROM HAPPENING IF THAT'S WHAT HE WANTS TO DO.

11       MR. STOLAR:  I UNDERSTAND THAT.  I SHOULD

12  BRING TO THE COURT'S ATTENTION SOME ITEMS OF INFORMATION

13  WHICH I HAVE, WHICH ARE OF AN ARTIFICIAL NATURE; AND THAT

14  IS, I KNOW ONE OF THE ATTORNEYS WHO HAS FILED A MOTION TO

15  DO FOREIGN DEPOSITIONS IN THE CASE TOGETHER WITH A REQUEST

16  FOR A CONTINUANCE OF THAT TRIAL.  I KNOW THAT THERE IS

17  ANOTHER ORDER THAT HAS BEEN ENTERED TO ALLOW FOREIGN

18  DEPOSITION TO TAKE PLACE.

19       AND I KNOW THAT GIVEN THE -- OVER THE LAST

20  THREE WEEKS OR SO ABOUT 6,000 PAGES OF DISCOVERY I HAVE

21  GOTTEN, SOME DISCOVERY I GOT LESS THAN A WEEK AGO NOW

22  INDICATES TO ME THAT IT WOULD MAKE MOST SENSE FOR ME TO GO

23  TO MEXICO AND TAKE A COUPLE OF FOREIGN DEPOSITIONS OF A

24  COUPLE OF THE CO-DEFENDANTS IN THAT CASE WHO WILL NOT BE

25  ALLOWED TO COME UP HERE BY THE MEXICAN AUTHORITIES, BUT

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA.

– – –

HONORABLE WILLIAM J. REA, JUDGE PRESIDING

– – –

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
| ) | |
| PLAINTIFF,   ) | |
| ) | |
| VS.   ) | CR 88-129-WJR |
| ) | |
| JUAN RAMON MATTA-BALLESTEROS,   ) | |
| ) | |
| DEFENDANT.   ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

TUESDAY, MAY 1, 1990

DONNA BOWERS, C.S.R., R.P.R.
OFFICIAL COURT REPORTER
430 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 621-2400

1        ON MAY 4TH, THE TRIAL DATE WAS SET FOR I BELIEVE

2   THE END OF JUNE OR THE BEGINNING OF JULY.  AT THAT TIME

3   THERE WAS A POSTPONEMENT BECAUSE THE GOVERNMENT -- THE OTHER

4   HAND OF THE GOVERNMENT WAS TRYING A CASE INVOLVING THE SAME

5   DEFENDANT.

6        SO THIS CASE WAS THEN PUT OVER WITH THE

7   EXPECTATION THAT IT WILL BE TRIED FOLLOWING OR SHORTLY

8   FOLLOWING THE FIRST MATTA CASE HERE, WHICH ENDED ON ABOUT

9   SEPTEMBER 6TH.

10        THERE WAS THEN A TRIAL DATE GIVEN IN OCTOBER.  THE

11   TRIAL DATE IN OCTOBER WAS POSTPONED.

12        THERE WAS ANOTHER TRIAL DATE GIVEN IN SEPTEMBER,

13   OR I AM SORRY, NOVEMBER, WHICH WAS POSTPONED.

14        THERE WAS THEN A TRIAL DATE GIVEN IN JANUARY,

15   WHICH WAS POSTPONED.

16        FINALLY, WE MET IN FRONT OF YOUR HONOR AND AGREED

17   THAT THE DISCOVERY OR THE BULK OF THE DISCOVERY HAD BEEN

18   HANDED OVER TO MR. STOLAR, AND WE AGREED ON WHAT WAS FOR

19   THIS ARM OF THE GOVERNMENT OR THIS END OF THE GOVERNMENT A

20   FIRM TRIAL DATE.

21        THE DEFENSE ALSO AGREED ON A FIRM TRIAL DATE, AND

22   THAT WAS APRIL 24TH; ALTHOUGH, IN MR. STOLAR'S MOTIONS, IT

23   SUDDENLY BECAME APRIL 27TH.

24        I HAVE ADVISED THE COURT THAT THIS IS GOING TO BE

25   WHAT I CONSIDER A LENGTHY TRIAL, AND THE WITNESSES COME FROM

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

BEFORE THE HONORABLE WILLIAM J. REA, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )
vs.                          )     CR-88-129-JWR
                             )
JUAN RAMON MATTA,            )
                             )
          Defendant.         )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL (STATUS CONFERENCE)
IN CHAMBERS

TUESDAY, MAY 15, 1990



VERNA R. MORON
COURT REPORTER PRO TEM
U.S. DISTRICT COURT HOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 894-3015

5

Now, what is the Government's big objection to it, as long as there is a waiver by Mr. Stolar and his client, that after he finishes with the Camarena case, to take care of the period of time, until we start this one?

MR. SIMON:  What is the objection as far as --

THE COURT:  Your concern  --

MR. SIMON:  No.  It's just that you mentioned August or September.  We would prefer August.

THE COURT:  Well, he wants the month of August off.  I'm thinking in terms of the last week of August --

MR.  STOLAR:   Or  maybe  the  second  week  of September, after Labor Day.

MR. SIMON:  We believe that the Camarena case will  end  in  early  July.   And  it  seems  to  us  if  -- perhaps a month off for Mr. Stolar would be reasonable, but you know, that's why we would prefer an August date.

THE COURT:  See, you're guessing the first part of July.  He's saying the middle of July.  You just don't know how long the jury is going to be deliberating. That puts it right into August as I see it.  So I think that the thing to do is go over until -- what is the last Tuesday in August?

THE COURT CLERK:  The 28th is the last Tuesday in August.

THE COURT:  The earliest that I would consider

000211

6

1    is August 28th.

2         MR. SIMON:   Then we would request that day if

3    possible.

4         MR. STOLAR:   What difference do two weeks

5    make, to let me get my kids back into school?

6         MR. SIMON:   I tell you, that both Mr. Connolly

7    and myself have other trial commitments after this case.

8    And we have been under pressure because of the fact that

9    the case has been dragging on for so long.

10        That's why we're under -- you know, we're

11   pushing for the earliest possible date, so we can get

12   onto those other matters --

13        MR. STOLAR:   It's certainly neither your fault

14   nor defense counsel's fault that the case has been

15   delayed, but the two weeks' difference, in terms of what

16   you consider to be a two, three-month trial before Judge

17   Rafeedie shouldn't make that much difference.

18        If you have other trial commitments in Sept-

19   ember, you're not going --

20        MR. SIMON:   I think the earliest that we can

21   get this is what we're opting for.

22        MR. STOLAR:   I understand.

23        MR. SIMON:   But it is another two weeks added

24   on to the considerable time that we have already pushed

25   it back.

7

1     MR. STOLAR:  Don't blame me for that, Brad.  I

2  have asked for September 11th.

3     MR. SIMON:  Well, we would ask for August

4  28th, because we do believe that it is -- that the trial

5  - Camarena trial - will end somewhere -- no later than

6  the second week of July.

7     We have discussed this over and over with

8  Mannie Medrano, and he has told us that the latest is

9  the second week of July --

10     MR. STOLAR:  Mannie has no kind of major

11  defense, that we're putting on (ph).

12     THE COURT:  I'm going to split the date.

13  We'll set it for September 4th, the day after Labor day.

14  So -- and that's the best I can do.

15     MR. SIMON:  All right.

16     THE COURT:  And so -- is notice waived of that

17  date, or do you need any formal notification?

18     MR. SIMON:  Sure.  That's waived.  We don't

19  need formal notification.

20     MR. STOLAR:  I don't need it  I'm here.

21     THE COURT:  All right.  9:30 on September 4th.

22     MR. SIMON:  Thank you, Your Honor.

23     MR. STOLAR:  Bradley, you better let the

24  Marshal Service know, or I'll give them an oral notice,

25  but they usually don't listen to me.

3                         - - -

4          HONORABLE WILLIAM J. REA, JUDGE PRESIDING

5                         - - -

6    UNITED STATES OF AMERICA,          )
                                        )
7                    Plaintiff,         )
                                        )
8              vs.                      )    No. CR 88-129-WJR
                                        )
9    JUAN RAMON MATTA-BALLESTEROS,      )
                                        )
10                   Defendant.         )
     _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               Los Angeles, California

16                 December 5, 1989

17

18

19

20

21

22              RON WORTH, CSR #9187
                Official Court Reporter
23              810 United States Courthouse
                751 West Santa Ana Boulevard
24              Santa Ana, California 92701-4599
                (714) 564-0580

25

                                              000214

1    but we are perfectly happy to sit and wait, in view of our

2    motion to dismiss.  We are certainly not in a great rush

3    to do it.  We understand you have the other trial, and

4    we're delighted to wait for it.

5              THE COURT:  Mr. Connolly?

6              MR. CONNOLLY:  Thank you, Your Honor.

7              Back in September when the Court gave us a

8    trial date for November, the Court set certain dates for

9    discovery and certain dates for defense's additional

10   motions.  The government has tried as best we could to

11   comply with these requirements, and we've given over to

12   the defense, I believe, at last count, over 17,000 pages

13   of discovery documents, including tape recordings from

14   wire taps in Mexico, Spain, United States, and some

15   consentual telephone recordings in the United States, as

16   well as detailed motions from this district, the district

17   of Arizona, various seizures in Los Angeles, or papers

18   from various seizures in Los Angeles, Arizona, and other

19   parts of the world, and in Mexico.

20             I have one matter that I have not provided

21   complete discovery to Mr. Stolar on, and that is some

22   single sideband tapes that are now being listened to that

23   we have not turned over to him, but we are now listening

24   to identify his client's conversations on these tapes that

25   are connected with transporting plane loads of cocaine

000215

1    from Mexico into the United States in 1984.

2            Other than that, I believe we have fully

3    complied with the dictates of discovery --

4            THE COURT:  I don't think there is any question

5    that you have met the Court's scheduling problem or

6    scheduling calendar.  I don't think there is any --

7            MR. CONNOLLY:  If there are additional motions

8    to be filed by the defense, I thought they were going to

9    be filed back in October.

10           MR. STOLAR:  Well, for example, Your Honor, I

11    didn't have these single side band tapes until a month

12    ago.

13           MR. CONNOLLY:  Right, I understand you couldn't

14    file a motion when you didn't have it.

15           MR. STOLAR:  Now I've got some additional wire

16    taps.

17           THE COURT:  What I'm talking about is more of a

18    practical problem that I have rather than going on with

19    this point with the motions that are now before me.  I've

20    got to -- I've been six weeks, I think, counsel -- am I

21    right?  I think it's been six weeks of pretrial motions on

22    this case with these 13 defendants.  I'm scheduled to

23    start trial next Tuesday.  I still have maybe 15 motions

24    to hear this week, and I've got to do that because these

25    13 defendants are all in custody.

1    So, as a practical matter, just from my

2    standpoint, I'm not going to be able to give you the time

3    that you should have on this case right now. I can't do

4    it.

5    MR. CONNOLLY:  Right, and the January 15th

6    trial date is not realistic, then?

7    THE COURT:  The January 15th trial date in this

8    court is not realistic.  Now, the only thing I can do is

9    seek some help from another judge in this case, maybe a

10   senior judge can take this case.  I don't know how long

11   you conceive for trial.

12   MR. CONNOLLY:  I can see this morning it might

13   last longer than I anticipated.

14   THE COURT:  How long before Judge Rymer did it

15   take?

16   MR. STOLAR:  Five weeks, Judge.

17   THE COURT:  Five weeks.

18   MR. CONNOLLY:  At least double that, Your

19   Honor, if Mr. Stolar hurries.

20   THE COURT:  This case will take twice that

21   long, is that what you think?

22   MR. STOLAR:  The indictment in this case

23   alleges conduct between May, 1983, and June, 1985.  We

24   have a two year period which they would like to present

25   evidence about.  I suspect that a great deal of the

000217

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

BEFORE THE HONORABLE WILLIAM J. REA, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CR-88-129-JWR |
| | ) | |
| JUAN RAMON MATTA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL (STATUS CONFERENCE)
IN CHAMBERS

TUESDAY, MAY 15, 1990

VERNA R. MORON
COURT REPORTER PRO TEM
U.S. DISTRICT COURT HOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 894-3015

000218